# Exhibit A

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### STRABAG SE, ERSTE NORDSEE-OFFSHORE HOLDING GMBH AND ZWEITE NORDSEE-OFFSHORE HOLDING GMBH

### v.

### FEDERAL REPUBLIC OF GERMANY

### (ICSID CASE NO. ARB/19/29)

I hereby certify that the attached documents are true copies of the Tribunal's Award dated December 18, 2024, and the Partial Dissenting Opinion of Prof. Dr. Maria Chiara Malaguti.

Martina Polasek
Secretary-General

Washington, D.C., December 18, 2024

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**STRABAG SE, ERSTE NORDSEE-OFFSHORE HOLDING GMBH AND ZWEITE NORDSEE-OFFSHORE HOLDING GMBH**

Claimants

and

**FEDERAL REPUBLIC OF GERMANY**

Respondent

**ICSID Case No. ARB/19/29**

---

# AWARD

---

***Members of the Tribunal***
Dr Veijo Heiskanen, President of the Tribunal
Ms Judith Gill KC, Arbitrator
Prof Dr Maria Chiara Malaguti, Arbitrator

***Secretary of the Tribunal***
Mr Govert Coppens

*Date of dispatch to the Parties*:

18 December 2024

## REPRESENTATION OF THE PARTIES

*Representing Strabag SE, Erste Nordsee-Offshore Holding GmbH and Zweite Nordsee-Offshore Holding GmbH*:

Dr Boris Kasolowsky
Dr Carsten Wendler
Ms Kristina Weiler
Mr Gregorio Pettazzi
Dr Alexander Grimm
Mr Samuel Trujillo
Freshfields PartG mbB
Bockenheimer Anlage 44
60322 Frankfurt am Main
Federal Republic of Germany

and

Mr Eric Leikin
Mr Clemens Treichl
Freshfields Rechtsanwälte PartG mbB
Peregringasse 4
1090 Vienna
Republic of Austria

and

Dr Nikolaos Tsolakidis
ARKTIK Rechtsanwälte
Rösch Kruse Tsolakidis PartGmbB
Mendelssohnstraße 66
60325 Frankfurt am Main
Federal Republic of Germany

*Representing the Federal Republic of Germany*:

Dr Anke Meier
Dr Barbara Maucher
Noerr PartGmbB
Börsenstraße 1
60313 Frankfurt am Main
Federal Republic of Germany

and

Ms Annette Tiemann
Federal Ministry for Economic Affairs
and Climate Action
Scharnhorststraße 34-37
10115 Berlin
Federal Republic of Germany

## TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES .................................................................. 1

II.   PROCEDURAL HISTORY .......................................................................... 2

III.  FACTUAL BACKGROUND ........................................................................ 17

      A.    The Evolution of the Regulatory Framework Governing Offshore Wind Energy in Germany (1997-2012) .................................................................. 17

            (1) The Development of the Regulatory Framework between 1997 and 2009 .... 17

                  a.  The 1997 Offshore Installations Ordinance ............................................... 17

                  b.  The 2000 Renewable Energy Sources Act................................................ 18

                  c.  The 2002 Offshore Installations Ordinance ............................................. 19

                  d.  The 2004 Renewable Energy Sources Act................................................ 20

                  e.  The 2006 Energy Act ................................................................................. 21

                  f.   The 2009 Renewable Energy Sources Act................................................ 21

                  g.  The 2009 BNA Position Paper................................................................... 22

                  h.  The 2009 Spatial Planning Ordinance ...................................................... 23

            (2) The Development of the Regulatory Framework in Germany between 2010 and mid-2012 ............................................................................ 24

      B.    The Claimants' Business Ventures in the German Offshore Wind Sector ........... 26

            (1) The Gravity Foundation Technology................................................................. 26

            (2) The Establishment of NOH 1 and NOH 2 for the Development of the Offshore Wind Projects ............................................................................ 28

      C.    The Changes to the Regulatory Regime Underlying the Dispute........................ 31

            (1) The Regulatory Changes during the Period from mid-2012 to 2016............. 32

            (2) The New Regulatory Framework Introduced in 2017 ................................... 37

      D.    The 2020 Decisions of the German Constitutional Court..................................... 38

      E.    Regulatory Developments after 2017 ................................................................. 40

IV.   THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ......................................... 41

      A.    The Claimants ..................................................................................................... 41

      B.    The Respondent ................................................................................................. 43

V.    JURISDICTION .......................................................................................... 43

      A.    Jurisdictional Objection *Ratione Voluntatis* ........................................................ 44

            (1) The Parties' Positions ...................................................................................... 44

                  a.  The Respondent's Position ....................................................................... 44

b. The Claimants' Position............................................................... 51

(2) The Tribunal's Analysis.................................................................. 56

a. The Interpretation of Article 26 of the ECT in accordance with the VCLT
...................................................................................................... 59

b. The applicability of VCLT rules regarding the application of successive treaties and amendment of multilateral treaties between certain of the parties only ................................................................................. 65

c. Conclusion ................................................................................. 70

B.    Jurisdictional Objection *Ratione Materiae* ........................................ 70

(1) The Parties' Positions .................................................................... 70

a. The Respondent's Position ....................................................... 70

b. The Claimants' Position............................................................ 81

(2) The Tribunal's Analysis.................................................................. 89

a. Whether the Claimants have shown that they have made an "Investment" under the ECT ...................................................... 90

b. Whether the Claimants have shown that they have made an "investment" under the ICSID Convention ................................. 93

c. Whether Strabag's claim is admissible .................................... 95

d. Conclusion ................................................................................. 96

C.    Jurisdictional Objection *Ratione Personae* ......................................... 96

(1) The Parties' Positions .................................................................... 96

a. The Respondent's Position ....................................................... 96

b. The Claimants' Position............................................................ 97

(2) The Tribunal's Analysis.................................................................. 98

VI.  LIABILITY .............................................................................................. 100

A.    The Alleged Breach of the Fair and Equitable Treatment Standard .................. 100

(1) The Parties' Positions .................................................................. 100

a. The Claimants' Position........................................................... 100

b. The Respondent's Position ...................................................... 109

(2) The Tribunal's Analysis................................................................ 117

a. Applicable legal standard......................................................... 117

b. The alleged breaches of the FET standard .............................. 118

B.    The Alleged Expropriation of the Claimants' Investments ......................... 143

(1) The Scope of the Claimants' Expropriation Claim....................... 143

(2) The Parties' Positions ................................................................... 143

        a. The Claimants' Position.........................................................................143

        b. The Respondent's Position ....................................................................146

    (3) The Tribunal's Analysis.............................................................................149

C.    The Alleged Breach of the Full Protection and Security Standard....................155

    (1) The Parties' Positions ................................................................................155

        a. The Claimants' Position.........................................................................155

        b. The Respondent's Position ....................................................................157

    (2) The Tribunal's Analysis.............................................................................158

D.    The Alleged Breach of the Non-Impairment Standard .....................................160

    (1) The Parties' Positions ................................................................................160

        a. The Claimants' Position.........................................................................160

        b. The Respondent's Position ....................................................................162

    (2) The Tribunal's Analysis.............................................................................164

VII.    QUANTUM ...........................................................................................................167

A.    The Parties' Positions .......................................................................................167

    (1) The Claimants' Position..............................................................................168

        a. Applicable valuation standard................................................................168

        b. The appropriate valuation date is that of Germany's first unlawful act . 169

        c. Absolute certainty is not required to quantify damages.........................170

        d. Quantification of damages for the Offshore Wind Projects...................171

        e. Full reparation requires pre- and post-award compound interest ...........176

    (2) The Respondent's Position .........................................................................178

        a. The Claimants rely on an incorrect standard of valuation .....................178

        b. The Claimants did not suffer damage in the claimed amounts in the
           Offshore Wind Projects..........................................................................181

        c. The Claimants are not entitled to compound interest ............................187

B.    The Tribunal's Analysis....................................................................................189

    (1) The Scope of Valuation and the Valuation Date .........................................189

    (2) Valuation of the NOH 1 and NOH 2 Projects.............................................190

        a. Valuation method...................................................................................190

        b. Application of the Comparable Transactions Method ...........................195

        c. Taxation of the Award ...........................................................................209

        d. Double Recovery ...................................................................................210

(3) Interest ................................................................................................... 213

VIII.   COSTS ............................................................................................................ 214

    A.    The Parties' Positions ................................................................................. 214

        (1) The Claimants' Position ......................................................................... 214

        (2) The Respondent's Position .................................................................... 219

    B.    The Tribunal's Analysis .............................................................................. 222

IX.   AWARD .............................................................................................................. 224

**TABLE OF ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| 1997 Offshore Installations Ordinance | Offshore Installation Ordinance of 23 January 1997 |
| 2000 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 April 2000 |
| 2001 Directive | Directive 2001/77/EC |
| 2002 Offshore Installations Ordinance | Offshore Installations Ordinance of 4 April 2002 |
| 2004 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 August 2004 |
| 2009 BNA Position Paper | BNA Position Paper of October 2009 |
| 2006 Energy Act | Energy Act of 17 December 2006 |
| 2009 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 January 2009 |
| 2009 Spatial Planning Ordinance | Spatial Planning Ordinance of 21 September 2009 |
| 2012 Energy Act | Energy Act of 28 December 2012 |
| 2012 Offshore Installations Ordinance | Offshore Installations Ordinance of 31 January 2012 |
| 2012 Renewable Energy Sources Act | Renewable Energy Sources Act of 1January 2012 |
| 2014 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 August 2014 |
| 2017 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 January 2017 |
| 2020 Offshore Wind Energy Act | Offshore Wind Energy Act of 6 November 2020 |
| 2020 Termination Agreement | Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union of 29 May 2020 |

| | |
|---|---|
| *Achmea* Judgment | *Slovak Republic v. Achmea B.V.*, CJEU Case No. C-284/16, Judgment, 6 March 2018 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings in force as of 10 April 2006 |
| BFO | Federal spatial offshore grid plan (*Bundesfachplan Offshore*) |
| BFO-N 2012 | Federal spatial offshore grid plan of 22 February 2013 |
| BNA | Federal Network Agency (*Bundesnetzagentur*) |
| BSH | Federal Maritime and Hydrographic Agency (*Bundesamt für Seeschifffahrt und Hydrographie*) |
| C-[#] | Claimants' Exhibit |
| Cl. Mem. | Claimants' Memorial on Jurisdiction and the Merits dated 11 December 2020 |
| Cl. First PHB | Claimants' Post-Hearing Brief dated 20 January 2023 |
| Cl. First SoC | Claimants' Statement of Costs dated 14 April 2023 |
| Cl. Rej. | Claimants' Rejoinder on Jurisdiction dated 27 July 2022 |
| Cl. Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated 14 March 2022 |
| Cl. Second PHB | Claimants' Reply Post-Hearing Brief dated 17 March 2023 |
| Cl. Second SoC | Claimants' Reply Statement of Costs dated 28 April 2023 |
| CL-[#] | Claimants' Legal Authority |
| CJEU | Court of Justice of the European Union |
| Constitutional Court | German Constitutional Court |
| DCF | Discounted Cash Flow |

| | |
|---|---|
| Demuth ERI | Expert Report of Mr Alexander Demuth dated 6 August 2021 and submitted with the Respondent's Counter-Memorial |
| Demuth ERII | Second Expert Report of Mr Alexander Demuth dated 24 June 2022 and submitted with the Respondent's Rejoinder |
| ECHR | European Convention of Human Rights |
| ECT | Energy Charter Treaty |
| EEZ | Germany's exclusive economic zone |
| EU | European Union |
| FEP | Area development plan (*Flächenentwicklungsplan*) |
| FET | Fair and Equitable Treatment |
| FPS | Full Protection and Security |
| GFT | Gravity Foundation Technology |
| Guillet ER | Expert Report of Dr Jerome Guillet dated 11 December 2020 and submitted with the Claimants' Memorial |
| Hearing | Hearing on jurisdiction and the merits held on 19–30 September 2022 |
| Hern ERI | Expert Report of Dr Richard Hern dated 10 December 2020 and submitted with the Claimants' Memorial |
| Hern ERII | Second Expert Report of Dr Richard Hern dated 11 March 2022 and submitted with the Claimants' Reply |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |

| | |
|---|---|
| ILC Articles | International Law Commission's Articles on State Responsibility for Internationally Wrongful Acts |
| January 2019 Declaration | Declaration of the Representatives of the Governments of the Member States of January 2019 |
| *Komstroy* Judgment | *Republic of Moldova v. Komstroy LLC*, CJEU Case No. C-741/19, Judgment of 2 September 2021 |
| Koselleck WSI | Witness Statement of Mr Felix Koselleck dated 11 December 2020 and submitted with the Claimants' Memorial |
| MW | Megawatt |
| NOH 1 | Erste Nordsee-Offshore Holding GmbH, or the Second Claimant |
| NOH 2 | Zweite Nordsee-Offshore Holding GmbH, or Third Claimant |
| O-NEP | Offshore grid development plan (*Offshore-Netzentwicklungsplan*) |
| Offshore Wind Energy Act | Offshore Wind Energy Act of 1 January 2017 |
| OWF | Offshore wind farm |
| R-[#] | Respondent's Exhibit |
| RfA | Request for Arbitration, 10 September 2019 |
| REIO | Regional Economic Integration Organization |
| Resp. C-Mem. | Respondent's Counter-Memorial on the Merits dated 9 August 2021 |
| Resp. Mem. | Respondent's Memorial on Jurisdiction and Request for Bifurcation dated 11 March 2021 |
| Resp. First PHB | Respondent's Post-Hearing Brief dated 20 January 2023 |
| Resp. First SoC | Respondent's Statement of Costs dated 14 April 2023 |

| | |
|---|---|
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated 27 June 2022 |
| Resp. Second PHB | Respondent's Reply Post-Hearing Brief dated 17 March 2023 |
| Resp. Second SoC | Respondent's Reply Statement of Costs dated 28 April 2023 |
| Rule 41(5) Application | Respondent's application filed under Rule 41(5) of the ICSID Arbitration Rules dated 8 June 2020 |
| RL-[#] | Respondent's Legal Authority |
| Slark ERI | Expert Report of Mr Richard Slark dated 8 August 2021 and submitted with the Respondent's Counter-Memorial |
| Strabag | Strabag SE, or the First Claimant |
| TenneT | TenneT TSO GmbH, the national electricity transmission system operator of the Netherlands |
| TEU | Treaty on European Union |
| TFEU | Treaty on the Functioning of the European Union |
| Tr. Day [#], [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 7 May 2020 |
| TSO | Transmission system operator |
| VAT | Value Added Tax |
| WACC | Weighted Average Cost of Capital |
| Weber WSI | Witness Statement of Mr Klaus Weber dated 11 December 2020 and submitted with the Claimants' Memorial |
| WTG | Wind turbine generator |

## I.    INTRODUCTION AND PARTIES

1.    The case has been submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") under Article 37(1) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**") and Article 26(3) of the Energy Charter Treaty ("**ECT**").[1]

2.    The parties to this arbitration are Strabag SE ("**Strabag**" or the "**First Claimant**"), Erste Nordsee-Offshore Holding GmbH ("**NOH 1**" or the "**Second Claimant**") and Zweite Nordsee-Offshore Holding GmbH ("**NOH 2**" or the "**Third Claimant**"), companies organized under the laws of the Republic of Austria ("**Austria**") (the "**Claimants**"), and the Federal Republic of Germany ("**Germany**" or the "**Respondent,**" and together with the Claimants, the "**Parties**").

3.    The dispute arises out of regulatory measures taken by the Respondent regarding the Claimants' development of installations for the production of offshore wind energy. The Claimants contend that the Respondent's measures undermined the Claimants' development of a new technology for installation of offshore wind farms ("**OWFs**") and their right to develop offshore wind energy projects in certain areas of the North Sea, resulting in a loss of their investments, in breach of the ECT.

4.    The Respondent argues that the Claimants' claims fall outside the Tribunal's jurisdiction on a number of grounds, including because the Respondent never agreed to arbitrate intra-EU investor-State disputes under the ECT. The Respondent also denies any breach of the ECT and contends that it merely exercised its right to regulate in the public interest, which cannot give rise to any valid claims under the ECT.

---

[1] The ECT entered into force for both the Republic of Austria and the Federal Republic of Germany on 16 April 1998; the ICSID Convention entered into force for Austria on 24 June 1971 and for Germany on 18 May 1969.

## II.    PROCEDURAL HISTORY

5.     On 10 September 2019, the Claimants filed a request for arbitration dated 5 September 2019 with the ICSID Secretariat, together with Exhibits C-0001 through C-0049 and Legal Authorities CL-0001 through CL-0003 (the "**Request**" or the "**RfA**").

6.     On 20 September 2019, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention. On the same day, she notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

7.     The Parties subsequently agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention. According to the Parties' agreement, the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.

8.     In the Request, the Claimants had appointed Ms Judith Gill KC, a national of the United Kingdom, as arbitrator. On 28 November 2019, the Respondent appointed Prof Dr Maria Chiara Malaguti, a national of the Italian Republic, as arbitrator. Ms Gill and Prof Dr Malaguti subsequently accepted their appointments.

9.     By communications of 6 May 2020 from the Claimants and 7 May 2020 from the Respondent, the Parties agreed to appoint Dr Veijo Heiskanen, a national of the Republic of Finland, as President of the Tribunal.

10.     On 7 May 2020, the Secretary-General of ICSID, in accordance with Rule 6(1) of the 2006 ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments, and that the Tribunal was therefore deemed to have been constituted on that date. Ms Anna Holloway, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal. On 3 March 2022, Ms Holloway was replaced by Mr Govert Coppens, ICSID Legal Counsel.

11.    On 8 June 2020, the Respondent filed an application under Rule 41(5) of the ICSID Arbitration Rules (the "**Respondent's Rule 41(5) Application**"), together with Legal Authorities RL-0001 through RL-0013, requesting that the Tribunal dismiss the Claimants' claims on the basis that they were manifestly without legal merit.

12.    On 9 June 2022, the Tribunal invited the Claimants to submit their observations on the Respondent's Rule 41(5) Application by 23 June 2020.

13.    In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 15 June 2020 by video conference.

14.    On 23 June 2020, the Tribunal issued Procedural Order No. 1, recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable ICSID Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and that the place of proceeding would be Washington, D.C., United States of America. In the letter to the Parties of the same date transmitting Procedural Order No. 1, the Tribunal requested that the Parties continue their efforts to reach an agreement on a procedural calendar and provided directions.

15.    Also on 23 June 2020, the Claimants filed their observations on the Respondent's Rule 41(5) Application (the "**Claimants' Observations on Rule 41(5)**"), together with Exhibit C-0050 and Legal Authorities CL-0004 through CL-0063.

16.    On 1 July 2020, following the Respondent's request of 30 June 2020, the Tribunal granted the Respondent leave to reply to the Claimants' observations on the Respondent's Rule 41(5) Application by 6 July 2020. The Tribunal also provided the Claimants with an opportunity to comment on the Respondent's reply by 10 July 2020.

17.    In accordance with the Tribunal's directions, on 6 July 2020, the Respondent submitted its reply on the Rule 41(5) Application (the "**Respondent's Reply on 41(5)**"), together with Legal Authorities RL-0014 and RL-0015; and on 10 July 2020, the Claimants submitted their comments thereon, together with Exhibit C-0051 and Legal Authorities CL-0064 through CL-0070.

18.   Also on 6 July 2020, the Parties submitted a joint proposal regarding the procedural calendar. On 14 July 2022, the Tribunal issued Procedural Order No. 2 adopting the procedural calendar agreed by the Parties.

19.   On 24 July 2020, the Tribunal issued its Decision on the Respondent's Rule 41(5) Application, dismissing the Application.

20.   On 11 December 2020, pursuant to the procedural calendar set out in Procedural Order No. 2, the Claimants filed their Memorial (the "**Claimants' Memorial**"), together with the Witness Statement of Mr Felix Koselleck dated 11 December 2020; the Witness Statement of Mr Klaus Weber dated 11 December 2020; the Expert Report of Dr Tomas Haug dated 11 December 2020, with Exhibits TH-0001 through TH-0411; the Expert Report of Dr Richard Hern dated 10 December 2020, with Exhibits RH-0001 through RH-0109; the Expert Report of Dr Jerome Guillet dated 11 December 2020, with Exhibits JG-0001 through JG-0116; the Expert Report of Mr Trevor Hodgson and Mr Andreas Zilles dated 11 December 2020, with Exhibits THD-0001 through THD-0084; Exhibits C-0052 through C-0317; and Legal Authorities CL-0071 through CL-0223.

21.   On 14 December 2020, the European Commission (the "**Commission**") filed a submission seeking leave to intervene in the proceeding, pursuant to ICSID Arbitration Rule 37(2) (the "**Commission's Application**").

22.   Upon invitation from the Tribunal, on 23 December 2020, each Party submitted observations on the Commission's Application.

23.   On 28 December 2020, the Respondent wrote to the Tribunal requesting leave to comment on certain of the Claimants' observations.

24.   By letter of 6 January 2021, the Tribunal informed the Parties, *inter alia*, that it had no need for further submissions concerning the Commission's Application.

25.   On 12 January 2021, the Tribunal issued Procedural Order No. 3, granting the Commission's Application in part and ruling, *inter alia*, that the Commission could file a written submission on certain issues on the condition that it bear its own costs and provide,

by 20 January 2021, a written undertaking that it would comply with any decision on costs that might be ordered by the Tribunal.

26.     On 18 January 2021, the Commission filed a request that the Tribunal alter Procedural Order No. 3 insofar as the Commission was directed to provide an undertaking regarding costs. Upon invitation from the Tribunal, on 21 January 2022, each Party filed observations on the Commission's request.

27.     On 27 January 2021, the Tribunal issued Procedural Order No. 4 dismissing the Commission's request to alter Procedural Order No. 3.

28.     On 11 March 2021, the Respondent filed its Memorial on Jurisdiction (the "**Respondent's Memorial**"), including a request to address its objections to jurisdiction as a preliminary question (the "**Request for Bifurcation**"), together with Legal Authorities RL-0018 through RL-0075.

29.     On 1 April 2021, the Claimants filed observations on the Request for Bifurcation, together with Legal Authorities CL-0232 through CL-0270.

30.     On 19 April 2021, the Tribunal issued Procedural Order No. 5, denying the Respondent's Request for Bifurcation and joining the objections to jurisdiction to the merits of the dispute.

31.     On 9 August 2021, the Respondent filed its Counter-Memorial on the Merits (the "**Respondent's Counter-Memorial**"), together with: the Witness Statement of Dr Manfred Zeiler dated 28 July 2021, with Exhibits MZ-0001 through MZ-0004; the Expert Report of Mr Alexander Demuth dated 6 August 2021, with Exhibits AD-0001 through AD-0148; the Expert Report of Mr Michael Lüders and Mr Andreas Lessmeister dated 5 August 2021, with Exhibits RD-0002 through RD-0018; the Expert Report of Mr Richard Slark dated 8 August 2021, with Exhibits RS-0001 through RS-0256; the Expert Opinion of Dr Frank Knappe, Dr Falk Lüddecke and Prof Dr Martin Skiba dated 3 August 2021, with Exhibits R82-0001 through R82-0048; the Expert Opinion of Prof Dr Jelena Bäumler and Prof Dr Thomas Schomerus dated 5 August 2021, with

Exhibits SB-0001 through SB0247; Exhibits R-0002 through R-0153; and Legal Authorities RL-0076 through RL-0353.

32.    Following exchanges between the Parties concerning production of documents, the Parties submitted their document production requests to the Tribunal on 11 October 2021. On 1 November 2021, the Tribunal issued its decisions on document production in the form of rulings set out in the Parties' respective document production schedules and indicated that a reasoned decision in the form of a procedural order would be issued at a later date.

33.    On 9 November 2021, the Tribunal issued Procedural Order No. 6 containing its reasoned decisions on the Parties' document production requests.

34.    On 6 December 2021, following a joint request from the Parties, the Tribunal issued Procedural Order No. 7 directing that all documents exchanged between the Parties in relation to document production would remain confidential and not be made public.

35.    On 14 March 2022, the Claimants filed their Reply on the Merits and Counter-Memorial on Jurisdiction (the "**Claimants' Reply**"), together with the Witness Statement of Mr Alexander Dierkes dated 14 March 2022; the Second Witness Statement of Mr Felix Koselleck dated 14 March 2022; the Second Witness Statement of Mr Klaus Weber dated 11 March 2022; the Expert Report of Prof Dr Jörg Gundel dated 14 March 2022, with Exhibits JG-0001 through JG-0128; the Expert Report of Prof Dr Charlotte Kreuter-Kirchhof dated 14 March 2022, with Exhibits KK-0001 through KK-0114; the Second Expert Report of Dr Tomas Haug dated 12 March 2022, with Exhibits TH2-0001 through TH2-0091; the Second Expert Report of Dr Richard Hern dated 11 March 2022, with Exhibits RH-0110 through RH-0179; the Second Expert Report of Mr Trevor Hodgson and Mr Andreas Zilles dated 11 March 2022, with Exhibits THD-0085 through THD-0110; Exhibits C-0318 through C-0424; and Legal Authorities CL-0271 through CL-0331.

36.    On 1 June 2022, pursuant to an agreement of the Parties, the Tribunal confirmed that the upcoming hearing would be held in London, the United Kingdom.

37.    On 27 June 2022, the Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction (the "**Respondent's Rejoinder**"), together with: the Witness Statement of

Dr Nico Nolte dated 23 June 2022, with Exhibits NN-0001 through NN-0016; the Second Witness Statement of Dr Manfred Zeiler dated 23 June 2022, with Exhibits MZ-0005 through MZ-0023; the Second Expert Report of Mr Michael Lüders and Mr Andreas Lessmeister dated 24 June 2022, with Exhibits RD-0019 through RD-0046; the Second Expert Report of Dr Frank Knappe, Dr Falk Lüddecke and Prof Dr Martin Skiba dated 24 June 2022, with Exhibits R82-0049 through R82-0079; the Second Expert Report of Mr Richard Slark dated 24 June 2022, with Exhibits RS2-0001 through RS2-0026; the Second Expert Report of Prof Dr Thomas Schomerus, Prof Dr Jelena Bäumler and Prof Jörg Terhechte dated 27 June 2022, with Exhibits SB-0248 through SB-0338; the Second Expert Report of Mr Alexander Demuth dated 24 June 2022, with Appendices AD-0010 through AD-0019 and Exhibits AD-0149 through AD-0223; Exhibits R-0154 through R-0221; and Legal Authorities RL-0370 through RL-0506.

38.    On 27 July 2022, the Claimants filed their Rejoinder on Jurisdiction (the "**Claimants' Rejoinder on Jurisdiction**"), together with Exhibits C-0425 through C-0427 and Legal Authorities CL-0332 through CL-0371.

39.    By letter of 23 August 2022, the Claimants requested leave from the Tribunal to submit additional documents into the record pursuant to Section 16.3 of Procedural Order No. 1.

40.    Pursuant to Section 19.1 of Procedural Order No. 1, on 24 August 2022, the Tribunal held a pre-hearing organizational meeting with the Parties by video conference. During the meeting, the Tribunal, *inter alia*, invited the Respondent to comment on the Claimants' request of 23 August 2022 to submit additional documents.

41.    On 30 August 2022, the Respondent commented on the Claimants' request for leave to submit additional documents into the record, arguing that the request should be denied.

42.    On 5 September 2022, the Tribunal decided to grant the Claimants' request for leave of 23 August 2022 and directed that the Claimants file the additional documents by 6 September 2022, while inviting the Respondent to submit any observations and/or responsive evidence thereon by 13 September 2022.

43.   By letter of 6 September 2022, the Respondent, *inter alia*, objected to the Tribunal's decision of the previous day.

44.   In accordance with the Tribunal's directions, also on 6 September 2022, the Claimants submitted the additional documents into the record as Exhibits C-0428 through C-0440.

45.   Further on 6 September 2022, the Tribunal invited the Claimants to comment on the Respondent's letter of the same date. The Claimants provided their comments by letter of 7 September 2022.

46.   On 8 September 2022, the Tribunal reaffirmed its rulings of 5 September 2022.

47.   In accordance with the Tribunal's directions, on 13 September 2022, the Respondent provided observations on the additional documents filed by the Claimants, together with Exhibit R-0222.

48.   A hearing on jurisdiction and the merits was held at the International Dispute Resolution Centre in London, United Kingdom, from 19 to 30 September 2022 (the "**Hearing**"). The following individuals participated in the Hearing:[2]

| TRIBUNAL | |
|---|---|
| Dr Veijo Heiskanen | President |
| Ms Judith Gill KC | Arbitrator |
| Prof Dr Maria Chiara Malaguti | Arbitrator |

| ICSID SECRETARIAT | |
|---|---|
| Mr Govert Coppens | Secretary of the Tribunal |

| CLAIMANTS | |
|---|---|
| **Mr/Ms First Name/ Last Name** | **Affiliation** |
| ***Counsel***: | |
| Dr Boris Kasolowsky | Freshfields Bruckhaus Deringer PartGmbB |
| Dr Carsten Wendler | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Eric Leikin | Freshfields Bruckhaus Deringer PartGmbB |
| Ms Kristina Weiler | Freshfields Bruckhaus Deringer PartGmbB |

---

[2] [R] denotes Remote Participant.

| CLAIMANTS | |
|---|---|
| **Mr/Ms First Name/ Last Name** | **Affiliation** |
| Mr Alexander Grimm | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Gregorio Pettazzi | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Clemens Treichl | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Samuel Trujillo | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Ingo Borgdorf | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Orhan Bayrak | Freshfields Bruckhaus Deringer PartGmbB |
| Ms Bettina Gomes Omizzolo [R] | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Alfonso Aljure Camacho [R] | Freshfields Bruckhaus Deringer PartGmbB |
| Ms Gabriela Jung [R] | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Felix Richolt [R] | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Paul Schiering [R] | Freshfields Bruckhaus Deringer PartGmbB |
| Mr Nikolaos Tsolakidis | ARKTIK Rösch Kruse Tsolakidis PartGmbB |
| Mr Sebastian Lutz-Bachmann | PSWP PartGmbB |
| Dr Wolf Spieth [R] | PSWP PartGmbB |
| Mr Markus Liedtke [R] | PSWP PartGmbB |
| *Parties*: | |
| Mr Felix Koselleck | Party Representative |
| Mr Carsten Vogt | Party Representative |
| Mr Martin Wolfbauer | Party Representative |
| Dr Majka Cernicky-Piechl | Party Representative |
| Mr Katharina Sandner | Party Representative |
| *Witnesses*: | |
| Mr Felix Koselleck | Party Representative |
| Mr Klaus Weber | Ed. Züblin AG |
| Mr Alexander Dierkes | MEC Energy |
| *Experts*: | |
| Dr Tomas Haug | NERA Economic Consulting |
| Dr Richard Hern | NERA Economic Consulting |
| Mr Dominik Huebler | NERA Economic Consulting |
| Ms Leonie Janisch | NERA Economic Consulting |
| Ms Niko Czaplicki | NERA Economic Consulting |
| Mr Maximilian Czernin [R] | NERA Economic Consulting |
| Mr Daniel Neuhold [R] | NERA Economic Consulting |
| Dr Jerome Guillet | Green Giraffe B.V. |
| Prof Dr Jörg Gundel | University of Bayreuth |
| Prof Dr Charlotte Kreuter-Kirchhof | Heinrich Heine University Düsseldorf |
| Mr Trevor Hodgson | Kent |
| Mr Andreas Zilles | Atkins |

| RESPONDENT | |
|---|---|
| **Mr/Ms First Name/ Last Name** | **Affiliation** |
| *Counsel*: | |
| Dr Anke Meier | Noerr PartGmbB |
| Mr Christof Federwisch | Noerr PartGmbB |
| Ms Lucie Gerhardt | Noerr PartGmbB |
| Dr Barbara Maucher | Noerr PartGmbB |
| Dr Kathrin Nordmeier | Noerr PartGmbB |
| Ms Judith Fuchs | Noerr PartGmbB |
| Mr Philipp Müller | Noerr PartGmbB |
| Mr Georg Zimmermann | Noerr PartGmbB |
| Dr Frederike Heitmann | Noerr PartGmbB |
| *Parties*: | |
| Ms Annette Tiemann | Federal Ministry for Economic Affairs and Climate Action |
| Mr Thomas Klippstein | Federal Ministry for Economic Affairs and Climate Action |
| Ms Christine Claaszen | Federal Ministry for Economic Affairs and Climate Action |
| Ms Julia Grisin [R] | Federal Ministry for Economic Affairs and Climate Action |
| Ms Nicole Schaling [R] | Federal Ministry for Economic Affairs and Climate Action |
| Mr Jonas Brost [R] | Federal Ministry for Economic Affairs and Climate Action |
| Dr Nina Kapaun [R] | Federal Ministry for Economic Affairs and Climate Action |
| Ms Bettina Thiele [R] | Federal Ministry for Economic Affairs and Climate Action |
| Dr Holger Klitzing [R] | Federal Foreign Office |
| Mr Christian Schmidt [R] | German Chancellery |
| Ms Kristen Huttner [R] | German Chancellery |
| Mr Cornelius Link [R] | Federal Ministry of Finance |
| Ms Dagmar Jantos [R] | Federal Ministry of Finance |
| Ms Martina Nemitz [R] | Federal Maritime and Hydrographic Agency |
| Dr Andrea Schulz [R] | Federal Ministry of Justice |
| Dr Anna-Julka Lilja [R] | Federal Ministry of Justice |
| Ms Bärbel Kohake [R] | Federal Ministry of Justice |
| Dr Katrin Brahms [R] | Federal Ministry of Justice |
| *Witnesses*: | |
| Dr Nico Nolte | Federal Maritime and Hydrographic Agency |
| Dr Manfred Zeiler | Federal Maritime and Hydrographic Agency |

| RESPONDENT | |
|---|---|
| **Mr/Ms First Name/ Last Name** | **Affiliation** |
| *Experts*: | |
| Prof Dr Thomas Schomerus | Leuphana University |
| Prof Dr Jelena Bäumler [R] | Leuphana University |
| Prof Dr Jörg Terhechte | Leuphana University |
| Mr Alexander Demuth | Alvarez & Marsal |
| Mr Richard Slark | Alvarez & Marsal |
| Mr Christian Gruschwitz | Alvarez & Marsal |
| Mr Björn Brand | Alvarez & Marsal |
| Ms Emily Palmer [R] | Alvarez & Marsal |
| Mr Tom Fisher [R] | Alvarez & Marsal |
| Mr Daniel Baeumler [R] | Alvarez & Marsal |
| Mr Alexander Massing [R] | Alvarez & Marsal |
| Mr Michael Lüders | DESIOS |
| Mr Andreas Lessmeister | DESIOS |
| Mr Maximilian Franke [R] | DESIOS |
| Dr Frank Knappe | 8.2 Consulting AG |
| Dr Falk Lüddecke | 8.2 Consulting AG |
| Prof Dr Martin Skiba | 8.2 Consulting AG |
| Mr Stefan Kleinhansl | 8.2 Consulting AG |

| COURT REPORTER | |
|---|---|
| **Mr/Ms First Name/ Last Name** | **Affiliation** |
| Ms Anne-Marie Stallard | The Court Reporter Ltd |

| INTERPRETERS | |
|---|---|
| **Mr/Ms First Name/ Last Name** | **Affiliation** |
| Ms Barbara Bethäusser-Conte | English-German Interpreter |
| Ms Silke Schoenbuchner | English-German Interpreter |
| Ms Barbara Weller | English-German Interpreter |

49.    In the course of the Hearing, the following individuals were examined:

> *On behalf of the Claimants*:
> Mr Felix Koselleck          Party Representative
> Mr Alexander Dierkes        MEC Energy
> Mr Klaus Weber              Ed. Züblin AG
> Dr Tomas Haug               NERA Economic Consulting
> Mr Trevor Hodgson           Kent

| | |
|---|---|
| Mr Andreas Zilles | Atkins |
| Prof Dr Jörg Gundel | University of Bayreuth |
| Prof Dr Charlotte Kreuter-Kirchhof | Heinrich Heine University Düsseldorf |
| Dr Richard Hern | NERA Economic Consulting |
| Dr Jerome Guillet | Green Giraffe B.V. |

*On behalf of the Respondent*:

| | |
|---|---|
| Dr Nico Nolte | Federal Maritime and Hydrographic Agency |
| Dr Manfred Zeiler | Federal Maritime and Hydrographic Agency |
| Mr Richard Slark | Alvarez & Marsel |
| Mr Michael Lüders | DESIOS |
| Dr Frank Knappe | 8.2 Consulting AG |
| Dr Falk Lüddecke | 8.2 Consulting AG |
| Prof Dr Martin Skiba | 8.2 Consulting AG |
| Mr Stefan Kleinhansl | 8.2 Consulting AG |
| Prof Dr Thomas Schomerus | Leuphana University Lüneburg |
| Prof Dr Jörg Terhechte | Leuphana University Lüneburg |
| Mr Alexander Demuth | Alvarez & Marsal |

50.    On 23 January 2023, the Parties filed simultaneous Post-Hearing Briefs (the "**Claimants' First Post-Hearing Brief**" and the "**Respondent's First Post-Hearing Brief,**" respectively); the Respondent also filed Legal Authorities RL-0513 through RL-0515. In their transmittal email, the Claimants requested leave from the Tribunal to introduce into the record six documents issued by Germany's Federal Maritime and Hydrographic Agency (the "*Bundesamt für Seeschifffahrt und Hydrographie*," or the "**BSH**," an authority of the Federal Ministry of Transport, Building and Urban Development, or the "**Ministry of Transport**"), pursuant to Section 16.3 of Procedural Order No. 1. Upon invitation from the Tribunal, the Respondent commented on the Claimants' request by letter of 26 January 2023. The Respondent did not object to the Claimants' request; however, in its letter, the Respondent objected to a graph that had been included in the Claimants' First Post-Hearing Brief and requested that the Tribunal strike it from the record.

51.    On 29 January 2023, the Tribunal (i) informed the Parties that it had granted the Claimants' request of 23 January 2023 to introduce additional documents to the record; and (ii) invited the Claimants to comment on the Respondent's request of 26 January 2023 to strike. The Claimants submitted their comments by letter of 1 February 2023. Also on 1 February 2023, the Claimants filed the additional documents into the record as Exhibits C-0441 through C-0446.

52.     On 6 February 2023, the Tribunal informed the Parties that it had rejected the Respondent's request of 26 January 2023 to strike from the record the graph included with the Claimants' First Post-Hearing Brief.

53.     The Parties filed simultaneous Reply Post-Hearing Briefs on 17 March 2023 (the "**Claimants' Second Post-Hearing Brief**" and the "**Respondent's Second Post-Hearing Brief**," respectively). In their transmittal email, the Claimants requested leave from the Tribunal to introduce into the record five documents issued by the BSH, pursuant to Section 16.3 of Procedural Order No. 1. Upon invitation from the Tribunal, the Respondent commented on the Claimants' request by letter of 24 March 2023; the Respondent did not object to the Claimants' request but requested leave to comment on the documents once filed.

54.     On 29 March 2023, the Tribunal informed the Parties that it had granted the Claimants' request of 17 March 2023 to introduce additional documents into the record and invited the Parties to make a round of submissions on the new documents. On the same day, the Claimants filed the additional documents into the record as Exhibits C-0441 through C-0446. Pursuant to the Tribunal's instructions, the Respondent commented on the new exhibits by letter of 19 April 2023, requesting leave to file nine additional documents into the record relating to the ongoing compensation proceedings in the German domestic courts. The Claimants responded by letter of 28 April 2023 stating that they did not object to the Respondent's request. In their letter, the Claimants also requested that the Tribunal close the proceeding.

55.     The Parties filed their Statements of Costs on 14 April 2023 (the "**Claimants' First Statement of Costs**" and the Respondent's "**First Statement of Costs**," respectively). The Claimants also filed Exhibits C-0452 through C-0455 and Legal Authorities CL-0372 through CL-0375, and the Respondent filed Legal Authorities RL-0516 through RL-0528. In its transmittal email, the Respondent requested leave from the Tribunal to comment on the Claimants' Statement of Costs.

56.     Further to the Respondent's request of 14 April 2023, on 16 April 2023, the Tribunal invited each Party to submit a Reply Statement of Costs by 28 April 2023. The Parties filed

their Reply Statements on that date (the "**Claimants' Second Statement of Costs**" and the "**Respondent's Second Statement of Costs**," respectively); the Claimants also filed Legal Authorities CL-0376 through CL-0383.

57.    On 16 May 2023, the Tribunal (i) informed the Parties that it had granted the Respondent's request of 19 April 2023 to introduce additional documents into the record and invited the Parties to make a round of submissions on the new documents; and (ii) indicated that it was not in the position to grant the Claimants' request of 28 April 2023 to close the proceeding. Pursuant to the Tribunal's instructions, on 22 May 2023, the Respondent filed the additional documents into the record as Exhibits R-0223 through R-0231 and commented on their alleged relevance and materiality. In its letter, the Respondent also requested leave to introduce further four documents into the record relating to the ongoing compensation proceedings in the German domestic courts. The Claimants responded by letter of 26 May 2023, objecting to the Respondent's request to introduce additional documents; the Claimants also filed Legal Authorities CL-0384 through CL-0386.

58.    On 1 June 2023, the Tribunal informed the Parties that it had granted the Respondent's request of 22 May 2023 to introduce additional documents into the record and invited the Parties to make a round of submissions on the new documents. The Tribunal also stated that it "[did] *not envisage granting any further requests for supplementing the record relating to the German domestic compensation proceedings unless it considers* […] *that it would benefit from a further update of the status of the proceedings*."

59.    Pursuant to the Tribunal's instructions, on 6 June 2023, the Respondent filed the additional documents into the record as Exhibits R-0232 through R-0235 and commented on their alleged relevance and materiality. The Claimants responded by letter of 12 June 2023.

60.    On 12 June 2023, the Claimants filed their comments on the Respondent's letter of 12 June 2023 and the accompanying exhibits, contending that the Respondent's evidence was neither relevant nor material to the outcome of the arbitration.

61.    On 13 September 2023, the Respondent sought a leave to introduce new documents relating to the ongoing compensation proceedings in the German domestic courts and supporting

legal authorities into the record. On 20 September 2023, the Claimants commented on the Respondent's request, contending that "*none of the documents add anything novel or material to this arbitration*" and that they also fell short of the "*exceptional circumstances*" standard in paragraph 16.3 of Procedural Order No. 1; however, "*in the interest of full transparency*," the Claimants did not object to the Respondent's request.

62.   On 26 September 2023, the Tribunal informed the Parties that it had granted the Respondent's request of 13 September 2023 to introduce new documents into the record and invited the Parties to make a round of submissions on the new documents.

63.   On 2 October 2023, pursuant to the Tribunal's directions, the Respondent filed the additional documents into the record as Exhibits R-0236 through R-0239 and Legal Authorities RL-0529 through RL-0531, and commented on their relevance and materiality. The Claimants filed their comments by letter dated 9 October 2023, while also updating Exhibit RH-0111, which contained a pre-award interest analysis.

64.   On 10 October 2023, the Tribunal provided the Respondent with an opportunity to comment on the Claimants' updated pre-award interest calculation.

65.   On 23 October 2023, the Respondent submitted its comments on the Claimants' updated damages calculation of 2 October 2023, arguing that the calculation was "*overstated and unjustified.*"

66.   On 30 October 2023, the Claimants wrote to the Tribunal, contending that the Respondent's comments of 2 October 2023 exceeded the scope permitted by the Tribunal and requesting that "*the last two paragraphs on page 2 of Germany's Letter be struck from the record.*" Pursuant to the Tribunal's directions, on 6 November 2023, the Respondent commented on the Claimants' letter of 30 October 2023.

67.   On 8 November 2023, the Tribunal denied the Claimants' application of 30 October 2023 to strike certain passages of the Respondent's letter of 23 October 2023 from the record.

68.   On 9 November 2023, the Claimants wrote to the Tribunal, commenting on "*the factual situation underlying the Tribunal's ruling*" and arguing that the Respondent could have

raised the arguments it raised in the relevant passages of its letter earlier. The Claimants indicated that they were "*in the Tribunal's hands with respect to how it deems fit to proceed*" in light of the Claimants' comments.

69.    Upon the Tribunal's invitation, on 14 November 2023 the Respondent commented on the Claimants' letter of 9 November 2023 and requested that the Tribunal uphold its decision of 8 November 2023.

70.    On 21 November 2023, the ICSID Secretariat wrote to the Parties on behalf of the Tribunal, stating that the Tribunal had taken note of the Claimants' email dated 9 November 2023, including the Claimants' statement that they did not seek reconsideration of the Tribunal's ruling of 8 November 2023, as well as of the Respondent's response of 14 November 2023. The Tribunal stated it would "*take a view on the issue in the Award, taking into account the procedural positions as now clarified by the Parties.*"

71.    On 6 August 2024, the Claimants wrote to the Tribunal, providing a further update on the status of payments under the German domestic compensation scheme, together with an updated version of Exhibit RH-0111, which contained the Claimants' pre-award interest analysis.

72.    On the same day, the Tribunal invited the Respondent to provide its observations on the Claimants' letter by 12 August 2024; on 10 August 2024, the Tribunal granted the Respondent's request for an extension of time to provide its observations by 19 August 2024.

73.    On 19 August 2024, the Respondent provided its comments on the Claimants' letter of 6 August 2024 and the Claimants' updated damages calculations.

74.    On 22 August 2024, the Tribunal wrote to the Parties, taking note of the Claimants' updated damages calculations as well as the Respondent's comments of 19 August 2024. The Tribunal indicated that it would consider the Parties' positions in the course of its deliberations, which were now in a final stage.

75.    The Tribunal declared the proceeding closed on 9 September 2024.

III.    **FACTUAL BACKGROUND**

76.    This Section summarizes in a non-exhaustive manner the factual background of the dispute, focusing on events and developments that appear to be undisputed between the Parties. Where the Parties disagree, the corresponding event or development has been identified as an allegation or argument.

77.    Disputed factual issues will be discussed and addressed in more detail in the relevant context in Sections IV, V and VI below.

A.    THE EVOLUTION OF THE REGULATORY FRAMEWORK GOVERNING OFFSHORE WIND ENERGY IN GERMANY (1997-2012)

(1)    **The Development of the Regulatory Framework between 1997 and 2009**

a.    *The 1997 Offshore Installations Ordinance*

78.    Germany was one of the pioneers in the development of renewable energy sources in Europe, including wind energy, as part of the transition from fossil fuels to renewable energy.[3] The initial regulatory steps governing offshore wind energy projects in Germany's exclusive economic zone (the "**EEZ**") were taken on 23 January 1997, when the offshore installations ordinance (the "**1997 Offshore Installations Ordinance**") was adopted.[4] Pursuant to the Ordinance, developers were required to obtain approval to build and operate an offshore wind energy project from the BSH.[5]

79.    In accordance with the 1997 Offshore Installations Ordinance, the BSH adopted an administrative procedure that required developers to file an initial application, participate in various public participation rounds and hold an application conference with various public stakeholders, and finally participate in a public hearing. The BSH would approve

---

[3] Resp. Rej., para. 291.

[4] Offshore Installations Ordinance (*Verordnung über Anlagen seewärts der Begrenzung des deutschen Küstenmeeres*), 23 January 1997 ("**1997 Offshore Installations Ordinance**"), **C-0008**. Germany had introduced feed-in tariffs already in 1991: *see* Cl. Mem., paras. 35-36; Resp. C-Mem., para. 195; Slark ERI, paras. 273 *et seq*.

[5] 1997 Offshore Installations Ordinance, **C-0008**, Sec. 2, Sentence 1.

the application once a developer had successfully completed each of these steps and complied with all administrative requirements.[6]

80. The BSH operated on a "first-come, first-served" basis. Accordingly, if the developer complied with all the formal requirements, the BSH approved the project, granting an exclusive right to develop a particular area in the EEZ; subsequent applications relating to the same area were not accepted. While further approvals, such as a construction permit and an operation permit were required, the Claimants argue that a developer's initial application had economic value which increased with the completion of each additional step, and that the related rights were freely transferable.[7]

### b.    The 2000 Renewable Energy Sources Act

81. On 1 April 2000, Germany enacted the first Renewable Energy Sources Act (the "**2000 Renewable Energy Sources Act**"), which set new renewable energy expansion targets and introduced a more favorable feed-in tariff and the right for offshore wind energy projects to be connected to the transmission grid.[8]

82. As to the feed-in tariff, the 2000 Renewable Energy Sources Act introduced a fixed feed-in tariff for electricity produced from wind, including additional incentives for projects further from the coast through a mechanism that envisaged a higher feed-in tariff for the first five years of operation, and nine years for wind farms located at least three nautical miles from the coast.[9] The feed-in tariffs were also degressive, *i.e.* the later the commissioning date, the progressively lower the tariff.[10]

83. As to the right to grid connection, the 2000 Renewable Energy Sources Act required that the transmission system operators (the "**TSOs**") provide a connection to the transmission

---

[6] Cl. Mem., paras. 27, 36 *et seq*.

[7] Cl. Mem., paras. 41-42.

[8] Renewable Energy Sources Act, 1 April 2000 (excerpts) ("**2000 Renewable Energy Sources Act**"), **C-0012 / RL-0157**.

[9] Cl. Mem., para. 63; Resp. C-Mem., para. 195; Cl. Reply, para. 27; 2000 Renewable Energy Sources Act, **C-0012 / RL-0157**, Sec. 7(1), Sentences 1 and 4.

[10] Resp. C-Mem., para. 195.

system as a matter of right, at the developer's request.[11] According to the Act, while the cost of the connection was to be borne by the operator, the obligation to provide a grid connection for a particular wind farm belonged to the TSO whose network was located closest to the installation.[12] The TSO responsible for providing grid connection to OWFs in the EEZ in the North Sea was TenneT TSO GmbH ("**TenneT**"), the national electricity transmission system operator of the Netherlands, which was owned and controlled by the Dutch government.

### c.    The 2002 Offshore Installations Ordinance

84.    In 2001, the European Parliament and the Council of the European Union (the "**EU**") issued Directive 2001/77/EC (the "**2001 Directive**") on the promotion of electricity produced from renewable sources.[13] The EU Member States, including Germany, were required to take steps to promote renewable energy in line with indicative national targets.[14]

85.    In 2002, on the basis of the 2001 Directive, the German federal government adopted a strategy for sustainable development, including for the increased development of offshore wind energy production. The strategy adopted an expansion target for offshore wind energy of 20 to 25 GW by 2025-2030.[15]

86.    In this connection, Germany also adopted an Offshore Installations Ordinance, amending the 1997 Ordinance (the "**2002 Offshore Installations Ordinance**").[16] In an effort to streamline the approval process for new offshore wind projects, the 2002 Offshore Installations Ordinance introduced the concept of "*designated areas*" and amended the

---

[11] 2000 Renewable Energy Sources Act, **C-0012 / RL-0157**, Sec. 3(1), Sentence 1.

[12] 2000 Renewable Energy Sources Act, **C-0012 / RL-0157**, Sec. 3(1), Sentences 1-2.

[13] Directive 2001/77/EC of the European Parliament and of the European Council on the promotion of electricity produced from renewable energy sources in the internal electricity market, 27 September 2001 ("**2001 Directive**"), **C-0013 / RL-0162**, Annex.

[14] 2001 Directive, **C-0013/ RL-0162**, Art. 3(1) ("*Member States shall take appropriate steps to encourage greater consumption of electricity produced from renewable energy sources in conformity with the national indicative targets*").

[15] Federal Government's Strategy for using Offshore Wind Energy (*Strategie der Bundesregierung zur Windenergienutzung auf See*), January 2002 ("**Strategy for using Offshore Wind Energy**"), **C-0014 / R-0020**, p. 7.

[16] Strategy for using Offshore Wind Energy, **C-0014 / R-0020**, p. 2; Offshore Installations Ordinance (*Verordnung über Anlagen seewärts der Begrenzung des deutschen Küstenmeeres*), 4 April 2002 ("**2002 Offshore Installations Ordinance**"), **C-0015 / RL-0175**.

developers' exclusivity rights. While under the 1997 Ordinance it was for each applicant to assess the suitability of the potential areas for the project, the 2002 Offshore Installations Ordinance provided that the Federal Ministry of Transport was to identify in advance the areas within the EEZ that were considered suitable for offshore wind energy installations.[17] As for the exclusivity right, or "priority principle," the 2002 Offshore Installations Ordinance provided that applicants' rights would be protected only once an application was capable of being finally approved, *i.e.* in the last phase of the approval procedure.[18] The Claimants contend that, nonetheless, in practice the BSH continued to refuse processing subsequent applications for the same area.[19] This is disputed by the Respondent, who contends that the applicable rule was "*equal treatment and fair procedure*."[20]

### d.    The 2004 Renewable Energy Sources Act

87.    In 2004, Germany amended the Renewable Energy Sources Act (the "**2004 Renewable Energy Sources Act**"). Effective as of 21 July 2004, the 2004 Renewable Energy Sources Act introduced into law the target for the share of renewable sources of Germany's overall electricity supply of 12.5 percent by 2010 and 20 percent by 2020.[21] The Act also extended the higher initial feed-in tariff renumeration period to twelve years and confirmed that the minimum remuneration was to be paid for twenty years from the start of operations.

88.    The 2004 Renewable Energy Sources Act also amended the provisions regarding the start date of the tariff degression, *i.e.* the gradual decrease of the feed-in tariff depending on the start date of the operation. The Act also increased the period over which OWFs could enjoy the initial higher feed-in tariff for projects that were located further from the coastline, and

---

[17] 2002 Offshore Installations Ordinance, **C-0015 / RL-0175**, Sec. 3a, Sentence 1.

[18] *See* Strategy for using Offshore Wind Energy, **C-0014 / R-0020**, p. 13; 2002 Offshore Installations Ordinance, **C-0015 / RL-0175**, Sec. 5(1), Sentence 4.

[19] Cl. Mem., para. 69.

[20] Resp. Rej., para. 344; *see also* paras. 342-352.

[21] Cl. Mem., para. 70; Resp. C-Mem., para. 197; Renewable Energy Sources Act (*Gesetz für den Vorrang Erneuerbarer Energien*), 1 August 2004 ("**2004 Renewable Energy Sources Act**"), **C-0016 / RL-0155**, Sec. 1(2).

further postponed the start date of tariff degression on the same basis – the further the OWF from the coastline, the later the start of the degression (the "**Coastal Distance Bonus**").[22]

### e.    The 2006 Energy Act

89.    In 2006, the Energy Act (the "**2006 Energy Act**"), which deals with the regulation of the electricity grid, was amended to include a new provision that addressed the increasing cost and timing of providing grid connections.

90.    While under the 2000 Renewable Energy Sources Act OWF developers had to bear the cost of the grid connection, the new provision, Section 17(2)(a) of the 2006 Energy Act, which applied exclusively to the offshore wind energy sector but not to other sources of renewable energy, required the TSOs to bear the cost of establishing the grid connection.[23] The provision also required that the TSOs complete the grid connection by the time the relevant OWF was ready to enter into operation.[24]

### f.    The 2009 Renewable Energy Sources Act

91.    In January 2009, Germany further amended its Renewable Energy Sources Act (the "**2009 Renewable Energy Sources Act**"). The amendment increased the target share of renewable energy of Germany's overall energy supply in 2020 from 20 to 30 percent, and in parallel increased by over 40 percent the initial feed-in tariff, which was to be paid for the first twelve years from entry into operation, while further postponing the tariff degression.[25]

92.    Germany also introduced a so-called "*Sprinter Bonus*" to support the development of offshore wind, which was made available for projects that entered into operation by

---

[22] Cl. Mem., para. 71; Cl. Reply, paras. 58-67; Resp. C-Mem., paras. 267-276; Resp. Rej., paras. 319-324; 2004 Renewable Energy Sources Act, **C-0016 / RL-0155**, Sec. 10(3), Sentence 4.

[23] Cl. Mem., para. 72. *See* 2000 Renewable Energy Sources Act, **C-0012 / RL-0157**, Sec. 10(1); Energy Act, 17 December 2006 ("**2006 Energy Act**"), **C-0018**, Sec. 17(2a).

[24] Cl. Mem., para. 73; Resp. CM, para. 520. *See* 2006 Energy Act, **C-0018**, Sec. 17(2a), Sentence 1.

[25] Cl. Mem., para. 91. *See* Renewable Energy Sources Act, 1 January 2009 ("**2009 Renewable Energy Sources Act**"), **C-0059 / RL-0154**, Secs. 1, 31.

1 January 2016. The Act also confirmed the availability of the Coastal Distance Bonus introduced under the 2004 Renewable Energy Sources Act.[26]

### g.    *The 2009 BNA Position Paper*

93.    In 2009, the Federal Network Agency (*Bundesnetzagentur* or the "**BNA**") published a position paper (the "**2009 BNA Position Paper**"), which was intended, like other position papers, to provide interpretations of legal rules and indicate how the BNA would exercise its discretion in applying them. The Parties disagree on whether the 2009 BNA Position Paper was binding; according to the Claimants, under German law, in practice it was binding,[27] indeed a "*guarantee*,"[28] whereas the Respondent submits that it "*has no legally binding value per se but rather provides an interpretation of the law by the authority still being subject to a potential review by state courts.*"[29]

94.    One of the issues addressed in the 2009 BNA Position Paper was what was referred to at the time as the "*chicken-and-egg*" problem: on the one hand, banks were unwilling to finance the development of OWFs if there was no commitment to a grid connection by a TSO; and on the other hand, TSOs were unwilling to grant a grid connection without the developer having secured the necessary financing.[30]

95.    The 2009 BNA Position Paper set out four criteria for granting a grid connection for an offshore wind project: (i) the required approvals (or corresponding commitments) for the project; (ii) a plausible construction schedule; (iii) completion of the necessary inspections of the building site; and (iv) binding agreements for ordering the turbines.[31] If a developer met three of the four criteria, it was entitled to obtain a "*conditional*" grid commitment, which could be relied upon to obtain financing. When all four criteria were met, the

---

[26] Cl. Mem., para. 91; 2006 Energy Act, **C-0018**, Sec. 31(2).

[27] RfA, fn. 37.

[28] Tr. Day 1, 31:21-24.

[29] Resp. C-Mem., para. 378.

[30] Cl. Mem., para. 101; Resp. C-Mem., paras. 371-372.

[31] BNA, Position Paper, October 2009 ("**2009 BNA Position Paper**"), **C-0019 / R-0018**, p. 5.

developer was entitled to an "*unconditional*" grid connection, which triggered a 30-month deadline for the TSO to provide a grid connection.[32]

96. In March 2010, the German federal government stated in Parliament (*Bundestag*) that it was "*committed to ensuring that grid operators implement the timely connection of offshore wind farms to the power grid quickly and effectively*,"[33] adding that "[t]*he BNA Position Paper by the BNA pursuant to Section 17(2a) Sentence 1 Energy Act contributed to a significant clarification and hence investment certainty for the individual projects*."[34] The government noted that it would "*review whether the realization of an offshore grid in the North Seat will require further measures*," including as to whether the integrated grid system "*will require an adjustment of the grid connection conditions*."[35]

### h.    The 2009 Spatial Planning Ordinance

97. In 2009, Germany introduced the Spatial Planning Ordinance for the EEZ of the North Sea (the "**2009 Spatial Planning Ordinance**").[36] The objective of the Ordinance, which entered into force on 25 September 2009, was to facilitate the economic (including offshore wind) and scientific uses of the EEZ while ensuring the safety and ease of maritime navigation and protection of the marine environment. The 2009 Spatial Planning Ordinance noted that it was based, *inter alia*, on the "*Strategy of the Federal Government for the Use of Wind Energy at Sea*," which was part of the federal government's sustainability strategy.[37]

---

[32] *See* 2009 BNA Position Paper, **C-0019 / R-0018**, pp. 19, 21.

[33] Government Response, "*The current status of the Expansion of OWFs in the North Sea and the Baltic Sea*," *Bundestag Drucksache* 17/1283, 31 March 2010, **C-0112 / R-0022**, p. 7.

[34] Cl. Mem., para. 113; Government Response, "*The current status of the Expansion of OWFs in the North Sea and the Baltic Sea*," *Bundestag Drucksache* 17/1283, 31 March 2010, **C-0112 / R-0022**, p. 7.

[35] Resp. Rej., para. 1221; Government Response, "*The current status of the Expansion of OWFs in the North Sea and the Baltic Sea*," *Bundestag Drucksache* 17/1283, 31 March 2010, **C-0112 / R-0022**, p. 7.

[36] Ordinance on Spatial Planning in the German Exclusive Economic Zone in the North Sea, 21 September 2009, **RL-0172** (attaching "*Spatial Plan for the German Exclusive Economic Zone in the North Sea*" ("**2009 Spatial Planning Ordinance**")), **RL-0198**.

[37] 2009 Spatial Planning Ordinance, **RL-0198**, p. 4.

98.     The Ordinance identified three priority areas for the development of offshore wind projects, each of which were located relatively close to the coastline.[38] In these areas, the production of wind energy was granted priority over other spatially significant uses, and spatially significant planning, measures and projects that were not compatible with the function of the wind energy priority areas were prohibited.[39]

### (2)     The Development of the Regulatory Framework in Germany between 2010 and mid-2012

99.     In 2010, the German federal government published a further strategy paper which stated that renewable energy was to be a "*supporting pillar of future energy supply*" and would "*form the major portion*" of Germany's future energy mix.[40] The government stressed that wind energy would play "*a decisive role in energy production in 2050*," and that this would require "*a massive extension of wind energy capacities on- and offshore*."[41] The government also reiterated its expansion target of 25 GW in offshore wind energy output by 2030.

100.    The German federal government continued to support the development of offshore wind energy in the course of 2011 and 2012,[42] including as a result of its decision to phase out nuclear power following the Fukushima accident on 11 March 2011.

101.    On 7 November 2011, TenneT wrote an "*urgent letter*" to the German federal government, stating that the construction of grid connection lines to OWFs in the North Sea "[was] *no longer possible*" in accordance with the 2009 BNA Position Paper. TenneT invoked the "*lack of financial, personal and material resources,*" and in particular the "*massive*

---

[38] Resp. C-Mem., paras. 241, 361-369; 2009 Spatial Planning Ordinance, **RL-0198**, pp. 4, 19-24, 38.

[39] 2009 Spatial Planning Ordinance, **RL-0198**, p. 19.

[40] Federal Government, Energy Concept for an Environmentally Friendly, Reliable and Affordable Energy Supply (*Energiekonzept für eine umweltschonende, zuverlässige und bezahlbare Energieversorgung*), 28 September 2010, **C-0020 / R-0012**, pp. 5, 9.

[41] Cl. Mem., para 104; Federal Government, Energy Concept for an Environmentally Friendly, Reliable and Affordable Energy Supply, 28 September 2010, **C-0020 / R-0012**, p. 8.

[42] Seventh Maritime Conference in Wilhelmshaven, 27 and 28 May 2011, **C-0021**, p. 101 (Speech by Federal Chancellor Dr Angela Merkel). *See* also Speech by Federal Chancellor Dr Angela Merkel (during the official commissioning of the offshore wind farm EnBW Baltic in Zingst), 1 and 2 May 2011, **C-0022**, pp. 2-3 (where Dr Merkel addressed industry insiders and potential investors, emphasizing the importance of offshore wind to Germany's future, stressing that it was important for the government and private sector to work together and promising public funds to help promote cutting-edge technology).

*problems with the acquisition of the necessary finances*." According to TenneT, in the circumstances, fundamental changes to the legal framework were required, including "*an orderly offshore grid expansion and development plan*."[43]

102.    On 1 January 2012, an amendment to the Renewable Energy Sources Act entered into force (the "**2012 Renewable Energy Sources Act**"), setting the target of at least 35 percent for renewable energy sources as a share of Germany's overall energy supply by 2020.[44] The Act also increased and extended the feed-in tariffs applicable to offshore wind, including by (i) increasing the initial feed-in tariff; (ii) postponing the tariff degression and (iii) introducing options available for OWFs that entered into operation before 1 January 2018. The Coastal Distance Bonus, which was initially introduced by the 2004 Renewable Energy Sources Act and maintained when the Act was amended in 2009, also remained in place.[45]

103.    Also in 2012, Germany adopted a revised offshore installations ordinance (the "**2012 Offshore Installations Ordinance**").[46] The 2012 Offshore Installations Ordinance aimed to streamline the approval process under the 1997 Offshore Installations Ordinance by adopting a more centralized plan approval process (*Planfeststellungsverfahren* or the "**Plan Approval Process**") for approval of OWFs.[47] The Plan Approval Process is not a procedure that was specifically designed for the OWFs; it is generally used in Germany to approve complex infrastructure projects that require reconciling several concurrent and potentially conflicting interests. The 2012 Offshore Installations Ordinance also made the BSH the central approval authority, which eliminated the need to obtain additional approvals from other authorities.[48]

---

[43] Letter from TenneT to Federal Chancellery, 7 November 2011, **R-0019**.

[44] Renewable Energy Sources Act (*Gesetz für den Vorrang Erneuerbarer Energien*), 1 January 2012 ("**2012 Renewable Energy Sources Act**"), **C-0023 / RL-0159**, Sec. 1(2).

[45] Cl. Mem., para. 185.

[46] Offshore Installations Ordinance (*Verordnung über Anlagen seewärts der Begrenzung des deutschen Küstenmeeres*), 31 January 2012, **C-0027 / RL-0147** ("**2012 Offshore Installations Ordinance**"). The 2012 Ordinance has also been referred by the Parties with the German acronym "*SeeAnlV 2012*" (*Seeanlagenverordnung 2012*).

[47] Cl. Mem., para. 185; 2012 Offshore Installations Ordinance, **C-0027 / RL-0147**.

[48] Cl. Mem., para. 187.

104. The 2012 Offshore Installations Ordinance also formalized and reinforced the priority principle by advancing the point in time in the approval process when it would be given effect. According to the Ordinance, if the formal requirements were met, the priority principle was now given effect as from the date when a request to hold an application conference was made.[49]

105. In 2011, in connection with the 2011 Energy Act, the BSH had been tasked to develop a federal spatial offshore grid plan (*Bundesfachplan Offshore* or the "**BFO**"); under the 2012 Offshore Installations Ordinance, the BSH was given the competence to reserve a specific area in the EEZ for grid connection facilities by issuing a development freeze.[50]

**B.    THE CLAIMANTS' BUSINESS VENTURES IN THE GERMAN OFFSHORE WIND SECTOR**

**(1)    The Gravity Foundation Technology**

106. As of 2008, having followed the developments in the regulation of offshore wind in Germany, Strabag began developing a gravity foundation technology (the "**Gravity Foundation Technology**" or the "**GFT**") for use in offshore wind energy projects, focusing on the development of a concept of serial production and installation of offshore wind turbines. According to the Claimants, Strabag planned to cover "*the entire OWF construction process, including design, engineering, onshore production of foundations, onshore pre-installation and testing of offshore wind turbines, and final transport and installation of the complete unit offshore.*"[51]

107. In May 2009, Strabag established Strabag Offshore Wind GmbH ("**SOW**"), based in Cuxhaven, Germany, for the purposes of research and development of the GFT.[52] SOW held the know-how and the intellectual property rights in the technology. In 2011, Strabag established Windkraft FiT GmbH ("**FiT**"), another German-incorporated entity, in order

---

[49] Cl. Mem., para. 194; 2012 Offshore Installations Ordinance, Sec. 3(4).

[50] 2012 Offshore Installations Ordinance, **C-0027** / **RL-0147**, Sec. 10(1), Sentence 1. At the time, the plan was called "*offshore netplan*" ("*Offshore-Netzplan*"); the term "*BFO*" was introduced by the Energy Act, 28 December 2012 ("**2012 Energy Act**"), **C-0035**: *see* Cl. Mem., fn. 453.

[51] Cl. Mem., paras. 78-79.

[52] Strabag Offshore Wind GmbH, extract from the Commercial Registry, District Court Stuttgart, 22 May 2019, **C-0028**, p. 1.

to build the first test field for gravity foundations at the location of one of its offshore wind projects.[53]

108.    In early 2011, Strabag informed the BSH that it planned to use the GFT in the offshore wind projects, which it was then in the process of acquiring (see the next section). At the BSH's request, Strabag selected OWP Albatross, which was closest to receiving the BSH's approval, as a test field for the purposes of testing the GFT.[54] Strabag's plan was to apply for a modification of the approval, once granted, to deploy the GFT on the Albatross test field (the "**Albatross Test Field**").[55]

109.    On 17 August 2011, the BSH approved the Albatross Test Field.[56] On 8 September 2011, the BSH accepted that FiT would be able to use gravity-based foundations in the test field,[57] and on 31 October 2011, TenneT provided the test field with a conditional grid connection commitment, indicating that it would be able to provide the grid connection within 45 months.[58] On 28 February 2012, the BSH granted approval for the construction of the ten installations of the Albatross Test Field using gravity-based foundations.[59]

110.    The Claimants state that local German authorities and the EU supported the development of the GFT. The local German authorities facilitated access to a suitable port location and facilities in Cuxhaven, and the state of Lower Saxony also financially supported the construction of the Cuxhaven industrial facility by investing some EUR 113 million for the preparation of the site and the construction of the port facilities.[60] The EU awarded a grant of EUR 58 million in the context of the planned construction of an OWF project named GlobalTech I.[61]

---

[53] Cl. Mem., para. 159; Windkraft FiT GmbH, extract from the Commercial Registry, District Court Hamburg, 22 May 2019, **C-0029**, p. 1.

[54] Cl. Mem., para. 128.

[55] Cl. Mem., para. 129.

[56] Cl. Mem., para. 160.

[57] Cl. Mem., para. 161.

[58] Cl. Mem., para. 163.

[59] Cl. Mem., para. 200.

[60] Cl. Mem., paras. 92-93, 108-09, 111.

[61] Cl. Mem., para. 109.

111.    The development of the GFT required substantial up-front investment, in particular because it envisaged the use of a custom-made vessel and extensive offshore testing in the context of an actual offshore wind project. Strabag acknowledged that it would have to develop a pipeline of OWF projects for the purposes of a roll-out, and to demonstrate the GFT's viability. Against this background, in 2009, Strabag started a search for a suitable German OWF to purchase and enable further development.[62]

### (2)    The Establishment of NOH 1 and NOH 2 for the Development of the Offshore Wind Projects

112.    In the course of 2009, Strabag conducted further research into the German market and came to the view that, given the favorable regulatory framework, the acquisition and development of a pipeline of OWF projects "*was an attractive investment in its own right.*"[63]  In September 2009, Strabag decided to commit some EUR 400 million for both the development of the GFT and the OWF project pipeline.[64]

113.    In late 2009, Strabag identified the original developers (the "**Original Developers**") of the offshore wind projects that it subsequently purchased as potential cooperation partners.[65] As of early 2010, the Original Developers had established and were developing a number of offshore wind projects (the "**Offshore Wind Projects**") in the EEZ in the North Sea, which were in various stages of development, between (and including) the application phase and public hearing.[66] These projects were the following:

i.      OWP West: Application in September 2006; 80 wind turbines;

ii.     OWP Albatros: Application in November 2007; 80 wind turbines;

iii.    SeaWind I: Application in December 2007; 80 wind turbines;

---

[62] Cl. Mem., paras. 94-95.

[63] Cl. Mem., para. 97.

[64] Cl. Mem., para. 99.

[65] Cl. Mem., para. 119.

[66] Cl. Mem., paras. 120-121.  The definition of "Offshore Wind Projects" does not include SeaWind I and SeaWind II as the Claimants are not bringing any claims in relation thereto; see below paragraph 117.

iv.  SeaWind II: Application in December 2007; 60 wind turbines;

v.  SeaStorm I: Application in December 2007; 80 wind turbines;

vi.  SeaWind IV: Application in May 2008; 80 wind turbines;

vii.  GAIA II: Application in May 2008; originally 80 wind turbines;

viii.  GAIA III: Application in May 2008; originally 80 wind turbines;

ix.  GAIA IV: Application in May 2008; 80 wind turbines;

x.  GlobalTech II: Application in July 2008; 80 wind turbines;

xi.  GlobalTech III; Application in July 2008; 21 wind turbines;

xii.  SeaStorm II: Application in August 2008; 38 wind turbines;

xiii.  SeaWind III: Application in August 2008; 80 wind turbines;

xiv.  GAIA I Nord: Application in February 2010; 80 wind turbines; and

xv.  GAIA V Nord: Application in February 2010; 80 wind turbines.

114.  On 1 December 2010, Strabag and the Original Developers signed a head of terms for a share purchase agreement of the project companies that were operating the above Offshore Wind Projects (the "**Head of Terms**"), and on 19 May 2011, the parties concluded a shareholder agreement (the "**Shareholder Agreement**") to enter into a joint venture to develop the projects. The Shareholder Agreement envisaged that the parties would establish two joint venture companies, NOH 1 and NOH 2, as owners and developers of the projects, and that Strabag would purchase from Etanax Beteiligungsverwaltungs GmbH ("**Etanax**") 51 percent of the shares in each NOH 1 and NOH 2. Etanax was an Austrian incorporated company into which Northern Energy Project GmbH, the owner of the project companies of NOH 1 and NOH 2, would be merged. The parties also agreed to set up

Strabag OW EVS GmbH ("**OWEVS**") to deal with day-to-day management of the Offshore Wind Projects,[67] and agreed on the financing of NOH 1 and NOH 2.[68]

115.    In November 2011, Strabag and the Original Developers established NOH 1 and NOH 2.[69]

116.    On 22 December 2011, NOH 1 purchased the following companies (the "**NOH 1 Project Companies**") from their parent company (and former owner of the projects), Etanax, for a total of EUR 30.1 million:[70]

    i.      OWP Albatros (EUR 11.35 million);

    ii.     OWP West (EUR 3.55 million);

    iii.    GlobalTech II (EUR 6.1 million);

    iv.     GlobalTech III (EUR 4.8 million);

    v.      SeaWind I (EUR 4.2 million); and

    vi.     SeaWind II (EUR 0.1 million).

117.    The Claimants are not bringing any claims in this arbitration in relation to SeaWind I and SeaWind II.[71]

118.    On 10 January 2012, NOH 2 purchased the following companies (the "**NOH 2 Project Companies**" and, together with the NOH 1 Project Companies, the "**Project Companies**") for a total of EUR 55.85 million:[72]

    i.      GAIA I (EUR 4.9 million);

---

[67] Cl. Mem., paras. 135-138.
[68] Cl. Mem., paras. 139-140.
[69] Cl. Mem., para. 174.
[70] Cl. Mem., para. 180.
[71] Cl. Mem., para. 21.
[72] Cl. Mem., para. 180.

    ii.      GAIA II (EUR 4.5 million);

    iii.     GAIA III (EUR 8.2 million);

    iv.     GAIA IV (EUR 7.7 million);

    v.      GAIA V (EUR 4.0 million);

    vi.     SeaStorm I (EUR 7.35 million);

    vii.    SeaStorm II (EUR 5.7 million);

    viii.   SeaWind III (EUR 6.5 million); and

    ix.     SeaWind IV (EUR 7.0 million).

119.    On the same dates, 12 December 2011 and 10 January 2012, Strabag acquired 51 percent of shares in NOH 1 and NOH 2 against a payment of EUR 13.87 million and EUR 25.98 million, respectively.[73] According to the Claimants, taking into account debt and working capital, NOH 1 and NOH 2 acquired the Offshore Wind Projects for a total of EUR 122.2 million.[74]

**C.    THE CHANGES TO THE REGULATORY REGIME UNDERLYING THE DISPUTE**

120.    The Claimants argue that, as of mid-2012, a few months after the Claimants' acquisition of the Offshore Wind Projects, Germany started modifying the regulatory framework governing offshore wind in a manner that significantly harmed the Claimants' interests. According to the Claimants, these changes resulted in substantial delays to the expected grid connection dates of the Offshore Wind Projects and caused significant loss and damage to the value of the Claimants' investments.

---

[73] Share Purchase Agreement entered into, among others, Erste NEP.ÖZ Holding GmbH as Vendor and Strabag SE as Purchaser for the sale and purchase of 51 percent of the shares in NOH 1, 22 December 2011, **C-0033**, pp. 2, 4; Share Purchase Agreement entered into, among others, Zweite NEP.ÖZ Holding GmbH as Vendor and Strabag SE as Purchaser for the sale and purchase of 51 percent of the shares in NOH 2, 10 January 2012, **C-0034**, pp. 2, 4.
[74] Cl. Mem., para. 180.

121.    The Respondent argues, in response, that the changes to the regulatory regime were foreseen by market participants, and that the regulatory regime was subject to "*constant review of the status of market introduction and cost development*."[75] According to the Respondent, at the time the Claimants made their alleged investments, the offshore energy sector was immature and faced significant challenges; the Respondent merely exercised its right to regulate in dealing with those challenges and developing the regulatory regime. In the circumstances, the Claimants themselves are to blame for the consequences of their risky business decisions.[76]

122.    In this Section, the Tribunal summarizes the changes to the regulatory regime during the period from mid-2012 to 2017, without however taking a view on any disputed factual or legal issues, including whether such changes amounted to a breach of the ECT. These issues will be addressed below in Section V.

### (1)    The Regulatory Changes during the Period from mid-2012 to 2016

123.    On 15 June 2012, the BSH enacted a development freeze for the EEZ in the North Sea (*Veränderungssperre* or the "**Development Freeze**").[77] The coordinates of the sea areas subject to the Development Freeze were identified in Annex 1 to the document.

124.    The Development Freeze, which was initially set for three years, identified areas in the EEZ that were reserved to accommodate future grid infrastructure, including the grid connection facilities and telecommunication cables, in the anticipated federal spatial offshore grid plan, or the BFO, which was to be adopted in 2013, and therefore to be kept clear from any OWFs.[78] According to the Claimants, the Development Freeze had a "*material impact*" on the Claimants' Offshore Wind Projects, in particular the NOH 2 projects, some 40 percent of which were affected. Pending the adoption of the grid plan, applications for offshore wind installations in these areas were put on hold.[79]

---

[75] Resp. C-Mem., para. 7.

[76] Resp. C-Mem., paras. 8-9.

[77] Development Freeze (*Veränderungssperre*), 15 June 2012 ("**Development Freeze**"), **C-0197**.

[78] Cl. Mem., paras. 209, 218-219.

[79] Cl. Mem., paras. 209, 220.

125.  On 28 December 2012, amendments to the Energy Act (the "**2012 Energy Act**") introduced a central planning system for the development of offshore wind and offshore grid expansion – the offshore grid development plan (*Offshore-Netzentwicklungsplan*, or the "**O-NEP**"). The O-NEPs, which were to be adopted annually by the BNA based on a proposal made by the TSOs, set out the timeframe for grid expansion, including by establishing connection dates for each offshore wind energy project.[80] According to the Claimants, as a result of the new system, the developers lost the right to request and obtain a grid connection at the time of their choosing.[81]

126.  The Claimants contend that, although the purported goal of the 2012 Energy Act was to synchronize the development of OWF projects and the expansion of the grid by the TSOs, the new system in effect slowed down the development of OWFs across the board.[82] According to the Claimants, as a result of the system change, including TenneT's announcement in the spring of 2012 that it was not in a position to provide a grid connection to the Albatross Test Field until 2017, some 60 months after the approval date, the Claimants decided to suspend any further investments in the Albatross Test Field.[83] After failed efforts to acquire another OWF project in the North Sea with an earlier grid connection, in December 2012, the Claimants decided to halt any further large-scale investments in the development of the GFT, including the production facility in Cuxhaven and the installation vessel.[84] The Claimants argue that Germany's adverse regulatory measures "*collectively destroyed the basis upon which STRABAG's business plan for the Gravity Foundation Technology rested.*"[85] While the Claimants made efforts to market the

---

[80] 2012 Energy Act, **C-0035**, Sec. 17b(1), Sentence 1, and Sec. 17c, Sentence 1.

[81] Cl. Mem., paras. 210, 248-252.

[82] Cl. Mem., para. 253.

[83] On 31 October 2012, TenneT issued conditional grid connection commitment for the remaining 69 installations of OWP Albatross. The commitment contained reservations, including that TenneT could not commit to deliver grid connections for the full capacity of 414 MW (but only 350 MW), and that it could not guarantee implementation by January 2018, as envisaged in the Claimant's construction schedule: *see* Cl. Mem., para. 245.

[84] Cl. Mem., paras. 204-205, 211, 244, 258, 260; Strabag, Press Release, 15 January 2013, **C-0198**; Strabag Offshore Wind GmbH, Restructuring Concept, 8 February 2013, **C-0202**; Strabag Offshore Wind GmbH, Status Report, May 2014, **C-0203**.

[85] Cl. Mem., para. 259.

GFT elsewhere in Europe, including in the United Kingdom, these efforts failed, mainly because the technology had not been tested in an actual project.[86]

127.    On 22 February 2013, the BSH published the final 2012 BFO for the North Sea ("**BFO-N 2012**"), identifying clusters of OWF projects suitable for a joint grid connection based on their proximity.[87] The BFO included in the clusters those OWF projects that had already (i) been constructed; (ii) received an approval; or (iii) submitted their application and no obvious grounds to deny the application existed. Conversely, the BFO-N 2012 excluded all OWFs that were either completely affected by the Development Freeze or located more than 180 km away from the shore. These OWF projects were not assigned any cluster.[88]

128.    In accordance with the 2012 Energy Act, the O-NEPs for 2013, 2014 and 2015, as confirmed by the BNA, fixed the timeframe for grid expansion by identifying connection dates for each offshore wind project. The connection dates for many of the Claimants' Offshore Wind Projects were substantially delayed from those allegedly expected by the Claimants when making their investments, the earliest NOH 1 projects until 2018 and the NOH 2 projects until 2025-2029; some of the projects were not provided any connection dates.[89] In this connection, the BNA gave particular weight to the "*distance to shore*" criterion, giving priority to OWF projects that were located closer to the shore.[90]

---

[86] Cl. Mem., paras. 304-305.

[87] Cl. Mem., para. 276; BSH, Offshore Gridplan for the Exclusive Economic Zone in the German North Sea 2012 and Environmental Report (*Bundesfachplan Offshore für die deutsche ausschliessliche Wirthschaftzone der Nordsee 2012 und Umweltbericht*), 22 February 2013 ("**BFO-N 2012**"), **C-0199 / R-0032**, p. 20.

[88] Cl. Mem., para. 277. The BSH however stressed that the prioritization of areas that were predominantly closer to shore did not mean that OWFs could not be developed in other areas: *see* BFO-N 2012, **C-0199 / R-0032**, p. 20.

[89] Cl. Mem., paras. 210, 213, 280-284. *See Offshore-Netzentwicklungsplan 2013 zweiter Entwurf der Übertragungsnetzbetreiber*, 24 June 2013 ("**Second Draft of O-NEP 2013 (2023)**"), **C-0036 / R-0072**, pp. 63, 88, 91; *Offshore-Netzentwicklungsplan 2014 zweiter Entwurf der Übertragungsnetzbetreiber*), 4 November 2014 ("**Second Draft of O-NEP 2014 (2024)**"), **C-0037 / R-0073**, pp. 43, 49, 57; *Offshorenetzentwicklungsplan 2025, Version 2015, zweiter Entwurf der Übertragungsnetzbetreiber*, 29 February 2016 ("**Second Draft of O-NEP 2015 (2025)**"), **C-0038 / R-0074**, pp. 43, 46, 54. The second draft of each O-NEP contains the expected grid connection dates for each project. Despite that the final version of the O-NEP approved by the BSH only includes the forthcoming connections dates, the whole second draft is considered to be accepted once approved by the BSH: *see Bestätigung Offshore-Netzentwicklungsplan 2013*, 19 December 2013 ("**O-NEP 2013 (2023)**"), **C-0039 / R-0033**, p. 5; *Bedarfsermittlung 2024 Bestätigung des Offshore-Netzentwicklungsplan (Zieljahr 2024)*, 4 September 2015 ("**O-NEP 2014 (2024)**"), **C-0040**, p. 5; *Bestätigung des Offshore-Netzentwicklungsplans 2025*, 25 November 2016 ("**O-NEP 2015 (2025)**"), **C-0041**, p. 1.

[90] Cl. Mem., paras. 212, 288; *Offshore-Netzentwicklungsplan 2013 Erster Entwurf der Übertragungsnetzbetreiber – Teil 1*), 2 March 2013 ("**First Draft of O-NEP 2013 (2023)**"), **C-0200 / R-0184**.

129.  The Claimants illustrate the effect of the O-NEP 2013 on the Claimants' Offshore Wind Projects with the following table:[91]

| OFFSHORE WIND PROJECTS' EXPECTED GRID CONNECTION DATES | | |
|---|---|---|
| PROJECT | 2011 WHEN THE CLAIMANTS MADE THEIR[92] INVESTMENT | O-NEP 2013 |
| NOH 1 Projects | | |
| OWP Albatros | Q3 2014 (Approval: Q3 2011) | 2018 |
| OWP West | Q4 2014 (Approval: Q4 2011) | 2021 |
| GlobalTech II (merged with GlobalTech III) | Q4 2015 (Approval: Q4 2012) | 2022 |
| NOH 2 Projects | | |
| GAIA I Nord | Q4 2016 (Approval: Q4 2013) | 2025 |
| GAIA II | Q4 2015 (Approval: Q4 2012) | 2027 |
| GAIA III | Q4 2015 (Approval: Q4 2012) | 2027 |
| GAIA IV | Q4 2015 (Approval: Q4 2012) | 2027 |
| GAIA V Nord | Q4 2016 (Approval: Q4 2013) | 2025 |
| SeaStorm I | Q1 2016 (Approval: Q1 2013) | None (completely affected by the Development Freeze) |
| SeaStorm II | Q1 2016 (Approval: Q1 2013) | None (completely affected by the Development Freeze) |
| SeaWind III | Q1 2016 (Approval: Q2 2013) | 2029 |
| SeaWind IV | Q1 2016 (Approval: Q2 2013) | 2029 |

130.  The Claimants contend that they sought to mitigate their losses by moving certain locations of the planned installations to areas unaffected by the Development Freeze. They also sought to prioritize securing approval for the NOH 1 projects so as to make them suitable for sale, allegedly to mitigate their losses, while taking steps "*to ensure the NOH 2 Projects would not lose their position within the Plan Approval Process, while reducing their*

---

[91] Cl. Reply, para. 408. *See also* Cl. Opening Statement, slides 77-78.

[92] The expected grid connected dates are set out in Koselleck WSI, para. 37. *See also* PwC, Commercial Due Diligence Report, 14 April 2011, **C-0118**, para. 448.

*expenses to a minimum*."[93] According to the Claimants, they also sought to advance the NOH 2 projects, but "*in vain*." The BSH specifically rejected the Claimants' request for an application conference for GAIA I Nord on the basis that a grid connection was not expected for the projects in the relevant cluster until 2027.[94]

131.    In 2014, after the 2013 federal elections and in response to public dissatisfaction with high electricity prices, Germany adopted a new energy policy, set out in amendments to the Renewable Energy Sources Act (the "**2014 Renewable Energy Sources Act**"). The 2014 Renewable Energy Sources Act reduced the expansion targets and adopted a tender system for the allocation of grid capacity which the Claimants contend had constituted "*an important basis*" for their investment decision.[95]

132.    In August 2014, the BNA adopted new rules for the allocation of grid capacity, based on a tender system,[96] which eliminated OWF project developers' right to obtain grid connection when needed. According to the Claimants, faced with grid capacity constraints, they had to sell OWP Albatross and the Albatross Test Field, to avoid the risk of not receiving a grid connection or having to incur additional costs in connection with the tender.[97]

133.    In February 2015, Germany announced further forthcoming changes to the regulatory framework governing offshore wind, which envisaged making the Plan Approval Process, grid connection and the remuneration mechanism dependent on a centralized tender process. In this connection, according to the Claimants, the BSH "*effectively stopped processing the ongoing Plan Approval Processes with reference to the delayed grid connection dates under the O-NEP system*."[98] In a letter to the Claimants, the BSH stated that it would no longer process the applications of the NOH 2 projects and GlobalTech II, as these projects could not expect to receive a grid connection within the next ten years,

---

[93] Cl. Mem., paras. 214, 222, 294.

[94] Cl. Mem., paras. 301-302; Letter from BSH to GAIA I, 2 June 2014, **C-0263**.

[95] Cl. Mem., paras. 216, 266, 307-313; 2014 Renewable Energy Sources Act, 1 August 2014 ("**2014 Renewable Energy Sources Act**"), **C-0207 / RL-0160**, Sec. 3(2).

[96] Cl. Mem., paras. 308-309.

[97] Cl. Mem., paras. 216, 314-318.

[98] Cl. Mem., para. 320.

according to the applicable O-NEP.[99] In the circumstances, as an alleged damage mitigation measure, the Claimants sold their remaining NOH 1 projects, OWP West and GlobalTech II (into which GlobalTech III had been merged).[100]

134.    On 15 June 2015, Germany extended the Development Freeze for another three years and confirmed O-NEP 2014, which further delayed the grid connection dates for the NOH 2 projects until 2027-2031.[101]

135.    On 25 November 2016, the BNA confirmed O-NEP 2015, which further postponed the grid connection dates for the Claimants' NOH 2 projects until 2031-2035.[102]

### (2)    The New Regulatory Framework Introduced in 2017

136.    On 1 January 2017, the Offshore Wind Energy Act (the "**Offshore Wind Energy Act**")[103] and an amended Renewable Energy Sources Act (the "**2017 Renewable Energy Sources Act**")[104] entered into force. These laws introduced a new regulatory regime for offshore wind energy based on a compulsory tendering system, which replaced the earlier feed-in tariffs, and rules on eligibility to participate in the transitional tenders, which replaced the earlier Plan Approval Process.[105]

137.    In order to be eligible to participate, an offshore wind project had to be located in clusters 1 to 8 of the North Sea (as defined by the BFO and the applicable O-NEP), and it either had to have received approval or a permit for the relevant area, or have had its public hearing prior to 1 August 2016.[106] Projects that were eligible to participate in the transitional

---

[99] Cl. Mem., para. 327; Letter from BSH to GAIA I, 6 March 2015, **C-0273**; Strabag, Board Information on UB4W Energie, 15 April 2015, **C-0274**.

[100] Cl. Mem., paras. 321, 364-367.

[101] Cl. Mem., paras. 331-344; BSH, Prolongation of the Development Freeze, 15 June 2015, **C-0275**.

[102] Cl. Mem., para. 368; O-NEP 2015 (2025), **C-0041**. *See also* Order of Projects, Comparison between O-NEPs 2013 (2023), 2014 (2024), 2015 (2025), **C-0042**; Second Draft of O-NEP 2015 (2025), **C-0038 / R-0074**.

[103] Offshore Wind Energy Act (*Gesetz zur Entwicklung und Förderung der Windenergie auf See*), 1 January 2017 ("**2017 Offshore Wind Energy Act**"), **C-0045 / RL-0148**. The Offshore Wind Energy Act is referred by the Parties also with the German acronym "***WindSeeG***" (*Windenergie-auf-See-Gesetz*).

[104] Renewable Energy Sources Act (*Gesetz für den Ausbau erneuerbarer Energien*), 1 January 2017 ("**2017 Renewable Energy Sources Act**"), **C-0044**, Sec. 2(3), Sentence 1, Sec. 28(4).

[105] Cl. Mem., paras. 350 *et seq*; Resp. C-Mem., paras. 1214 *et seq*.

[106] 2017 Offshore Wind Energy Act, **C-0045 / RL-0148**, Sec. 26(2).

tenders, but were eventually unsuccessful, were assigned a step-in right for any future awarded right to develop a project in the area in which they had held rights prior to the 2017 Renewable Energy Sources Act. Pursuant to the step-in right, the developers of these projects were entitled to take over the positions of the respective winners of the yearly auctions.[107]

138.    Offshore wind projects that were not eligible to participate in the tender process lost their legal position in the Plan Approval Process.[108] These included all of the Claimants' NOH 2 projects.

**D.    THE 2020 DECISIONS OF THE GERMAN CONSTITUTIONAL COURT**

139.    In July 2017, a number of offshore wind project developers, including each of the Claimants' NOH 2 Project Companies, challenged the constitutionality of the 2017 Offshore Wind Energy Act before the German Constitutional Court (the "**Constitutional Court**" or the "**Court**").[109]

140.    In a decision issued on 30 June 2020, the Court held that the termination of the Plan Approval Processes and the deprivation of the positions held by the offshore wind projects in the Plan Approval Processes without any form of compensation for investment costs incurred by the developers was unconstitutional.[110] By contrast, the Court found that the relevant provisions of the Offshore Wind Energy Act were not in principle incompatible with Article 14 of the Constitution, which deals with protection of property rights, as neither the approval of an offshore wind project nor its position in the approval process constituted a property right under the Constitution.[111]

141.    The Court held that the termination of the Plan Approval Processes and the deprivation of the positions held by the offshore wind projects in the Plan Approval Processes violated the German constitutional law principle of protection of legitimate expectations. According

---

[107] 2017 Offshore Wind Energy Act, **C-0045/ RL-0148**, Sec. 39.

[108] 2017 Offshore Wind Energy Act, **C-0045/ RL-0148**, Sec. 46.

[109] Cl. Mem., para. 386.

[110] Cl. Mem., para. 387; Resp. C-Mem., paras. 123-125.

[111] Resp. C-Mem., para. 125; German Constitutional Court, Case No. BvR 1679/17, Decision, 30 June 2020 ("**June 2020 Constitutional Court Decision**"), **C-0305 / RL-0145**, para. 74.

to the Court, legitimate expectations are created if the state encourages and induces investment, and once such expectations have been created, the fundamental features of the legislative basis of the developer's investment cannot be substantially changed to the developer's detriment without any compensation. Applying this standard, the Court held that the regulatory regime that was in place prior to the introduction of the Offshore Wind Energy Act, including the priority principle, had created on the part of the applicants the legitimate expectation that they would be in a position to develop, build and operate their offshore wind projects, if they continued to progress the various steps in the Plan Approval Process, or its predecessor, the approval process under the 2002 Offshore Installations Ordinance.[112]

142.    On this basis, the Court held that the termination of the Plan Approval Process by way of a tender system without compensation violated the legitimate expectations that the prior regulatory regime had created. This was in particular the case because the applicants' position in the Plan Approval Process had been deprived of any value. The Court ordered the German government to provide compensation for the wasted investment costs that the applicants had incurred in relying on the applicable regulatory framework. The Court, however, only ordered the German government to provide compensation for necessary planning and site investigation expenses, to the extent that such expenses related to data and documentation that could be used for the preparatory investigation of sites to be carried out under the new tender system.[113]

143.    In November 2020, Germany introduced a new Section 10a to the Offshore Wind Energy Act, adopting the following requirements for eligibility for compensation based on the guidelines provided by the Court:

i.     the offshore wind projects must be located in clusters 9 to 13, *i.e.* zone 3;

ii.    the investigations conducted must have been necessary for obtaining an approval under the 2012 Offshore Installations Ordinance; and

---

[112] Cl. Mem., paras. 388-389; June 2020 Constitutional Court Decision, **C-0305 / RL-0145**, paras. 140, 163.

[113] Cl. Mem., para. 390; June 2020 Constitutional Court Decision, **C-0305 / RL-0145**, paras. 159, 173.

iii.   the results and documents of these investigations are capable of being used in the preparatory investigation to be carried out under the new legislation.[114]

144.   The Claimants contend that the legislation provides the BSH with discretion in determining which costs are to be considered "*necessary,*" and that the BSH will only have to determine whether the investigations conducted are still capable of being used in the new system when it starts pre-developing the relevant sites for purposes of a tender, which is likely to be far in the future. According to the Claimants, the delay will ensure that "*almost all conducted studies during the Approval Process will have become obsolete and thus ineligible for compensation.*"[115]

145.   The Respondent submits that the German legislator has established a rule for compensation that is "*comparable to Sec. 41 Offshore Wind Energy Act, the provision applicable to existing projects which were not rewarded in the transitional auctions.*"[116] According to the Respondent, the Court's decision "*has been implemented on time, meaning before 30 June 2021, which was also the date by which the application for compensation must have been filed to the BSH, alongside with the submission of the documents.*"[117]

### E.   REGULATORY DEVELOPMENTS AFTER 2017

146.   In June 2019, Germany amended the Offshore Wind Energy Act, introducing the area development plan (*Flächenentwicklungsplan* or the "**FEP**"), which incorporates the BFO and parts of the O-NEPs.[118] The amended Act eliminated the role of TSOs in the regulatory process and assigned the development of the FEP, including the timing of tenders and grid connections, to the BSH.[119]

---

[114] Cl. Mem., para. 391; Amendment to the Offshore Wind Energy Act, 27 November 2020 ("**2020 Offshore Wind Energy Act**"), **C-0306 / RL-0148**; Resp. C-Mem., paras. 6, 144-146.

[115] Cl. Mem., paras. 393-394.

[116] Resp. C-Mem., para. 149.

[117] Resp. C-Mem., para. 150 [footnotes omitted].

[118] Cl. Mem., para. 381; Resp. C-Mem., paras. 617-618; 2017 Offshore Wind Energy Act, **C-0045/ RL-0148**, Sec. 6(7).

[119] Cl. Mem., para. 381; BSH, Area Development Plan 2019 for the German North Sea and Baltic Sea (*Flächenentwicklungsplan*), 28 June 2019 ("**2019 FEP**"), **C-0301 / R-0183**, p. 17.

147.    In the 2019 FEP, the BSH declared zone 3, which included all of the NOH 2 projects, to be an "*area for the construction and operation of wind energy plants offshore*,"[120] as this was "*necessary in order to reach [the] expansion targets*."[121] In the 2020 FEP, the BSH announced that certain project areas in zone 3 were open for auction before 2024 and could become operational before 2030. The 2020 FEP includes all former NOH 1 and NOH 2 sites with the exception of OWP SeaStorm I and II, which were eliminated as a result of the Development Freeze.[122] The draft FEP of December 2021, in turn, foresees the development of all project sites in zone 3.[123]

148.    In November 2021, Germany increased its expansion targets to 30 GW by 2030, and 40 GW and 70 GW by 2035 and 2045, respectively.[124]

## IV.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

### A.    THE CLAIMANTS

149.    In their Second Post-Hearing Brief, the Claimants make the following prayer for relief:

> *For the foregoing reasons, the Claimants respectfully request that the Tribunal:*
>
> (a)    *DECLARE that Germany has:*
>
> (i)    *breached Article 10(1) ECT by failing to accord fair and equitable treatment to the Claimants and their investments;*
>
> (ii)    *breached Article 10(1) ECT by impairing through unreasonable and discriminatory measures the management, maintenance, use, enjoyment or disposal of the Claimants' investments;*

---

[120] The FEP is a new instrument for area development, issued by the BSH, incorporating the BFO and O-NEPs to determine the timeline for tenders and grid connection dates: *see* 2017 Offshore Wind Energy Act, **C-0045 / RL-0148**, Secs. 4(1), 5(1) No. 3, 6(7).

[121] Cl. Reply, para. 572; Resp. Rej., para. 748; 2019 FEP, **C-0301 / R-0183**, p. 146.

[122] Cl. Reply, para. 150.

[123] Cl. Reply, para. 612; BSH, Draft FEP, 17 December 2021, **C-0397**, p. 6.

[124] Cl. Reply, para. 611.

(iii)    breached Article 10(1) ECT by failing to afford the Claimants and their investments the most constant protection and security;

(iv)    breached Article 13(1) ECT by expropriating NOH 2 and STRABAG's investments without compensation;

(b)    ORDER Germany:

(i)    to compensate

(1)    NOH 1 for damages caused to its investment in the NOH 1 Project Companies and the NOH 1 Projects as a result of Germany's ECT violations, in the sum of €64,400,000.00 or any other amount the Tribunal determines to be appropriate; or

(2)    in the alternative, STRABAG in the sum of €32,844,000.00 or any other amount the Tribunal determines to be appropriate for said ECT violations, commensurate with STRABAG's 51 percent interest in NOH 1;

(ii)    to compensate

(1)    NOH 2 for damages caused to its investment in the NOH 2 Project Companies and the NOH 2 Projects as a result of Germany's ECT violations, in the sum of €234,700,000.00 or any other amount the Tribunal determines to be appropriate; or

(2)    in the alternative, STRABAG in the sum of €119,697,000.00 or any other amount the Tribunal determines to be appropriate for said ECT violations, commensurate with STRABAG's 51 percent interest in NOH 2;

(iii)    to compensate STRABAG for damages caused to its investment in the Gravity Foundation Technology as a result of Germany's ECT violations, in the sum of €206,200,000.00 or any other amount the Tribunal determines to be appropriate;

(iv)    to pay pre-and post-award interest on all amounts awarded at a commercially reasonable rate established on a market basis;

42

> (v)     to pay all of the costs and expenses of this
>          arbitration, including the Claimants' legal and
>          expert fees, the fees and expenses of any experts
>          appointed by the Tribunal, the fees and expenses of
>          the Tribunal, and ICSID's other costs; and
>
> (c)     AWARD any other relief to the Claimants as the Tribunal
>          considers appropriate.[125]

150.    As to the Respondent's objections to jurisdiction, in their Rejoinder on Jurisdiction the
         Claimants request that the Tribunal:

> (a)     DISMISS the jurisdictional objections raised by Germany;
>
> (b)     DISMISS the admissibility objection raised by Germany;
>
> (c)     DECLARE that it has jurisdiction over all the claims raised
>          in this dispute; and
>
> (d)     ORDER Germany to pay all of the costs and expenses of this
>          arbitration, including the Claimants' legal and expert fees,
>          the fees and expenses of any experts appointed by the
>          Tribunal, the fees and expenses of the Tribunal, and ICSID's
>          other costs.[126]

## B.    THE RESPONDENT

151.    In its First Post-Hearing Brief, the Respondent requests that the Tribunal:

> 1.      Dismiss all Claimants' claims for lack of jurisdiction, in
>          eventu, dismiss all, or any remaining, Claimants' claims due
>          to the lack of jurisdiction or for the lack of merit.
>
> 2.      Order Claimants to reimburse Respondent all its costs of the
>          proceedings, with interest.[127]

## V.    JURISDICTION

152.    The Respondent contends that the Tribunal lacks jurisdiction *ratione voluntatis*, *ratione
         materiae* and *ratione personae*. According to the Respondent, there is no valid arbitration
         agreement between the Parties under Article 25(1) of the ICSID Convention or Article 26

---

[125] Cl. Second PHB, para. 234; Cl. Reply, para. 1008.

[126] Cl. Rej., para. 246.

[127] Resp. Rej., para. 1806.

of the ECT (Section V.A); the Claimants did not make a qualifying investment under either Article 1(6) of the ECT or Article 25(1) of the ICSID Convention (Section V.B); and the Claimants do not qualify as protected investors because they are not nationals of another Contracting State as required by Article 26(3) and (4) of the ECT and Article 25(1) of the ICSID Convention (Section V.C).

153.    The Respondent also objects to the admissibility of the First Claimant's claim regarding its participation in the Second and Third Claimants, and contends that the First Claimant's participation does not qualify as an investment under the ICSID Convention; this objection is also addressed in Section V.B below.

154.    The Tribunal summarizes below the Parties' positions on jurisdiction, as set out in their submissions and at the Hearing. The summary is not exhaustive, however, when making its determinations, the Tribunal has considered the Parties' submissions in detail and with care, even if not specifically mentioned below. This caveat also applies to sections VI, VII and VIII below.

## A.    JURISDICTIONAL OBJECTION *RATIONE VOLUNTATIS*

### (1)    The Parties' Positions

#### a.    *The Respondent's Position*

155.    The Respondent submits that the Tribunal lacks jurisdiction *ratione voluntatis* under both Article 25(1) of the ICSID Convention and Article 26(4) of the ECT. According to the Respondent, there is no valid arbitration agreement between the Parties because the Respondent has not given a valid consent to arbitrate under the ECT.[128]

156.    In support of its contention, the Respondent raises two main arguments: (i) there is no valid arbitration agreement between the Parties because the present case involves an intra-EU dispute, and the Respondent has not given its consent to arbitrate intra-EU disputes under the ECT such that there is no jurisdiction under Article 26 of the ECT or Article 25(1) of the ICSID Convention; and (ii) recent developments in the EU, including decisions taken

---

[128] Resp. Mem., paras. 4, 12.

by the Court of Justice of the European Union ("**CJEU**"), establish that the Tribunal does not have jurisdiction under the ECT.[129]

### (i)    There is no jurisdiction under the ECT properly interpreted

157.    By way of a preliminary argument, the Respondent submits that it has not given a valid consent to arbitrate because Article 26(1) and (3) of the ECT only provide for consent to arbitrate disputes with an investor of "*another ECT Contracting Party*." Both Austria, the Claimants' state of incorporation, and Germany are Member States of the EU. Moreover, the EU itself is an ECT Contracting Party. On this basis, the Respondent argues that since both Austria and Germany are "*part of the greater unit of the EU*," the Claimants are not investors of "*another ECT Contracting Party*," as required under Article 26(1) and (3) of the ECT.[130]

158.    It follows, according to the Respondent, that since Germany has not given a valid offer to arbitrate under the ECT, the Tribunal lacks jurisdiction *ratione voluntatis*.[131] The Respondent only consented to arbitration when it was in line with EU law and therefore could not have given a standing offer to arbitrate intra-EU disputes.[132] The Respondent notes that the European Commission shares this opinion: "*Article 26 of the Energy Charter Treaty does not contain an offer for arbitration by the Federal Republic of Germany to investors from other EU Member States. It is directed only to investors from third countries.*"[133]

159.    The Respondent submits that the ECT must be interpreted in accordance with Articles 31 and 32 of the Vienna Convention on the Law of Treaties ("**VCLT**") and in light of the principle of effectiveness.[134] When the ECT was negotiated, the EU and its Member States acted as a single entity.[135] This is reflected in the ECT as the EU is itself a "*Contracting*

---

[129] Resp. Mem., paras. 19-23.

[130] Resp. Mem., para. 21.

[131] Resp. Mem., para. 80.

[132] Resp. Mem., para. 84.

[133] Resp. Mem., para. 84; Commission Application, **RL-0018**, para. 25.

[134] Resp. Mem., paras. 81, 86; Cl. Mem., para. 406.

[135] Resp. Mem., para. 86.

*Party*" to the ECT and its Member States are treated as a single territory in the ECT – the territory of the EU.[136] The Respondent argues that this means that an investment made by an investor from an EU Member State in another EU Member State is not an investment in the "*Area*" of another Contracting Party, but in the "*Area*" of the same Contracting Party. As the EU is a single investment area for its Member States, the offer of arbitration made by the EU is only made to investors from Contracting Parties that are not EU Member States.[137] As a result, the plain wording of the ECT excludes intra-EU arbitration under Article 26 of the ECT.[138]

160.    The Respondent further argues that the interpretation of Article 26(3) of the ECT in light of its object and purpose, and in the context of Article 26 as a whole, confirms that the EU and its Member States are bound by their obligations under the ECT *vis-à-vis* other Contracting Parties but not as between themselves.[139] The ECT was never meant to influence the EU's internal – intra-EU – energy market, and this has always been the understanding of the European Commission. This interpretation is supported by the language of Article 26(3) of the ECT, when interpreted in the context of Article 26(6), which makes clear that "*issues in dispute*" must be resolved "*in accordance with this Treaty and applicable rules and principles of international law*." Such rules and principles include EU law, which is part of international law, and therefore include EU treaties.[140]

161.    The Respondent contends that EU law also prevails in accordance with the supplementary means of interpretation in Article 31 of the VCLT.[141] The Respondent relies on *Electrabel v. Hungary*, which in the Respondent's view confirms that EU law prevails over any conflicting provisions of the ECT under Article 351 of the Treaty on the Functioning of the European Union ("**TFEU**") whenever a harmonious interpretation with the ECT is not

---

[136] Resp. Mem., para. 86; Resp. Reply on 41(5), para. 44.
[137] Resp. Mem. , para. 95; Resp. Reply on 41(5), para. 43.
[138] Resp. Mem., para. 100.
[139] Resp. Mem., paras. 101-107; Commission Application, **RL-0018**, para. 28.
[140] Resp. Mem., paras. 101-108; Resp. Reply on 41(5), para. 51.
[141] Resp. Mem., paras. 109-115; Resp. Rule 41(5) Application, para. 131.

possible.[142] The Respondent adds that, even though the ECT is a multilateral agreement, it consists of a series of bilateral relationships and accordingly, in the bilateral relationship between two EU Member States, EU law must prevail.[143]

### (ii)  There is no jurisdiction in view of recent EU legal developments

162.  The Respondent argues that recent developments in investment arbitration in the EU, in particular EU measures reaffirming the inadmissibility of intra-EU arbitration, combined with recent decisions of the CJEU and other courts and tribunals, establish that the Tribunal lacks jurisdiction *ratione voluntatis*.[144]

163.  According to the Respondent, this is the case even assuming that Article 26 of the ECT initially contained a consent to arbitrate intra-EU investment disputes, since such position has become incompatible with EU law in light of recent developments. In particular, the adoption by the EU Member States of the Lisbon Treaty and the CJEU's judgment of 6 March 2018 in *Slovak Republic v. Achmea* (the "***Achmea* Judgment**") establish that international agreements between two EU Member States must be interpreted in compliance with EU law.[145]

164.  The adoption of the Lisbon Treaty in 2009, in particular, reinforced the role of the CJEU and the legal understanding of the EU as a "*legal union*" within the meaning of Article 19 of the Treaty on European Union ("**TEU**") and provided the EU with exclusive competence regarding foreign direct investment.[146] Declaration 17, annexed to the Lisbon Treaty,

---

[142] Resp. Mem., paras. 109-111, citing *Electrabel v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ("*Electrabel v. Hungary*"), **CL-0042 / RL-0262**, para. 4.130.

[143] Resp. Mem., paras. 112-115.

[144] Resp. Mem., paras. 116 *et seq.*

[145] Resp. Mem., para. 6; *Slovak Republic v. Achmea B.V.*, CJEU Case No. C-284/16, Judgment, 6 March 2018 ("***Achmea* Judgment**"), **RL-0006**.

[146] Resp. Mem., paras. 27-30, 121-122.

establishes in the Respondent's view that "[t]*he* [EU] *Treaties and the law adopted by the Union on the basis of the* [EU] *Treaties have primacy over the law of Member States*."[147]

165.    In the *Achmea* Judgment, the CJEU established that arbitration clauses in bilateral investment treaties ("**BITs**") concluded between EU Member States are incompatible with EU law.[148] As a result of this decision, 22 EU Member States issued a written Declaration of the Representatives of the Governments of the Member States in January 2019 (the "**January 2019 Declaration**"), explicitly confirming that the *Achmea* Judgment applies to intra-EU investor-State cases brought under the ECT.[149] Both the Respondent and Austria, where the Claimants are incorporated, signed this declaration.[150] In May 2020, 23 EU Member States agreed to terminate all BITs concluded between them due to the "*common understanding that intra-EU arbitration was inadmissible*" (the "**2020 Termination Agreement**").[151]

166.    The Respondent further relies on the judgment in *Moldova v. Komstroy* (the "**Komstroy Judgment**") of 2 September 2021, in which the CJEU confirmed that the principles set forth in the *Achmea* Judgment apply to intra-EU investor-State arbitration conducted under Article of the 26 of the ECT.[152] The CJEU confirmed in a further judgment issued on 26 October 2021 in *Poland v. PL Holdings* (the "**PL Holdings Judgment**") that intra-EU investor-State arbitration is also inadmissible in *ad hoc* investment arbitration.[153] The CJEU found in particular that a Member State court has an obligation to grant an application for the setting aside of an arbitral award that is incompatible with EU Treaties. Furthermore, on 25 January 2022, the CJEU held in *European Commission v. European*

---

[147] Resp. Mem., para. 30; Declarations Annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, 13 December 2007, Doc. No. 2008/C 115/01, **RL-0019**, Declaration 17.

[148] Resp. Mem., paras. 32-33; *Achmea* Judgment, **RL-0006**.

[149] Resp. Mem., para. 34; Declaration of the Representatives of the Governments of the Member States, 15 January 2019, **RL-0008**.

[150] Resp. Mem., para. 35; Commission Application, **RL-0018**, para. 19.

[151] Resp. Mem., para. 46; Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union, 29 May 2020, **RL-0025**; Resp. Rule 41(5) Application, para. 88.

[152] Resp. Rej., paras. 54, 57-72; *Republic of Moldova v. Komstroy LLC*, CJEU Case No. C-741/19, Judgment, 2 September 2021 ("**Komstroy Judgment**"), **C-0398 / RL-0378**.

[153] Resp. Rej., paras. 55, 73-83; *Republic of Poland v. PL Holdings S.à.r.l.*, CJEU Case No. C-109/20, Judgment, 26 October 2021 ("**PL Holdings Judgment**"), **C-0399 / RL-0379**.

*Food* (the "***European Food* Judgment**") that the principles underpinning the *Achmea* Judgment are relevant in ICSID arbitration and that compliance with an arbitral award granting damages to an investor may constitute state aid in violation of Article 108 TFEU.[154]

167. In addition to CJEU case law, the Respondent relies on the arbitral award in *Green Power v. Spain* to argue that the application of EU law is "*inescapable*" in the present case.[155] According to the Respondent, the tribunal in *Green Power* found, relying on *Electrabel*, that EU law is part of the international legal order and relevant to its analysis of Article 26 of the ECT,[156] and that Article 26 of the ECT must be interpreted in accordance with EU law since EU Treaties are *lex superior* between EU Members States.[157] On this basis, the *Green Power* tribunal ruled that Spain's offer to arbitrate under the ECT is not applicable in intra-EU relations and there was no valid offer to arbitrate that the claimants could have accepted.[158]

168. The Respondent also refers to decisions of national courts that have stayed the enforcement of intra-EU awards, to support their position that Article 26 of the ECT does not constitute a valid offer to arbitrate intra-EU disputes.[159]

---

[154] Resp. Rej., paras. 56, 84-97; *European Commission v. European Food and others*, CJEU Case No. C-638/19 P, Judgment, 25 January 2022 ("***European Food Judgment***"), **RL-0380**.

[155] Resp. Rej., paras. 39-42, 121-138, *Green Power Partners K/S and SCE Solar Don Benito APS v. Kingdom of Spain*, SCC Arbitration V2016/135, Award, 16 June 2022 ("***Green Power v. Spain***"), **RL-0370**.

[156] Resp. Rej., para. 40 citing *Green Power v. Spain*, **RL-0370**, para. 170; *Electrabel v. Hungary*, **CL-0042 / RL-0262**.

[157] Resp. Rej., paras. 137-138, citing *Green Power v. Spain*, **RL-0370**, para. 469.

[158] *Green Power v. Spain*, **RL-0370**, para. 445.

[159] Resp. Mem., paras. 40-45; Resp. First PHB, paras. 7-10; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 ("***Novenergia II v. Spain***"), **CL-0035**, paras. 438-442; *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 ("***Cube v. Spain***"), **CL-0027 / RL-0283**, para. 413; *Ioan Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, **CL-0123 / RL-0084**, para. 669; *DA v. Romanian Air Traffic Services Administration (Romania) and others and FC and others v. Romanian Air Traffic Services Administration (Romatsa) and others*, CJEU Case No. C-333/19, Judgment, 21 September 2021, **RL-0513**; *Kingdom of the Netherlands v. Uniper SE, Uniper Benelux Holding B.V. and Uniper Benelux N.V.*, Higher Regional Court of Cologne, Case No. 19 SchH 14/21, Decision, 1 September 2022 ("***Netherlands v. Uniper***"), **RL-0507**; *Kingdom of the Netherlands v. RWE AG and RWE Eemshaven Holding II BV*, Higher Regional Court of Cologne, Case No. 19 SchH 15/21, Decision, 1 September 2022 ("***Netherlands v. RWE***"), **RL-0508**; *PL Holdings* Judgment, **C-0399 / RL-0379**; *Republic of Poland v. PL Holdings S.à.r.l.*, Supreme Court of Sweden, Case No. T-1569-19, Decision, 14 December 2022

169.    The Respondent submits that its position that Article 26 of the ECT has been superseded by the relevant provisions of the TEU and TFEU is also supported by the conflict rules in Articles 30(2), 30(4)(a) and 41(1)(b) of the VCLT. By adopting the Lisbon Treaty, Austria and Germany reaffirmed the autonomy of the EU legal order in Articles 4(3) and 19 of the TEU and Articles 267 and 344 of the TFEU subsequent to the ratification of the ECT and prior to the commencement of this arbitration.[160] Article 344 of the TFEU and Article 19(1) of the TEU therefore establish an obligation of EU Member States to submit disputes exclusively to the judicial system of the EU whenever EU law is to be interpreted or applied.[161]

170.    The Respondent submits that Article 41(1) of the VCLT, which allows the modification of a multilateral treaty by certain parties only, also bars the application of Article 26(4) of the ECT. According to the Respondent, the January 2019 Declaration constitutes such an agreement, modifying the ECT between EU Member States, while not affecting the rights and obligations of other Contracting States.[162]

### (iii)    Analogy to other international agreements shows that the ECT is inapplicable in an intra-EU context

171.    The Respondent submits that the incompatibility of Article 26(4) of the ECT with Article 344 of the TFEU is supported by the CJEU's reasoning in its Opinion 2/13 concerning the European Convention of Human Rights ("**ECHR**").[163]

172.    When addressing the question of whether the EU itself could accede to the ECHR, the CJEU considered that this was not possible under the principle of mutual trust applicable under the EU law.[164] The CJEU also noted that the dispute resolution mechanism in Article 33 of the ECHR would allow the application of EU law in intra-EU disputes, and

---

("*Poland v. PL Holdings*"), **RL-0514**; *Kingdom of Spain v. Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR*, Svea Court of Appeal, Case No. T-4658-18, Decision, 13 December 2022 ("*Spain v. Novenergia II*"), **RL-0515**.

[160] Resp. Mem., para. 125.

[161] Resp. Mem., para. 126.

[162] Resp. Mem., paras. 134-135.

[163] Resp. Mem., para. 145.

[164] Resp. Mem., para. 146; CJEU, Opinion 2/13, 18 December 2014, **RL-0045**, para. 194.

in disputes between EU Member States, which would undermine Article 344 of the TFEU.[165] The Respondent submits that this reasoning is also applicable in this case, precluding the Tribunal's jurisdiction.[166]

### (iv)    There is no jurisdiction based on an arbitration agreement pursuant to private law

173.    The Respondent further argues that, separately from its position under Article 26 of the ECT, the Respondent has "*not consented to arbitrate on the basis of private law.*"[167]

174.    As an EU Member State, the Respondent cannot consent to arbitrate intra-EU disputes as its jurisdictional objections cannot be waived under EU law, and it does not agree to waive them in the present case.[168] Accordingly, in the absence of "*common will*" of the Parties, the Tribunal cannot found its jurisdiction on Article 26 of the ECT or any other basis.[169]

### b.    The Claimants' Position

175.    The Claimants submit that the Tribunal has jurisdiction *ratione voluntatis* because (i) Article 26 of the ECT contains the Contracting Parties' (including Germany's) valid standing offer to arbitrate disputes arising under the ECT with investors of other Contracting Parties (including Austria); and (ii) recent developments under EU law do not affect the meaning and scope of Article 26 of the ECT.

### (i)    The Parties have given their consent to ICSID jurisdiction under Article 26 of the ECT

176.    The Claimants submit that in Article 26 of the ECT, Germany gave its consent to arbitrate disputes concerning an "*investment*" made in its territory by "*Investors*" of another Contracting Party.[170] Since both Austria and Germany are Contracting Parties to the ICSID

---

[165] Resp. Mem., para. 147.
[166] Resp. Mem., paras. 149-151.
[167] Resp. Mem., para. 152.
[168] Resp. Mem., paras. 152-153.
[169] Resp. Mem., para. 154.
[170] Cl. Mem., paras. 400-402.

Convention, the Tribunal has jurisdiction under both the ECT and the ICSID Convention.[171]

177.    The Claimants provided their consent to arbitrate this dispute in the Notice of Dispute notified to the Respondent on 16 June 2017[172] and in the Claimants' RfA dated 5 September 2019 and registered by the Secretary-General of ICSID on 20 September 2019.[173]

178.    The Claimants argue that Article 26 of the ECT contains the Respondent's "*unconditional*" consent to arbitrate investment disputes with investors that are nationals of any other Contracting Party to the ECT, including Austria or any other EU Member State.[174] According to the Claimants, this position has been endorsed by no less than 39 other ECT tribunals that have addressed the issue.[175] A total of 47 arbitral tribunals have "*unanimously rejected*" the arguments raised by the Respondent in this case, and the Respondent has failed to raise any other arguments than those "*which have already been unanimously dismissed by every single ECT tribunal that confronted them*."[176] As a result, any objection to the Tribunal's jurisdiction based on Austria's or Germany's membership of the EU or on EU law lack any merit.[177]

179.    The Claimants submit that the jurisdiction of the Tribunal is exclusively governed by the ECT, not the EU legal framework, and that the relevant ECT provisions must be interpreted according to the rules of treaty interpretation in Articles 31 and 32 of the VCLT.[178] The correct interpretation of Article 26 of the ECT leads to the conclusion that the provision

---

[171] Cl. Mem., paras. 397-398.

[172] Cl. Mem., paras. 396, 403; Letter from the Claimants to Germany, 16 June 2017 ("**Notice of Dispute**"), **C-0049**, p. 6.

[173] Cl. Mem., paras. 396, 403; RfA, para. 83.

[174] Cl. Mem., para. 404; Energy Charter Treaty, 17 December 1994 (entered into force 16 April 1998) ("**ECT**"), **CL-0001**, Art. 26(3)(a); Cl. Reply, para. 618.

[175] Cl. Mem., para. 404; *see also* Cl. Mem., fn. 893.

[176] Cl. Reply, paras. 620-621.

[177] Cl. Mem., para. 405.

[178] Cl. Mem., para. 406; *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 ("***Vattenfall v. Germany*, Decision on *Achmea*"), **CL-0032**, paras. 131-132.

does not carve out intra-EU arbitrations from its scope of application.[179] The Claimants maintain that there is no incompatibility between EU law and the ECT and that, even if there were, the interpretation of conflicting treaty obligations is regulated by Article 30 of the VCLT.[180]

180.   According to the Claimants, in order for Article 30 of the VCLT to be applicable, two requirements must be met: (i) the treaties must relate to the same subject matter; and (ii) the treaties must be in conflict with one another.[181] The Claimants argue that in this dispute, neither requirement is met.[182] The Claimants further argue that even if there were a conflict, Article 16 of the ECT directs the interpreter of the treaties to apply the treaty provisions that grant more extensive treaty protections to investors and their investments.[183] However, there is no need for such analysis here as the plain wording of the ECT contains all of the relevant terms and "*there is no need to interpret that which has no need of interpretation.*"[184]

### (ii)    Recent developments do not affect the meaning and scope of Article 26 of the ECT

181.   The Claimants reject the Respondent's claim that recent developments, such as the Lisbon Treaty, the CJEU's judgments in *Achmea*, *Komstroy* and *PL Holdings*, the January 2019 Declaration and the CJEU's Advocate Generals' opinions, affect the meaning and scope of Article 26 of the ECT. According to the Claimants, ICSID arbitrations belong to a self-contained regime within international law and therefore are not affected by CJEU decisions

---

[179] Cl. Reply, para. 628.

[180] Cl. Mem., para. 407; Cl. Observations on Rule 41(5), paras. 32-38; Vienna Convention on the Law of Treaties dated 23 May 1969 and entered into force 27 January 1980 ("**VCLT**"), **CL-0050**, Art. 30.

[181] Cl. Mem., para. 407; M. E. Villiger, "Article 30," in *Commentary on the 1969 Vienna Convention on the Law of Treaties* (2009), **CL-0048**, pp. 401-402, para. 5; *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection, 7 May 2019, **CL-0025**, para. 135.

[182] Cl. Mem., para. 407; Cl. Observations on Rule 41(5), paras. 39-43.

[183] Cl. Mem., para. 407; ECT, **CL-0001**, Art. 16.

[184] Cl. Reply, para. 630.

and developments under EU law.[185] In this context, CJEU case law is only relevant within the EU legal order.[186]

182. According to the Claimants, the Respondent's own conduct before the CJEU in relation to the *Achmea* Judgment demonstrates that Article 26 of the ECT provides a valid basis for this Tribunal's jurisdiction. The Respondent alleges that "*Germany's case* [as a preliminary matter is] *that the ECT was from the very beginning inapplicable in intra-EU relations*."[187] However, the Claimants note that in another ECT proceeding brought against Germany in 2012, Germany never raised the intra-EU objection.[188] The failure to raise this objection is "*a major obstacle to Germany's proposition that Article 26* [of the] *ECT reflects all ECT Contracting Parties' understanding*" when the ECT was ratified and that "*EU Member States did not intend to create inter se obligations between the EU Member States themselves.*"[189]

183. The Claimants deny that the Lisbon Treaty amended or suspended the application of the ECT between EU Member States.[190] First, the Claimants argue that the principle of primacy of EU law, codified in Declaration 17 annexed to the Lisbon Treaty, operates as a conflict rule within the EU law legal order but cannot have any bearing on the ECT.[191] Second, according to the Claimants, the ECT should not be considered as having the same subject matter as, or as being incompatible with, the EU Treaties. The Respondent's reliance on Article 30(2) and (4) is therefore "*misplaced.*"[192]

184. The Claimants further contend that Article 40(1) of the VCLT is inapplicable. The Claimants point out that the Lisbon Treaty does not refer to the ECT. Furthermore, neither the EU nor the EU Members States ever notified the other Contracting Parties to the ECT

---

[185] Cl. Reply, para. 664.
[186] Cl. Reply, paras. 666-675.
[187] Cl. Reply, para. 623.
[188] Cl. Reply, para. 623; *Vattenfall v. Germany*, Decision on *Achmea*, **CL-0032**, para. 18.
[189] Cl. Reply, para. 624; Resp. Rule 41(5) Application, para. 4; Resp. Mem., para. 11.
[190] Cl. Reply, paras. 651-653.
[191] Cl. Reply, para. 654.
[192] Cl. Reply, para. 656.

of their intention to modify the ECT among the EU Member States.[193] As to the January 2019 Declaration, the Claimants claim that it is "*merely political in nature*" and has no effect on the ECT.[194]

185.   Additionally, the Claimants highlight the lack of consensus within the EU legal framework regarding whether EU investors' resorting to arbitration against an EU Member State is incompatible with EU law.[195] First, the Claimants note that the *Achmea* Judgment does not extend to multilateral treaties to which the EU is also party, including the ECT.[196] Second, the Claimants note that EU Member States have not been uniform in their political declarations regarding the effects of the *Achmea* Judgment on the applicability of Article 26 of the ECT in intra-EU disputes.[197] Third, the Claimants argue that the *Komstroy* and *PL Holdings* Judgments have no impact on the Tribunal's jurisdiction as both decisions only operate within the EU legal order, while the Tribunal is constituted under the international legal order.[198]

186.   In response to the Respondent's reliance on *Green Power v. Spain*, the Claimants raise three arguments. First, the *Green Power* award does not support the Respondent's case because the tribunal relied on the premise that EU law applied to issues of jurisdiction because the seat of arbitration was in Stockholm.[199] The Claimants note that this is not the case here as this is an ICSID arbitration. Second, the set aside decisions by the Swedish Supreme Court in *Poland v. PL Holdings* and the Svea Court of Appeal in *Spain v. Novenergia II* do not advance the Respondent's case because the decisions rest upon the application of Swedish law to the underlying arbitrations, again because their seats were in

---

[193] Cl. Reply, para. 657.

[194] Cl. Reply, paras. 676-677.

[195] Cl. Mem., para. 408; Cl. Observations on Rule 41(5), paras. 44-47.

[196] Cl. Mem., para. 408; *Achmea* Judgment, **RL-0006**, para. 58. *See also Masdar Solar & Wind Cooperatief UA v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 ("***Masdar v. Spain***"), **CL-0034**, para. 679.

[197] Cl. Mem., para. 408; Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019, **C-0314**.

[198] Cl. Reply, para. 622; *Komstroy* Judgment, **C-0398 / RL-0378**; Cl. Reply, para. 622; *PL Holdings* Judgement, **C-0399 / RL-0379**.

[199] Cl. Second PHB, paras. 16-17; Cl. Rej., paras. 130-146; Resp. First PHB, para. 6; *Green Power v. Spain*, **RL-0370**.

Stockholm.[200] Similar to the *Green Power* award, the location of the seat of arbitration within the EU was dispositive. As a result, the rulings have no bearing on this ICSID arbitration.[201] Third, the decisions of the Higher Regional Court of Cologne in *Netherlands v. RWE* and *Netherlands v. Uniper* are also irrelevant to the Respondent's intra-EU objection because those decisions were rendered under German and EU law, which do not form part of the law applicable to the Tribunal's jurisdiction.[202]

187. The Claimants further submit that, in any event, by virtue of Article 25(1) of the ICSID Convention, no legal or factual development after the filing of the Claimants' RfA on 5 September 2019 could affect the Tribunal's jurisdiction over this dispute.[203]

**(2)    The Tribunal's Analysis**

188. The Tribunal recalls that the Respondent previously raised an objection to the Tribunal's jurisdiction *ratione voluntatis* in its Rule 41(5) Application. When rejecting the Respondent's Application, the Tribunal determined as follows:

> *Having carefully considered the Parties' positions and the legal authorities on which the Parties rely, the Tribunal is unable to conclude that the Claimants' case on jurisdiction manifestly lacks legal merit. Article 26 of the ECT does not, on its face, exclude from its scope of application disputes between member States of the EU. Nor is there any indication in Article 26 that the provision is subject to exceptions or exclusions in any other provision of the ECT, except for purposes of Annexes IA and ID, which are not at issue in this case. In the circumstances, there is no basis, pursuant to the legal standard applicable under Rule 41(5), for the Tribunal to engage in a more elaborate analysis to determine whether disputes between member States of the EU would be excluded from the scope of application of Article 26 of the ECT on grounds of any subsequent legal developments. These include developments such as (i) any new international treaties or any amendments to existing international treaties, entered into since the conclusion of the ECT by the member States of the EU, (ii) any other subsequent legal developments such*

---

[200] Cl. Second PHB, para. 18; *Spain v. Novenergia II*, **RL-0515**, pp 36-40; *Poland v. PL Holdings*, **RL-0514**, paras. 30-31, 58-59.

[201] Cl. Second PHB, para. 18.

[202] Cl. Second PHB, para. 19; Cl. First PHB, paras. 17-18; *Netherlands v. Uniper*, **RL-0507**, p. 6; *Netherlands v. RWE*, **RL-0508**, pp. 5-6.

[203] Cl. Reply, para. 650, 678-681.

> *as the Achmea Judgment of the CJEU, or indeed (iii) on any other*
> *grounds, including the intentions of the EU and the EU member*
> *States when negotiating the ECT, insofar as such grounds are not*
> *reflected in the language of Article 26. Indeed, if such further*
> *analysis is required, which is the case here, the Tribunal's asserted*
> *lack of jurisdiction under Article 26 of the ECT cannot be*
> *considered manifest.*[204]

189.    The Tribunal must now engage in the "*more elaborate analysis*" that it was not required to undertake in connection with the Respondent's Rule 41(5) Application, insofar as the Respondent continues to rely on the arguments it raised in support of its Rule 41(5) Application or indeed raises new arguments.

190.    As summarized above, the Claimants rely, for the purposes of the Tribunal's jurisdiction *ratione voluntatis*, on Article 26(3) of the ECT which provides that, "[s]*ubject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration* [...] *in accordance with the provisions of this Article.*"[205]

191.    It is undisputed that the two exceptions referred to in subparagraphs (b) and (c) of Article 26(3) of the ECT are not applicable in this case.[206]

192.    It is also undisputed that the Claimants gave their consent to arbitrate in the Notice of Dispute and in the RfA. Thus the Claimants have complied with Article 26(4)(a)(1) of the

---

[204] Decision on Rule 41(5) Application, para. 65 [footnote omitted].

[205] While the ICSID Convention sets out criteria for the Tribunal's jurisdiction *ratione materiae* and *ratione personae* (as will be discussed further below), it does not contain the Contracting States's consent to arbitrate disputes falling under ICSID jurisdiction. Article 25(1) of the ICSID Convention provides that such consent is to be provided in a separate undertaking: "*The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally*" [emphasis added].

[206] Article 26(3)(b)(i) refers to Annex ID, which lists the Contracting Parties which do not give their unconditional consent "*where the Investor has previously submitted the dispute under subparagraph 26(a) or (b)*" (which refer to the courts or administrative tribunals of the Contracting Party to the dispute and any previously agreed dispute settlement procedure, respectively; under Article 26(3)(b)(ii), each such Contracting Parties shall provide a written statement "*of its policies, practices and conditions*" by the date of the deposit of its instrument of ratification, acceptance or approval, or the deposit of its instrument of accession. Article 26(3)(c) refers, in turn, to Annex IA, which lists the Contracting Parties that do not give unconditional consent with respect to "*a dispute under the last sentence of Article 10(1)*," *i.e.* the so-called umbrella clause.

ECT, which provides that "[i]*n the event an Investor chooses to submit the dispute for resolution under subparagraph (2)(c)* [*i.e.* international arbitration], *the Investor shall further provide its consent in writing for the dispute to be submitted to* […] [t]*he International Centre for Settlement of Investment Disputes* […] *if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention* […]."

193.    It is further undisputed that both Austria, the home jurisdiction of the Claimants, and Germany are Contracting Parties to the ECT and Contracting States to the ICSID Convention.

194.    As summarized above, the Respondent argues that, regardless of the language of Article 26 of the ECT, there is no valid arbitration agreement between the Parties because Article 26 is incompatible with EU law. The Respondent submits that, while in its view the ECT "*was and is inapplicable to intra-EU disputes ab initio,*" even assuming this were not the case, "*the progressive development of EU Treaties again established such inapplicability.*"[207] According to the Respondent, by adopting the Lisbon Treaty in 2009, the EU Member States "*reaffirmed*" the understanding, subsequently confirmed by the CJEU in the *Achmea* Judgment, that arbitration clauses in investment treaties are inapplicable between member states of the EU.[208] As noted by the Respondent, the *Komstroy* Judgment of the CJEU extended this interpretation to the ECT,[209] and Article 26 of the ECT "*has therefore been superseded by the applicable provisions of the TEU and TFEU.*"[210]

195.    The Respondent also invokes, in support of its position, Article 30 of the VCLT, which deals with the "*Application of successive treaties relating to the same subject matter,*" and Article 41 of the VCLT, which deals with "*Agreements to modify multilateral treaties between certain of the parties only,*" as well as the subsequent developments of EU law and policy since the conclusion of the ECT.

---

[207] Resp. Mem., para. 120.
[208] Resp. Mem., para. 4.
[209] *Komstroy* Judgment, **C-0398 / RL-0378**, para. 66.
[210] Resp. Mem., para. 125.

196.   The Tribunal will deal with each of these arguments in turn.

        *a.*     ***The Interpretation of Article 26 of the ECT in accordance with the VCLT***

197.   The relevant provision of the ECT for the purposes of the Tribunal's jurisdiction *ratione voluntatis* is Article 26, which provides, in relevant part:

> (1) *Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*

> (2) *If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*

> [...]

> (c) *in accordance with the following paragraphs of this Article.*

> (3) (a) *Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*

> (b)(i)   *The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).*

> (ii) *For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.*

> (c) *A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).*

*(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*

*(a)(i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention;*

*[…]*

*(5) (a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:*

*(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules[.]* [211]

198. There is no dispute between the Parties that the relevant rules of treaty interpretation are codified in Articles 31 and 32 the VCLT. Article 31 ("*General rule of interpretation*") provides:

*1.      A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*

*2.      The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*

*(a)      Any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;*

*(b)      Any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.*

---

[211] ECT, **CL-0001**, Art. 26.

> *3.      There shall be taken into account, together with the context:*
>
> *(a)    Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*
>
> *(b)    Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*
>
> *(c)    Any relevant rules of international law applicable in the relations between the parties.*
>
> *4.      A special meaning shall be given to a term if it is established that the parties so intended.*[212]

199.    Article 32 ("*Supplementary means of interpretation*") further provides:

> *Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:*
>
> *(a)    Leaves the meaning ambiguous or obscure; or*
>
> *(b)    Leads to a result which is manifestly absurd or unreasonable.*[213]

200.    The Claimants argue that Article 26 of the ECT contains Germany's "*unconditional*" consent to arbitrate investment disputes with investors that are nationals of any other ECT Contracting Party, including Austria. According to the Claimants, "[t]*he plain wording of Article 26 ECT leaves no doubt as to its meaning or scope: Germany gave its 'unconditional consent' to arbitrate investment disputes with any investor from any ECT Contracting Parties, including EU Member States and Austria.*"[214] The Claimants note that

---

[212] VCLT, **CL-0050**, Art. 31.

[213] VCLT, **CL-0050**, Art. 32.

[214] Cl. Reply, para. 625.

this position has been consistently upheld by ECT tribunals that have considered the issue.[215]

201.    The Respondent invokes Articles 31 and 32 of the VCLT, arguing that, according to the ordinary meaning of the terms of the ECT, the EU and its Member States must be considered as a single territory under the ECT, that is, the territory of the EU.[216] The Respondent refers, specifically, to Article 1(2) of the ECT, which defines the term "*Contracting Party*" to the ECT as "*a State or Regional Economic Integration Organization which has consented to be bound by the ECT and for which that treaty is in force,*" and Article 1(3) of the ECT, which defines "*Regional Economic Integration Organization*" ("**REIO**") as "*an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by the ECT, including the authority to take decisions binding on them in respect of those matters.*" The Respondent further refers to Article 1(10) of the ECT which provides that "[*w*]*ith respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization.*" According to the Respondent, "[t]*herefore, an investment by an investor from an EU Member State in another EU Member State is not an investment in the area of another Contracting Party, but in the area of the same Contracting Party.*"[217] It follows that "[t]*he EU being a single investment area for its Member States, the offer for arbitration made by the EU is hence only made to investors from Contracting Parties that are not EU Member States.*"[218] The Respondent submits that, since the EU is a Contracting Party to the ECT, an investor of an EU Member State that invests in another Member States invests "*in one and the same 'Contracting Party.'*" Accordingly, in the absence of a conflict rule in the ECT providing that in such event the single EU Member States prevail as "*Contracting Parties,*" "[d]*ue to the lack of*

---

[215] Cl. Mem., para. 404.

[216] Resp. Mem., para. 81, 86.

[217] Resp. Mem., para. 95. *See* ECT, **CL-0001**, Arts. 1(2)-(3), and 1(10).

[218] Resp. Mem., para. 95.

*a clear conflict rule, Art. 1(2), 1(3) 26(1) ECT are 'ambiguous or obscure' in the sense of Art. 32(a) VCLT and there is room for interpretation.*"[219]

202.    The Respondent further contends that the same conclusion is reached when the ECT is interpreted in its context and in light of its object and purpose, including Article 26(6) of the ECT, which provides that "[a] *tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*" According to the Respondent, the applicable rules and principles of international law in this context "*include EU law which constitutes part of international law and therefore,* inter alia, *include the TFEU and TEU as international treaties.*"[220]

203.    The Claimants submit, in response, that EU law does not form part of the law applicable to determine the Tribunal's jurisdiction under the ECT. The jurisdiction of the Tribunal "*is governed exclusively by its constitutive instrument, the ECT.*" The Claimants argue that the relevant provisions of the ECT ought to be interpreted in accordance with the rules of treaty interpretation in Articles 31 and 32 of the VCLT.[221]

204.    The Parties thus agree that the relevant provisions of the ECT should be interpreted in accordance with the rules of treaty interpretation in the VCLT. However, they reach conflicting positions when applying those rules.

205.    The Tribunal is not persuaded by the Respondent's interpretation of Article 26. The wording of Article 26(3) of the ECT is not ambiguous or obscure, and it makes no exception for, or mention of, rules specifically applicable to disputes between an EU Member State and a national of another EU Member State; on the contrary, it provides that "[s]*ubject only to subparagraphs (b) and (c), each Contracting Party*" – that is, including Austria and Germany – "*gives its unconditional consent to the submission of a dispute to international arbitration in accordance with* [Article 26]." As noted above, it is undisputed between the Parties that the two exceptions referred to in subparagraphs (b) and (c) of Article 26(3) of the ECT are not applicable in this case. The ordinary meaning of the term

---

[219] Resp. Rej., para. 27.
[220] Resp. Mem., para. 107.
[221] Cl. Mem., para. 406.

"*unconditional*" is that there are no other conditions attaching to a Contracting Party's consent to international arbitration than those mentioned in subparagraphs (b) and (c) of Article 26(3).

206.    Nor is there anything in the context of Article 26 or in the object and purpose of the ECT that would suggest otherwise. While the Respondent is correct in stating that an investment made by an investor of an EU Member State in another EU Member State is an investment made "*in the area of the same Contracting Party*" (because the EU is also a Contracting Party to the ECT), this does not mean that such investments are not covered by the ECT; it simply means that they are investments made in the Area of both an EU Member State and the EU. This is reflected in the language of Article 1(10) of the ECT, which defines "*Area*" with respect to a state that is a Contracting Party as "*the territory under its sovereignty*," and with respect to a REIO, as "*the Areas of the member states of such Organization.*" In the absence of any indication in the ECT that one of the "*Areas*" should be given priority over the other, Article 26 cannot be interpreted so as to exclude its applicability to Contracting Parties that are EU Member States.

207.    The Parties also disagree on whether Article 26(6) of the ECT, which deals with the applicable law, applies to the merits of the dispute (which is the Claimants' position) or whether it also governs issues of jurisdiction (which is the Respondent's position). Article 26 does not address the issue specifically, although the language and the context of the provision, including the language of Article 26(1) of the ECT (which provides that "[d]*isputes between a Contracting Party and an Investor of another Contracting Party* […], *which concern an alleged breach of an obligation of the former under Part III* […]"),[222] suggest that the provision governs the law applicable to the merits.[223]

---

[222] Part III of the ECT deals with "*Investment Promotion and Protection.*"

[223] The Tribunal notes that there is no consistent arbitral jurisprudence on this issue; thus, the *Electrabel* tribunal specifically held that "*under Article 26(6) ECT, these rules* [*i.e.* the rules of international law agreed by the parties under Article 42(1) of the ICSID Convention] *comprise the ECT and principles of international law*" (*Electrabel v. Hungary*), **CL-0042 / RL-0262**, para. 4.192) whereas the *Vattenfall* tribunal held that "*Article 26(6) ECT* […] *applies only to the merits of a dispute between the Parties. It does not apply to issues or questions relating to the Tribunal's jurisdiction*" (*Vattenfall v. Germany*, Decision on *Achmea*, **CL-0032**, para. 121).

208.    However, the Tribunal need not take a final view on the issue since the Tribunal's jurisdiction *ratione voluntatis* does not turn on it (as it is undisputed that the question of whether the ECT contains a consent to arbitrate is a matter of treaty interpretation and as such is governed by international law), and moreover, under Article 31(3)(c) of the VCLT, when interpreting the ECT, the Tribunal must take into account, together with the context, "*any relevant rules of international law applicable in the relations between the parties.*" The rules of EU law qualify as such "*relevant rules of international law applicable in the relations between*" the Parties to this case, insofar as they are consistent with the ECT, interpreted in accordance with the rules of treaty interpretation under the VCLT, as the Tribunal's jurisdiction (if any) is founded on the ECT. Moreover, there are other provisions in the VCLT that deal specifically with the application of successive treaties relating to the same subject matter, as well as amendment of multilateral treaties between certain of the parties only, which the Respondent also invokes in support of its position. The Tribunal therefore next turns to these issues.

### b.    The applicability of VCLT rules regarding the application of successive treaties and amendment of multilateral treaties between certain of the parties only

209.    The Respondent contends that the Tribunal lacks jurisdiction *ratione voluntatis* in light of recent developments under EU law. Specifically, as summarized above, the Respondent relies on the Lisbon Treaty, including Declaration 17 annexed to the Treaty, which in the Respondent's view provides the applicable conflict rule, and the *Achmea* and *Komstroy* Judgments, to argue that Article 26 of the ECT has been "*superseded by the applicable provisions of the TEU and TFEU.*"[224] According to the Respondent, the applicable provisions include Article 344 of the TFEU and Article 19(1), second sentence of the TEU, which establish "*an exclusive obligation of EU Member States to submit disputes to the judicial system of the EU whenever EU law is interpreted or applied.*"[225] In support of its position under the ECT, the Respondent refers to Articles 30(2), 41(1)(b) and 30(4)(a) of

---

[224] Resp. Mem., para. 125.

[225] Resp. Mem., para. 126. Article 344 of the TFEU provides: "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*" Article 19(1), second sentence of the TEU provides that "*Member States shall provide remedies sufficient to ensure effective legal protection in the fields covered by Union law.*"

the VCLT, without however elaborating on its position regarding the application of Articles 30 or 41 of the VCLT.[226]

210.    The Claimants submit that under international law, the interpretation of conflicting treaty provisions is governed by Article 30 of the VCLT ("*Application of successive treaties relating to the same subject matter*"). According to the Claimants, the application of Article 30 is subject to "*two distinct and cumulative requirements, ie (i) the relevant treaties must relate to the 'same subject-matter' and (ii) such treaties must be in conflict with one another.*" [227] The Claimants argue that these requirements are not met since the TFEU and the TEU do not deal with the same subject matter as the ECT and there is no conflict between them, even in light of the Lisbon Treaty.[228] In any event, according to the Claimants, "*Article 16 ECT directs the interpreter to apply whichever treaty provisions grant a more extensive treaty protection to investors and their investments.*"[229]

211.    Article 30 of the VCLT provides, in relevant part:

> 1.    Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.
>
> 2.    When a treaty specifies that it is subject to, or that it is not to be considered incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
>
> 3.    When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.
>
> 4.    When the parties to the later treaty do not include all the parties to the earlier one:

---

[226] It is not clear whether the Respondent continues to rely on its position as set out in its Rule 41(5) Application (where it did set out its position under these provisions).

[227] Cl. Mem., para. 407.

[228] The Claimants rely on *Novenergia II v. Spain*, **CL-0035**, paras. 438-442; and *Vattenfall v. Germany*, Decision on *Achmea*, **CL-0032**, para. 214.

[229] Cl. Mem., para. 407.

(a)    *As between States Parties to both treaties the same rule applies as in paragraph 3*[.][230]

212.    As noted above, the Respondent relies on Articles 30(2) and 30(4)(a) of the VCLT in support of its position that the ECT has been superseded by subsequent EU treaties, including the TFEU and the TEU. Although the Respondent does not elaborate on its position in its submissions on jurisdiction, it appears that the Respondent's case is that the ECT, on the one hand, and the TFEU and TEU, on the other, relate to "*the same subject matter,*" and that accordingly the ECT applies to the parties of the ECT that are also parties to the TFEU and the TEU only to the extent that the provisions of the ECT are compatible with the TFEU and the TEU.[231]

213.    The Tribunal is unable to agree that the ECT, on the one hand, the TFEU and the TEU, on the other, relate to "*the same subject matter.*" While the Respondent argues that "*EU law comprehensively governs and protects such* [*i.e.* foreign direct] *investments*, it does not cite to any specific provisions of the EU Treaties in support of its position; indeed, it acknowledges elsewhere that "*the EU provisions on internal market technically do not address promotion and protection of investments*" (while stressing that "*they share the same efforts of integration*").[232] There is therefore, in substance, no dispute between the Parties that, while the EU Treaties contain provisions regarding free movement of capital, unlike the ECT, they do not contain any specific provisions regarding the promotion and protection of investments or the settlement of investment disputes. The Tribunal therefore finds that Article 30 of the VCLT does not apply in the circumstances of this case and does not support the Respondent's objection to jurisdiction *ratione voluntatis*.

214.    The Respondent also relies on Article 41(1)(b) of the VCLT in support of its position that "*EU Member States effectively modified the ECT by adhering to the Lisbon Treaty.*"[233] Article 41 ("*Agreements to modify multilateral treaties between certain of the parties only*") provides, in relevant part:

---

[230] VCLT, **CL-0050**, Art. 30.

[231] This is the position taken by the Respondent in its Rule 41(5) Application, paras. 153 *et seq*.

[232] Resp. Rule 41(5) Application, para. 162.

[233] Resp. Rule 41(5) Application, para. 163.

> *1.    Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:*
>
> *[…]*
>
> *(b)    the modification in question is not prohibited by the treaty and*
>
> > *(i)    does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;*
> >
> > *(ii)    does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.*
>
> *2.    Unless a case falling under paragraph ((a) of the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.*[234]

215.    The Tribunal is unable to accept the Respondent's argument. The Lisbon Treaty makes no reference to the ECT, and the EU member states never notified the Contracting Parties to the ECT of their intention to conclude a treaty – the Lisbon Treaty – that would modify the ECT, as required by Article 41(2) of the VCLT. Nor is it clear which precise provisions of the ECT would have been modified by the Lisbon Treaty – apart, apparently, from Article 26 of the ECT. Finally, even assuming the ECT and the Lisbon Treaty related to "*the same subject matter,*" which in the Tribunal's view is not the case, Article 16 of the ECT ("*Relation to other agreements*") specifically precludes a subsequent agreement between the Contracting Parties to the ECT that would derogate from any provision of Parts III or V of the ECT or from any right to dispute resolution under the ECT "*where any such provision is more favourable to the Investor or Investment:*"

> *Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,*

---

[234] VCLT, **CL-0050**, Art. 41.

(1)    *nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and*

(2)    *nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,*

*where any such provision is more favourable to the Investor or Investment.*[235]

216.    In the Tribunal's view, having the option of being able to choose between the fora listed in Article 26(2) and (4) of the ECT is "*more favourable*" to the Investor and the Investment than having only one forum available, *i.e.* the competent domestic court.

217.    The Tribunal takes note that the CJEU has taken the position that Article 26 of the ECT is in conflict with the EU Treaties as a matter of EU law. In the *Komstroy* Judgment, the CJEU determined that "*Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.*"[236] Although the CJEU's ruling is based on the finding that under Article 26(2)(c) of the ECT an investor of an EU Member State cannot submit a dispute with another EU Member State arising under Part III of the ECT to international arbitration (rather than a finding that an EU Member State cannot have given an unconditional consent to arbitrate in Article 26(3) of the ECT), the end result is the same – EU law does not allow arbitration of intra-EU investment disputes under the ECT, thus giving effect to the transfer of competence over foreign investment within the EU from the Member States to the EU.

218.    In light of the above, the Tribunal accepts that, while there is, under rules of international law governing treaty interpretation, no conflict between Article 26(3) of the ECT and EU Treaties, there is such a conflict as a matter of EU law. This conflict cannot be eliminated by way of systemic or harmonious interpretation in accordance with Article 31(3)(c) of the

---

[235] ECT, **CL-0001**, Art. 16.

[236] *Komstroy* Judgment, **C-0398** / **RL-0378**, para. 66. Article 26(2)(c) creates a right for an investor to submit a dispute arising under Part III of the ECT to international arbitration or conciliation.

VCLT since international law is not the source of the conflict; the conflict originates from the interpretation of EU law. The Tribunal is mindful that treaty conflicts are undesirable from a legal policy perspective, however, they cannot always be fully eliminated and may also arise as between other legal systems, including between international law and municipal law. Moreover, the elimination of treaty conflicts is a matter for makers of international policy, not for an international tribunal established under the ICSID Convention and the ECT, which must apply these treaties, as properly interpreted in light of the applicable rules of treaty interpretation, even if the application of such rules may not fully eliminate a treaty conflict.[237]

### c.   Conclusion

219.   In conclusion, the Tribunal rejects the Respondent's objection to the Tribunal's jurisdiction *ratione voluntatis*.

## B.   JURISDICTIONAL OBJECTION *RATIONE MATERIAE*

### (1)   The Parties' Positions

#### a.   The Respondent's Position

220.   The Respondent argues that the Claimants have not made any investments in Germany within the meaning of the ECT or the ICSID Convention and therefore the Tribunal lacks jurisdiction *ratione materiae.*

221.   The Respondent raises five arguments in support of its position: (i) the Tribunal must consider both Article 1(6) of the ECT as well as Article 25(1) of the ICSID Convention when deciding whether there was a qualifying investment on behalf of the Claimants;[238] (ii) Strabag's activities do not qualify as an investment under the ECT; (iii) Strabag's activities do not qualify as an investment under Article 25(1) of the ICSID Convention; (iv) Strabag's participation in NOH 1 and NOH 2 does not constitute an investment under

---

[237] The Respondent also argues that the Tribunal lacks jurisdiction under private law, however, as the Claimants themselves note, they have not argued that the Tribunal's jurisdiction may be founded on private law: *see* Cl. Reply, fn. 1478.

[238] Resp. C-Mem., para. 158.

Article 25(1) of the ICSID Convention; and (v) NOH 1 and NOH 2's operations do not constitute an investment under Article 25(1) of the ICSID Convention.

222. In support of its position, the Respondent contends that, although Article 25(1) of the ICSID Convention does not contain a definition of "*investment*," ICSID tribunals have developed a test, which has come be known as the *Salini* test, which defines the characteristics of an "*investment*:" (i) the project in question must have a certain duration; (ii) there must be an element of risk; (iii) there must be a substantial commitment; and (iv) the project must constitute a significant contribution to the host State's development.[239]

223. In summary, the Respondent claims that "*none of the Claimants' activities pass the* Salini *test*" and the Tribunal does not have *ratione materiae* jurisdiction over the Claimants' claims.[240]

        (i)      **The Tribunal must consider Article 1(6) of the ECT and Article 25(1) of the ICSID Convention together when determining whether the Claimants made an investment**

224. According to the Respondent, the Tribunal must consider both Article 25(1) of the ICSID Convention and Article 1(6) of the ECT when determining whether the Claimants have made an "*investment*." According to Article 25(1) of the ICSID Convention, the jurisdiction of an arbitral tribunal established under the ICSID Convention depends on the existence of a dispute "*arising directly out of an investment*." The Respondent argues that since the ICSID Convention does not define the term "*investment*," the Tribunal should consider, in general terms, Article 1(6) of the ECT to determine its meaning.[241] According to the Respondent, Article 25(1) of the ICSID Convention works as a controlling and corrective element to the definition of an investment in Article 1(6) of the ECT and thus,

---

[239] Resp. Mem., paras. 186-188, referring to *Salini Construttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001 ("***Salini v. Morocco***"), **CL-0090 / RL-0054**.

[240] Resp. Mem., para. 264.

[241] Resp. Mem., para. 162.

for instance, ordinary commercial transactions were never meant to be covered by the ICSID Convention.[242]

### (ii)    Strabag's activities do not qualify as an investment under the ECT

225.    The Respondent claims that Strabag's activities, in particular the development of the Gravity Foundation Technology, do not qualify as an investment under Articles 1(4) to 1(6) of the ECT.

226.    The Respondent points out that, under Articles 1(4) to 1(6) of the ECT, "*an investment activity must be connected to an economic activity concerning energy within Annexes EM I and EM II to the ECT.*" However, "*these Annexes do not mention offshore wind energy as energy materials or products.*"[243] While the Respondent acknowledges that according to Understanding 2 to Article 1(5) of the ECT "*construction and operation of power generation facilities, including those powered by wind and other renewable energy sources,*" shall be considered an "*economic activity in the energy sector*" within the meaning of Article 1(5) of the ECT, it argues that "*research and development of technology that only potentially might be used in power generation facilities does not qualify as economic activity in the energy sector.*"[244] According to the Respondent, "[d]*eveloping a new technology without knowing whether it could ever be used* [...] *is preparatory and guess work, pre-investment work at most.*" Accordingly, in the Respondent's view, research and development are not covered by the definition of "*Investment*" in Article 1(6) of the ECT, read in conjunction with Articles 1(4) and 1(5) of the ECT.[245]

227.    The Respondent argues that the Tribunal is bound by the CJEU's findings in the *Komstroy* Judgment regarding the definition of "*Investment*" in Article 1(6) of the ECT.[246] According to the Respondent, this is the case because in *inter se* relations between two EU Member

---

[242] Resp. Mem., paras. 164-165; C. Schreuer, *The ICSID Convention: A Commentary* (2009) (excerpt), **RL-0048**, p. 117; R. Dolzer and C. Schreuer, *Principles of International Investment Law* (2012), **RL-0049**, pp. 245 *et seq*.

[243] Resp. Mem., para. 174.

[244] Resp. Mem., paras. 175-176.

[245] Resp. Mem., para. 176.

[246] Resp. Rej., para. 151; *Komstroy* Judgment, **C-0398 / RL-0378**, paras. 23, 49.

States, the ECT forms part of EU law.[247] In the *Komstroy* Judgment, the CJEU specifically found that the definition of "*Investment*" in Article 1(6) of the ECT "*includes two cumulative conditions*:" (i) the investment must concern an asset of a type owned or controlled directly or indirectly by an investor and (ii) the asset must include at least one of the elements mentioned in points (a) to (f) of that provision.[248] In the CJEU's view, in order to qualify as an "*Investment*" under the ECT, the asset must also be an "*investment associated with an Economic Activity in the Energy Sector*" in accordance with Article 1(6), third sub-paragraph, of the ECT.[249]

228.    The Respondent notes that Strabag only held shares in companies set up for the purpose of developing the GFT. According to the Respondent, Strabag's shareholding in these companies does not constitute a "*company or business enterprise* […] *associated with an Economic Activity in the Energy Sector*" pursuant to Article 1(6)(b) of the ECT.[250] The mere existence of a company is not enough to qualify as an "*Investment*" within the meaning of Article 1(4) to (6) of the ECT or even to prove a contribution of money or assets.[251] Rather, it is the activities developed by companies that determine whether a qualifying investment has been made.[252]

229.    The Respondent submits that Articles 1(4) to 1(6) of the ECT requires that a company must develop an economic activity in the energy sector. According to the Respondent, the only real activity that Strabag has been engaged in is the development of the GFT, which is a research and development activity only; Strabag did not construct or operate any power generation facilities.[253] A research and development activity is an activity with an open-

---

[247] Resp. Rej., para. 152; *Komstroy* Judgment, **C-0398 / RL-0378**, paras. 23, 49.

[248] Resp. Rej., para. 153; *Komstroy* Judgment, **C-0398 / RL-0378**, para. 69.

[249] Resp. Rej., para. 154; *Komstroy* Judgment, **C-0398 / RL-0378**, para. 67.

[250] Resp. First PHB, para. 111; Resp. Rej., paras. 156-157; Resp. Mem., para. 172.

[251] Resp. Mem., paras. 177-179; Resp. First PHB, para. 111; *Quiborax SA, Non Metallic Minerals SA and Allan Fosk Kaplun v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, 27 September 2012 ("***Quiborax v. Bolivia***"), **RL-0052**, para. 232.

[252] Resp. Mem., para. 180.

[253] Resp. Mem., paras. 181-182; Cl. Mem., para. 428.

ended outcome and does not qualify as an "*Investment*" under Articles 1(4) to 1(6) of the ECT.[254]

### (iii) Strabag's activities do not qualify as an investment under Article 25(1) of the ICSID Convention

#### (a) Strabag's development of the GFT does not qualify as an investment under Article 25(1) of the ICSID Convention

230. The Respondent submits that the development of the GFT does not qualify as an investment under Article 25(1) of the ICSID Convention. In the Respondent's view, the limits of what constitutes an "investment" under Article 25(1) of the ICSID Convention "*worthy of protection*" under the ICSID regime have been developed by ICSID tribunals and have come to be known as the *Salini* test.[255] This test consists of four elements: (i) the project in question must have a certain duration; (ii) there must be an element of risk; (iii) there must be a substantial commitment; and (iv) the project must constitute a significant contribution to the host State's development.[256]

231. The Respondent contends that Strabag's activities fail to meet the *Salini* criteria because the development of the GFT does not involve any contribution to the economic development of the Respondent as the host State.[257] In support of its position, the Respondent makes five arguments: (i) Strabag's specific activities did not contribute to the economic development of the Respondent as a host State; (ii) Strabag's activities did not contribute to the Respondent's economic development on the basis of a relationship between the Respondent and Strabag; (iii) Strabag's activities did not contribute to the Respondent's economic development on the basis of official statements; (iv) Strabag's activities did not *de facto* contribute to the Respondent's economic development; and

---

[254] Resp. Mem., para. 182.

[255] Resp. Mem., para. 186; *Salini v. Morocco*, **CL-0090 / RL-0054**.

[256] Resp. Mem., para. 188; *Joy Mining Machinery Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award, **RL-0050**, para. 53; *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Jurisdiction, 24 May 1999, **RL-0053**.

[257] Resp. Mem., para. 187; Resp. First PHB, para. 12 ("*when assessing a possible investment, the existence of a contribution was a true jurisdictional requirement*"); *Nova Scotia Power Incorporated (Canada) v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/1, Award, 30 April 2014, **RL-0412**, para. 84.

(v) Strabag's activities did not form an integral part of the Claimants' Offshore Wind Projects.[258]

232. While every economic activity will make some economic contribution to the host State, the Respondent argues that not every activity in the territory of a host State can be considered an "*investment*."[259] In order to qualify as an investment, the activity in question must have some positive impact on the host State's economic development; consequently, setting up a business without contributing to the economic development of the host State does not qualify as an investment.[260]

233. The Respondent argues that the States that participated in the drafting of the ICSID Convention only agreed to investment protection "*in consideration of economic development*;" they did not agree to protection of every business set up in their territories.[261] The Respondent argues that ICSID case law reflects the proposition that "*an agreement or consent of the host government to receive or admit the investment in question is required in order to find in favor of a contribution to the host [S]tate*."[262] According to the Respondent, this implies that only when the host State "*agrees to consider the activities as investment*" and "*makes some kind of legally binding and dependable promise in this regard*," can the host State be held responsible.[263]

234. The Respondent alleges that, where an investor has only undertaken "*preparatory activities and expenditures without a clear commitment on the part of the host State to consider these operations as an investment, there is no contribution to the economic development of the*

---

[258] Resp. Mem., paras. 187-190.

[259] Resp. Mem., para. 191.

[260] Resp. Mem., paras. 191, 193; C. Schreuer, *The ICSID Convention: A Commentary* (2009) (excerpt), **RL-0055**, pp. 128 *et seq.*; *Malaysian Historical Salvors SDN BHD v. Government of Malaysia*, ICSID Case No. ARB 05/10, Award, 17 May 2007 ("***Malaysian Historical Salvors v. Malaysia***"), **RL-0056**, para. 125; *Patrick Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on Annulment, 1 November 2006, **RL-0051**, para. 29 ("*It is thus quite natural that the parameter of contributing to the economic development of the host State has always been taken into account, explicitly or implicitly, by ICSID arbitration tribunals in the context of their reasoning in applying the Convention, and quite independently from any provisions of agreements between parties or the relevant bilateral treaty*").

[261] Resp. Mem., para. 193.

[262] Resp. Mem., para. 198.

[263] Resp. Mem., para. 198.

*host* [S]*tate.*"[264] In the present case, the Respondent never committed to consider Strabag's financial expenditures as investments and, as a result, Strabag's activities are not protected investments.[265]

235.    The Respondent claims that Strabag made no contribution to the Respondent's economic development "*because there was no consent on behalf of Respondent to consider Strabag activities as investment.*"[266] In support of its position, the Respondent contends that: (i) there was no legally binding endorsement or relationship between the Respondent and Strabag;[267] (ii) there was no agreement or consent on the part of the Respondent to receive or admit Strabag's activities as an investment;[268] (iii) the Respondent was not involved in the development of the project in any way;[269] (iv) the Respondent did not ask Strabag to develop a new technology;[270] (v) there was no auction for the best technology and Strabag did not win a bid;[271] (vi) Strabag gave up the project of its own accord without any coercion or other prompts by the Respondent;[272] and (vii) the Respondent and Strabag never negotiated nor signed a contract relating to the development of the GFT.[273]

236.    The Respondent argues that expenditures made by an investor of its own accord, without any promise or consent on the part of the host State, are not "*investments*" within the meaning of Article 25(1) of the ICSID Convention.[274] The host State can assume responsibility for such costs only with its consent, and in this case the Respondent never gave such consent. In this context, it does not matter that the GFT might have been of

---

[264] Resp. Mem., para. 206.
[265] Resp. Mem., para. 207.
[266] Resp. Mem., para. 209.
[267] Resp. Mem., para. 209.
[268] Resp. Mem., para. 209.
[269] Resp. Mem., para. 210.
[270] Resp. Mem., para. 211.
[271] Resp. Mem., para. 211.
[272] Resp. Mem., para. 211.
[273] Resp. Mem., paras. 209-212.
[274] Resp. Mem., paras. 209-213.

relevance to the Respondent's energy sector as it did not make a significant contribution to the Respondent's economic development.[275]

237.    The Respondent alleges that the "*positive remarks*" made by German politicians and officials in relation to offshore wind energy cannot be considered as inviting a contribution to the Respondent's economic development because they were made in public "*without the will on the part of the Respondent to be bound*."[276] The Respondent acknowledges that there was general support for offshore wind energy but that such statements "*were not calls to invest.*"[277] In any event, any such calls were made only after Strabag had already started the development of the GFT and thus Strabag could not have been relied upon them when making its investment.[278]

238.    The Respondent claims that Strabag did not *de facto* contribute to the Respondent's economy in any significant way. Strabag's research and development activities ended long before a viable technology had been developed; the GFT was never useable and it was never used by the Respondent or in the Respondent's territory.[279] According to the Respondent, Strabag's research and development efforts never reached a sufficiently advanced stage for the GFT to be used in the construction and operation of any offshore wind farm.[280] Strabag's efforts did not involve anything more than "*the registration of a few intellectual property rights which expired or were abandoned*."[281]

239.    According to the Respondent, Strabag did not create any permanent value and its activities were not instrumental in developing Respondent's wind energy sector.[282] Rather, Strabag's

---

[275] Resp. Mem., para. 217.

[276] Resp. Mem., para. 219.

[277] Resp. Mem., para. 221.

[278] Resp. Mem., para. 221.

[279] Resp. Mem., para. 223.

[280] Resp. First PHB, para. 112.

[281] Resp. First PHB, para. 112; Resp. Rej., paras. 160, 975, 1561.

[282] Resp. Mem., para. 224.

activities were normal commercial activities with no positive impact on the Respondent's development.[283]

240.    The Respondent asserts that Strabag's activities do not constitute an investment because they did not form an integral part of an overall operation that could qualify as an investment. The OWFs held by NOH 1 and NOH 2 did not require the development of a new technology and the development of the GFT was not connected to the OWFs at all.[284] Nor was the development of the GFT vital to the Claimants' investments in the OWFs; indeed, the development of the GFT started before NOH 1 and NOH 2 even existed.[285] Strabag's activities therefore do not qualify as investments within the meaning of either Article 1(4) to (6) of the ECT or Article 25(1) of the ICSID Convention.

*(b) Strabag's participation in NOH 1 and NOH 2 does not qualify as an investment under Article 25(1) of the ICSID Convention*

241.    The Respondent argues that Strabag's participation in NOH 1 and NOH 2 does not constitute an investment under the ICSID Convention as it fails to meet the *Salini* test, in particular the requirement of significant contribution to the Respondent's economic development.[286]

242.    The Respondent maintains that Strabag did not establish NOH 1 and NOH 2 or the Project Companies that were in charge of the development of the offshore wind projects. The Project Companies had already been set up by the Original Developers before their acquisition by Strabag, and before Strabag entered into a joint venture with the Original Developers in 2010.[287] In May 2011, the Original Developers restructured their ownership of the Project Companies by merging the German company Northern Energy Projekt GmbH, which was the owner of the Project Companies, into an Austrian incorporated

---

[283] Resp. Mem., para. 226; Resp. C-Mem., para. 1060; Resp. First PHB, para. 13; Cl. Rej., paras. 210, 240, 1082; *Raymond Charles Eyre and Montrose Developments* (Private) *Limited v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/16/25, Award, 5 March 2020, **RL-0418**, para. 301; *William Nagel v. Czech Republic*, SCC Case No. 049/2002, Final Award, 9 September 2003, **RL-0441**, para. 328.

[284] Resp. Mem., para. 228.

[285] Resp. Mem., paras. 229-230.

[286] Resp. Mem., para. 241.

[287] Resp. Mem., para. 242; Cl. Mem., para. 31.

company.[288] In a further step, in November 2011, NOH 1 and NOH 2 were incorporated in Austria, to hold all Project Companies in charge of the offshore wind projects. Since NOH 1 and NOH 2 were set up Austria, there was no contribution to the Respondent's economic development.[289]

243.   The Respondent recalls that, on 22 December 2011, Strabag purchased 51 percent of the shares in NOH 1,[290] and in January 2012, Strabag purchased 51 percent of the shares in NOH 2.[291] The purchase price in these transactions was paid to an Austrian company.[292] According to the Respondent, the transfer of funds thus took place within Austria only, without any contribution to the Respondent's economy.[293]

244.   The Respondent also argues that Strabag's claim for damages for its participation in NOH 1 and NOH 2 should be dismissed on the basis that the Claimants explicitly excluded the claim in the RfA, but then reintroduced it in their Memorial.[294] According to the Respondent, this is contrary to Article 26(1) of the ECT as the claim was not part of the negotiations between the Parties in 2017. In the absence of any attempt to settle the claim amicably, the Claimants' obligation to settle the dispute amicably thus arises *de novo*.[295]

   *(c)  The operations of NOH 1 and NOH 2 do not qualify as an investment under Article 25(1) of the ICSID Convention*

245.   The Respondent alleges that the operations of NOH 1 and NOH 2 do not constitute an investment under the ICSID Convention because they do not pass the *Salini* test. Specifically, the operations of NOH 1 and NOH 2 (i) did not have a sufficient duration; (ii) did not meet the risk criterion; and (iii) did not contribute to the economic development of the Respondent as the host State.[296]

---

[288] Resp. Mem., para. 243.
[289] Resp. Mem., para. 244.
[290] Resp. Mem., para. 245.
[291] Resp. Mem., para. 246.
[292] Resp. Mem., para. 247.
[293] Resp. Mem., para. 247.
[294] Resp. Mem., paras. 234-240.
[295] Resp. Mem., para. 239.
[296] Resp. Mem., para. 249.

246.    The Respondent contends that, in order to satisfy the durational requirement of the *Salini* test, a claimant needs to invest for "*at least two to five years*."[297] The operations of NOH 1 and NOH 2 do not satisfy this criterion: NOH 1 and NOH 2 were incorporated in November 2011, and they purchased the offshore wind projects in December 2011 and January 2012, respectively.[298] The Respondent claims that the companies did not engage in any substantial activities, and NOH 1 offered their projects "*for sale*" in April 2013, just over one year after they were originally acquired. The first NOH 1 project, OWP Albatros, was sold in 2014, within three years of the incorporation of the companies, and the last project was sold in August 2016, before the five-year mark of their incorporation. According to the Respondent, as a result of the limited duration of ownership and activity, there was no long-term commitment and accordingly the *Salini* test is not met.[299]

247.    The Respondent further argues that the activities of NOH 1 and NOH 2 do not meet the risk element of the *Salini* test as they only incurred normal project development risks that "*did not surpass commercial risks*."[300] In addition, the Respondent contends that the activities of NOH 1 and NOH 2 did not contribute to the economic development of the Respondent as the host State. The Claimants also cannot rely on Germany's calls for investments in the offshore wind energy sector since such "*political remarks*" are not binding and were not specifically aimed at the Claimants.[301]

248.    The Respondent submits that in order to determine whether the activities of NOH 1 and NOH 2 contributed to the Respondent's economy in a significant way, one must look at the facts.[302] NOH 1 and NOH 2 "*did nothing substantially with the Offshore Wind Projects after purchasing the shares in an all Austrian-related transaction;*"[303] NOH 1's and

---

[297] Resp. Mem., para. 250; *Salini v. Morocco*, **CL-0090 / RL-0054**, para. 54; *Malaysian Historical Salvors v. Malaysia*, **RL-0056**, para. 110; C. Schreuer, *The ICSID Convention: A Commentary* (2009) (excerpt), **RL-0055**, p. 130.

[298] Resp. Mem., para. 251.

[299] Resp. Mem., paras. 251-253.

[300] Resp. Mem., para. 255.

[301] Resp. Mem., para. 257.

[302] Resp. Mem., para. 258.

[303] Resp. Mem., para. 259.

NOH 2's activities "*never left the stage of pre-investment*;"[304] none of the offshore wind projects obtained the necessary approval;[305] and within a short period of time, all of NOH 1's projects were sold, "*with the money going to an Austrian-incorporated company*."[306] The Respondent did not benefit from the sale of these companies.

249.   As a result, the Respondent argues that the activities of NOH 1 and NOH 2 remained in a pre-investment phase and "*were not different from activities by other applicants in any other approval process*."[307] As a result, they also did not contribute to the economic development of the Respondent as the host State.

### b.    The Claimants' Position

250.   The Claimants submit that the Tribunal has jurisdiction *ratione materiae* since the assets owned and controlled by the Claimants in the Respondent's offshore wind energy sector and the GFT qualify as investments under both the ECT and the ICSID Convention. The Claimants put forward four arguments: (i) Article 1(6) of the ECT is wide in scope; (ii) the Claimants' assets in Germany constitute an investment associated with an Economic Activity in the Energy Sector under Article 1(6) of the ECT; (iii) Article 25(1) of the ICSID Convention does not restrict the ECT definition of investment – and even if the *Salini* criteria limited the scope of the ECT definition, the Claimants' investments would still meet the criteria; and (iv) Strabag's subsidiary claim is admissible.

### (i)    Article 1(6) of the ECT is wide in scope

251.   The Claimants argue that the ordinary meaning of Article 1(6) of the ECT contains a broad, inclusive definition of "*Investment*" for purposes of ECT protection.[308] The only requirement of Article 1(6) of the ECT for an asset owned or controlled by an investor to qualify as a protected investment is that it has to be associated with an "*Economic Activity in the Energy Sector*."[309] The Claimants note that Article 1(5) of the ECT defines

---

[304] Resp. Mem., para. 260.
[305] Resp. Mem., para. 260.
[306] Resp. Mem., para. 261.
[307] Resp. Mem., para. 262.
[308] Cl. Mem., para. 419.
[309] Cl. Mem., para. 420.

"*Economic Activity in the Energy Sector*" as an economic activity concerning various activities that include the "*construction and operation of power generation facilities*," and accordingly "*anything owned or controlled by an investor that can be freely bought and sold*" constitutes a protected investment under the ECT if it is related to one of the activities mentioned in Article 1(5) of the ECT.[310]

252.   The Claimants further argue that Article 1(6) of the ECT includes an illustrative but non-exhaustive list of categories of assets falling within the scope of protection of the ECT.[311] According to the Claimants, Article 1(6) of the ECT is "*extremely broad*" and covers "*any asset owned or controlled by a qualifying investor having a financial value and being associated with an economic activity in the energy sector*."[312]

**(ii)     The Claimants' assets constitute an investment associated with an Economic Activity in the Energy Sector under Article 1(6) of the ECT**

253.   The Claimants submit that they directly and indirectly acquired and developed assets in Germany in the offshore wind energy industry for the purpose of developing the Offshore Wind Projects and researching, developing, testing and then marketing the GFT.[313] According to the Claimants, these assets are therefore related to economic activity in Germany's energy sector under Article 1(6) of the ECT.[314] The Claimants' assets were the Offshore Wind Projects at their respective points in the approval process.[315] According to the Claimants, the Constitutional Court's finding that the procedural position of the offshore wind projects did not qualify as property rights under German law does not impact the *ratione materiae* analysis under Article 1(6) of the ECT as the ECT's definition of investment is much broader than the domestic German law notion of property.[316]

---

[310] Cl. Mem., para. 420.

[311] Cl. Reply, para. 687.

[312] Cl. Reply, para. 688.

[313] Cl. Mem., para. 424.

[314] Cl. Mem., para. 425; Cl. Reply, para. 685.

[315] Cl. First PHB, para. 3.

[316] Cl. First PHB, paras. 331-334.

#### (a) The Offshore Wind Projects owned by NOH 1 and NOH 2 are an investment under Article 1(6) of the ECT

254. The Claimants argue that NOH 1's and NOH 2's direct shareholding in the Project Companies in conjunction with the Project Companies' shareholder loans constitute qualifying investments under Article 1(6) of the ECT.[317] Article 1(6)(b) of the ECT expressly lists interests in companies as qualifying forms of investment, and NOH 1 and NOH 2 have an interest in the Project Companies. The Project Companies own a bundle of "*tradeable and money-worth assets and rights*."[318] In December 2011 and January 2012, NOH 1 and NOH 2 acquired 100 percent of shares in the individual German-incorporated Project Companies[319] for the purpose of developing the offshore wind projects in Germany. These assets and rights fall under Article 1(6)(a) of the ECT, under the language of "*every kind of asset*" having an economic value.[320]

255. According to the Claimants, the Respondent's arguments must fail as the record demonstrates that after acquisition, Strabag provided millions of Euros to the Germany-based Project Companies.[321] The Claimants assert that ECT tribunals have commonly accepted that the acquisition of already established locally-incorporated companies from foreign nationals qualifies as a protected investment.[322]

#### (b) The GFT owned by Strabag is an investment under Article 1(6) of the ECT

256. The Claimants argue that in addition to Strabag's indirect stake in the Offshore Wind Projects through its shareholding in NOH 1 and NOH 2, Strabag also established two fully owned subsidiaries incorporated in Germany for the development of the GFT. Strabag's direct ownership of the entire shareholding of these two companies constitutes "*Investments*" under Article 1(6) of the ECT.[323]

---

[317] Cl. Reply, para. 690; Cl. Mem., paras. 425-426.

[318] Cl. Reply, para. 691.

[319] Cl. Mem., para. 425; BSH, Approval of OWP Albatros, 17 August 2011, **C-0076 / R-0029**; Weber WS, para. 73.

[320] Cl. Reply, para. 691; ECT, **CL-0001**, Art. 1(6).

[321] Cl. Reply, para. 693; Hern ERI, paras. 155-157, Table 4.8; Shareholders Agreement, 19 May 2011, **RH-0002**, Sec. 14.

[322] Cl. Reply, para. 694.

[323] Cl. Mem., paras. 427-428.

257.    Strabag indirectly owns and controls the bundle of assets and rights of these subsidiaries as well as the GFT through these subsidiaries. The GFT is composed of intellectual property rights, which are tradeable, have economic value, are associated with an economic activity in the energy sector and are specifically enumerated in the fourth asset class under Article 1(6)(d) of the ECT. Additionally, in connection with the development of the GFT, Strabag set up research and development and production facilities through one of its subsidiaries in Cuxhaven, to build and test the technology, which led to employment of a local work force and the transfer of knowledge to Germany.[324] According to the Claimants, it is irrelevant for the Tribunal's jurisdiction that a number of these patents have expired. The Claimants explain that throughout the lifetime of Strabag's investment in the GFT, the composition of the bundle of assets that constitutes the investment changed, including due to Germany's measures, but this has no bearing on whether the Claimants made an investment.[325]

258.    Contrary to the Respondent's argument, the technology developed by the Claimants was not merely "*preparatory and guess work*" as significant work was specifically performed to test the GFT for the Albatros Test Field.[326] Rather, the Claimants enterprise spanned several companies with dozens of employees at a facility constructed specifically for that purpose, and the technology attracted millions of Euros in support from Germany and the EU.[327]

### (iii)    Article 25(1) of the ICSID Convention does not restrict the ECT definition of investment

259.    The Claimants argue that the requirements for ICSID jurisdiction are met because the dispute is of a legal nature and arises directly out of their investments.[328]

260.    The Claimants point out that the Parties agree that the ICSID Convention does not define the term "*investment*;" however, the Claimants argue that Article 25(1) of the ICSID

---

[324] Cl. Mem., para. 428.
[325] Cl. Reply, para. 697.
[326] Cl. Reply, paras. 697, 702.
[327] Cl. Reply, para. 702.
[328] Cl. Mem., paras. 429-435; Cl. Reply, paras. 703-706.

Convention does not allow ICSID tribunals to replace or restrict the definition of investment that was agreed upon by the Parties – in this case, the term "*Investment*" as defined in the ECT.[329] In response to the Respondent's arguments, the Claimants argue that the *Salini* criteria are not jurisdictional requirements but "*descriptive investment features*,"[330] and that the contribution to the development of the host State is not part of the definition of investment.[331]

261.    The Claimants argue that the *Salini* criteria are not "*fixed or mandatory as a matter of law*;" rather, they merely provide guidance and need not be identified in each and every case.[332] The *Salini* tribunal itself explained that "*the various criteria are deeply intertwined and hence cannot constitute cumulative jurisdictional requirements*."[333] The Claimants contend, relying on case law and the changes between the first and second edition of Prof Schreuer's Commentary on the ICSID Convention, that the Respondent is wrong to claim that the lack of one of the *Salini* criteria causes an activity not to be considered an investment under Article 25 of the ICSID Convention.[334]

262.    The Claimants further allege that the contribution to the host State's development should not be considered to be a requirement for a qualifying investment. Relying on arbitral decisions, the Claimants assert that it cannot be inferred from the preamble of the ICSID Convention that the economic development of the host State is a condition of a qualifying investment; rather, it is a desired consequence of foreign investment.[335] According to the Claimants, it cannot be inferred from this general aim that each and every private foreign investment must, on its own, make a significant, or even measurable, contribution to the development of the economy of the host State.[336]

---

[329] Cl. Reply, para. 705.

[330] Cl. Reply, paras. 710-715.

[331] Cl. Reply, paras. 716-722.

[332] Cl. Reply, paras. 710, 713.

[333] Cl. Reply, para. 714; *Salini v. Morocco*, **CL-0090 / RL-0054**, para. 52.

[334] Cl. Reply, para. 713, citing C. Schreuer, *The ICSID Convention: A Commentary* (2009) (excerpt), **RL-0055**, pp. 128 *et seq.*, p. 133, para. 171.

[335] Cl. Reply, paras. 717-719.

[336] Cl. Reply, para. 719, citing *İçkale İnşaat Limited Şirketi v. Turkmenistan*, ICSID Case No. ARB/10/24, Award, 8 March 2016, **CL-0302**, para. 291.

>    **(iv)    Even if the *Salini* criteria were to apply, the Claimants'**
>    **investments meet these criteria**

263.    The Claimants claim that even if the *Salini* criteria did apply as strict jurisdictional requirements under Article 25(1) of the ICSID Convention, the Claimants' Offshore Wind Projects and the GFT would satisfy these requirements.[337]

>    *(a) The Offshore Wind Projects fulfill the Salini criteria*

264.    The Claimants argue that their interest in the fifteen Offshore Wind Projects satisfies the *Salini* test because (i) the Claimants acquired NOH 1 and NOH 2 in 2011 and 2012, respectively, for EUR 122 million and incurred development expenses; (ii) the Claimants worked according to a business plan; (iii) the Claimants assumed risk when committing significant resources over a long term; (iv) the Claimants expected to make profits from marketing, constructing and operating the Offshore Wind Projects; and (v) the Claimants' investments were made in response to Germany's call for investments in its offshore wind energy sector.[338]

265.    As to the duration requirement, the Claimants argue that the Tribunal should analyze the investment's intended duration but for the Respondent's measures in order to prevent the Respondent, and States generally, from benefiting from their own wrongdoing.[339] The projects held by NOH 1 were acquired in December 2011 and were sold between 2014 and 2016, and NOH 2's projects were acquired in January 2012. NOH 2 exercised control over the projects until their "*value* [was] *eroded by Germany's Adverse Measures* [...] *until being completely taken away*" on 1 January 2017.[340]

266.    As to the risk requirement, the Claimants argue that the assumption of risk can be considered "*inherent in any long-term commercial contract.*"[341] Risk is a broad concept

---

[337] Cl. Mem., paras. 432-434; Cl. Reply, paras. 723-745.

[338] Cl. Mem., para. 433.

[339] Cl. Reply, para. 727; *KT Asia Investment Group BV v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013, **CL-0269 / RL-0410**, para. 209.

[340] Cl. Reply, para. 727.

[341] Cl. Reply, para. 730; C. Schreuer, *The ICSID Convention: A Commentary* (2009) (excerpt), **RL-0055**, pp. 128 *et seq.*, p. 131, para. 163; *Bayindir Insaat Turizm Ticaret Ve Sanayi AS v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005, **CL-0307 / RL-0423**, para. 136.

that encompasses commercial, financial, market, political and sovereign risk and tribunals have found "*mere commercial risk*" to satisfy the risk requirement.[342] The Claimants argue that risk was present in their long-term project, which saw the Claimants spending approximately EUR 122 million.

267.    As to the requirement of contribution to the economic development of the host State, as noted in paragraph 262 above, the Claimants maintain that this requirement is not a pre-condition for their assets to be considered an "*investment*" under the ICSID Convention.[343] The Claimants argue that, in any event, investments in Germany's offshore wind energy sector and the Claimants' subsequent acquisition and further investment of resources into this sector is a contribution to the development of Germany's offshore wind energy sector.[344] The Offshore Wind Projects therefore meet this criterion.

### (b) The GFT fulfils the Salini criteria

268.    According to the Claimants, the GFT also fulfils all of the *Salini* features of an investment because (i) Strabag invested more than EUR 55 million of its own funds; (ii) Strabag envisaged a business existing for over ten years; (iii) Strabag assumed entrepreneurial, environmental and market risks by committing significant resources; (iv) Strabag expected to make profits by marketing the GFT in Germany and beyond; and (v) Strabag's investment was made in response to Germany's call to invest in its offshore wind energy sector.[345]

269.    According to the Claimants, the final outcome of an economic venture is irrelevant when assessing its contribution to the economic development of the host State.[346] In particular, the Claimants argue that their investments were adversely affected by the Respondent's measures and therefore cannot be judged by their success or lack thereof.[347]

---

[342] Cl. Reply, para. 729; *Mamidoil Jetoil Greek Petroleum Products Societe S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015 ("***Mamidoil v. Albania***"), **CL-0133 / RL-0272**, para. 286.

[343] Cl. Reply, para. 732.

[344] Cl. Reply, para. 732; Cl. Mem., para. 433(e).

[345] Cl. Mem., para. 434.

[346] Cl. Reply, para. 735; *Quiborax v. Bolivia*, **RL-0052**, para. 220.

[347] Cl. Reply, para. 736; Cl. Mem., paras. 7-12.

270.    The Claimants note that the Respondent's argument that Germany had not officially recognized the Claimants' investments is irrelevant.[348] According to the Claimants, the cases cited by the Respondent concern investment treaties that did not include protections for pre-contractual activities and expenditures.[349] In the case at hand, however, the Claimants' assets are plainly included in the ECTs definition of investment and meet the *Salini* criteria.[350]

### (c) The Offshore Wind Projects and the GFT must be considered together as a single economic operation

271.    According to the Claimants, despite the fact that the Offshore Wind Projects and the GFT each constitute a qualifying investment under Article 25(1) of the ICSID Convention, both investments also constitute "*one single 'overall' operation*" and must be considered together. The Claimants argue that the rule of "*general unity of an investment operation*" applies to their investments.[351] An ICSID tribunal does not need to examine each element of the overall transaction to examine whether each transaction, standing alone, satisfies the applicable requirements.[352]

272.    The Claimants argue that the application of the rule of general unity of an investment operation in this dispute leads to the result that the entire bundle of rights and assets that formed the GFT and the Offshore Wind Projects constitutes a qualifying investment.[353]

### (v)    Strabag's subsidiary claim is admissible

273.    The Claimants submit that, contrary to the Respondent's argument, Strabag's claim for compensation based on its participation in NOH 1 and NOH 2 and, through NOH 1 and NOH 2, in the Project Companies and the Offshore Wind Projects is admissible.[354] According to the Claimants, Strabag's claim is subsidiary to NOH 1's and NOH 2's claims

---

[348] Cl. Reply, para. 737; Resp. Mem., para. 198.

[349] Cl. Reply, paras. 738-739.

[350] Cl. Reply, para. 739.

[351] Cl. Reply, paras. 742-743.

[352] Cl. Reply, para. 744; *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010, **CL-0309**, para. 92.

[353] Cl. Reply, para. 745.

[354] Cl. Reply, para. 746; Cl. Mem., para. 641(b)(i)(2).

and is admissible under both the ICSID Convention and the ICSID Arbitration Rules since, under both instruments, claims are crystallized in a claimant's memorial, not in the request for arbitration.[355]

274.   Article 36 of the ICSID Convention only establishes that the request for arbitration "*shall contain information concerning the issues in dispute*,"[356] while ICSID Arbitration Rule 31 establishes that the memorial "*shall contain: a statement of the relevant facts; a statement of law; and the submissions*."[357] The Claimants argue that the phrase "*the submissions*" in ICSID Arbitration Rule 31 refers to claims and highlights that ancillary claims, if any, can and must be raised at the latest in a claimant's reply under ICSID Arbitration Rule 40.[358]

275.   According to the Claimants, the Respondent's objection under Article 26(1) of the ECT is without merit because the Claimants included Strabag's subsidiary claim in the Claimants' Notice of Dispute.[359] As a result, there is no issue with the required cooling-off period requirement in the ECT and the claim can be settled by this Tribunal.[360]

### (2)    The Tribunal's Analysis

276.   As summarized above, the Respondent objects to the Tribunal's jurisdiction *ratione materiae*, contending that the Claimants' activities qualify as investments neither under the ICSID Convention nor under the ECT, whereas the Claimants' case is that both the Offshore Wind Projects and the GFT qualify as investments within the meaning of Article 25(1) of the ICSID Convention and Article 1(6) of the ECT, and indeed together constitute "*a single economic operation*."

277.   It is undisputed between the Parties that, for the purposes of establishing the Tribunal's jurisdiction over their claims, the Claimants must show that they have made a qualifying

---

[355] Cl. Reply, para. 748.

[356] Cl. Reply, para. 748; ICSID Convention, **CL-0279**, Art. 36(2).

[357] Cl. Reply, para. 748; ICSID Convention, **CL-0279**, ICSID Arbitration Rules, Rule 31(3).

[358] Cl. Reply, para. 749. ICSID Arbitration Rule 40(2) states: "*An incidental or additional claim shall be presented not later than in the reply and a counter-claim no later than in the counter-memorial, unless the Tribunal, upon justification by the party presenting the ancillary claim and upon considering any objection of the other party, authorizes the presentation of the claim at a later stage in the proceeding.*"

[359] Cl. Reply, para. 750; Resp. Mem., para. 239; Notice of Dispute, **C-0049**, p. 2.

[360] Cl. Reply, para. 750.

investment under both the ICSID Convention and the ECT. The Tribunal will deal with these two issues in turn, addressing first the question of whether the Claimants' activities qualify as an "*Investment*" under the ECT.

### a.    Whether the Claimants have shown that they have made an "Investment" under the ECT

278.    The term "*Investment*" is defined, for the purposes of the ECT, in Article 1(6) ("*Definitions*"), which provides:

> "*Investment*" *means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:*
>
> (a)    *tangible and intangible, movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;*
>
> (b)    *a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;*
>
> (c)    *claims to money and claims to performance pursuant to contract having an economic value and associated with an investment;*
>
> (d)    *Intellectual Property;*
>
> (e)    *Returns;*
>
> (f)    *any right conferred by law or contract or by virtue of any licenses and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.*
>
> […]
>
> "*Investment*" *refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.*[361]

279.    "*Economic Activity in the Energy Sector*" is defined in Article 1(5) as

---

[361] ECT, **CL-0001**, Art. 1(6).

> *an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale of Energy Materials and Products except those included in Annex NI, or concerning the distribution or heat to multiple premises.*[362]

280. According to the Understanding with respect to Article 1(5) of the ECT, agreed and adopted in connection with the signing of the Final Act of the European Energy Charter Conference, "*construction and operation of power generation facilities, including those powered by wind and other renewable energy sources*" is considered "*illustrative*" of Economic Activity in the Energy Sector. The Claimants' activities are thus, in principle, governed by the ECT.

281. The Claimants argue that their assets in Germany constitute "*an investment associated with an Economic Activity in the Energy Sector*" in accordance with Article 1(6) of the ECT. The Claimants' alleged investments include, with respect to NOH 1 and NOH 2 (and indirectly Strabag), the Offshore Wind Projects, and with respect to Strabag, the GFT.

282. As to NOH 1 and NOH 2, the Claimants assert that in December 2011 and January 2012, NOH 1 and NOH 2 acquired, for approximately EUR 122 million, the entire direct shareholding in the Project Companies.[363] According to the Claimants, "*NOH 1 and NOH 2 Project Companies, together with shareholder loans extended to such companies, constitute a qualifying investment under Article 1(6) ECT, being assets having an economic value.*"[364] The Claimants further argue that "*NOH 1 and NOH 2 indirectly own and control Project Companies' assets and rights.*"[365] The Project Companies' position in the Plan Approval Process was "*a freely transferrable asset having an economic value,*" which was driven by the right to receive a grid connection, once approved by the BSH, and the right to receive a feed-in tariff once the OWFs entered into operation.[366] According to the Claimants, they have produced evidence showing that Strabag spent approximately

---

[362] ECT, **CL-0001**, Art. 1(5).

[363] Cl. Mem., para. 425.

[364] Cl. Mem., para. 425 [footnote omitted].

[365] Cl. Mem., para. 426.

[366] Cl. Mem., para. 426.

EUR 122 million in the acquisition of the Project Companies and incurred additional costs, in the amount of approximately EUR 10.2 million, in developing the projects.[367]

283.    As to Strabag, in addition to its shareholding in NOH 1 and NOH 2 (and through them, its indirect stake in the Offshore Wind Projects), it also established a number of German-incorporated fully owned subsidiaries for the development of GFT – SOW, Offshore Logistik GmbH and FiT. According to the Claimants, Strabag's direct ownership of the entire shareholding of these companies constitutes an "*Investment*" within the meaning of Article 1(6) of the ECT, since its shareholdings are an asset having an economic value and are associated with Economic Activity in the Energy Sector within the meaning of the ECT. Strabag also indirectly owns and controls the assets of these companies, including the GFT, owned by SOW.[368] The evidence shows that, over time, Strabag spent more than EUR 55 million in the development of the GFT.[369]

284.    The Tribunal is satisfied that the Claimants' Offshore Wind Projects and the GFT fall within the scope of the definition of "*Investment*" in Article 1(6) of the ECT, and that both the Offshore Wind Projects and the GFT are associated with Economic Activity in the Energy Sector, as required by Article 1(6) [*in fine*] of the ECT, in accordance with the Understanding with respect to Article 1(5) of the ECT.

285.    As to the Offshore Wind Projects specifically, the Tribunal notes that, while the list of assets in Article 1(6) of the ECT that qualify as "*Investments*" is not exhaustive, it does specifically mention, in Article 1(6)(b), assets such as "*a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise.*" The Project Companies owned and controlled by NOH 1 and NOH 2 directly, and by Strabag indirectly, through NOH 1 and NOH 2, fall under this category of assets. The fact that the payments for the acquisition of the Project Companies were made in Austria is irrelevant in this context, since they were made for the purposes of acquiring companies incorporated in Germany, and it is this acquisition that constitutes the

---

[367] Hern ERI, paras. 34, 155-157; Purchase Price Analysis, **RH-0004**.

[368] Cl. Mem., para. 427.

[369] Cl. Mem., para. 434; *see also* Hern ERI, paras. 200-201.

investment. As a result, the Claimants "*owned or controlled directly or indirectly*" companies incorporated in Germany, within the meaning of Article 1(6) of the ECT.[370] Moreover, Article 1(8) of the ECT provides that "*Make Investments*" or "*Making Investments*" means "*establishing new Investments*" as well as "*acquiring all or part of existing Investments.*"

286.    As to the GFT, the Tribunal notes that Strabag established German-incorporated companies such as SOW and FiT to research and develop the GFT and to set up test fields for gravity foundations at the location of one of its Offshore Wind Projects, the Albatros Test Field. SOW also held the know-how and intellectual property rights, including patents, relating to the GFT, which fall under the category of "*Intellectual Property*" in Article 1(6)(d) of the ECT. Whether the Claimants' investments in the GFT had created any value as of the date of the alleged breach of the ECT, or whether the GFT merely constituted research and development activity as alleged by the Respondent, is a matter for the merits and does not concern the Tribunal's jurisdiction. The Claimants have indisputably "*invested*" in the development of the GFT.

### b.    Whether the Claimants have shown that they have made an "investment" under the ICSID Convention

287.    Article 25(1) of the ICSID Convention does not define the term "*investment*," and merely provides that "[t]*he jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment.*" The term "*investment*," as employed in the ICSID Convention, must therefore be interpreted in accordance with its ordinary meaning, pursuant to the VCLT.

288.    The Tribunal agrees with the Claimants that the so-called "*Salini* test," developed in arbitral jurisprudence to spell out the term's ordinary meaning, is not a true legal test but rather an attempt to characterize the elements that should be considered in determining whether a claimant has made an "investment" within the meaning of Article 25(1) of the ICSID Convention. Indeed, the key elements of the *Salini* test – capital contribution, duration and risk – cannot be considered separate or independent requirements but rather

---

[370] *See, e.g., Quiborax v. Bolivia*, **RL-0052**, para. 229.

intertwined elements of an "*investment*." Contribution of capital to a business venture, regardless of type or category of assets contributed and regardless of the legal form of the business venture, in particular when it involves direct (rather than portfolio) investment, which is the case here, necessarily involves assumption of risk and a certain duration, and thus constitutes the defining element of an "investment" within the meaning of Article 25(1) of the ICSID Convention.

289.   The Respondent does not appear to dispute that the Claimants have made capital contributions to the development of both the NOH 1 and NOH 2 projects, as well as the GFT, investing significant amounts in the operation of both NOH 1 and NOH 2, and in the development of the GFT. Instead, the Respondent argues, as summarized above, that the Claimants' investments do not meet the required duration and do not involve assumption of risk.[371] The Tribunal is satisfied that, even though the Claimants put the NOH 1 projects "*for sale*" some fourteen months after their acquisition, this was in an effort to mitigate the damage caused by the Respondent's measures that the Claimants allege amount to a breach of the ECT. The Tribunal notes that, in any event, the NOH 1 projects were only sold between 2014 and 2016, *i.e.* some three to five years after their acquisition, which the Respondent acknowledges meets the required duration for the purposes of constituting an "*investment*."

290.   The Tribunal further agrees with the Claimants that contribution to the economic development of the host State, which the *Salini* tribunal considered could be added as "*an additional condition*," is not part of the definition of "*investment*."[372] The Tribunal notes that, while the preamble of the ICSID Convention refers to "*the need for international cooperation for economic development, and the role of private international investment therein*," this is not a definition of the term "*investment*;" the clause rather sets out one of the objects and purposes of the ICSID Convention – promotion of economic development by way of private foreign investment. While private foreign investment, as a whole, tends to contribute to the economic development of the host State, an investor cannot reasonably be required to demonstrate, for the purposes of showing that it has made an "*investment*"

---

[371] *See* Resp. Mem., para. 249.

[372] *Salini v. Morocco*, **CL-0090 / R-0054**, para. 52.

within the meaning of Article 25(1) of the ICSID Convention, that its investment has made a "*contribution*" to the economic development of the host State.  As noted by several ICSID tribunals, contribution to the economic development of the host State is a consequence of foreign investment, rather than a material element in determining whether an investment has been made.[373]

291.    The Tribunal is therefore satisfied that the Claimants' Offshore Wind Projects and the GFT qualify as "investments" within the meaning of Article 25(1) of the ICSID Convention.

### c.      Whether Strabag's claim is admissible

292.    The Respondent also argues that Strabag's claim in relation to its indirect shareholding in the Project Companies should be dismissed because the Claimants explicitly excluded the claim in the RfA, but then reintroduced it in their Memorial. Thus, according to the Respondent, the claim was never subject to negotiations between the Parties, as required under Article 26(1) of the ECT, and is therefore inadmissible.[374]

293.    The Claimants note, in response, that Strabag's claim is subsidiary to NOH 1's and NOH 2's claims and contends that the claim is admissible because under both the ICSID Convention and the ICSID Arbitration Rules, claims are crystallized in a claimant's memorial, not in the request for arbitration.[375] Moreover, the Claimants raised the claim in their Notice of Dispute and as such it was subject to the cooling-off period in the ECT.[376]

294.    The Tribunal notes that the relevant issue is not whether Strabag's claim was included in the Claimants' RfA, but whether it was included in the Notice of Dispute, since it is the latter, and not the former, that triggers the obligation to attempt to settle the dispute

---

[373] *See, e.g. Victor Pey Casado and President Allende Foundation v. Republic of Chile,* ICSID Case No. ARB/98/2, Award, 8 May 2008, **CL-0303**, para. 232; *LESI SpA and Astaldi SpA v. People's Democratic Republic of Algeria,* ICSID Case No. ARB/05/3, Decision on Jurisdiction, 12 July 2006, **CL-0304**, para. 72; *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010, **CL-0305 / RL-0413**, paras. 110-111; *Quiborax v. Bolivia*, **RL-0052**, para. 220.

[374] Resp. Mem., paras. 235-240.

[375] Cl. Reply, para. 748.

[376] Cl. Reply, para. 750; Resp. Mem., para. 239; Notice of Dispute, **C-0049**, p. 2.

amicably under Article 26(1) and (2) of the ECT. It is undisputed that the Claimants' Notice of Dispute did include Strabag's indirect claim.

295. Moreover, while Strabag had indicated in the RfA that it did not make a separate claim in relation to its indirect shareholding in NOH 1 and NOH 2, this is irrelevant since the cooling-off period had already expired by then. Moreover, pursuant to Article 36(2) of the ICSID Convention and Rule 2(1)(e) of the ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings, an RfA must "*contain information concerning the issues in dispute*," whereas pursuant to Rule 31(3) of the ICSID Arbitration Rules, the "*submissions*" of the Parties, as well as "*a statement of the relevant facts*" and "*a statement of law*" are required to be set out in detail in the memorial. The submission where a claimant's claims must be set out in detail is thus the memorial, not the request for arbitration.

### d.    Conclusion

296. In conclusion, the Tribunal rejects the Respondent's objections to the Tribunal's jurisdiction *ratione voluntatis* and to the admissibility of Strabag's claim.

## C.    JURISDICTIONAL OBJECTION *RATIONE PERSONAE*

### (1)    The Parties' Positions

#### a.    The Respondent's Position

297. In its First Post-Hearing Brief, the Respondent objected to the Tribunal's jurisdiction *ratione personae* on the basis that in the present case, there is no dispute between a Contracting State and a national of another Contracting State. According to the Respondent, the Claimants do not qualify as nationals of another Contracting State as required by Article 26(3) and (4) of the ECT and Article 25(1) of the ICSID Convention as they were, on the day of filing of the RfA, under Russian control.[377] The Russian

---

[377] Resp. First PHB, para. 15.

Federation is neither a Contracting Party to the ECT nor a Contracting State to the ICSID Convention.[378]

298.    The Respondent contends that the Claimants' own witness, Mr Felix Koselleck, confirmed that Strabag is owned partly by MKAO Rasperia Trading Ltd. ("**Rasperia**"), which is incorporated in Moscow, Russian Federation.[379] Rasperia, in turn, is ultimately controlled by Mr Oleg Deripaska, a Russian national who has held shares in Strabag since 2007.[380]

### b.    The Claimants' Position

299.    According to the Claimants, the Tribunal has jurisdiction *ratione personae* because (i) the Claimants qualify as Austrian investors under Article 1(7) of the ECT; (ii) the Claimants qualify as Austrian investors under Article 25(2)(b) of the ICSID Convention; (iii) the Respondent failed to contest jurisdiction *ratione personae* in a timely manner; and (iv) Strabag has never been under Russian control.

300.    First, the Claimants argue that, as companies incorporated in Austria, which is an ECT Contracting Party, they qualify as Austrian investors under Article 1(7)(a)(ii) of the ECT and are therefore entitled to initiate arbitration against the Respondent pursuant to the "*clear terms*" of Article 26(1) of the ECT.[381] Article 1(7) of the ECT defines the term "*Investor*" as a "*company* [...] *organized in accordance with the law applicable in that Contracting Party.*"[382] As a result, in the Claimants' view, it is clear that they qualify as "*Investors*" of another Contracting Party.

301.    Second, the Claimants contend that they qualify as nationals of another Contracting State under Article 25(1) of the ICSID Convention, as they are companies incorporated in Austria, an ICSID Contracting State. The Claimants' claims therefore fall under ICSID

---

[378] Resp. First PHB, paras. 15-16. The Russian Federation notified pursuant to Article 45(3)(a) of the ECT that it had no intention of becoming a member of the ECT: *see* Russian Federation, Decree No. 1055-r, 30 July 2009https://www.energychartertreaty.org/fileadmin/DocumentsMedia/Founding_Docs/Letter_Russian_Federation_2009.pdf); ICSID, List of Contracting States (available at: https://icsid.worldbank.org/about/member-states/database-of-member-states).

[379] Resp. First PHB, para. 16; Tr. Day 2, 16:21-23.

[380] Resp. First PHB, para. 16; Tr. Day 2, 16:21-23.

[381] Cl. Second PHB, Sec. C.

[382] Cl. Second PHB, para. 29.

jurisdiction *ratione personae*, which extends to "*any legal dispute arising directly out of an investment between a Contracting State* [...] *and a national of another Contracting State*."[383]

302.  Third, the Claimants argue that the Respondent's *ratione personae* objection is inadmissible because it was not timely.[384] The Respondent only raised the objection in its First Post-Hearing Brief and, accordingly, the objection is late.[385] According to ICSID Arbitration Rule 41(1), any jurisdictional objection must be made "*as early as possible*"[386] and in any event cannot be filed later than the date fixed for the filing of the counter-memorial unless the relevant facts on which the objection is based were unknown at the time. Here, the facts relied on by the Respondent were known on 9 August 2021, when the Respondent filed its Counter-Memorial, and the Respondent has not alleged otherwise.[387] Therefore, the Respondent's jurisdictional objection *ratione personae* is belated and as such inadmissible.

303.  Finally, the Claimants assert that, contrary to the Respondent's allegations, Strabag has never been controlled by Russian entities or persons because Rasperia, which is controlled by Mr Oleg Deripaska, a Russian national, has never held more than 28 percent of Strabag's shares.[388] Moreover, Rasperia's shareholding is currently frozen so any exercise of rights linked to Rasperia's shareholding in Strabag is blocked.[389]

### (2)    The Tribunal's Analysis

304.  The relevant provisions for the purposes of the Tribunal's jurisdiction *ratione personae* are Article 1(7) of the ECT and Article 25(1) of the ICSID Convention. Article 1(7) of the ECT defines "*Investor*," *inter alia*, as "*a company or other organization organized in accordance with the law applicable in that Contracting Party*." Article 25(1) of the ICSID

---

[383] Cl. Mem., para. 416; ICSID Convention, **CL-0279**, Art. 25.
[384] Cl. Second PHB, para. 27.
[385] Cl. Second PHB, para. 27.
[386] Cl. Second PHB, para. 28; ICSID Convention, **CL-0279**, ICSID Arbitration Rules, Rule 41(5).
[387] Cl. Second PHB, para. 28.
[388] Cl. Second PHB, para. 30.
[389] Cl. Second PHB, para. 30.

Convention provides, in turn, that the jurisdiction of the Centre extends to any dispute "*between a Contracting State* […] *and a national of another Contracting State.*"

305.　It is undisputed that Austria is a Contracting Party to the ECT and a Contracting State to the ICSID Convention. The Respondent contends, however, that the Claimants cannot be considered qualified "*Investors*" under the ECT or "*nationals*" of Austria under the ICSID Convention because, on the day of filing of the RfA, Strabag was "*under Russian control,*" and the Russian Federation is not a Contracting Party to the ECT or a Contracting State to the ICSID Convention.[390]

306.　The Tribunal notes that the Respondent raised its objection only in its First Post-Hearing Brief. According to ICSID Arbitration Rule 41(1) "[a]*ny objection that the dispute* […] *is not within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal shall be made as soon as possible,*" and "*no later than the expiration of the time limit fixed for the filing of counter-memorial,* […] *unless the facts on which the objection is based are unknown to the party at that time.*"

307.　The Respondent has not offered any justification for the late filing of its objection. The Respondent's objection is thus made belatedly and is rejected.

308.　Moreover, and in any event, the Respondent has failed to produce any evidence to support its allegation that Strabag was "*under Russian control.*" The sole support for the Respondent's allegation is Mr Koselleck's evidence during the Hearing that, in addition to two Austrian entities, Rasperia was one of the three main shareholders of Strabag, and that Rasperia was "*49% owned indirectly by Oleg Deripaska,*" a national of the Russian Federation who was subsequently placed on the European Union sanctions list. However, contrary to what the Respondent alleges, Mr Koselleck did not "*confirm*" that Strabag was "*under Russian control.*"[391]

---

[390] Resp. First PHB, para. 15.
[391] Tr. Day 2: 16:15–17:2 (testimony of Mr Felix Koselleck).

309.   In conclusion, the Tribunal rejects the Respondent's objection to the Tribunal's jurisdiction *ratione personae*.

****

310.   Having rejected each of the Respondent's objections to jurisdiction and admissibility, the Tribunal determines that it has jurisdiction over the entirety of the Claimants' claims, and that the Claimants' claims are admissible.

## VI.   LIABILITY

311.   The Claimants raised in their Memorial four heads of claim under the ECT: (i) breach of the fair and equitable treatment standard (Article 10(1) of the ECT); (ii) expropriation (Article 13 of the ECT): (iii) breach of the full protection and security standard (Article 10(1) of the ECT); and (iv) breach of the non-impairment standard (Article 10(1) of the ECT). While the order in which the Claimants raised these claims and the related arguments evolved in the course of the arbitration, the Tribunal will address and determine the Claimants' claims in this order.

312.   The Respondent denies that it committed any breach of the ECT, for reasons set out in detail in its submissions and as summarized below.

### A.   THE ALLEGED BREACH OF THE FAIR AND EQUITABLE TREATMENT STANDARD

#### (1)   The Parties' Positions

##### a.   *The Claimants' Position*

###### (i)   Applicable legal standard

313.   The Claimants argue that under Article 26(6) of the ECT, the Tribunal must decide the issues in dispute "*in accordance with* [the ECT]" and "*any applicable rules and principles of international law*."[392] The Claimants also refer to Article 42(1) of the ICSID Convention, which provides that the Tribunal shall decide a dispute "*in accordance with such rules of law as may be agreed by the parties*" and, in the absence of any such rules,

---

[392] Cl. Mem., para. 439.

"*the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.*"[393]

314.    The Claimants submit that, in light of these provisions, "*German law 'is relevant to this dispute only as a matter of fact or background context, and that it should not influence the legal standards that the Tribunal applies to determine whether the Respondent violated the ECT.'*"[394]

315.    For the purposes of their fair and equitable treatment ("**FET**") claim, the Claimants rely on Article 10(1) of the ECT, which provides, in relevant part, that each Contracting Party shall "*encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area,*" and that "[s]*uch conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.*"[395]

316.    The Claimants contend that the FET standard in Article 10(1) of the ECT is autonomous and broad, and "*is not assimilated to, or limited by, the minimum standard of treatment under customary international law.*"[396] According to the Claimants, the Contracting Parties' obligation to maintain legal stability and transparency is particularly important in the energy sector, which is highly regulated and in which investments are characterized by "*high capital intensity and long duration of capital recovery.*"[397] The Claimants argue that, when interpreted in accordance with the VCLT, the first two sentences of Article 10(1) of the ECT establish the obligations to (i) honor legitimate expectations; (ii) ensure legal stability and transparency; and (iii) act reasonably and proportionately in relation to protected investments and investors.[398]

---

[393] Cl. Mem., para. 437.

[394] Cl. Mem., para. 440, quoting *ESPF Beteiligungs GmbH, ESPF Nr. 2 Austria Beteiligungs GmbH, and InfraClass Energie 5 GmbH & Co. KG v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020, **CL-0072 / RL-0253**, para. 401.

[395] ECT, **CL-0001**, Art. 10(1).

[396] Cl. Mem., para. 445.

[397] Cl. Mem., para. 449.

[398] Cl. Mem., para. 453.

**(ii)    The Claimants' reliance on the German regulatory regime**

317.    The Claimants argue that the Respondent frustrated the Claimants' legitimate expectations by (i) radically changing the essential features of the regulatory framework governing offshore wind energy; and (ii) failing to treat the Claimants reasonably and proportionately.[399]

318.    The Claimants submit that they invested in the Offshore Wind Projects and in the development of the GFT in reliance on the regulatory framework governing the development, construction and operation of OWFs. According to the Claimants, the German legal framework granted investors legal certainty in terms of (i) a predictable permitting process that provided a subjective public law right to approval and control over the location and pace of development; (ii) an exclusive right to develop an OFW in the area on which their Application rested; (iii) an unrestricted right to a timely grid connection once the developer met certain objective criteria; and (iv) a remuneration mechanism, including feed-in tariffs, and specific incentives for faster and further from shore development.[400]

319.    The Claimants assert that they also expected to be able to develop their OWFs in areas further away from shore, as "*the development of OWF further from shore was necessary to achieve Germany's 25 GW expansion target*."[401] The future offshore expansion was "*central to the Claimants' business plan, particularly in light of the Coastal-Distance Bonus*," as explained by the Claimants' witnesses Mr Koselleck and Mr Weber.[402]

320.    The Claimants submit that Germany "*induced*" the Claimants to invest in the Offshore Wind Projects and the GFT, for which Germany expressed "*specific support*."[403] According to the Claimants, Germany invited the offshore wind industry to develop innovative foundation technologies that would help bring down the cost of offshore wind

---

[399] Cl. Mem., para. 475.
[400] Cl. Mem., para. 477; Cl. First PHB, paras. 72-86.
[401] Cl. First PHB, para. 102.
[402] Cl. First PHB, para. 103.
[403] Cl. First PHB, para. 72.

energy and allow OWF installations in deeper water depths.[404] Germany further granted Strabag access to a suitable port in Cuxhaven, which was favorably located and allowed easy access to the EEZ for offshore works.[405] Strabag was also granted EU funding of up to EUR 58.54 million for the development of the GFT.[406]

321.   The Claimants argue that their reliance on the stability of the German regulatory framework was reasonable.[407] According to the Claimants, they were entitled to rely on the 30-month deadline for a grid connection in the 2009 BNA Position Paper when making their investments, as the 2009 BNA Position Paper was authored by Germany's central regulatory authority for the energy sector.[408] Indeed, Germany's own agencies also relied upon the 2009 BNA Position Paper.[409]

322.   For the same reason, the Claimants were also entitled to invest in offshore wind projects located further away from shore (*i.e.* in areas that were subsequently designated as zones 3 to 5 of the EEZ in the North Sea). The Claimants' reliance was reasonable as Germany's expansion target was set at 25 GW by 2030,[410] and reaching this target required development in areas further away from shore, including areas that were later designated as zone 3.[411] The need to develop zone 3 was confirmed by Germany's subsequent conduct, including the reopening of zone 3 for development in 2021, after termination, in 2017, of all OWF projects located in that zone.[412]

323.   The Claimants maintain that they were also entitled to pursue the implementation of a project pipeline as a route to market the GFT, in reliance on the German legal framework.[413]

---

[404] Cl. First PHB, para. 88.

[405] Cl. First PHB, para. 91.

[406] Cl. First PHB, para. 92.

[407] Cl. First PHB, para. 109.

[408] Cl. First PHB, para. 111.

[409] Cl. First PHB, paras. 110, 112-113.

[410] Cl. First PHB, para. 121.

[411] Cl. First PHB, para. 122.

[412] Cl. First PHB, paras. 123-124.

[413] Cl. First PHB, paras. 126-127.

(iii) **The Respondent's frustration of the Claimants' legitimate expectations and breach of commitment to regulatory stability**

324. The Claimants argue that Germany's adverse measures removed the key features of the regulatory framework which formed the basis of the Claimants' investments in Germany's offshore wind energy sector. According to the Claimants, the changes to the regulatory regime were "*so radical as to constitute per se a violation of the* [FET] *standard under Article 10(1) ECT.*"[414]

325. The fundamental changes included (i) the Development Freeze, which significantly reduced the Claimants' planned offshore installations; (ii) the implementation of a centralized grid connection system, which gave the TSOs control over offshore wind expansion; (iii) the reduction of the expansion targets and halting the development in areas further away from shore; and (iv) the introduction of a compulsory tender procedure, which "*destroyed all key features of the regulatory framework previously established.*"[415]

(a) *The Development Freeze*

326. The Claimants argue that the Development Freeze, adopted on 15 June 2012, resulted in putting on hold all applications for offshore wind installations in areas in the EEZ that were considered necessary to accommodate future grid infrastructure.[416]

327. The Development Freeze had a major impact on the NOH 2 projects, as it affected approximately 40 percent of NOH 2 projects' planned installations, *i.e.* 244 out of 611 installations. Two of the NOH 2 projects, OWP SeaStorm I and II, were effectively terminated by the Development Freeze.[417]

(b) *The Centralized Grid Connection System*

328. The Claimants submit that the second adverse measure was the 2012 Energy Act, together with the O-NEPs for 2013, 2014 and 2015, which eliminated the TSOs' obligation to provide OWF developers with grid connection and implemented a central planning system

---

[414] Cl. First PHB, para. 128; *see also* Cl. Mem., paras. 468-469.
[415] Cl. First PHB, para. 129.
[416] Cl. Mem., para. 485.
[417] Cl. Mem., para. 485; Cl. First PHB, para. 131.

for grid connections. Instead of OWP developers, the TSOs were given the authority to fix binding grid connection timelines for OWF projects, which not only took away the Claimants' control over the development timeline, but also severely delayed – by over ten years – the entry into commercial operation of the Claimants' Offshore Wind Projects.[418]

329.   The Claimants contend that, since TSOs had an interest in "*simplifying and reducing their own obligation to provide grid connections*," they prioritized grid connections for projects closer to shore and delayed those further away, in particular those in the newly established zone 3, where most of the Claimants' projects were located.[419] According to the Claimants, the 2012 Energy Act "*completely reversed the system of grid connection on which the Claimants had relied.*"[420]

### (c) Reduction of expansion targets and halting the development in areas further away from shore

330.   In 2012, Germany announced that it intended to reduce its expansion targets for offshore wind energy, and in 2014 it took a formal decision to that effect, reducing its target for offshore wind energy from 25 GW to 15 GW by 2030.[421]

331.   The Claimants contend that, once the development target was reduced, Germany abandoned the OWF projects located in zone 3 without any legal basis, by way of a BSH circular halting the Plan Approval Processes for all projects located in zone 3.[422]

### (d) Compulsory Tender Procedure

332.   In 2017, Germany enacted the 2017 Renewable Energy Sources Act and the Offshore Wind Energy Act, which dismantled the remaining elements of Germany's original regulatory framework, by irrevocably terminating ongoing Plan Approval Processes of most existing projects and replacing them with a compulsory central tender procedure.[423] The Claimants

---

[418] Cl. First PHB, paras. 135-136.
[419] Cl. First PHB, para. 136.
[420] Cl. First PHB, para. 137.
[421] Cl. First PHB, para. 138.
[422] Cl. First PHB, para. 140; Letter from BSH to GAIA I, 6 March 2015, **C-0273**, pp. 2-3.
[423] Cl. First PHB, para. 141.

submit that these measures frustrated their legitimate expectations regarding "*the Offshore Wind Projects' (i) position in the (Plan) Approval Process, (ii) site control and (iii) renumeration mechanism.*"[424]

333.    The Claimants explain that, under the transitory rules for existing projects in zones 1 and 2, their original developers had the right to participate in two transitional tenders conducted in 2017 and 2018 and, if they were unsuccessful, they would obtain step-in rights for previously developed sites as a form of compensation. According to the Claimants, however, "*projects located in zone 3 were excluded from both mechanisms as Germany no longer deemed their development 'necessary at the time to reach the reduced expansion targets.*'"[425] As a result, the Plan Approval Processes for these projects were terminated as of 1 January 2017, "*without adequate compensation,*" and the Claimants were prevented from developing the NOH 2 sites, lost their positions and "*had to write off their remaining market value as well as the stranded investments for necessary site investigations.*"[426]

334.    According to the Claimants, the 2017 measures thus "*frustrated the Claimants' expectation to recover their investments in planning and exploratory work and to profit from the operable windfarms.*"[427]

        *(e)   At the time of the Claimants' investments, Germany's breaches were not foreseeable*

335.    The Claimants submit that, contrary to the Respondent's argument, "*foreseeability is only relevant in the context of the Claimants' fair and equitable treatment claim to assess whether the Claimants' subjective expectations were objectively reasonable.*"[428] The Respondent has also failed to prove that the 2012 and 2017 measures were foreseeable. More specifically, according to the Claimants, the Respondent's attempt to argue that the introduction of the suitability and priority areas in 2002 and 2009, respectively, was foreseeable, is unfounded since the purpose of these designations was to make it easier for

---

[424] Cl. Mem., para. 490; Cl. First PHB, paras. 141-145.

[425] Cl. First PHB, para. 143, quoting Tr. Day 7, 17:25–18:6 1 (testimony of Prof Dr Jörg Gundel).

[426] Cl. First PHB, para. 143.

[427] Cl. First PHB, para. 143.

[428] Cl. First PHB, para. 146.

investors to develop these areas and not to exclude development outside of such areas. The Claimants note that this was confirmed by the Respondent's own legal expert, Prof Dr Schomerus, at the Hearing.[429]

336.    The Claimants further contend that, contrary to the Respondent's case, the EEG Progress Reports issued in 2002, 2007 and 2011 "*did not foreshadow the 2012 and 2017 Measures*," and thus those measures were not foreseeable.[430] According to the Claimants, there was no reference in the EEG Progress Reports to the specific measures that were subsequently implemented. In particular, there was no reference to a reduction in the offshore wind development targets, or the O-NEPs or the distance to shore being a relevant criterion for development to be permitted, or the termination of the Plan Approval Processes.[431]

*(f)  Germany breached its obligation to refrain from radically changing its regulatory framework*

337.    The Claimants submit that the Respondent's 2012 and 2017 measures also constitute a breach of "*the self-standing obligation of stability of the regulatory framework under Article 10(1) ECT, irrespective of the Claimants' legitimate expectations*."[432] According to the Claimants, both sets of measures "*constitute a radical change of the applicable legal framework at the detriment of qualifying investors and investments*."[433]

338.    The Claimants contend that as a result of the regulatory shift in 2012, Germany moved away from a developer-driven system, "*with a fully predictable development schedule and an automatic right to a grid connection to a fully Germany-driven central planning system where grid connections exclusively depended upon Germany's discretion*."[434] However, these had been "*the two essential features*" of the legal framework applicable at the time

---

[429] Cl. First PHB, paras. 150-151.
[430] Cl. First PHB, para. 152.
[431] Cl. First PHB, paras. 152-153.
[432] Cl. Mem., para. 503.
[433] Cl. Mem., para. 503.
[434] Cl. Mem., para. 504.

of the Claimants' investments, and their elimination "*caused severe damages to the Claimants' investments*."[435]

339.   Similarly, according to the Claimants, the 2017 measures also constituted a fundamental change of the regulatory framework governing OWFs. The Respondent "*fundamentally altered two further essential pillars of its regulatory regime*," that is, the permitting process, which was replaced by a tender process, and the fixed feed-in tariff granted by law, which was replaced by "*a totally unpredictable bid-driven remuneration mechanism*."[436] These measures destroyed the residual value of the Claimants' investments. The fact that Germany in 2019 again adjusted the regulatory framework, this time by increasing its offshore wind energy targets and by offering the former NOH 2 project sites for development, highlights the "*continuous oscillation and unpredictability*" of the applicable legal regime.[437]

### (g) Germany failed to treat the Claimants fairly and equitably by placing disproportionate effects of its adverse measures on the Claimants' investments

340.   The Claimants argue that the 2012 and 2017 measures had a disproportionate effect on the Claimants' investments and were thus in breach of the FET standard under Article 10(1) of the ECT. The measures "*did not rationally further Germany's policies*" and their effect on the Claimants "*went well beyond the burden any qualifying investor and investment may legally bear under the ECT*."[438]

341.   The Claimants contend that the 2012 and 2017 measures reduced the value of the Claimants' Offshore Wind Projects, while "*the true beneficiary*" of the system change was the TSOs, at the expense of the OWF developers.[439]

342.   The Claimants argue that two of the Claimants' Offshore Wind Projects, SeaStorm I and II, lost their fair market value already as a result of the 2012 Development Freeze, which

---

[435] Cl. Mem., para. 504.

[436] Cl. Mem., para. 505.

[437] Cl. Mem., para. 506, quoting *Mamidoil v. Albania*, **CL-0133 / RL-0272**, para. 621.

[438] Cl. Mem., para. 507; Cl. First PHB, para. 155.

[439] Cl. First PHB, para. 156.

also significantly reduced the number of installations of the remaining NOH 1 and NOH 2 projects, effectively stalling their development. The 2012 measures also resulted in a significant delay to the grid connection dates, which further reduced their value. In order to mitigate their damage, the Claimants were forced to sell OWP West and OWP GlobalTech II, "*at a fraction of their former market value.*"[440] The 2017 measures ultimately irrevocably destroyed the remaining value of the Claimants' NOH 2 projects.[441]

343.    The Claimants contend that Germany prioritized TSOs' interests at the expense of the developers' interests, and introduced a transitional rule that disregarded the investments that the developers had already made. According to the Claimants, Germany effectively "*reversed its policy and placed the entire burden of the system change on OWF developers.*"[442]

### b.    The Respondent's Position

344.    The Respondent denies that it breached the FET standard under Article 10(1) of the ECT. According to the Respondent, "*Claimants did not have legitimate expectations for Respondent's regulatory framework to remain unchanged or only change to their benefit,*" and "*there is no self-standing prohibition of 'radical changes' under Article 10(1).*"[443] In any event, the Respondent "*never instituted any changes to its regulatory regime that could be considered 'radical';*'" the regulatory changes that were introduced were "*reasonable and proportionate.*"[444]

### (i)    Applicable legal standard

345.    The Respondent argues that Article 10(1) of the ECT "*does not stipulate any particular restrictions of the right to regulate.*"[445] The first sentence of Article 10(1), which refers to encouragement and creation of "*stable, equitable, favourable and transparent conditions*

---

[440] Cl. First PHB, paras. 157-160.

[441] Cl. First PHB, para. 161.

[442] Cl. First PHB, paras. 163-167.

[443] Resp. First PHB, para. 158.

[444] Resp. First PHB, para. 158.

[445] Resp. C-Mem., para. 1078.

*for Investors of other Contracting Parties to make Investments in its Area*"[446] only has "*a programmatic character as it informs and defines the FET standard in the second sentence*" of Article 10(1) of the ECT.[447]

346.    The Respondent submits that the State's right to regulate "*includes the right to change* [the] *existing legal framework, even if the change results in the deterioration of the individual situation for one of the actors involved.*"[448] This principle applies in the field of investment protection and is not excluded by investment treaties, "*as long as* [States] *have not entered into public international law obligations that prevent them from exercising* [the right to regulate] *in a particular manner.*"[449] The right to regulate thus forms part of the "*context*" of the ECT and must be taken into account in treaty interpretation in accordance with Article 31(2)(a) of the VCLT.[450]

347.    The Respondent submits that the first sentence of Article 10(1) of the ECT does not create any binding obligation of regulatory stability; the provision only deals with "*the pre-investment phase,*" *i.e.* the promotion and making of investments, but not with the post-investment phase. This reading is consistent with the definition of the terms "*Make Investments*" and "*Making Investments*" in Article 1(8) of the ECT, which refer to "*establishing new Investments.*" The obligations of the first sentence of Article 10(1) are therefore obligations "*to facilitate and to make best efforts concerning the pre-investment phase, only.*" This is not an obligation that can be invoked by investors; it can only be invoked by other Contracting Parties.[451] Consequently, according to the Respondent, "*once an investment has been made,* […] *the first sentence of Art. 10(1) ECT no longer directly applies, but only has a programmatic character.*"[452]

---

[446] ECT, **CL-0001**, Art. 10(1).

[447] Resp. C-Mem., para. 1079.

[448] Resp. C-Mem., para. 1084.

[449] Resp. C-Mem., paras. 1087-1088, citing *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, **CL-0115 / RL-0243**, para. 332.

[450] Resp. C-Mem., para. 1089.

[451] Resp. C-Mem., paras. 1093-1095.

[452] Resp. C-Mem., para. 1099.

348.   The Respondent contends that in the Claimants' view the first sentence of Article 10(1) of the ECT is effectively a stabilization clause, which cannot be correct. According to the Respondent, "[o]*ne simply cannot presume that states are willing to be restricted in their sovereign right to regulate without clear evidence of such intent*."[453] Given the novelty of the underlying technology of renewable energy, and the challenge posed by climate change, "*the renewable energy sector is characterized by a need for continuous evolution of the legislative framework*."[454]

349.   The Respondent submits that the obligation to provide fair and equitable treatment in Article 10(1) of the ECT is not as broad as the Claimants suggest. Under the provision, the investors' interests need to be balanced against the host State's right to regulate. A breach of the FET standard is "*only conceivable where an investor has legitimate expectations of regulatory continuity*," which is the case if the host State has made specific commitments that it will not change its legislative framework.[455] General legislation cannot give rise to legitimate expectations, nor can investors legitimately rely on policy statements or general policies "*aimed at inviting investments*."[456] The circumstances prevailing in the host State, in particular when investment is made in a field that is subject regulatory change, must also be taken into account.[457]

350.   The Respondent submits that there is no basis in the text of the ECT or in arbitral practice for a "*self-standing*" prohibition of radical change. In any event, according to the Respondent, the Claimants have failed to provide "*even a hint of an indication as to what is to be regarded as '*radical change*.'*"[458] Indeed, there are circumstances in which a radical change of the regulatory framework may be necessary.[459]

---

[453] Resp. C-Mem., para. 1108; Resp. First PHB, para. 164.

[454] Resp. C-Mem., para. 1114.

[455] Resp. C-Mem., paras. 1121-1128.

[456] Resp. C-Mem., paras. 1134-1135.

[457] Resp. C-Mem., paras. 1136-1147.

[458] Resp. C-Mem., paras. 1168-1169; Resp. First PHB, paras. 248-257.

[459] Resp. C-Mem., para. 1170.

351.    Finally, the Respondent contends that, while the impact of the host State's measure on an investment "*must obviously be considered*," it only forms part of the overall assessment. In order to determine whether a host State's regulatory measure is disproportionate, the impact of the measure on the investment must be weighed against other relevant circumstances, including "*competing public interests and the host state's right to regulate*."[460] It is well established in arbitral practice that "*states enjoy a wide margin of appreciation with a view to both, the setting of policy objectives and the choice of the means with which to pursue such objectives*."[461]

### (ii)    Germany did not breach the FET standard

352.    The Respondent argues that the Claimants have the burden of proof to establish the allegation that their legitimate expectations were frustrated, and that the Claimants have failed to meet this burden. Moreover, even assuming the Claimants had legitimate expectations, they did not rely on any such expectations when making their business decisions.[462]

### (a) The Respondent did not frustrate the Claimants' legitimate expectations

353.    The Respondent argues that it has the sovereign right to regulate as it sees fit; it never committed to a "*regulatory standstill*."[463] The Claimants bear the burden of proof on this issue, but they have failed to discharge it. There was no "*general permit or license issued from which Claimants could derive any expectation of regulatory stasis*" and the German regulatory framework "*did not contain a specific commitment towards regulatory standstill*."[464] Nor is there is any evidence that German officials made any commitments to maintain a "*regulatory stasis*."[465] According to the Respondent, "*broad policy-related*

---

[460] Resp. C-Mem., para. 1172.

[461] Resp. C-Mem., para. 1174, citing *Philip Morris Brands Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016 ("**Philip Morris v. Uruguay**"), **RL-0287**, para. 399.

[462] Resp. First PHB, para. 159.

[463] Resp. First PHB, paras. 161-163.

[464] Resp. First PHB, para. 163.

[465] Resp. First PHB, paras. 165-170.

*statements by politicians are not suited to give rise to legitimate expectations of investors.*"[466]

354.    The Respondent submits that 2009 BNA Position Paper "*did not promise any regulatory standstill*" and in any event was not binding.[467] The Respondent further points out that the Claimants' legal expert confirmed that the 2009 BNA Position Paper was merely an "*interpretive paper.*" The German courts would not have been bound by it, and the Claimants therefore could not have based any expectations on it.[468]

355.    The Respondent also argues that the Claimants had no "*objective reason*" to develop legitimate expectations regarding a regulatory standstill.[469] According to the Respondent, "*the regulatory framework was constantly evolving, with changes being clearly communicated well in advance,*"[470] and there was "*no alternative*" to the reforms taken by the Respondent, as confirmed by the Respondent's experts.[471] The Respondent contends that the Claimants were aware of the upcoming imminent regulatory changes, "*as confirmed by* [the] *Claimants' witnesses.*"[472] Indeed, according to the Respondent, in light of TenneT's "*urgent letter*" of 7 November 2011 to the German federal government, in which it had set out the challenges it faced in providing timely grid connections, "*there could not be any question anymore that significant changes towards a coordinated and efficient grid connection system would be needed.*"[473]

356.    The Respondent maintains that the Claimants' alleged expectations were not reasonable in light of "*long-standing jurisprudence of the German Constitutional Court on investor protection.*"[474] The Respondent's position is supported by the June 2020 decision of the Constitutional Court, which (i) "*widely confirmed the constitutionality of the Offshore*

---

[466] Resp. First PHB, para. 165, citing *Mamidoil v. Albania*, **CL-0133** / **RL-0272**, para. 643.
[467] Resp. First PHB, para. 171.
[468] Resp. First PHB, para. 173.
[469] Resp. First PHB, para. 175.
[470] Resp. First PHB, para. 175.
[471] Resp. First PHB, paras. 176-180.
[472] Resp. First PHB, para. 184.
[473] Resp. C-Mem., para. 241.
[474] Resp. First PHB, para. 190.

*Wind Energy Act*;" (ii) "*found no violation of property rights*" under the German Constitution;[475] and (iii) "*confirmed* […] *that legitimate expectations have been protected under Art. 2 (1) German Constitution well before the June 2020 Decision.*"[476]

357.    The Respondent contends that, for a number of reasons, "[t]*he basic elements of the legal framework applicable at the time of Claimants' purported investments prevented Claimants from having the alleged expectations with regard to their purported investments.*"[477]

358.    First, according to the Respondent, the approval procedure was "*a long and unpredictable process,*" as confirmed by the Parties' experts regarding the legal requirements and the costs to be incurred in undertaking the process,[478] and "*the mere fact that there were expansion targets did not guarantee that any developer could successfully develop an OWF.*"[479] Second, the priority principle only applied during the year 2012, and therefore "*there was no security with regard to obtaining an Approval unless it was actually obtained.*"[480] Third, "*an OWF developer was only entitled to receive a grid connection after an Approval had been granted,*" and since most of the Claimants' NOH 1 and NOH 2 projects never obtained approvals, the Claimants "*cannot have formed any legitimate expectations regarding grid connection.*"[481] Fourth, the regulatory framework's remuneration system provided that "*only operational OWFs enjoyed a right to receive feed-in tariffs.*"[482]

359.    The Respondent further argues that the Claimants did not rely on their alleged expectation of a regulatory standstill in making their investment decisions.[483] The Respondent refers, in support, to the Claimants' conduct, including (i) the Claimants' chronology, noting that

---

[475] Resp. First PHB, para. 193.
[476] Resp. First PHB, para. 195.
[477] Resp. First PHB, para. 203.
[478] Resp. First PHB, paras. 204-210.
[479] Resp. First PHB, para. 214.
[480] Resp. First PHB, para. 216.
[481] Resp. First PHB, para. 219.
[482] Resp. First PHB, para. 223.
[483] Resp. First PHB, para. 228.

the Shareholder Agreement was signed "*before the* [Commercial Due Diligence Report (the "**CDDR**")] *was completed and could be taken into account;*"[484] (ii) "*the fact that Strabag's management apparently did not take the findings of the CDDR into account;*" "[t]*he CDDR contained no specific information on existing regulatory risks;*"[485] and (iii) "*the fact that Claimants executed the share purchase agreement on 22 December 2011 despite knowing that TenneT's Urgent Letter had been made public in November 2011 and after having received TenneT's letter dated August 2011 alerting individual developers to the massive delay regarding grid connection.*"[486]

### (b) The Respondent's changes to the regulatory framework were not radical

360.    The Respondent argues that its changes to the regulatory framework were not radical and "*were an improvement and further development of the previously existing provisional framework.*"[487] In the Respondent's view, the regulatory framework was "[f]*rom the very beginning* […] *of provisional nature.*"[488] Relying on the testimony of expert witnesses, the Respondent argues that the system was subject to "*ongoing evaluation, adjustments and improvements.*"[489]

361.    The Respondent contends that "[i]*t is perfectly legitimate for a host State to resort to central strategic planning, even if it applied another system before,*"[490] and that the Respondent's decision to introduce a central planning procedure can also not be considered "*radical*" as the system was "*well-known under German law.*"[491] According to the Respondent, "*there was no guarantee under the old system for a developer to obtain Approval and to operate an OWF at some point.*"[492]

---

[484] Resp. First PHB, para. 229.

[485] Resp. First PHB, para. 230.

[486] Resp. First PHB, para. 237.

[487] Resp. First PHB, para. 248.

[488] Resp. First PHB, para. 249.

[489] Resp. First PHB, paras. 249-253, quoting Tr. Day 8, 3:11-12 (testimony of Prof Dr Thomas Schomerus).

[490] Resp. First PHB, para. 254.

[491] Resp. First PHB, para. 255.

[492] Resp. First PHB, para. 256.

> (c) *The Respondent's changes to the regulatory framework were reasonable and proportionate*

362.    The Respondent argues that the changes to the regulatory framework were reasonable and proportionate and, given the State's right to regulate, must be presumed to be legal.[493] According to the Respondent, the changes introduced in 2012 and 2017 "*successfully pursued the legitimate goal of speeding up the expansion of the offshore wind energy sector*,"[494] and were confirmed as being necessary by the Respondent's experts.[495] Thus the Development Freeze of 2012 "*enabled coordinated planning and prevented uncontrolled proliferation of offshore installations*," and was "*necessary to 'secure the preparation of the federal spatial offshore grid plan.*'"[496]

363.    The Respondent submits that there were "*no reasonable alternatives that would have resulted in a better or even same outcome*."[497] Moreover, since the Respondent's measures were taken in pursuit of legitimate policy objectives, the Respondent enjoyed "*a wide margin of appreciation as to what measures it would take*."[498] In the circumstances, given that the offshore wind industry was a relatively new field, "*the margin of appreciation was particularly wide*."[499]

364.    The Respondent submits that the Claimants were "*not overly burdened by Respondent's changes to the regulatory framework*."[500] The Claimants were well aware of the problems in the offshore wind energy sector, including that TenneT "*was de facto incapable of providing timely grid access*," as acknowledged by the Claimants' witnesses.[501] Indeed, the Claimants "*could not have had the legitimate expectation to receive Approvals at all*," as their projects were in the very early stages of the approval procedure.[502] The Respondent

---

[493] Resp. First PHB, para. 258.

[494] Resp. First PHB, para. 259.

[495] Resp. First PHB, paras. 262-264.

[496] Resp. First PHB, para. 261, quoting Tr. Day 3, 93:21-22 (testimony of Dr Nico Nolte).

[497] Resp. First PHB, para. 265.

[498] Resp. First PHB, para. 265, citing *Philip Morris v. Uruguay*, **RL-0287**, para. 399.

[499] Resp. First PHB, para. 265.

[500] Resp. First PHB, para. 267.

[501] Resp. First PHB, paras. 267-273.

[502] Resp. First Post-Hearing Brief, paras. 274-276.

points out that, apart from OWP Albatros and OWP West, none of the Claimants' Offshore Wind Projects ever reached the public hearing stage.[503]

### (2)     The Tribunal's Analysis

#### a.     *Applicable legal standard*

365.    The Claimants' FET claim is based on Article 10(1) of the ECT, which provides, in relevant part:

> *Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.*[504]

366.    The Parties disagree on whether the first sentence of Article 10(1) creates a binding legal obligation. The Respondent submits that the first sentence is merely "*programmatic*" and creates a "*best efforts obligation.*" As such, it only applies in the pre-investment phase, but not after an investment has been made.

367.    The Tribunal notes that the first sentence of Article 10(1) provides that each Contracting Party to the ECT "*shall*" take action described in the clause, *i.e.* "*encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.*" According to the ordinary meaning of the term "*shall,*" the provision creates a legal obligation to "*encourage*" and "*create*" the conditions referred to in the provision for making investments in their respective Areas. Thus, the provision cannot be considered merely "*programmatic*" or as creating a "*best efforts obligation.*"

368.    In terms of the general rule of treaty interpretation in Article 31 of the VCLT, the first sentence of Article 10(1) rather forms part of the "*context*" of the second sentence of Article 10(1). In this sense, the Tribunal agrees with the Respondent that the first sentence

---

[503] Resp. First PHB, para. 275.
[504] ECT, **CL-0001**, Art. 10(1).

"*informs and defines the FET standard in the second sentence of Art. 10(1) ECT*;" that the two sentences are meant to be read together is also reflected in the wording of the second sentence ("*Such conditions*"). In the Tribunal's view, therefore, the obligation in the first sentence of Article 10(1) of the ECT to "*encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area*" includes the obligation to accord fair and equitable treatment in accordance with the second sentence of Article 10(1).[505] The obligation referred to in the first sentence of Article 10(1) of the ECT therefore cannot be considered to be confined to the pre-investment phase.

369.   While the Parties disagree on the scope of the FET standard in Article 10(1) of the ECT, it is undisputed that the FET obligation constitutes an autonomous standard and is not co-extensive with the minimum standard of treatment under customary international law.[506] The Parties' positions are consistent with the language of Article 10(1), which makes no reference to the minimum standard of treatment or indeed customary international law.

### b.    The alleged breaches of the FET standard

370.   The Claimants raise, in substance, two different claims: one relating to the GFT and the other to the Offshore Wind Projects. However, since the Claimants rely, in part, on the same events as the factual basis for their claims, the Tribunal will first address the evidence relating to both the GFT and the Offshore Wind Projects claims and will then determine, on the basis of its factual findings and the applicable legal standard as set out above, the Claimants' GFT claim, before turning to the evidence and legal argument relating to the Offshore Wind Projects claim, which covers a longer period of time.

371.   As summarized above, the Claimants' case is that the Respondent breached the FET standard, in relation to both the GFT and the Offshore Wind Projects, by dismantling the

---

[505] Other ECT tribunals have adopted a similar view: *see*, *e.g.*, *SunReserve Luxco Holdings S.À.R.L., SunReserve Luxco Holdings II S.À.R.L., SunReserve Luxco Holdings III S.À.R.L. v. Italian Republic*, SCC Case No. 2016/32, Final Award, 25 March 2020, **CL-0012 / RL-0251**, para. 677.

[506] The Claimants argue in their submissions, including in their Memorial, that "*the* [FET] *standard enshrined in Article 10(1) ECT is not assimilated to, or limited by, the minimum standard of treatment under customary international law*:" Cl. Mem., para. 445. The Respondent does not make any reference to the minimum standard of treatment in its submissions.

key components of the regulatory framework governing offshore wind energy. According to the Claimants, these changes were implemented by four sets of measures: (i) the Development Freeze; (ii) the shift to a centralized grid connection system; (iii) the reduction of expansion targets and halting the development in areas further away from shore; and (iv) the introduction of a compulsory tender procedure by way of the 2017 Renewable Energy Sources Act and the Offshore Wind Energy Act.

372.    The Claimants contend that the Development Freeze introduced in June 2012 stalled the development process for most of the NOH 2 projects, affecting 40 percent of the planned NOH 2 installations, while the development of two NOH 2 projects (SeaStorm I and SeaStorm II) was stalled entirely.[507] The 2012 Energy Act delegated to the TSOs the right to determine, with the BNA's approval, binding grid connection dates for OWF developers, contrary to the earlier system which vested the developers with the right to trigger the grid connection obligation. The 2013, 2014 and 2015 O-NEPs that were subsequently issued pursuant to the new regime "*delayed the NOH2 Projects by over a decade*."[508] The compulsory tender procedure introduced in 2017 delivered, according to the Claimants, "*the final knock-out blow*" and, as a result, "[t]*he Claimants lost their exclusive rights to develop* [the NOH 2] *projects, thereby destroying their entire value, without receiving any form of compensation*."[509]

373.    The Respondent denies, on a number of grounds, that it breached the FET standard, including that (i) the Claimants did not have any legitimate expectation of a "*regulatory standstill*;" (ii) there were no "*radical*" changes to the regulatory framework but rather an improvement and further development of the existing system; and (iii) the changes were foreseeable, reasonable and proportionate. The Respondent raises further, more specific arguments in relation to each of these points, which will be addressed below.

---

[507] Cl. Mem., para. 220; Cl. First PHB, para. 45; Strabag, Statement to the Draft of the Offshore Gridplan North Sea, 18 July 2012, **C-0210**, p. 3.

[508] Cl. First PHB, para. 46.

[509] Cl. Mem., para. 10.

### (i)    The Development Freeze

374.    The Tribunal notes that it was generally acknowledged during the period from 2010 to 2012, including in the offshore wind industry, that TenneT, which was the TSO dealing with construction of grid connections in the EEZ in the North Sea, was unable to provide grid connections within the 30-month period envisaged in the 2009 BNA Position Paper, and that action was necessary to address the causes of delay.[510] The Claimants were aware of the delays and acknowledged at the time, in 2011-2012, that "*problems* [with regard to the grid connection of the planned test field] *are emerging,*" and that grid connections could be delayed by up to 45 months.[511]

375.    As noted above in Section III.A(2), on 7 November 2011, TenneT wrote an "*urgent letter*" to the German federal government, stating that the construction of grid connection lines to OWFs in the North Sea "[was] *no longer possible*" in accordance with the 2009 BNA Position Paper. In its letter, TenneT referred to the lack of financial and other resources, including "*massive problems with the acquisition of the necessary finances.*" In TenneT's view, fundamental changes to the legal framework were therefore required, including "*an orderly offshore grid expansion and development plan.*"[512]

376.    The German authorities sought to address the issue. In January 2012, in connection with the 2012 Renewable Energy Sources Act, the German government issued the 2012 Offshore Installations Ordinance, which introduced the Plan Approval Process for the construction and operation of offshore installations and nominated the BSH as the plan approval authority. The BSH was also given the competence to enact a temporary development freeze; according to Section 10 of the 2012 Offshore Installations Ordinance, the BSH "*may define sea areas within the exclusive economic zone of the Federal Republic of Germany in which certain installations are temporarily not subject to plan approval,*"

---

[510] *See, e.g.*, German Offshore Wind Foundation, Position Paper, 4 August 2010, **R-0038**; German Association of Energy and Water Industries, Statement, 30 January 2012, **R-0070**.

[511] *See* Letter from TenneT to Windkraft FIT GmbH, 26 October 2011, **C-0170**; Minutes of Strabag Board Meeting, 15 February 2012, **R-0167**; Minutes of Strabag Board Meeting, 30 March 2011, **R-0176**; Minutes of Strabag Board Meeting, 9 November 2011, **R-0172**.

[512] Letter from TenneT to Federal Chancellery, 7 November 2011, **R-0019**.

*planning permission or licensing (development freeze)*."[513] BSH had been previously, in July 2011, tasked with the development of a federal spatial offshore grid plan, or the BFO.[514]

377.     On 15 June 2012, the BSH exercised its competence and imposed the Development Freeze for certain sea areas in the EEZ in the North Sea, as specified in Annexes 1 and 2 of its decision. In these areas, all technical installations "*may not be subject to plan determination, plan approval or approval for the duration of the development freeze if they could impede the construction of grid infrastructure due to their size and location*." The Development Freeze did not apply to installations "*for which the public announcement pursuant to Section 2a Offshore Installations Ordinance as amended by the end of 30 January 2012, was made before 31 January 2012*."[515]

378.     The Development Freeze was set to expire in three years and "*in any event no later* [than when] […] *the offshore grid plan has been secured by the spatial arrangements*." The offshore grid plan would also define "*the necessary routes for the connection services of the offshore wind farms*," as well as the "*locations for converter platforms, routes for cross-border power lines and a presentation of possible interconnections that can help to ensure system security and are compatible with efficient grid expansion*."[516]

379.     On 28 December 2012, Germany enacted the 2012 Energy Act, which substantially modified the system for obtaining grid connections. According to Section 17b of the Act, the TSOs were to submit to the regulatory authority (the BNA) for its confirmation each year, starting on 3 March 2013, a joint offshore grid development plan, or the O-NEP, for the EEZ. The plan was to establish criteria and timing of implementation, taking into account, *inter alia*, "*spatial proximity to the coast*."[517] According to the transitional provisions of the 2012 Energy Act, the previous regime would continue to apply to offshore

---

[513] 2012 Offshore Installations Ordinance, **C-0027 / RL-0147**, Sec. 10.

[514] Energy Act, 27 July 2011, **C-0081**. *See also* paragraph 105 above.

[515] Development Freeze, **C-0197**.

[516] Development Freeze, **C-0197**.

[517] 2012 Energy Act, **C-0035**, Sec. 17b.

installations that had received "*an unconditional or a conditional grid connection commitment by 29 August 2012.*"[518]

### (a) Gravity Foundation Technology

380.    The Claimants argue that their investments in the GFT were undermined by the German regulatory developments that took place in 2012. According to the Claimants, while in the first half of 2012 Germany "*stood by the enforcement of its regulations,*" Germany's commitment subsequently "*evaporated*" and the 2012 Energy Act "*radically changed the regulatory framework and delegated to TenneT the power to determine grid connection dates.*"[519]

381.    According to the Claimants, these developments "*destroyed the Gravity Foundation Technology's commercial viability and its business rationale.*" In the circumstances, the Claimants decided "*to temporarily halt further large-scale investment in the Gravity Foundation Technology.*"[520] The 2012 Energy Act and the adoption of the O-NEPs of 2013, 2014 and 2015 pursuant to the Act "*served to cement the fate of the Gravity Foundation Technology.*"[521]

382.    The contemporaneous evidence regarding the impact of the relevant regulatory developments includes the minutes of meetings of Strabag's board held in the second half of 2012. At the meeting held on 12 September 2012, the board discussed, *inter alia*, the competitiveness of the GFT and potential further investments in the Cuxhaven facilities. The presentation attached to the minutes notes that "[g]*rid connection problem was brought to a political solution,*" and that "*STRABAG's GBF is designed ready for execution and market-ready.*"[522] The presentation refers to the Development Freeze, noting that approximately one third of Strabag's pipeline is affected by the Development Freeze, and that administrative complaints had been filed on behalf of the most affected projects.[523]

---

[518] 2012 Energy Act, **C-0035**, Sec. 118.

[519] Cl. Mem., para. 499.

[520] Cl. Mem., para. 500.

[521] Cl. Mem., para. 501.

[522] Minutes of Strabag Board Meeting, 12 September 2012, **R-0154**, p. 39.

[523] Minutes of Strabag Board Meeting, 12 September 2012, **R-0154**, p. 50.

The presentation also refers to the delays caused by TenneT's financing and delivery times, "[c]*urrent grid connection problems*," including "[p]*roblems with […] financing*," "[d]*elays caused by Approval and planning procedures*," "[l]*ong delivery and construction times for cables and converter stations*" and "[s]*ignificant delays of grid connections (from 30 to 60 months)*."[524]

383.   The Claimants state that Strabag's board took the decision to halt any large-scale investment in the development of the GFT in December 2012.[525] However, the Tribunal notes that there is no indication in the (redacted) board meeting minutes in December 2012 (or indeed in the minutes of the November 2012 meeting) that a decision was taken at the December meeting to suspend the GFT project (although it does appear from the minutes that the matter was discussed). The minutes of the November meeting briefly note that, at the next meeting of the board in December 2012, "[a]*gainst the background of the currently unsolvable general conditions (delays in the grid connection, non-recourse financing ...) only a short verbal report should be submitted and a written report can therefore be omitted*."[526] In the December 2012 meeting minutes there is a reference to a draft press release which apparently was meant to inform the market of the decision to suspend the GFT project, and the minutes also refer to an annex dealing with "*Offshore Wind - capitalised initial costs / preliminary work*."[527]

384.   Both Mr Koselleck and Mr Weber state in their first witness statements that at its December 2012 meeting, Strabag's board indeed decided to halt any large-scale investments into the development of the GFT, including the production facility in Cuxhaven and the installation vessel (although neither Mr Koselleck nor Mr Weber attended the board meetings or were involved in the board's decision-making).[528] Similarly, the "Restructuring Concept" of SOW dated 8 February 2013 recorded that "[i]*n December 2012, the Executive Board of*

---

[524] Minutes of Strabag Board Meeting, 12 September 2012, **R-0154**, p. 52.

[525] *See*, *e.g.*, Cl. Mem., para. 211.

[526] Minutes of Strabag Board Meeting, 7 November 2012, **AD-0213**; Minutes of Strabag Board Meeting, December 2012, **R-0221**.

[527] Minutes of Strabag Board Meeting, 5 December 2012, **R-0221**.

[528] Koselleck WSI, para. 72; Weber WSI, para. 77; Tr. Day 2, 70:5–72:24 (testimony of Mr Felix Koselleck).

*STRABAG SE decided to suspend investments in this project for the time being, due in part to the unclear legal situation in Germany.*"[529]

385.    In light of this evidence, the Tribunal finds that the decision to suspend the development of the GFT was indeed taken at Strabag's board meeting in December 2012.

386.    On 7 January 2013, Strabag informed the EU, which had financially supported the development of the GFT, that it had decided to suspend investments in further development of the technology. Strabag explained that it would be "*excessively difficult to proceed*" with the GFT project in the circumstances:

> *The German offshore wind market in 2012 has seen a lot of setbacks for the industry. TenneT, the grid provider for all North Sea projects has informed not to be able to provide grids within the timeframes foreseen by the German State, without having given clear new dates since then. The status of onshore grids to distribute future offshore wind power to their potential users is unclear to the public. On the other hand new regulations have been implemented to support offshore wind on a long-term perspective, but do increase uncertainty for the time being. Consequently the financial market has become more hesitant in financing offshore-wind projects in Germany.*[530]

387.    Strabag went on to state that it expected that the German authorities would be able to "*bring more clarity*" and allow Strabag to resume the GFT project:

> *We all expect that the currently ongoing development of master schedules for the development of the German "AWZ" and the intentions of the German government, the Federal Maritime and [Hydrographic] Agency and the Federal Network Agency to bring all regulations to an overall fit will bring more clarity to all market players and will allow us to resume our activities in the field. Depending on these "legal clarifications" for the German offshore market, our target is to have the project suspended for not more than one year.*[531]

---

[529] Strabag Offshore Wind GmbH, Restructuring Concept, 8 February 2013, **C-0202**.

[530] Letter from Strabag to the Commission, 7 January 2013, **C-0235**.

[531] Letter from Strabag to the Commission, 7 January 2013, **C-0235**.

388.  On 15 January 2013, Strabag issued a press release stating that it was "*postponing its planned investments in the field of gravity-based foundation technology for offshore wind for the time being.*" The press release quoted Mr Haselsteiner, chairman of Strabag's board, stating that there were currently "*too many reasons not to do so* [*i.e.* "*to invest for the moment in constructing factories and special ships in the field of offshore wind*"] – *from the unclear legal situation and unclear future of energy policy in the German market to the lack of storage technology for electricity from renewable sources and the lack of ability to transport energy from the producer to the consumer.*" The press release noted that "*STRABAG's 51% stake in 15 project companies for the development of offshore wind farms remains unaffected by the decision.*"[532]

389.  The Tribunal accepts, on the basis of the evidence before it, that the Development Freeze applied to a substantial part of the Claimants' NOH 2 projects. As noted above, the Development Freeze affected 40 percent of the planned NOH 2 installations, while two NOH 2 projects (SeaStorm I and SeaStorm II) were effectively stalled "*in their entirety.*"[533] The Respondent does not dispute the Claimants' evidence on the effect of the Development Freeze on the NOH 2 projects.

390.  However, the Tribunal notes that the Development Freeze was intended to be temporary and did not prevent the Claimants from progressing the NOH 2 projects that were not affected by the Development Freeze – or indeed the NOH 1 projects, which were not directly affected by the Development Freeze. Moreover, it is not clear from the contemporaneous evidence that the anticipated time impact of the Development Freeze – three years, or 36 months (and possibly less) – caused any further delay in the development of the NOH 2 projects that were impacted by it. The Tribunal notes, in this connection, that already on 2 May 2012 (*i.e.* before the enactment of the Development Freeze), when TenneT granted an unconditional grid connection commitment for the Albatros Test Field (which was to be used as the test field for the GFT), it informally communicated to the

---

[532] Strabag, Press Release, 15 January 2013, **C-0198**. *See also* Strabag Offshore Wind GmbH, Restructuring Concept, 8 February 2013, **C-0202** (referring to the Strabag board's decision to suspend investments in GFT for the time being, *due in part to the* "*unclear legal situation*" *in Germany*).

[533] Cl. First PHB, para. 45

Claimants that grid connection could not be expected earlier than 2017, *i.e.* some 60 months after the approval date. The Claimants state that "[a] *delay of such magnitude* [...] *was a major concern for the development of the Gravity Foundation Technology*" and "*seriously endangered the entire business case for the Gravity Foundation Technology.*" Accordingly, "*in mid-2012, the Claimants internally decided to temporarily freeze any further investment in the Albatros Test Field until the situation was resolved.*"[534]

391.    The contemporaneous evidence also suggests that the Development Freeze was not the sole or even the primary reason for the Claimants' decision to suspend the development of the GFT. Indeed, in early 2013, when Strabag informed the EU of its decision to suspend the GFT project, it singled out, as reasons for the decision, TenneT's difficulties with providing grid connections in a timely manner, and regulatory uncertainty, as well as its own difficulties with obtaining financing. In its press release of 15 January 2013, Strabag referred to a host of reasons for the suspension, ranging "*from the unclear legal situation and unclear future of energy policy in the German market to the lack of storage technology for electricity from renewable sources and the lack of ability to transport energy from the producer to the consumer.*"[535]

392.    In conclusion, the Tribunal is unpersuaded that the Claimants' decision to suspend the development of the GFT was a consequence of the Development Freeze or the 2012 Energy Act, which was enacted some three weeks after the decision of Strabag's board to suspend the development of the GFT in December 2012.[536] The evidence indicates that there were many different factors being considered by Strabag at the time. The Tribunal notes, in this connection, that the minutes of Strabag's board meeting in December 2012 are heavily redacted and do not disclose either reasons for, or even the fact of the decision to suspend the development of the GFT (although, as noted above, the Tribunal accepts, on the basis of the totality of evidence on the record, that the decision was taken at that meeting). Moreover, while the Development Freeze and other regulatory developments, including

---

[534] Cl. Mem., paras. 203-205; Minutes of Strabag Board Meeting, 19 April 2012, **C-0195**.

[535] Strabag, Press Release, 15 January 2013, **C-0198**.

[536] The market was obviously aware earlier that the Act was being prepared: *see* Federal Ministry for the Environment, Nature Conservation and Reactor Safety, Press Release, 29 August 2012, **R-0083**; Discussion in the German Parliament, 29 November 2012, **C-0233**.

the preparation of the 2012 Energy Act, clearly created regulatory uncertainty regarding the time frame and the regulatory framework governing the development of OWFs, this cannot amount to a breach of the ECT in the circumstances, given the challenges faced by the offshore wind energy industry in Germany at the time and the inability of the TSOs to provide grid connections in a timely manner. Indeed, it is evident from the record that TenneT, the TSO responsible for grid connections in the EEZ in the North Sea, faced particularly serious challenges and had been unable to provide grid connections in a timely manner since at least 2010.[537] In the circumstances, changes in the regulatory regime were not only justified but indeed necessary to facilitate the development of the federal spatial offshore grid plan (the BFO) and an orderly expansion of the offshore grid.

393.    The Tribunal therefore does not accept that the Development Freeze or the 2012 Energy Act introduced a regime change that frustrated the Claimants' legitimate expectations or were otherwise in breach of the FET standard in relation to the Gravity Foundation Technology. The Claimants' claims, insofar as they relate to the Gravity Foundation Technology, are therefore rejected.

### (b) Offshore Wind Projects

394.    As summarized above, the Development Freeze did not come as a surprise to the offshore wind industry. The challenges faced by TenneT in particular, and its inability to comply with the 30-month time limit for providing a grid connection, were well known to the industry, including the Claimants. As a result of these issues, the Claimants' Offshore Wind Projects were already in delay at the time the Development Freeze was enacted, and indeed the development of the Albatross Test Field had already been suspended by the Claimants.

395.    The Development Freeze specifically referred to the issues justifying the measure:

> The development of a strategically planned grid infrastructure for the transmission of electricity is of enormous importance for the supply of renewable energies. Without the offshore grid plan, there would be a risk that individual lines would be planned in an uncoordinated

---

[537] German Offshore Wind Energy Foundation, Position Paper, 4 August 2010, **R-0038**, pp. 6 e*t seq.* (stating that "*several German OWP projects are in danger of failing due to delays in grid connection*"); Discussion in the German Parliament, 29 November 2012, **C-0233**.

*manner, particularly for connecting individual offshore wind farms. Compared to collective connections, significantly more planning and approval resources would be required, which could lead first to delays and second to unnecessary conflicts.*[538]

396.    There is no indication in the terms of the Development Freeze that it was intended to operate so as to further increase the delay in granting grid connections. While the Development Freeze was imposed for a period of three years as of the date of its announcement on 15 June 2012, it was to expire "*in any event no later than* [when] […] *the offshore grid plan has been secured by the spatial arrangements.*"[539] The three-year period was significantly less than the 60 months that TenneT had indicated a month earlier, in May 2012, the Claimants would have to wait for grid connection to be provided to the Albatross Test Field.

397.    In the circumstances, while the Development Freeze could have had a substantial effect on the Claimants' Offshore Wind Projects, had TenneT been able to comply with the 30-month period for granting grid connections at the time the Development Freeze was enacted, this was in reality not the case, and the Projects were already expected to be substantially delayed. Moreover, as noted above, at the time it was enacted, the Development Freeze was envisaged as being temporary, pending the development of the federal spatial offshore grid plan, or the BFO, and the Claimants' NOH 2 projects that were most affected (SeaStorm I and II) were at an early stage of development (application conference) so they were still at least three years from approval.[540] Furthermore, as noted above, the Development Freeze did not apply to OWFs that had reached the stage of formal public participation by 31 January 2012.[541]

398.    In light of the evidence before it, the Tribunal finds that the Development Freeze was a legitimate regulatory measure at the time it was enacted and did not amount to a breach of

---

[538] Development Freeze, **C-0197**.

[539] Development Freeze, **C-0197**.

[540] Hern ERI, Table 4.4, p. 39. By the time the Development Freeze was enacted, the Claimants had spent a total of EUR 0.42 million on SeaStorm I and II (EUR 0.42 million on SeaStorm I and EUR 0.00 on SeaStorm II): Hern ERI, Table 4.8, p. 49. The Claimants subsequently spent a further EUR 0.29 million on SeaStorm I and EUR 0.23 million on SeaStorm II, for a total of EUR 0.94 million.

[541] Development Freeze, **C-0197**.

the FET standard in relation to the Claimants' Offshore Wind Projects, regardless of whether the applicable FET standard is stated in terms of legitimate expectations, regulatory stability or proportionality.

399.    This finding is limited to the immediate impact of the Development Freeze. The Tribunal will address in the next section the impact on the Claimants' Offshore Wind Projects of the 2012 Energy Act and of the 2013, 2014 and 2015 O-NEPs, as well as of the further extension of the Development Freeze in 2015 and the 2017 regulatory reform.

### (ii)    The 2012 Energy Act, the 2013, 2014 and 2015 O-NEPs, the 2017 Energy Act and the Offshore Wind Energy Act

#### (a) The factual background as established by the evidence

400.    As noted above, the 2012 Energy Act substantially modified the system for obtaining grid connections by introducing the annual O-NEPs for the EEZ in the North Sea.[542] The O-NEPs were to be developed by the TSOs and confirmed by the BNA.

401.    On 22 February 2013, the BSH published the final 2012 BFO-N for the North Sea, identifying clusters of OWF projects suitable for a joint grid connection.[543] The BFO included in the clusters those OWF projects that had already (i) been constructed; (ii) received an approval; or (iii) submitted their application and no obvious grounds to deny the application existed. The BFO-N 2012 excluded all OWFs that were either in their entirety affected by the Development Freeze or located more than 180 km away from the shore, and these OWF projects were not assigned any cluster.[544]

402.    On 19 December 2013, the BNA confirmed the first O-NEP (O-NEP 2013) proposed by the TSOs. The BNA agreed that the "*distance to shore*" criterion proposed by the TSOs was "*appropriate*" for "*the timely order of the offshore grid connections*."[545] In the BNA's view, "[a] *priority weighting of the criterion 'realization progress of the OWP to be connected' would contradict the path decided by the legislator, away from an individual*

---

[542] *See above* paragraph 379.

[543] Cl. Mem., para 276; BFO-N 2012, **C-0199 / R-0032**.

[544] Cl. Mem., para. 277.

[545] O-NEP 2013 (2023), **C-0039 / R-0033**, p. 44.

*connection claim of the OWP towards a wind farm-unspecific expansion planning of the grid connection system.*"[546] On this basis, O-NEP 2013 divided the EEZ into zones that extended from 1 to 5, depending on their distance from shore:[547]



403.    On 2 June 2014, the BSH responded to GAIA I Nord's request for an application conference, noting that the project was located in cluster 13 according to the BFO-N 2012, and according to O-NEP 2013, "*a grid connection is not expected to be commissioned in the cluster until 2027 at the earliest.*" On this basis, the BSH stated that "*holding an Application Conference at the present time and the associated scoping meeting* […] *does not appear to be reasonable.*"[548]

---

[546] O-NEP 2013 (2023), **C-0039 / R-0033**, p 50.

[547] O-NEP 2013 (2023), **C-0039 / R-0033**, p. 41. *See also* First Draft of O-NEP 2013 (2023), **C-0200 / R-0184**, p. 70.

[548] Letter from BSH to GAIA I, 2 June 2014, **C-0263**.

404.    On 1 August 2014, Germany amended the Renewable Energy Sources Act (the "**2014 Renewable Energy Sources Act**"), which reduced the target for offshore wind by 2030 from 25 GW to 15 GW and adopted a tender system for the allocation of the previously unrestricted grid capacity.[549]

405.    On 6 March 2015, the BSH issued a circular (the "**March 2015 Circular**") addressed to "*all offshore wind energy projects planned far from the coast in zones 3, 4 and 5 of the Offshore Grid Development Plan (O-NEP) of the* [BNA]."[550] The purpose of the circular was "*to inform* [the offshore wind energy projects] *about the BSH's position in this regard* [*i.e.* in light of recent political and legal developments regarding the construction and operation of offshore wind projects] *with respect to a possible plan approval of offshore wind farm projects in the above-mentioned zones.*"[551] The circular reminded that "[i]*n principle, a plan approval decision may only be issued if the plan is justified,*" which is the case "*if the project is reasonably required according to the objectives of the specialized planning law,*" and then went on to state:

> *For the following reasons, I do not currently consider the necessary plan justification or necessity for offshore wind farms in zones 3, 4 and 5 to be given and will therefore not conduct any plan approval procedures for projects located there until further notice; in particular, no application conferences and public hearings will be held. [...]*
>
> *1.    Consideration of the O-NEP*
>
> *After the system change in the [2012 Energy Act], grid expansion planning is based on the specifications of the O-NEP, so that it is no longer the individual offshore wind farm that triggers the grid connection. [...] The O-NEP contains details of the planned completion date for all the above-mentioned measures and provides binding dates for the start of implementation.*
>
> *[...]*
>
> *Consequently, a project is not justified in planning terms if the grid connection measure has not been confirmed in the O-NEP by the*

---

[549] 2014 Renewable Energy Sources Act, **C-0207** / **RL-0160**.

[550] Letter from BSH to GAIA I, 6 March 2015, **C-0273**, p. 1.

[551] Letter from BSH to GAIA I, 6 March 2015, **C-0273**, p. 1.

*BNetzA for the following ten years. Furthermore, there is no interest in a decision if the purpose of an offshore wind farm – production and transmission of the electricity generated – cannot be achieved due to the lack of a foreseeable grid connection. Moreover, I assume that such a project cannot be objectively realized or financed without a confirmed grid connection.*

*As a precautionary measure, I would like to point out that the O-NEP 2014, second draft of the TSO, which can currently be viewed on the Internet, does not envisage a line in zones 3, 4 and 5 in any scenario over the next ten years. In addition, the second draft of the TSO was prepared on the basis of the 2014 scenario framework and does not yet take into account the amendment to the EEG 2014 that has since been made, in particular the expansion path of 6.5 GW in 2020 and 15 GW in 2030 provided for therein. [...]*

*2.     Consideration of the expansion path [...]*

*According to Section 3 No. 2, the amended [Renewable Energy Sources Act] provides for an expansion path of 6.5 GW in 2020 and 15 GW in 2030. [...] I assume that the potential of the coastal sea and zones 1 and 2 basically cover the expansion targets. [...]*

*Of the capacity limits of 6.5 GW in 2020 and 15 GW in 2030 provided for in Section 17d (3) Sentence 2 EnWG, Section 118 (14) EnWG provides for the exception that the BNetzA, in consultation with the BSH, may allocate a maximum of 7.7 GW of connection capacity before January 1, 2018, taking into account all existing unconditional grid connection commitments. This option was opened up in order to achieve the target of 6.5 GW in 2020 even in the event of non-implementation.*

*This capacity limit of 7.7 GW by 2020, taking into account all approved offshore wind farms in the North Sea and Baltic Sea that already have an unconditional grid connection commitment or a capacity allocation pursuant to Section 17d (3) EnWG, is expected to be exhausted by the time the capacity allocation procedures are completed in 2015 and can therefore no longer be open to projects located in zones 3, 4 and 5.*[552]

---

[552] Letter from BSH to GAIA I, 6 March 2015, **C-0273**.

406.    On 15 June 2015, the BSH extended the Development Freeze for three more years, until 15 June 2018, redefining in part the sea areas in the EEZ in the North Sea that were affected.[553]

407.    On 1 July 2015, the Federal Ministry of Economics and Energy announced a planned shift to a tender procedure for offshore wind installations in accordance with a "*central model*."[554] According to the announcement, wind farm projects in zones 1 and 2 that had valid approvals or plan approvals would be eligible to participate, if located on a network connection system already commissioned or confirmed in the current O-NEP 2013. Developers of projects that were not awarded a project in the auction were to be granted financial compensation based on the average costs of project development if they "*waive*[d] *the rights from approval and ma*[de] *the data generated during project development* […] *available to the central state authority*."[555]

408.    On 4 September 2015, the BNA confirmed O-NEP 2014 proposed by the TSOs.[556] O-NEP 2014 pushed the expected grid connection dates for the NOH 1 projects further into the future – from 2018 to 2019 for OWP Albatros, from 2021 to 2022 for OWP West and from 2022 to 2023 for GlobalTech II (which had in the meantime been merged with GlobalTech III).[557] The expected grid connection dates for the NOH 2 projects were similarly delayed, each of them by two years, *i.e.* projects with an expected grid connection date in 2025 were delayed to 2027, those with an expected grid connection date in 2027 to 2029 and those with an expected grid connection date in 2029 to 2031.[558]

---

[553] BSH, Prolongation of the Development Freeze, **C-0275**. The Development Freeze was initially set to "*expire three years after announcement, and in any event no later than as soon as the offshore grid plan has been secured by the spatial arrangements*;" however, the right to extend the term of validity was reserved: Development Freeze, **C-0197**. As noted above, the offshore grid plan, or the BFA, had been adopted in the meantime, in 2013.

[554] Federal Ministry of Economics and Energy, Key Points Paper on Tender Procedure, **C-0277**, p. 6.

[555] Federal Ministry of Economics and Energy, Key Points Paper on Tender Procedure, **C-0277**, p. 19.

[556] O-NEP 2014 (2024), **C-0040**.

[557] Order of Projects, Comparison between O-NEPs 2013 (2023), 2014 (2024), 2015 (2025), **C-0042**; Second Draft of O-NEP 2013 (2023), **C-0036 / R-0072**, p. 89.

[558] Order of Projects, Comparison between O-NEPs 2013 (2023), 2014 (2024), 2015 (2025), **C-0042**; Second Draft of O-NEP 2013 (2023), **C-0036 / R-0072**, p. 89.

409.   In the meantime, the Claimants sold the NOH 1 projects: OWP Albatros was sold in December 2014, whereas OWP West was sold in December 2015, three months after the confirmation of O-NEP 2014, and GlobalTech II/III was sold in August 2016.[559]

410.   On 25 November 2016, the BNA confirmed O-NEP 2015,[560] which further delayed the grid connection dates for the NOH 2 Projects: GAIA I Nord and GAIA V Nord were delayed from 2027 to 2031, GAIA II, GAIA III and GAIA IV were delayed from 2029 to 2034, and SeaWind III and SeaWind IV were delayed from 2031 to 2035.[561]

411.   On 1 January 2017, the 2017 Offshore Wind Energy Act was enacted, introducing the tender system announced by the Federal Ministry of Economics and Energy in July 2015. According to Section 46(1) of the Act, "[t]*he application for the implementation of the planning approval procedure for the construction and operation of offshore wind energy installations can only be submitted by a party whose tender bid has been accepted by the* [BNA] *for the location to which the plan refers*."[562] Pursuant to Section 46(3) of the Act, as of 1 January 2017, "*all ongoing planning approval procedures or approval procedures to construct and operate offshore wind energy installations shall end unless the projects fall within the scope of the tenders for existing projects pursuant to Section 26 Subsection 2*."[563]

412.   On the same day, 1 January 2017, the 2017 Renewable Energy Sources Act abolished the feed-in tariff system and confirmed that "[t]*he amount of payments for electricity generated from renewable sources is intended to be determined by tenders*."[564]

413.   On 29 June 2017, the NOH 2 Project Companies (SeaStorm I, SeaStorm II, SeaWind III, SeaWind IV, GAIA I Nord, GAIA II, GAIA III, GAIA IV and GAIA V Nord) and a number of other investors in the German offshore wind energy sector filed complaints with

---

[559] Cl. Mem., para. 368.

[560] O-NEP 2015 (2025), **C-0041**.

[561] Order of Projects, Comparison between O-NEPs 2013 (2023), 2014 (2024), 2015 (2025), **C-0042**; Second Draft of O-NEP 2015 (2025), **C-0038 / R-0074**, p. 46.

[562] 2017 Offshore Wind Energy Act, **C-0045/ RL-0148**, Sec. 46(1).

[563] 2017 Offshore Wind Energy Act, **C-0045/ RL-0148**, Sec. 46(3). Section 26(2) defines "*existing projects*" that are allowed to participate in the tenders.

[564] 2017 Renewable Energy Sources Act, **C-0044**, Sec. 2(3).

the Constitutional Court, challenging the constitutionality of Article 2, Section 46(3), first sentence, of the 2017 Offshore Wind Energy Act.

414.    On 30 June 2020, the Court issued its decision in the matter, finding that the 2017 Offshore Wind Energy Act was incompatible with the provisions of the German Constitution protecting legitimate expectations, and that "*providing for a compensation regime is necessary.*"[565] More specifically, having determined that the provisions governing the transition from the 2012 Offshore Installations Ordinance to the 2017 Offshore Wind Energy Act did not apply to the complainants, the Court ruled that the complaints were in part well-founded:

> *Insofar as the Offshore Wind Energy Act introduces a fundamentally revised legal framework for the approval of offshore wind farms that renders invalid procedural steps completed in the process under the previously applicable law, including permits and planning approvals, this is compatible with Art. 14(1) GG [...]. It does not violate Art. 12(1) GG either [...]. However, the quasi-retroactive effects following from the transition are not entirely compatible with the general principle of the protection of legitimate expectations (Art. 2(1) in conjunction with Art. 20(3) GG) [...]. There has been no violation of Art. 3(1) GG.*[566]

415.    The Court also determined that, as a result of the quasi-retroactive effect of the Act, the complainants' legal positions had lost their value:

> *In the present case, the affected legal position in this sense is the sum of procedural steps taken under the old law to meet approval requirements then in force, in particular the planning work and explorations carried out by the complainants. [...] The complainants had therefore not simply expected that a law that was favourable to them will not change but had instead gone through the approval process provided for by law and had carried out separate procedural steps, such as base line surveys of the marine environment and preparatory explorations of the ground of the building site as well as, in some cases, attending hearings as part of the planning approval procedure. [...]*

> *These procedural positions have lost their value. The value of the procedural steps taken was to satisfy the necessary requirements for*

---

[565] June 2020 Constitutional Court Decision, **C-0305** / **RL-0145**, p. 3.

[566] June 2020 Constitutional Court Decision, **C-0305** / **RL-0145**, para. 73.

*the putting into operation of the planned wind farms. Their value has been lost in that they no longer contribute to satisfying the requirements for putting the wind farms into operation. This applies to all procedural steps taken by all complainants. The steps taken under the old law have become futile because the processes have been terminated and the position reached in those processes cannot be transferred or taken into account under the new law. [...]*

*The principle of the protection of legitimate expectations is only affected insofar as the quasi-retroactive effects of the Act cause the loss of value of the legal positions in question.*[567]

416.   By contrast, the Court found that the Article 14(1) of the Constitution, which deals with protection of property rights, had not been violated:

> *Art. 14(1) GG has not been violated. The challenged provisions do not affect protected property rights. In principle, the constitutional guarantee of property protects all rights constituting assets (vermögenswerte Rechte) that the legal order assigns to those entitled to these rights in such a way that they may exercise the associated powers at their own choice for their private benefit [...]. The permit granted to the complainant in proceedings 1 BvR 2190/17 does not, however, constitute property within the meaning of Art. 14(1) GG, and nor do the procedural positions reached by the complainants in proceedings 1 BvR 1679/17 under previously applicable law.*[568]

417.   As noted above (see paragraph 143), in November 2020, pursuant to the Court's decision, the German government amended the Offshore Wind Energy Act, providing compensation to reimburse the owners of offshore wind projects whose plan approval process had been terminated, or whose approval had been lost in accordance with the earlier version of the Offshore Wind Energy Act, for certain costs they had incurred in site investigations.[569]

*(b) The Tribunal's determinations*

418.   As summarized above, the Claimants submit that (i) the centralized grid connection system introduced by the 2012 Energy Act; (ii) the halting of development in areas further away from shore by way of the O-NEPs and related measures, together with the "*abrupt*"

---

[567] June 2020 Constitutional Court Decision, **C-0305 / RL-0145**, paras. 140-142.

[568] June 2020 Constitutional Court Decision, **C-0305 / RL-0145**, para. 74.

[569] 2020 Offshore Wind Energy Act, **C-0306 / RL-0148**.

reduction of Germany's renewable energy expansion targets; and (iii) the introduction of a compulsory tender procedure by way of the 2017 Energy Act and the Offshore Wind Energy Act, amount to a breach of the FET standard in Article 10(1) of the ECT.

419. The Claimants contend that the 2012 Energy Act deprived the OWF developers of control over their grid connections, which were no longer a matter of legal right. Instead of the OWFs, it was now the TSOs that were able to fix, with the BNA's approval, binding grid connection dates. According to the Claimants, the 2013, 2014 and 2015 O-NEPs that were subsequently issued pursuant to the new regime "*delayed the NOH 2 Projects by over a decade*" and also adopted "*distance to shore*" as the primary regulatory criterion, thus giving priority to grid connections for OWF projects located nearer to the coast. As a result, the earliest possible grid connection dates for the NOH 1 projects were pushed back to 2018 (for OWP Albatros), and the NOH 2 projects, which were located further away from shore, were delayed even further, with some scheduled initially, by O-NEP 2013, for 2025-2029 and then eventually, by O-NEP 2015, for 2031-2035.[570] Finally, according to the Claimants, the compulsory tender procedure introduced in 2017 delivered "*the final knock-out blow*" and, as a result, "[t]*he Claimants lost their exclusive right to develop* [the NOH 2] *projects, thereby destroying their entire value, without receiving any form of compensation.*"[571]

420. As noted above, the Respondent denies any breach of the FET standard. According to the Respondent, the German government never committed to a regulatory standstill *vis-à-vis* the Claimants, did not frustrate the Claimants' legitimate expectations and did not make any radical changes to the applicable legal framework. Germany merely exercised its right to regulate, which should be respected.

421. The Tribunal analyzes below the Parties' arguments in light of facts that the Tribunal finds established, based on the evidentiary record.

---

[570] Cl Mem., paras. 280-284, 368. *See also* Order of Projects, Comparison between O-NEPs 2013 (2023), 2014 (2024), 2015 (2025), **C-0042**; Second Draft of O-NEP 2015 (2025), **C-0038 / R-0074**.

[571] Cl. Mem., para. 10.

422.    The Tribunal notes that, while the centralized grid connection system introduced by the 2012 Energy Act was on its face a justified and legitimate measure in view of the challenges faced by the offshore wind energy industry at the time, and did not necessarily have to result in additional delay in granting grid connections, the way in which the O-NEPs were in fact implemented did result in substantial additional delay. Thus, as discussed above, O-NEP 2013 established binding grid connection dates that resulted in substantial delays for the Claimants' Offshore Wind Projects, in particular for the NOH 2 projects (with grid connection dates between 2025-2029), when compared with the 30-month delay set out in the 2009 BNA Position Paper.[572] While the Tribunal does not consider that the 2009 BNA Position Paper was legally binding, or created a legal right to a 30-month delivery time for a grid connection, it was an authoritative indication, based on the BNA's interpretation of the 2009 Energy Act, of the expected timeframe at the time of its adoption.

423.    Moreover, although it was clear by 2010-2011 at the latest that the Claimants' Offshore Wind Projects would be delayed in any event, in view of the difficulties faced by TenneT, in March 2010, the German federal government stated that it was "*committed to ensuring that grid operators implement the timely connection of offshore wind farms to the power grid quickly and effectively.*" The government further noted that "[t]*he Position Paper by the BNA pursuant to Section 17(2a) Sentence 1 Energy Act contributed to a significant clarification and hence investment certainty for the individual projects.*"[573] The Claimants thus reasonably expected at the time they made their investments that the delivery time for a grid connection indicated in the 2009 BNA Position Paper would not be unreasonably delayed, even if some delay was to be expected.

424.    However, this expectation was frustrated when O-NEPs 2013, 2014 and 2015 established grid connection dates that were much later than the delayed dates envisaged by TenneT at the time when the Development Freeze was introduced, including for the NOH 1 projects,

---

[572] *See above* paragraphs 128 *et seq.*

[573] Cl. Mem., para. 113; Government Response, "*The current status of the Expansion of OWFs in the North Sea and the Baltic Sea,*" *Bundestag Drucksache* 17/1283, 31 March 2010, **C-0112 / R-0022**, p. 7.

which were first postponed to 2018-2022 and then to 2019-2023, and for the NOH 2 projects, which were ultimately pushed back to 2031-2035.[574]

425.    The additional delay appears to have been largely a consequence of the O-NEPs' hard-coding of the distance to shore criterion, which according to the 2012 Energy Act was only one of the criteria and not the main criterion, for the implementation of the offshore grid development plan. Indeed, in the 2012 Energy Act, it was listed as the third of four criteria, together with "*the progress of realization of the offshore plants to be connected, the efficient use of the connection capacity to be built*" and "*the planned commissioning of the grid connection points*."[575] By contrast, the O-NEP 2013, as proposed by the TSOs, confirmed a weighting and ranking of criteria that established "*the distance from the coast*" as one of "*particular importance*" and as the "*first/primary selection criterion*" for determining the timing of offshore grid expansion.[576] For the projects in zones 3-5, it effectively became the sole criterion applied, producing massive delays to these projects. The change also destroyed the Coastal Distance Bonus, which was introduced by the 2004 Renewable Energy Sources Act and was maintained in the 2009 and 2012 amendments of the Act, and which provided specific incentives to projects that were to be developed further away from shore and in deeper waters.[577] The O-NEPs deprived the Coastal Distance Bonus of any relevance given the delays they caused to the projects.

426.    Moreover, the March 2015 Circular announced that the BSH would "*not conduct any plan approval procedures for projects located* [in zones 3, 4 and 5] *until further notice*," and confirmed that "*no application conferences and public hearings will be held*."[578] The circular thus endorsed the priority being given to projects closer to shore, regardless of their stage of development, in accordance with the O-NEPs, rather than any provisions of the 2012 Energy Act or the terms of the 2012 Renewable Energy Sources Act, which had,

---

[574] *See above* paragraph 126 (TenneT announcing in the spring of 2012 that it was not in a position to provide a grid connection to the Albatross Test Field until 2017, some 60 months after the approval date).

[575] 2012 Energy Act, **C-0035**, Sec. 17b(2).

[576] O-NEP 2013 (2023), **C-0039 / R-0033**, p. 49.

[577] 2004 Renewable Energy Sources Act, **C-0016 / RL-0155**, Sec. 10(3), Sentence 4; 2012 Renewable Energy Sources Act, **C-0023 / RL-0159**, Sec. 31(2), Sentence 2; 2009 Renewable Energy Sources Act, 1 **C-0059 / RL-0154**, Sec. 31(2), Sentence 2.

[578] Letter from BSH to GAIA I, 5 March 2015, **C-0273**.

*inter alia*, maintained the Coastal Distance Bonus. As a result, the Claimants were effectively prevented from progressing their projects to the approval stage.

427.    Strabag's board noted in its meeting held on 15 April 2015 that the circular meant "*an immediate development stop by BSH for all projects of Strabag pipeline.*"[579] These included one of the NOH 1 projects (GlobalTech II) and all of the NOH 2 projects. The board further noted that "*the BSH's statement can be interpreted as a preparation for a further system change in the German North Sea and Baltic Sea – namely to introduce a tendering system for offshore capacities,*" and that "[w]*hether compensation will be paid for the previous upfront costs cannot be estimated at present and will become a core topic of system change 2.*"[580]

428.    While the March 2015 Circular also referred to the 2014 Renewable Energy Sources Act, which reduced the target for offshore wind energy by 2030 from 25 GW to 15 GW, the Tribunal is not persuaded that such a policy change would amount, in itself, to a breach of the FET standard under the ECT.[581] The Contracting States' right to regulate is not limited by the ECT, so long as such regulations, or the way in which they are implemented, remain compatible with the terms of the ECT, including those providing for exceptions from the obligations imposed by the ECT, such as Articles 21 and 24.[582] The reduction of the offshore wind energy target falls under this category.

429.    Finally, the 2017 Offshore Wind Energy Act formalized as a matter of law the effects of the March 2015 Circular by terminating the plan approval processes to construct and operate offshore wind energy installations for all projects that did not fall under the transitional provisions in Section 26(2) of the Offshore Wind Energy Act and thus were not entitled to participate in the tenders and did not obtain any step-in rights. This included all NOH 2 projects.

---

[579] Strabag, Board Information on UB4W Energie, 15 April 2015, **C-0274**, p. 1.

[580] Strabag, Board Information on UB4W Energie, 15 April 2015, **C-0274**, pp. 1-2.

[581] 2014 Renewable Energy Sources Act, **C-0207 / RL-0160**.

[582] Article 21 ("*Taxation*") carves out "*Taxation Measures*" (as defined in the ECT) from its scope of obligations, with the conditions and limitations set out in the provision, whereas Article 24 ("*Exceptions*") contains a series of exceptions similar to those included in the General Agreement on Tariffs and Trade.

430.    The 2017 Offshore Wind Energy Act thus in part merely formalized the effects of measures already taken earlier, as the approval processes had *de facto* been suspended already since 2013-2014 for projects located further away from shore,[583] by terminating the plan approval processes for all projects that did not fall under the transitional provisions of the Act. The 2017 Wind Energy Act also introduced a further regime change by substantially modifying the remuneration regime as it eliminated the feed-in tariff and introduced a tender-based system.

431.    The Tribunal finds that, while the regulatory measures taken by Germany as of late 2012, including the 2012 Energy Act, are not on their face incompatible with the FET standard, the way they were implemented – including by way of O-NEPs and other communications by the German authorities, including the March 2015 Circular and the BSH's rejection, on 2 June 2014, of the Claimants' request for an application conference for GAIA I Nord – frustrated the Claimants' legitimate expectation that the legal framework under which they had made their investments, and indeed which had been specifically enacted to support the kinds of investments the Claimants had made, would not be effectively dismantled.[584] Dr Guillet aptly summarized these developments in his expert report:

> [T]*hese Regulatory Changes effectively introduced a "rationing" of offshore wind development by making grid connection a regulatory bottleneck and explicitly using it to control the overall capacity of offshore wind farms developed. What was a temporary bottleneck (the capacity of the TSOs to actually build the first wave of grid connections, as per their obligation towards the developers under*

---

[583] Letter from BSH to GAIA I, 2 June 2014, **C-0263**; Letter from BSH to GAIA I, 6 March 2015, **C-0273**; Letter from BSH to GAIA I, 4 August 2016, **C-0281**; Tr. Day 3, 109:4-13 (testimony of Dr Nico Nolte).

[584] For a case adopting a similar approach on the level of principle *see, e.g., Cube v. Spain*, **CL-0027 / RL-0283**, para. 388:

> *The Tribunal does not consider it necessary that a specific commitment be made to each individual claimant in order for a legitimate expectation to arise. At least in the case of a highly-regulated industry, and provided that the representations are sufficiently clear and unequivocal, it is enough that a regulatory regime be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them.*

> *the previous regime) turned into a regulatory bottleneck managed*
> *by the German government and subject to party politics.*[585]

432.    In view of the above, the Tribunal finds that the Respondent's conduct thus undermined the "*stable, equitable, favourable and transparent conditions for Investors*" that it committed to encourage and create under Article 10(1) of the ECT and resulted in a denial of the Claimants' right to fair and equitable treatment.

433.    The Tribunal's finding governs both the NOH 1 and NOH 2 projects. While the Claimants had sold the NOH 1 Project Companies by the time the 2017 Offshore Wind Energy Act was enacted, each of the NOH 1 Project Companies – OWP Albatros (which had been sold in December 2014), OWP West (which had been sold in December 2015) and GlobalTech II/III (which had been sold in August 2016) – had been adversely affected by O-NEP 2013, which was first issued in draft form on 2 March 2013 and again on 24 June 2013, and was confirmed by the BNA on 19 December 2013.[586] While the O-NEPs were developed and proposed by the TSOs, they were confirmed by the BNA, a governmental agency whose decisions are indisputably attributable to Germany under international law.[587]

434.    In conclusion, the Tribunal is satisfied that the Claimants have established that the Respondent is in breach of the FET standard under the ECT as regards the Offshore Wind Projects. While the Respondent's breach was a result of a series of acts beginning on 19 December 2013, when the BNA confirmed the first O-NEP (O-NEP 2013) proposed by the TSOs, the Tribunal determines that the Respondent's conduct amounted to a breach of the FET standard at the latest by 6 March 2015, when the BSH issued the March 2015 Circular and confirmed that it would not conduct any plan approval procedures for projects

---

[585] Guillet ER, para. 123; *see also* para. 124 (the term "*party politics*" referring to the debate surrounding the surcharges paid by consumers to support the feed-in tariff, "*following its substantial increase caused by the large volumes of solar capacity installed in 2009-2011 under very high* [feed-in tariff].").

[586] Cl. Mem., para. 368.

[587] That the BNA is an organ of the German state is undisputed. *See* Cl. Mem., para. 56 (defining BNA as "*governmental agency within the Federal Ministry of Economics and Technology:*" and Resp. Rej., para. 569 (defining the BNA as "*the competent regulatory authority*") and para. 576 (noting that "*the TSOs had to draft the ONEPs, while the BNetzA took the final decision on the grid connection and their implementation dates, after conducting extensive public consultations several times each planning cycle.*")

located in zones 3, 4 and 5, and that it would not hold any application conferences and public hearings for such projects.

## B.   THE ALLEGED EXPROPRIATION OF THE CLAIMANTS' INVESTMENTS

### (1)   The Scope of the Claimants' Expropriation Claim

435.   The Claimants claim that the Respondent expropriated both the GFT and the NOH 2 projects; however, they do not bring an expropriation claim for the NOH 1 projects, which were all sold during the period 2014-2016, albeit (according to the Claimants) at a substantially decreased price.[588]

436.   As to the Claimants' claim for expropriation of the GFT, the Tribunal has found above that the Claimants' decision to suspend the development of the GFT in December 2012 was not a consequence of the Development Freeze or the 2012 Energy Act and, accordingly, the Respondent's treatment of the GFT did not amount to a breach of the FET standard. Since the Claimants have not shown that Germany's measures caused the suspension of the development of the GFT, the Tribunal rejects the Claimants' expropriation claim in relation to the GFT for the same reasons as the Claimants' FET claim.

437.   Accordingly, this Section is limited to an analysis of the Claimants' expropriation claim in relation to the NOH 2 projects, and the Respondent's defense thereto.

### (2)   The Parties' Positions

#### a.   *The Claimants' Position*

##### (i)     Applicable legal standard

438.   The Claimants argue that the Respondent expropriated the NOH 2 projects in breach of Article 13(1) of the ECT. According to the Claimants, Article 13 of the ECT establishes "*a cumulative set of requirements*" and covers, by its terms, both direct and indirect, or *de facto*, expropriations. The Claimants submit that "[t]*he core element of an indirect expropriation is the economic effect that State actions or omissions have on a specific*

---

[588] *See* Cl. Mem., paras. 513-552; and Cl. Reply, paras. 824 *et seq.*

*investment*," and therefore an indirect expropriation "*cannot be identified through an abstract set of legal principles but rather require*[s] *a case by case analysis*."[589]

439.    The Claimants submit that regulatory measures may amount to an indirect expropriation, to the extent that such measures result in a substantial deprivation of the investment. In other words, what is relevant is not the State's intent or the form of the measure or its underlying purpose, but the economic impact.[590] According to the Claimants, "[a] *series of acts may cumulatively result in such substantial deprivation of value, even when no single act is per se tantamount to expropriation*."[591]

440.    The Claimants also disagree with the Respondent's argument that the Claimants' expropriation claim fails under the police powers doctrine. According to the Claimants, the police powers doctrine is simply not applicable in this case, and in any event, the Respondent's measures would not fall within the police powers doctrine, even if it did apply.[592] The Claimants submit, citing *Pope & Talbot v. Canada*, that the police powers doctrine "*has a very limited scope and is not a 'gaping loophole' providing a 'blanket exception for regulatory measures*.'"[593] The doctrine only covers two specific fields – "*neutralising threats to the environment or public order and health*" and "*enforcing existing regulations against wrongdoings such as the imposition of sanctions or revocation of licenses*."[594]

441.    Finally, the Claimants submit that the ECT is "*lex specialis*" and "*carves out any exception from the duty to compensate under Article 13 ECT*."[595] The Claimants refer, specifically, to Article 24 of the ECT which incorporates "*a closed list of exceptions which partially overlap with the scope of the police powers doctrine*."[596] The Claimants point out that

---

[589] Cl. Mem., paras. 514-516.

[590] Cl. Mem., para. 518.

[591] Cl. First PHB, para. 40.

[592] Cl. Reply, para. 824.

[593] Cl. Reply, para. 828(i), citing *Pope & Talbot Inc. v. Government of Canada*, UNCITRAL, Interim Award, 26 June 2000, **CL-0172 / RL-0303**, para. 99.

[594] Cl. Reply, para. 835.

[595] Cl. Reply, para. 837.

[596] Cl. Reply, para. 837.

Article 24(1) specifically provides that the provision "*shall not apply to Articles 12, 13 and 29.*"[597]

### (ii) Germany expropriated the NOH 2 projects without prompt and adequate compensation

442. The Claimants submit that Germany expropriated the NOH 2 projects by first eroding their value through a series of measures that impeded their advancement in the Plan Approval Process and delayed their grid connections by a decade, before eliminating all remaining value by extinguishing their rights in the Plan Approval Process altogether. These measures not only destroyed the NOH 2 projects, "*but also a large part of Germany's offshore wind market.*"[598]

443. The Claimants state that it is uncontested that NOH 2 paid "*a total amount of €78.46 million cash-free and debt-free to acquire the NOH2 Project companies on 10 January 2012.*"[599] The Claimants continued to carry out the necessary site investigations and progress the Projects in the approval process. The Claimants' expectation to be able to rely on the existing regulatory framework was frustrated by Germany.[600]

444. First, the Development Freeze by the BSH in June 2012 stalled the development of most of the NOH 2 projects. Moreover, while the Development Freeze was initially a temporary measure, it effectively became permanent for projects located in zones 3-5 as a result of Germany' subsequent measures.[601] Second, Germany's subsequent measures, including the 2013, 2014 and 2015 O-NEPs, severely delayed the expected grid connection dates for the NOH 2 projects. By way of the March 2015 Circular Germany then halted development of projects further away from the shore altogether, including all NOH 2 projects.[602] Finally, Germany's 2017 measures irrevocably destroyed any remaining value of the Claimants'

---

[597] Cl. Reply, para. 837.
[598] Cl. First PHB, para. 6.
[599] Cl. First PHB, para. 44.
[600] Cl. First PHB, paras. 44-45.
[601] Cl. First PHB, para. 45.
[602] Cl. First PHB, para. 46.

NOH 2 projects, as their Plan Approval Processes were terminated and they were not allowed to participate in the transitional tenders and did not obtain any step-in rights.[603]

445.    The Claimants further refer to the June 2020 decision of the Constitutional Court, which determined that the procedural positions of the complainants, including those of the NOH 2 Project Companies, "*have lost their value*."[604]

446.    The Claimants contend that "*Germany's compensation scheme does not provide prompt, and much less adequate, compensation for the NOH 2 Projects' fair market value as of the Valuation Dates*."[605] According to the Claimants, the scope of the compensation scheme is limited to "*futile expenditure (ie 'negatives Interesse') as opposed to full reparation in the form of putting the Claimants in the position but for the measures*."[606]

447.    Finally, the Claimants submit that the expropriation of the NOH 2 projects was also discriminatory (although they acknowledge that this has no practical effect on damages in this case) because the 2017 Offshore Wind Energy Act treated projects located in zones 1 and 2 more favorably than those located in zones 3, 4 and 5, regardless of their stage of development.[607]

### b.    *The Respondent's Position*

448.    The Respondent denies that the Claimants' expropriation claim has any merit. According to the Respondent, "[w]*itnesses and experts alike confirmed that Respondent did not indirectly expropriate NOH 2's purported investments*."[608] Moreover, a mere loss in value is not sufficient to establish expropriation and, in any event, regulatory measures taken by the host State in the normal exercise of its regulatory powers, and in the public interest, do not amount to an indirect expropriation.[609]

---

[603] Cl. First PHB, para. 47.

[604] Cl. PHB, para. 48; June 2020 Constitutional Court Decision, **C-0305** / **RL-0145**, para 141.

[605] Cl. First PHB, para. 49.

[606] Cl. First PHB, para. 49

[607] Cl. Second PHB, para. 40.

[608] Resp. First PHB, para. 279.

[609] Resp. C-Mem., para. 1297.

449.    The Respondent submits that expropriation only occurs "*if there is not only loss in value, but veritable loss of control over the investment.*"[610] The determination of whether a regulatory measure constitutes an indirect expropriation is a balancing act between the degree of interference by the host State with the investor's right of ownership and the host State's right to exercise its regulatory powers.[611] The former does not trump the latter.

### (i)     Applicable legal standard

450.    The Respondent contends that expropriation presupposes that the investor had protected rights under the domestic law of the host State; if there are no such rights, there can be no expropriation. This is the case here: the position of the NOH 2 projects in the approval process was not a legal position recognized under German law, as also confirmed by the Constitutional Court. According to the Respondent, the fact that an asset or a position can be sold on the market "*is not sufficient to render this a constitutionally protected asset or position, which could be expropriated.*"[612]

451.    In this case, the NOH 2 projects were located in the EEZ, over which Germany does not exercise sovereignty; the Claimants therefore cannot procure any property rights over those sites either. In any event, an administrative license or permit granted by State authorities, or the steps taken to obtain such license or permit, cannot be equated with a property right.[613] The definition of "*Investment*" in Article 1(6) of the ECT is consistent with this position: while it refers to "*any right conferred* […] *by virtue of any licenses and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector,*" it does not refer to any "*position in the Approval Procedure.*"[614]

452.    The Respondent submits that the Claimants' expropriation claim is excluded by the police powers doctrine, which is "*the primary test*" for distinguishing between indirect expropriation and legitimate non-compensable regulation, not a justification for indirect

---

[610] Resp. C-Mem., para. 1303.
[611] Resp. C-Mem., para. 1303.
[612] Resp. C-Mem., para. 1309.
[613] Resp. C-Mem., paras. 1311-1312.
[614] Resp. First PHB, para. 288; ECT, **CL-0001**, Art. 1(6)(f).

expropriation.[615] According to the Respondent, the police powers doctrine is part of customary international law, and as such applies in the present case by virtue of Article 26 of the ECT, and should also be taken into account in the interpretation of Article 13 of the ECT as a "*relevant rule*[] *of international law applicable in the relations between the parties*" to the ECT, in accordance with Article 31(1)(c) of the VCLT.[616] The Respondent submits that the police powers doctrine is broader than claimed by the Claimants; the doctrine "*is not limited to regulatory measures that aim to protect public health, public order or the environment*," but "*also encompasses regulatory measures that are adopted in furtherance of other public purposes or interests*."[617]

453.    Finally, the Respondent disagrees with the Claimants' argument that the police powers doctrine is excluded by virtue of Article 24 of the ECT. The Respondent submits that the police powers doctrine "*is only concerned with establishing whether or not a particular state conduct can be characterized as indirect expropriation*," and not with derogation from treaty obligations.[618] Accordingly, in the Respondent's view, Article 24 of the ECT "*has no bearing whatsoever on the question whether or when regulatory conduct can be characterized as indirect expropriation under Art. 13 ECT*."[619]

### (ii)    There was no governmental interference or discrimination

454.    The Respondent submits that the regulatory changes invoked by the Claimants cannot amount to an expropriation since the Claimants did not have any legitimate expectation that the regulations would not change. The Claimants' expectations can only be legitimate if the host State has made a specific commitment not to amend its legislation, and there was no such commitment in this case.[620]

455.    Moreover, there was no governmental interference with the Claimants' alleged investments because the Claimants did not lose control of their investments. The Claimants remained

---

[615] Resp. Rej., paras. 1308, 1357.
[616] Resp. Rej., paras. 1358-1361.
[617] Resp. Rej., para. 1369.
[618] Resp. Rej., para. 1381.
[619] Resp. Rej., para. 1381.
[620] Resp. First PHB, paras. 292-293.

free to conduct their day-to-day business and have not complained about loss of control, or that they had to "*clos*[e] *down the NOH2 Projects*."[621] Even assuming the sole effects doctrine (*i.e.* which only considers the effect of a measure taken) applied, this would not help the Claimants since the Respondent's measures did not have any effect on the value of the NOH 2 projects. Moreover, given the NOH 2 projects were still far away from obtaining approval, let alone a grid connection, "*their value was relatively low*," and accordingly there was no "*severe depreciation*."[622]

456.   The Respondent also denies that it discriminated against the Claimants. The measures applied equally to all developers in the EEZ, and the criteria for the scope of application of the transitional rules were not discriminatory either. Indeed, the Claimants' experts were unable to come up with alternative criteria at the Hearing. The Constitutional Court also did not find that the Offshore Wind Energy Act contained any discriminatory provisions.[623]

### (3)    The Tribunal's Analysis

457.   The relevant provision of the ECT in connection with the Claimants' expropriation claim is Article 13(1), which provides in relevant part:

> *Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:*
>
> *(a) for a purpose which is in the public interest;*
>
> *(b) not discriminatory;*
>
> *(c) carried out under due process of law; and*
>
> *(d) accompanied by the payment of prompt, adequate and effective compensation.*[624]

---

[621] Resp. First PHB, paras. 295-299.
[622] Resp. First PHB, paras. 300-302.
[623] Resp. First PHB, paras. 303-307.
[624] ECT, **CL-0001**, Art. 13(1).

458.   It is undisputed that Article 13(1) governs both direct and indirect expropriations; however, the Parties disagree as to what constitutes an indirect expropriation. The Claimants argue that regulatory measures may amount to an indirect expropriation, and whether or not they do, depends solely on the effect of the measure on the value of the investment; the State's intent or the form of the measure or its underlying purpose are not relevant. Moreover, according to the Claimants, an indirect expropriation may also be "*creeping*," that is, it may involve a series of acts that cumulatively result in a substantial deprivation of value, even when no single act is *per se* tantamount to expropriation.

459.   The Respondent argues, in response, that liability for substantial deprivation can be assumed only in exceptional circumstances, and that this cannot be the case if the host State has legitimately exercised its right to regulate. Moreover, according to the Respondent, a creeping expropriation did not take place in this case since the Claimants retained control over the NOH 2 projects and were able to continue the day-to-operations of the NOH 2 Project Companies. The Respondent further relies on the police power doctrine, contending that the measures at issue in this case fall within the police powers doctrine as the Claimants' investments were made in a "*highly regulated industry that underwent constant regulatory change and technological evolution*."[625] More specifically, the Respondent contends that "[t]*he police powers doctrine is not limited to regulatory measures that aim to protect public health, public order or the environment*," but "*also encompasses regulatory measures that are adopted in furtherance of other public purposes or interests*."[626]

460.   The Tribunal notes at the outset that, while it has determined above that the Respondent is in breach of the FET standard under Article 10(1) of the ECT, this does not entail that the measures that were found to amount to a breach of the FET standard also amount, *ipso jure*, to an unlawful expropriation. Whether an expropriation has occurred within the meaning of Article 13(1) of the ECT is a separate determination as a matter of fact and law.

---

[625] Resp. Rej., para. 1367.
[626] Resp. Rej., para. 1369.

461.   Having considered the evidence before it, the Tribunal finds that the way in which the regulatory measures taken by Germany during the period 2012-2017 were implemented gradually resulted, as a matter of fact, in a total loss of the value of the NOH 2 projects.

462.   First, as determined above in connection with the Claimants' FET claim, while the centralized grid connection system introduced by the 2012 Energy Act was a justified and legitimate measure in the circumstances, the way the 2012 Energy Act was implemented, including by way of the O-NEPs and other related measures, effectively undermined the Claimants' investments in the NOH 2 projects. Thus, while according to the 2012 Energy Act the distance to shore criterion was only one of the criteria for the implementation of the offshore grid development plan, O-NEP 2013 prioritized this particular criterion and made it effectively the sole criterion to be applied for the projects in zones 3-5. As a result, O-NEP 2013 substantially delayed the expected grid connection dates for all of the NOH 2 projects, first until 2023-2027[627] and subsequently, by the 2014 and 2015 O-NEPs, until 2031-2035.[628]   As determined above, the O-NEPs also effectively destroyed the Coastal Distance Bonus, which was introduced by the 2004 Renewable Energy Sources Act and was maintained in the 2009 and 2012 amendments of the Act.

463.   Second, from March 2015, compounding the effect of the O-NEPs, the BSH indicated that it would no longer process the applications for the NOH 2 projects at all, as these projects could not expect to receive a grid connection within the next ten years, according to the applicable O-NEP.[629] Finally, the 2017 Offshore Wind Energy Act terminated the Plan Approval Processes for the NOH 2 projects altogether, as of 1 January 2017, without any compensation or right to participate in the tender process or any right to "step in." As a result, the investments made by the Claimants in the development of the NOH 2 projects were lost without any compensation, whether financial or in-kind. The Tribunal will address below the relevance of the subsequent compensation implemented following the decision of the Constitutional Court.

---

[627] *See above* paragraph 129.

[628] *See above* paragraphs 134-135.

[629] Cl. Mem., para. 327; Letter from BSH to GAIA I, 6 March 2015, **C-0273**; Strabag, Board Information on UB4W Energie, 15 April 2015, **C-0274**.

464.	The Tribunal must therefore determine whether, as a matter of international law, the measures at issue qualify as a legitimate exercise of police powers, as contented by the Respondent, even if they resulted in a total loss of value of the Claimants' investments in the NOH 2 projects.

465.	As noted by investment treaty tribunals, there is no bright-line rule under international law to distinguish between an indirect expropriation and the legitimate exercise by the State of its police powers. While it is well established that a State may in certain circumstances, including by way of taxation and fines and other criminal law and administrative sanctions, effectively "take" private property without compensation, as noted by the *Saluka v. Czech Republic* tribunal:

> [International law] *has yet to draw a bright and easily distinguishable line between non-compensable regulations on the one hand and, on the other, measures that have the effect of depriving foreign investors of their investment and are thus unlawful and compensable in international law.*[630]

466.	In the absence of any bright-line rules, the Tribunal must consider whether in the circumstances of this case, and in light of the jurisprudence of international courts and tribunals on the subject, the measures taken by Germany qualify as legitimate exercise of police powers under international law.

467.	The Tribunal notes that the Claimants' investments in the NOH 2 projects were not deprived of value as a result of regulatory measures, but rather by way of administrative acts and decisions taken by State authorities in connection with the implementation of regulatory measures, including, in particular, the 2012 Energy Act. Indeed, the Tribunal has determined above that the 2012 Energy Act in itself was a justified and legitimate regulatory measure in the circumstances. Moreover, while the 2017 Offshore Wind Energy Act effectively sealed the fate of the NOH 2 projects by terminating the Plan Approval Processes and excluding the right to participate in tenders or any step-in rights, the NOH 2 projects had effectively lost much if not all of their value prior to this date, as a result of

---

[630] *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006 ("**Saluka v. Czech Republic**"), **CL-0112 / RL-0271**, para. 263.

the O-NEPs and the BSH's refusal in March to process applications for the NOH 2 projects in view of the forthcoming regulatory changes.[631]

468.    The Tribunal notes that it is for the Respondent, as the Party relying on the police powers doctrine as a defense against the Claimants' expropriation claim, to demonstrate that the measures that resulted in a total loss of value of the Claimants' investments in the NOH 2 projects qualify as a legitimate exercise of police powers under international law. The Respondent has failed to do so. The measures at issue are not comparable, *ejusdem generis*, to measures that are generally considered to fall within the police powers doctrine under international law, such as taxation or fines or other sanctions imposed as a result of a breach of a legal obligation under public law, including criminal and administrative law sanctions,[632] or measures related to protection of public order, public health or the environment.[633] Indeed, from the perspective of protection of the environment, the measures appear to have delayed rather than expedited the deployment of renewable energy in Germany. Having carefully considered the Parties' positions and the supporting legal authorities and the evidence on the record, the Tribunal therefore rejects the Respondent's defense that the conduct of German authorities during the relevant period should be characterized as legitimate exercise of police powers, justifying the taking of the Claimants' investments without compensation.

469.    While denying any liability, the Respondent further refers, in support of its position that no expropriation has taken place, to measures taken by the German government to address the adverse consequences of the Offshore Wind Energy Act on certain offshore wind projects, including the NOH 2 projects, in accordance with the decision of the Constitutional Court of 30 June 2020. Pursuant to the Court's decision, the German government amended the Offshore Wind Energy Act to provide a mechanism to compensate the owners of offshore

---

[631] *See above* footnote 578 and accompanying text. *See also* Cl. Reply, paras. 15-16.

[632] *See, e.g.*, *Saluka v. Czech Republic*, **CL-0112** / **RL-0271**, paras. 270-275.

[633] *See, e.g.*, *Methanex Corporation v. United States of America*, UNCITRAL, Final Award, 3 August 2005, **RL-0266**, Part IV, Chapter D, p. 4, paras. 7 *et seq.*.

wind projects, including the NOH 2 projects, whose Plan Approval Process had been terminated in accordance with the earlier version of the Offshore Wind Energy Act.[634]

470.   The Tribunal notes, however, that the compensation to be provided pursuant to the amended Offshore Wind Energy Act is not intended to remedy a breach of the ECT relating to a loss of an "*Investment*," as defined in the ECT; any such compensation is limited to planning and site investigation expenses, to the extent that such expenses relate to data and documentation that may be used for the preparatory investigation of sites to be carried out under the new tender system. In view of its purpose, the quantification of any such compensation is not based on the valuation standards or methods to be applied by this Tribunal, which operates under international law. Nonetheless, the measures taken by the German Government relate, at least in part, to the same loss and will be considered by the Tribunal when determining the quantum of the Claimants' expropriation claim.

471.   In light of the above, the Tribunal finds, on the basis of the totality of the evidence before it, that the way in which the regulatory measures taken by Germany in 2012, in particular the 2012 Energy Act, were implemented had, over time, an effect on the Claimants' investments in the NOH 2 projects that is equivalent to expropriation, and thus amounts to an "*Expropriation*" within the meaning of Article 13(1) of the ECT. While, following the decision of the Constitutional Court, the Respondent has provided some compensation to the Claimants pursuant to the amended the Offshore Wind Energy Act (as discussed below in Section VI.VII), the compensation was neither prompt nor adequate, within the meaning of Article 13(1) of the ECT. The Respondent is thus in breach of its obligation under Article 13(1) of the ECT not to subject Investments of Investors of a Contracting Party to measures having effect equivalent to expropriation, without prompt, adequate and effective compensation.

---

[634] Resp. C-Mem., paras. 144-156; 2020 Offshore Wind Energy Act, **C-0306 / RL-0148**.

**C.    THE ALLEGED BREACH OF THE FULL PROTECTION AND SECURITY STANDARD**

**(1)    The Parties' Positions**

472.    It is undisputed between the Parties that the full protection and security ("**FPS**") standard imposes an obligation of due diligence on the host State, however, they disagree on the scope of the standard as well as on whether, on the facts, the Respondent breached the FPS standard.

***a.    The Claimants' Position***

**(i)    Applicable legal standard**

473.    The Claimants contend that it is now "*widely accepted*" that the FPS standard encompasses not only protection of investors and their investments against physical threats, but also "*an obligation to afford qualifying investors and investments* legal (*as opposed to mere physical*) *protection.*"[635] The FPS and the FET standard may therefore "*become closely linked,*" however, in substance, they are distinguishable.[636] According to the Claimants,

> *full protection and security is effectively the mirror image of the fair and equitable treatment standard: whereby fair and equitable treatment imposes upon host States (and, a fortiori, their organs) to refrain from carrying out measures impairing qualifying investments and investors, full protection and security requires host States to actively prevent their organs from causing harm to them.*[637]

474.    Moreover, in relation to third parties, the FPS standard is more extensive than the FET standard as it requires the host State actively to prevent third parties from causing harm to protected investors and their investments. The host State is in breach of the FPS standard if it fails to ensure enforcement of its own laws and regulations and to comply with its commitment to protect investments. Thus, ECT tribunals have focused on the host State's obligation of due diligence in protecting investments of investors of other Contracting Parties.[638]

---

[635] Cl. Mem., para. 553 [emphasis in original].
[636] Cl. Mem., para. 554.
[637] Cl. Mem., para. 555.
[638] Cl. Mem., para. 555.

475.    The Claimants submit that the FPS standard in Article 10(1) of the ECT must interpreted in accordance with the VCLT, "*neither restrictively nor broadly.*" According to the Claimants, the sole qualification is that the assets in question must constitute "*Investments,*" which under Article 1(6) of the ECT includes intangible assets.[639]

### (ii)    The Respondent failed to provide full protection and security to the Claimants' investments

476.    The Claimants allege that Germany failed to discharge its due diligence obligation to protect the Claimants and their investments from the unlawful infringement of their interests by governmental agencies and third parties.[640] Germany allegedly disregarded the Claimants' interests when implementing the centralized grid connection system in 2012, which allowed the TSOs to shape the grid connection system in a way that gave priority to their interests over those of OWF developers. While the BNA had to approve the O-NEPs, it failed to exercise due diligence and ensure that the TSOs and the OWFs interests were balanced.[641]

477.    While the 2012 Energy Act established non-exhaustive criteria for offshore grid expansion, Germany failed to provide guidance on the application of those criteria and allowed the TSOs to prioritize the distance to shore criterion. This served the TSOs interests as there was, from the TSOs' perspective, a direct relationship between distance to shore and the investments required from the TSOs. While this linkage was, in the experts' view, questionable, the BNA endorsed the distance to shore criterion, thus approving the self-interested ranking of the TSOs.[642]

478.    The Claimants submit that, in failing to consider alternatives such as investing in TenneT or improving the investment conditions, Germany failed to comply with its due diligence obligation under Article 10(1) of the ECT.[643]

---

[639] Cl. Reply, para. 848.

[640] Cl. First PHB, paras. 178-179.

[641] Cl. First PHB, para. 179.

[642] Cl. First PHB, paras. 180-181; *see also* Cl. Mem., para. 560.

[643] Cl. First PHB, para. 182.

### b.  The Respondent's Position

#### (i)  Applicable legal standard

479.  The Respondent submits that the FPS standard "*still primarily involves the duty to grant physical protection and security*."[644] This is consistent with the *effet utile* rule, which is relevant in the context of Article 10 of the ECT, since it is only this more restrictive interpretation that allows a meaningful distinction between the FET standard and the FPS standard.[645] Thus, according to the Respondent, the protection of intangible assets is "*not a given*," and the Claimants have failed to explain why the wider standard would be appropriate in the circumstances of this case.[646]

480.  The Respondent contends that, in any event, the FPS standard does not protect against the host State's right to legislate or regulate investments. The FPS standard is also not "*absolute*;" it only imposes a due diligence obligation, that is, the obligation to exercise reasonable care and take reasonable actions. In arbitral practice, a high threshold has been applied before finding a violation.[647]

#### (ii)  The Respondent has complied with the full protection and security standard

481.  The Respondent argues that it cannot be held responsible for TenneT's inability to deliver grid connections to OWF developers. It is in fact undisputed that providing a grid connection is the responsibility of third party private grid operators such as TenneT, and any obligations TenneT may have had *vis-à-vis* OWF developers were governed exclusively by private law.[648]

482.  The Respondent acted reasonably by listening to the industry and taking the only measure that was reasonable and sustainable in the circumstances, that is, reforming the grid connection system.[649] The Respondent also created an industry working group and listened

---

[644] Resp. C-Mem., para. 1401.
[645] Resp. C-Mem., para. 1401.
[646] Resp. C-Mem., para. 1407.
[647] Resp. C-Mem., paras. 1410-1411; Resp. First PHB, para. 345-347.
[648] Resp. First PHB, para. 349.
[649] Resp. First PHB, para. 357.

to its suggestions as to how to improve the system.[650] Instead of committing a breach of the FPS standard, the Respondent exercised its right to regulate to fix the dysfunctional grid connection system.[651] Indeed this was a "*culmination*" of the Respondent's public policy goals, which included enhancing planning, cost security for consumers and reducing the risk of stranded investments.[652]

483.    According to the Respondent, the Hearing confirmed that Germany was mindful of the Claimants' interests, even though there was no legal obligation to that effect.[653] Thus, for instance, the BSH agreed to amend the milestone plan for the construction of the Albatros Test Field.[654] The Claimants never took legal action against the Respondent or TenneT before ending their activities, although this would have been possible.[655]

### (2)    The Tribunal's Analysis

484.    The Claimants' FPS claim is governed by Article 10(1) of the ECT, which provides, in relevant part, that the Investments of Investors of other Contracting Parties "*shall* [...] *enjoy the most constant protection and security.*"[656]

485.    As noted above, while the Parties agree that the FPS standard imposes an obligation of due diligence on the host State, they disagree on whether the scope of the standard has evolved over time beyond its customary international law origins to cover forms of security other than physical security, including legal security.

486.    The Tribunal notes that, while the FET and FPS standards under the ECT are closely related and indeed complementary, they are not co-extensive, and a breach of the FET standard does not necessarily amount to a breach of the FPS standard.  Indeed, the Parties appear to agree that the core of the FPS standard under international law is the obligation of the host

---

[650] Resp. First PHB, para. 358.
[651] Resp. First PHB, para. 359.
[652] Resp. First PHB, para. 360.
[653] Resp. First PHB, para. 364.
[654] Resp. First PHB, para. 365.
[655] Resp. First PHB, para. 366.
[656] ECT, **CL-0001**, Art. 10(1).

State to exercise appropriate due diligence to protect investments against impermissible third-party interference.[657]

487.    As summarized above, the Claimants argue that the German federal government disregarded the Claimants' interests when implementing the centralized grid connection system in 2012, and that the BNA, an organ of the German State, failed to exercise the required due diligence by allowing the TSOs to shape the grid connection system in a way that gave priority to their interests over those of OWF developers.

488.    As to the Claimants' argument that Germany disregarded the Claimants' interests when implementing the centralized grid connection system in 2012, the Tribunal has determined above in connection with the Claimants' FET claim that the regulatory measures taken by the German government in 2012 were legitimate in the circumstances and did not amount to a breach of the FET standard.  They therefore also cannot amount to a breach of the FPS standard.

489.    The Tribunal is also unable to agree that Germany failed to exercise the required due diligence. While the TSOs indeed proposed the O-NEPs, which were then subject to "*confirmation*" ("*Bestätigung*") by the BNA, the role of the TSOs in the process cannot be characterized as impermissible third-party interference with the Claimants' investments. While the TSOs participated in the development of the O-NEPs, their participation was of a technical and preliminary nature and as such had no direct or immediate adverse impact on the Claimants' investments. Nor can the BNA's confirmation of the O-NEPs be considered to amount to a breach of the FPS standard. While the way in which the O-NEPs were implemented did adversely affect the Claimants' investments (as determined above in connection with the Claimants' FET and expropriation claims), there is no evidence before the Tribunal that the BNA failed to exercise due diligence when confirming the

---

[657] *See, e.g, Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/04/6, Award, 16 January 2013, **CL-0182 / RL-0485**, para. 223 ("[T]*he Tribunal is broadly in agreement that* [the FPS standard] *applies at least in situations where actions of third parties involving either physical violence or the disregard of legal rights occur, and requires that the State exercise due diligence to prevent harm to the investor*"). *See also AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, **CL-0135 / RL-0249**, para. 13.3.2; *Eskosol, S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Award, 4 September 2020, **CL-0183 / RL-0451**, para. 481; *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 17 July 2016, **CL-0038 / RL-0293**, para. 817.

TSO's proposals.  Indeed, as stressed by the Respondent, the BNA did not simply endorse the O-NEPs as drafted by the TSOs; the BNA's decision was taken after extensive public consultations.[658]

490.    In light of the above, the Claimants' FPS claim is rejected.

## D.    THE ALLEGED BREACH OF THE NON-IMPAIRMENT STANDARD

491.    The Claimants also claim that the Respondent breached the investment protection standard in Article 10(1) of the ECT, often referred to as the "**Non-Impairment Standard**," which prohibits the Contracting Parties from impairing by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of Investments of Investors of the other Contracting Parties.

492.    The Parties disagree on both the content of the obligation as well as on whether the Respondent has breached the standard.

### (1)    The Parties' Positions

#### a.    *The Claimants' Position*

##### (i)    Applicable legal standard

493.    The Claimants argue that ECT tribunals have applied a two-fold test in assessing whether the Non-Impairment Standard has been breached: first, it must be established that an "*impairment*" has occurred, which is an objective matter; and second, the host State's conduct causing the impairment must be found to have been unreasonable or discriminatory.[659]

494.    The Claimants submit that, given the magnitude of the impact of Germany's measures, the Tribunal need not determine whether the impairment must be "*significant*."[660] As to the content of the Non-Impairment Standard, the host State's conduct is "*unreasonable*" if it does not serve a legitimate and rational policy or, even if it does, the problem addressed by

---

[658] Resp. CM, para. 458 ; Resp. Rej., para. 576.

[659] Cl. Mem., para. 562; Cl. First PHB, para. 168.

[660] Cl. Mem., para. 563.

the measures could have been avoided and the problem resulted from the host State's own regulatory failures. In order to meet the test of reasonableness, the host State's conduct must also be proportionate.[661]

495.   As to discriminatory impairment, the Claimants submit that the investor need not show discriminatory intent on the part of the host State; discriminatory effect is sufficient. For the purposes of this determination, an appropriate comparator must be established, *i.e.* one must identify a similarly situated investor or investment. According to the Claimants, for this purpose, "[o]*ther participants in the investor's market are appropriate comparators*."[662]

### (ii)    The Respondent breached the Non-Impairment Standard

496.   The Claimants submit that in this case, to say that Germany's conduct caused impairment "*is an understatement, regardless of how the threshold is articulated*."[663] According to the Claimants, Germany's measures "*severely affected the NOH1 Projects and completely destroyed the entire economic use and value of the Claimants' investment in the NOH2 Projects and the Gravity Foundation Technology*."[664]

497.   The Claimants submit that Germany's measures were both unreasonable and discriminatory. They were unreasonable because the measures "*not only failed to achieve a legitimate and rational policy, as proven by their subsequent reversal, but were also directed at solving issues created by Germany's regulatory failure, for which there were alternative solutions less burdensome to the Claimants' investments*."[665] According to the Claimants, "*the measures lacked any shred of proportionality*" as they were designed to suit the self-serving interests of the TSOs, "*with no effective oversight*" by Germany.[666]

---

[661] Cl. Mem., para. 563-564.

[662] Cl. Mem., para. 565; Cl. First PHB, para. 168.

[663] Cl. Mem., para. 566.

[664] Cl. Mem., para. 566.

[665] Cl. Mem., para. 566(a) [footnotes omitted].

[666] Cl. Mem., para. 566(a).

498.   The Claimants contend that the measures were also discriminatory with respect to the NOH 2 projects, as Germany failed to provide any compensation, even if other OWF developers were compensated in kind, in the form of a step-in right. These other developers are the appropriate comparators as they participated in the same market, had invested similar resources and had assumed the same risks over a similar period of time.[667]

499.   The Claimants submit that the Hearing confirmed that Germany's measures were both unreasonable and discriminatory. First, Germany's treatment of the Claimants' NOH 2 projects was unbalanced as there were viable alternatives and, furthermore, the measures were inadequate to achieve the stated policy goals, as evidenced by Germany's recent "*regulatory U-turn*."[668] Second, the distinction made by Germany between projects located in zones 1 and 2, and those located in zone 3, lacked an objective justification and was therefore discriminatory. The Claimants allege that zoning based on the distance to shore criterion was an arbitrary government decision in the first place and resulted in discrimination between essentially equal projects.[669]

500.   According to the Claimants, the Hearing showed that Germany's discriminatory measures were also unreasonable. With the benefit of hindsight, and in view of the recent increase in Germany's offshore wind energy targets above its pre-2012 levels, Germany's regulatory roller coaster since 2012 was "*irrational and ultimately counterproductive*."[670]

### b.    The Respondent's Position

### (i)    Applicable legal standard

501.   The Respondent denies any breach of the Non-Impairment Standard and argues that the Claimants misrepresent the standard. Citing *Saluka*, the Respondent argues that the reasonableness standard is effectively a procedural standard – the host State's conduct must bear "*a reasonable relationship to some rational policy*."[671] According to the Respondent,

---

[667] Cl. Mem., para. 566(b).

[668] Cl. First PHB, para. 169.

[669] Cl. First PHB, para. 169.

[670] Cl. First PHB, para. 177.

[671] Resp. C-Mem., paras. 1442-1443; *Saluka v. Czech Republic*, **CL-0112 / RL-0271**, para. 460.

a governmental measure is therefore reasonable if the host State pursues a rational policy, "*based on a good sense explanation and the measure under scrutiny must be taken in relation to said rational policy*."[672]

502.   Similarly, since the ECT does not provide a definition of "*discriminatory*" conduct, the Respondent argues, drawing on arbitral practice, that the determination of whether a governmental measure is discriminatory involves (i) the identification of a relevant comparator; (ii) establishing differential treatment by evidence; and (iii) the assessment of the justification, if any, offered for the differential treatment. Thus the host State's conduct is discriminatory if it cannot offer any justification for the differential treatment of comparable investments.[673]

### (ii)    The Respondent did not impair the Claimants' investments

503.   The Respondent submits that Germany's measures did not impair the Claimants' investments because they did not affect the Claimants' management, maintenance, use, enjoyment or disposal of their assets.[674] The Respondent contends that this was confirmed by the evidence given at the Hearing, which showed that the Claimants "*were still free to use and enjoy or dispose of their projects as they saw fit*."[675]

504.   The Respondent contends that Germany's measures were also reasonable as they were "*necessary to reach the legitimate and rational policy goal of implementing a fair tender process, in the public interest of the improvement of the overall offshore wind energy regime*."[676] The reasonableness of the measures was allegedly confirmed by the Constitutional Court in its June 2020 decision.[677]

505.   According to the Respondent, the measures were also proportionate since they "*pursued a legitimate policy objective, they were suitable and necessary for the pursuit of that*

---

[672] Resp. C-Mem., para. 1445.
[673] Resp. C-Mem., paras. 1446-1452.
[674] Resp. First PHB, para. 369.
[675] Resp. First PHB, para. 370.
[676] Resp. First PHB, para. 372.
[677] Resp. First PHB, para. 373.

*objective and not excessive when weighed against competing investor's interests*."[678] There was also no imbalance between the regulatory measures and the competing investors' interests, and the industry and all relevant stakeholders were consulted.[679]

506.    The Respondent contends that the measures were also non-discriminatory since the relevant comparator is investors in zone 3, who were all treated equally.[680] The Claimants voluntarily chose to develop their projects in zone 3, even though the Respondent had made clear that the different zones would be treated differently. The Claimants' NOH 2 projects were all in the early development stages and could thus be treated differently from those in zones 1 and 2. Consequently, since there was no differential treatment, there is no need for a justification.[681]

507.    In any event, in the Respondent's view, there was an objective justification for differential treatment of zones 1 and 2: cost effective development of offshore wind energy. This not only served the legitimate purpose of enabling the transition to the new system with tenders and preliminary investigation of suitable sites by the Respondent, but also the "*coordinated and efficient offshore expansion especially with regard to a demand-based grid planning and the functioning of the tenders*."[682]

### (2)    The Tribunal's Analysis

508.    The Non-Impairment Standard is set out in Article 10(1) of the ECT, which provides, in relevant part, that "*no Contracting Party shall in any way impair by unreasonable or discriminatory measures the*[] *management, maintenance, use, enjoyment or disposal* [of Investments]."[683]

509.    Based on its ordinary meaning, the clause requires that an investor invoking the Non-Impairment Standard must first establish that there was an "*impairment*" of a protected

---

[678] Resp. First PHB, para. 378.
[679] Resp. First PHB, para. 379.
[680] Resp. First PHB, para. 381.
[681] Resp. First PHB, paras. 383-385.
[682] Resp. First PHB, para. 385.
[683] ECT, **CL-0001**, Art. 10(1).

investment (which is a matter of fact), and that the measure that caused such impairment was either unreasonable or discriminatory (which are matters of law). The Tribunal notes that the Parties largely agree with this reading of the provision, even if they disagree on whether the Claimants' investments were "*impaired*."

510.    The Tribunal notes that, according to its ordinary meaning, the term "*impair*" refers to any negative impact or effect caused by the measures taken by the host State.[684] The Tribunal is satisfied, on the basis of the evidence before it (and as determined above in Sections VI.A(2) and VI.B(3) in connection with the FET and expropriation claims), that the way in which the Respondent applied the regulatory measures governing offshore wind projects, as of 19 December 2013, "*impaired*" the Claimants' NOH 1 and NOH 2 projects.

511.    In order to meet the legal criteria for a breach of the Non-Impairment Standard, the Claimants must further show that the measures complained of are either unreasonable or discriminatory; however since these are alternative criteria ("*or*"), the Claimants do not need to show that the measures that impaired their investments were both unreasonable and discriminatory.

512.    As for reasonableness, the Parties effectively agree that a regulatory measure is "*reasonable*" if it bears a reasonable relationship to a legitimate and rational policy, that is, if the measure arguably serves a policy that is *prima facie* legitimate and rational.[685] On this basis, the Claimants argue that Germany's regulatory measures in 2012, and notably the 2012 Energy Act, were unreasonable because they did not serve a legitimate and rational policy (as also proven by their subsequent reversal) and "*were also directed at solving issues created by Germany's regulatory failure, for which there were alternative solutions less burdensome to the Claimants' investments*."[686] The Respondent argues, by contrast, that the measures were reasonable as they were necessary to reach a legitimate

---

[684] *See, e.g., Saluka v. Czech Republic*, **CL-0112 / RL-0271**, para. 458.

[685] *See, e.g., Saluka v. Czech Republic*, **CL-0112 / RL-0271**, para. 460.

[686] Cl. Mem., para. 566(a).

and rational policy goal (implementation of a fair tender process) and were also in the public interest as they sought to improve "*the overall offshore wind energy regime.*"[687]

513.    The Tribunal notes that, as determined above in connection with the Claimants' FET and expropriation claims, the issue in the present case is not the regulatory measures taken by the Respondent in 2012, in particular the 2012 Energy Act, which is on its face a legitimate and rational regulatory measure, but the way in which those measures were implemented. In light of these findings, the Tribunal is unable to conclude that Germany's regulatory measures were, in themselves, "*unreasonable*" within the meaning of Article 10(1) of the ECT.

514.    As for the second limb of the Non-Impairment Standard, *i.e.* whether Germany's regulatory measures were "*discriminatory*," the Parties again appear to agree on the core requirement of the standard: the host State cannot treat investments that are in a comparable situation differently without justification. On this basis, the Claimants argue that Germany's measures were discriminatory with respect to the NOH 2 projects, as Germany failed to provide any compensation, even if other OWF developers were compensated in kind, in the form of a step-in right. According to the Claimants, these other developers are the appropriate comparators as they participated in the same market, had invested similar resources and had assumed the same risks over a similar period of time. The Respondent argues, in response, that the measures were non-discriminatory since the relevant comparators are investors in zone 3, who were all treated equally.

515.    The Tribunal agrees with the Claimants that the appropriate comparator for the Claimants' NOH 2 projects is projects in zones 1, 2 and 3, and not solely projects in zone 3, since the differential treatment of projects in zones 1 and 2, on the one hand, and zone 3, on the other, is the very basis of the Claimants' complaint.[688] The Tribunal must therefore

---

[687] Resp. First PHB, para. 372.

[688] The Tribunal notes that the German Federal Ministry of Justice appears to have adopted the same view, contemporaneously; *see* Letter from Federal Ministry of Justice and Consumer Protection to Federal Ministry for Economic Affairs and Climate Action, 26 April 2016, **C-0382**, p. 2 (noting that "[t]*here are still constitutional-law concerns regarding the design of the transitional provisions in Part 3 Sec. 3 and 4 WindSeeG*. […] *The justification for Section 26(2) number 2 of the Offshore Wind Energy Act is not yet sufficient to justify the unequal treatment of installations in zones 1 and 2 on the one hand and in zone 3 on the other (Article 3(1) of the Basic Law). This is especially true when comparing two projects that are equally well developed but have different locations.*").

determine whether projects in zone 3 were treated differently from projects in zones 1 and 2, without justification. In this connection, as set out above in Section III.C, while projects in zones 1 and 2 were entitled to participate in the tender process established by the 2017 Renewable Energy Sources Act, and were also given a step-in right if unsuccessful in the tenders, projects in zone 3, such as the NOH 2 projects, were excluded from any kind of compensation. The two sets of projects were therefore undeniably treated differently.

516.    Having considered the Parties' positions and the supporting evidence, the Tribunal nonetheless cannot agree that the Respondent's differential treatment of projects in zones 1 and 2, on the one hand, and projects in zone 3 (which included the Claimants' NOH 2 projects), on the other hand, was "*discriminatory*" within the meaning of Article 10(1) of the ECT. Differential treatment does not, in itself, amount to discrimination; whether or not it does, depends on whether the reason for the differential treatment is legitimate. In the context of the Claimants' Non-Impairment claim, the reason for the differential treatment of the two sets of projects – distance to shore – cannot be considered, in itself, illegitimate. While the Tribunal considered above, in the context of the Claimants' FET claim, that the O-NEPs' hard-coding of the distance to shore criterion, which according to the 2012 Energy Act was only one of the criteria for the implementation of the offshore grid development plan, was relevant in determining whether the Respondent had breached the FET standard, the issue with the distance to shore criterion in that context is the way in which it was implemented following the adoption of the 2012 Energy Act, and not that it must be considered inherently suspect or otherwise on its face illegitimate and, as such, discriminatory.

517.    Accordingly, the Tribunal finds that the Respondent cannot be considered to be in breach of the Non-Impairment Standard in Article 10(1) of the ECT. The Claimants' Non-Impairment claim is therefore rejected.

## VII.    QUANTUM

### A.    THE PARTIES' POSITIONS

518.    This section sets out the Parties' positions regarding the valuation of the claims relating to the Offshore Wind Projects. The summary does not consider the GFT as the Tribunal has

determined above that the Claimants' decision to suspend the development of the GFT has not been proved to be a consequence of regulatory or any other measures taken by the Respondent and accordingly cannot amount to a breach of its obligations under the ECT.

### (1)    The Claimants' Position

#### a.    *Applicable valuation standard*

519.    The Claimants argue that since the ECT is silent on the standard of compensation to be applied for breaches of Article 10(1), the appropriate standard of compensation must be established, in accordance with Article 26(6) of the ECT, by reference to customary international law.[689] According to the Claimants, customary international law requires that a State provide "*full reparation*," as determined by the Permanent Court of International Justice ("**PCIJ**") in the *Chorzów Factory* case.[690]

520.    According to *Chorzów Factory*, compensation must "*wipe out all the consequences of the illegal act*."[691] Accordingly, the full reparation standard entitles the investor to monetary compensation equal to the economic losses that it would have avoided, or the profits it would have earned, but for the respondent State's unlawful conduct.[692] The Claimants note that the standard of full reparation is also codified in Articles 31 and 32 of the International Law Commission's Articles on State Responsibility for Internationally Wrongful Acts (the "**ILC Articles**").[693]

521.    The assessment of full reparation thus begins with the consideration of the economic position that the investor would have been in, absent the treaty breach. According to the Claimants, this position is typically assessed by reference to the fair market value of the affected investment immediately prior to the breach.[694] This is consistent with Article 13

---

[689] Cl. Mem., para. 570.

[690] Cl. Mem., para. 572, citing *Factory at Chorzów* (Claim for Indemnity), PCIJ, Judgment No. 13, 13 September 1928 ("***Chorzów Factory***"), **CL-0189 / RL-0316**, p. 89.

[691] Cl. Mem., para. 572, citing *Chorzów Factory*, **CL-0189 / RL-0316**, p. 89.

[692] Cl. Mem., para. 573.

[693] Cl. Mem., para. 572, citing *Chorzów Factory*, **CL-0189 / RL-0316**, p. 89; International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts*, ILC Yearbook Vol. II(2) (2001) ("**ILC Articles**"), **CL-0191 / RL-0317**, Arts. 31, 34.

[694] Cl. Mem., para. 573, citing ILC Articles, **CL-0191 / RL-0317**, p. 75.

of the ECT, which explicitly provides for compensation to be assessed on the basis of the fair market value standard. The Claimants submit that this standard also applies to the valuation of claims arising under Article 10 of the ECT.[695] The Respondent's position that only a portion of the consequences of the wrongful act should be compensated is, according to the Claimants, antithetical to established public international law.[696]

522.    The Claimants state that they do not seek double recovery and will reduce their damages claim in this arbitration to account for any amounts received in the future pursuant to the Constitutional Court's June 2020 decision.[697]

### b.    *The appropriate valuation date is that of Germany's first unlawful act*

523.    The Claimants submit that where an investor has been substantially deprived of the value of an investment through a series of measures that amount to an internationally wrongful act, the appropriate valuation date is "*that of the first important act that gave rise to a creeping expropriation*." According to the Claimants, this also applies to breaches other than expropriation.[698]

524.    The Claimants submit that, although certain tribunals have considered that for breaches other than expropriation the appropriate valuation date is the date on which the breach reaches a "*watershed*," the result is the same in practical terms.[699]

525.    Based on these principles, the Claimants submit that in the present case, the appropriate valuation dates are:

a.    As to the NOH 2 projects and the NOH 2 Project Companies, the first important act giving rise to a creeping expropriation under Article 13 of the ECT as well as breach of the investment protection standards under Article 10(1) of the ECT is the Development Freeze, adopted on **15 June 2012**; and

---

[695] Cl. Mem., para. 574.
[696] Cl. Reply, para. 871.
[697] Cl. Mem., para. 576.
[698] Cl. Mem., para. 577.
[699] Cl. Mem., para. 578.

b.    As to the NOH 1 projects and the NOH 1 Project Companies, the first important act giving rise to a breach of the investment protection standards under Article 10(1) of the ECT is the 2012 Energy Act, adopted on **28 December 2012**.[700]

526.    The Claimants disagree with the Respondent's argument that *ex post* information can be used in assessing damages. According to the Claimants, there is no legal basis for the Respondent's approach, and the legal authorities relied upon by the Respondent in support of its position in fact unanimously confirm that damages should be assessed *ex ante*.[701]

527.    The Claimants submit that, when a State lawfully expropriates an investment, the investor only has the right to compensation reflecting the fair market value of the investment at the time. By contrast, when a State unlawfully expropriates an investment, the investor may also claim restitution, *i.e.* the return of the expropriated assets. In this case, the value of the Claimants' investments did not increase after Germany's unlawful acts, and accordingly the Claimants have chosen not to exercise their right to restitution, *i.e.* an *ex post* approach.[702]

528.    The Claimants note that, in the present case, the Respondent seeks to reduce damages by relying on *ex post* events that have arisen as a result of the Respondent's own breaches. Such an approach is contrary to established principles of international law and belies common sense.[703]

*c.*    *Absolute certainty is not required to quantify damages*

529.    The Claimants submit that arbitral tribunals have consistently held that claimants need not prove with absolute certainty what the fair market value of an investment would have been but for the State's wrongful conduct.[704] Thus, when assessing compensation in the present

---

[700] Cl. Mem., para. 580.

[701] Cl. Reply, para. 879.

[702] Cl. Reply, para. 880.

[703] Cl. Reply, para. 881.

[704] Cl. Mem., para. 581.

case, the Tribunal should arrive at a fair market value which, in the Tribunal's view, the Claimants' investments would have had but for Germany's wrongful acts.[705]

530.    According to the Claimants, when assessing the Claimants' damages, the Tribunal may apply "*any number of generally accepted valuation techniques which it deems most appropriate*," the most commonly utilized methods being (i) comparable transactions; (ii) discounted cash flow ("**DCF**"); and (iii) sunk costs.[706]

531.    The Claimants submit that the most appropriate methodology to quantify the loss and damage suffered by them in relation to the Offshore Wind Projects is the comparable transactions method. The Claimants note that the Respondent's experts "*have chosen, or were instructed*," not to engage with the quantification of the Claimants' damages; accordingly, "*the only expertise that can effectively assist the Tribunal to arrive at a reasonably certain fair market value is that provided by Dr Guillet and Dr Hern*."[707]

### d.    *Quantification of damages for the Offshore Wind Projects*

#### (i)    **The appropriate valuation methodology**

532.    The Claimants submit that the damages caused to the Claimants' Offshore Wind Projects should be assessed using the comparable transactions methodology. This methodology is appropriate because it "*indirectly captures the profit potential that claimants have lost due to the respondent's breaches*," in particular where market transactions are "*relatively plentiful and comparable – as is the case here*."[708]

533.    The Claimants instructed two quantum experts, Dr Guillet and Dr Hern, to conduct damages assessments. Both Dr Guillet and Dr Hern applied the comparable transactions methodology, however, they adopted a different approach. While Dr Guillet considered transactions in a number of jurisdictions, including transactions in which he had been personally involved, Dr Hern considered transactions in the German market that were completed prior to the implementation of the adverse measures complained of by the

---

[705] Cl. Mem., para. 583.
[706] Cl. Mem., para. 583.
[707] Cl. Reply, para. 884.
[708] Cl. Mem., para. 585.

Claimants. Further, while Dr Guillet quantified the value of the transactions on the basis of the electrical power capacity of an offshore wind project, measured in megawatts ("**MW**"), Dr Hern considered project value based on the number of wind turbine generators ("**WTG**").[709] Dr Hern also incorporated elements of an income-based approach, by first establishing a median transaction value per WTG and then deducting expected development and capital costs relying on what he considered to be an appropriate discount rate.[710]

534.    The Claimants further instructed Dr Hern to evaluate the sunk costs incurred by NOH 1 and NOH 2 in relation to the Offshore Wind Projects, to allow the Tribunal to rely on such costs as a "*reality check.*"[711]

535.    The Claimants stress that, while Dr Guillet and Dr Hern conducted their analyses independently and have reached different valuations, their overall results are consistent and provide the Tribunal "*with a strong basis upon which it can,* 'with reasonable confidence, estimate the extent of the loss.'"[712] The Claimants put forward Dr Hern's valuation figures as the basis for their damages claims since, in the Claimants' view, Dr Hern adopted "*a more granular approach, focusing on comparable transactions in Germany prior to the Adverse Measures.*"[713]

536.    The Claimants note that the Respondent and its expert, Mr Demuth, do not dispute that as of the valuation date, the Offshore Wind Projects did have value, and that a causal link exists between the adoption of the adverse measures and a decrease in value of the Offshore Wind Projects.[714] In the Claimants' view, it is therefore undisputed that Germany's measures negatively affected the value of the Offshore Wind Projects.

---

[709] Cl. Mem., para. 589.

[710] Cl. Mem., para. 590.

[711] Cl. Mem., para. 591.

[712] Cl. Mem., para. 592.

[713] Cl. Mem., para. 593, quoting *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011 ("***Lemire v. Ukraine***"), **CL-0204 / RL-0494**, para. 246.

[714] Cl. Reply, para. 887.

537.    The Claimants contend that the Respondent's and Mr Demuth's criticisms of Dr Hern's damages assessment are without merit. The Claimants argue that Dr Hern's valuation is sound and appropriate as it (i) factors in all relevant project-specific risks, including regulatory risks;[715] (ii) relies on transactions that are comparable with the Offshore Wind Projects;[716] (iii) appropriately accounts for project development expenses;[717] (iv) correctly observes that Windreich AG's call option to purchase the NOH 2 projects for a fixed price of EUR 500,000 per WTG (the "**Windreich Option**") is irrelevant for purposes of valuation of the NOH 2 projects;[718] and (v) properly factors in all relevant tax assumptions.[719]

> ### (ii)    The value of the NOH 2 Project Companies was destroyed by the Respondent's measures

538.    The Claimants allege that the Respondent's breaches collectively deprived the NOH 2 Project Companies of any value.[720] According to the Claimants, when the entire value of an investment has been destroyed, the appropriate measure of the investor's loss is the full fair market value of the investment, as of the date of the first breach. Thus, the loss suffered by NOH 2 is equal to the full fair market value of the NOH 2 Project Companies as of 15 June 2012.[721]

539.    The Claimants note that their quantum experts, Dr Hern and Dr Guillet, calculated similar damages figures for each of the seven more-advanced NOH 2 projects (SeaStorm I, GAIA II, GAIA III, GAIA IV, SeaStorm II, SeaWind III and SeaWind IV), with Dr Hern reaching a cumulative valuation for these seven projects of EUR 178.4 million and Dr Guillet a total of EUR 170 million.[722]

---

[715] Cl. Reply, Sec. V.B.2.a.

[716] Cl. Reply, Sec. V.B.2.b.

[717] Cl. Reply, Sec. V.B.2.c.

[718] Cl. Reply, Sec. V.B.2.d.

[719] Cl. Reply, Sec. V.B.2.e.

[720] Cl. Mem., para. 594.

[721] Cl. Mem., para. 595.

[722] Cl. Mem., para. 598.

540. Moreover, while the Claimants acknowledge that Dr Hern's and Dr Guillet's valuations of the two remaining NOH 2 projects (GAIA I Nord and GAIA V Nord) were materially different, Dr Hern reaching the figure of EUR 56.3 million and Dr Guillet EUR 10 million, the difference is driven by the methodology adopted – Dr Hern derives the value of pre-approval stage projects by reference to the average costs and the average time span needed to reach approval, while Dr Guillet adopts a more qualitative approach based on the development stage of the projects.[723]

541. The Claimants submit that each of these approaches is reasonable and well-supported. According to the Claimants, "[t]*he fact that there is a differential with respect to GAIA I Nord and GAIA V Nord is reflective of the natural variation that may arise in any valuation, as the same asset may be assessed differently depending on extrinsic factors and the needs and preferences of different potential buyers*."[724]

542. Finally, the Claimants note that Dr Hern calculates that the Claimants incurred total investment expenditures of EUR 81.1 million in relation to the NOH 2 projects, "*which represents approximately 35% of the damages being claimed on the basis of his comparable transactions methodology*." According to the Claimants, this further confirms that "*the damages being sought by NOH2 are reasonable and reflect an appropriate valuation of the NOH2 Projects*."[725]

     (iii)    **The value of the NOH 1 Project Companies was substantially reduced by the Respondent's measures**

543. The Claimants submit that the development of the NOH 1 projects was significantly delayed by the 2012 Energy Act and the O-NEPs, as well as further adverse measures, which had a detrimental impact on the value of the NOH 1 projects. Nonetheless, the Claimants state they were able to take a number of mitigation measures in order to obtain "*some value*" from the NOH 1 projects. These measures include the sale of (i) OWP Albatros in December 2014 for a total of EUR 42 million; (ii) OWP West in

---

[723] Cl. Mem., paras. 599-600.

[724] Cl. Mem., para. 601.

[725] Cl. Mem., para. 602.

December 2015 for a total of EUR 15.1 million; and (iii) GlobalTech II (together with GlobalTech III) in August 2016 for EUR 15 million.[726]

544.   The Claimants state that, when an investor is able to retain some value from the investment, the appropriate measure of the investor's loss is the fair market value of the investment as of the date of the breach, minus the residual value. Thus the loss suffered by NOH 1 is equal to the full fair market value of the NOH 1 Project Companies as of 15 June 2012, minus the value received by NOH 1 for the subsequent sales of the NOH 1 projects.[727]

545.   The Claimants note that Dr Hern and Dr Guillet have calculated the damages suffered by NOH 1 on this basis, with Dr Hern coming to a total of EUR 64.4 million and Dr Guillet to a total of EUR 85 million.[728] While Dr Guillet's figure for NOH 1 is somewhat higher, the Claimants note that his valuation of NOH 2 was somewhat lower than that of Dr Hern, which indicates that the approaches adopted by their quantum experts are reasonable and supported by their respective data and independent judgment.[729]

546.   The Claimants note that they incurred total investment expenditures in the amount of EUR 54.5 million in relation to the NOH 1 projects, which represents over 84 percent of the value of their damages claim. In the Claimants' view, this provides further comfort and shows that the valuations of the Claimants' experts are reasonable.[730]

### (iv)   Tax assumptions are properly reflected in the Claimants' damage assessment

547.   The Claimants argue that the Respondent's allegation that the proceeds from the hypothetical sales of the NOH 1 and NOH 2 Project Companies would have been subject to taxation regardless of the type of sale is incorrect. The relevant transactions would have been "*fully tax-exempt*."[731]

---

[726] Cl. Mem., para. 603.
[727] Cl. Mem., para. 604.
[728] Cl. Mem., para. 605.
[729] Cl. Mem., para. 606.
[730] Cl. Mem., para. 607; Hern ERI, para. 160.
[731] Cl. Reply, para. 931.

548.    According to the Claimants, the Respondent's assumption that the Claimants would have opted for the asset deal for the hypothetical sale of the Offshore Wind Projects is "*nonsensical*."[732] The correct assumption is that the relevant transactions would have been executed by way of a share deal, which is a standard approach in the German market because of its simplicity and tax considerations. In this case, there is an additional regulatory advantage as the approvals granted by authorities would remain operative. Indeed, the sales of OWP Albatros, OWP West and OWP GlobalTech II/III were executed in this way.[733]

549.    In response to the Respondent's argument that the capital gains from the share sales would have been taxable under Austrian or German law, the Claimants submit that Austrian law (specifically Section 10(3) of the Austrian Corporate Income Act) provides for tax-neutral capital gains from the sale of shares in a non-Austrian company.[734] Similarly, the relevant capital gains would also have been exempt from corporate income tax and trade tax in Germany. According to the Claimants, the German Federal Tax Court has held that, in the absence of a permanent establishment in Germany, German tax laws do not apply to "*any capital gains which are subject to German corporate income tax pursuant to Section 49(1) no 2 lit e) German Income Tax Act*." Moreover, since neither NOH 1 nor NOH 2 had a permanent establishment in Germany, German trade tax would not apply.[735]

### e.    Full reparation requires pre- and post-award compound interest

550.    The Claimants argue that, in order for an investor to be placed in the economic position it would have been in had the State not breached its obligations, it must be compensated for the delay in receipt of the value as of the date of the breach.[736] This is reflected in Article 13(1) of the ECT, which provides that "[c]*ompensation shall also include interest at a commercial rate established on a market basis*." While the provision applies on its

---

[732] Cl. Reply, para. 933.

[733] Cl. Reply, paras. 933-934.

[734] Cl. Reply, para. 936.

[735] Cl. Reply, para. 943.

[736] Cl. Mem., para. 636.

face only to expropriations, it also serves as guidance for interest payable for other breaches of the ECT.[737]

551.    The Claimants submit that, in this case, the most appropriate pre-award commercial rate is Strabag's market cost of borrowing. Dr Hern calculates this rate as 4.31 percent as of 15 June 2012, in relation to the damages sustained by NOH 2, and 3.56 percent as of 28 December 2012, in relation to the damages sustained by NOH 1.[738] According to the Claimants, the interest payable must be compounded as this better reflects business and economic realities and thus the actual damage suffered by a party. The Claimants note that this approach has been adopted by the majority of recent ECT tribunals.[739]

552.    As to post-award interest, the Claimants argue this rate should be set higher than pre-award interest because it serves the additional purpose of incentivizing compliance with the terms of the award as expediently as possible.[740] On this basis, the Claimants submit that the post-award interest rate should be set at 100 basis points (*i.e.* one percent) higher than the pre-award interest rate.[741]

553.    The Claimants submit, in response to the Respondent's case, that Germany's own borrowing cost, reflected in its sovereign bond yields, would lack a market basis as it only compensates for the risk of Germany's inability to repay its sovereign debt, not for its willingness to pay an arbitral award, and in particular an intra-EU arbitral award.[742] The Claimants contend that this merits a higher post-award interest rate.[743]

---

[737] Cl. Mem., para. 637.

[738] Cl. Mem., para. 637.

[739] Cl. Mem., paras. 638-639.

[740] Cl. Mem., para. 640, quoting *Watkins Holdings S.À.R.L. and others v. Kingdom of Spain,* ICSID Case No. ARB/15/44, Award, 21 January 2020, **CL-0015**, para. 747 (citing, in turn, *Bernhard von Pezold and others v. Republic of Zimbabwe,* ICSID Case No. ARB/10/15, Award, 28 July 2015, **CL-0222**, para. 943). *See also Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. v. Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, **CL-0036 / RL-0465**, para. 478; *Foresight Luxembourg Solar 1 S.à.r.l. and others v. Kingdom of Spain,* SCC Case No. 2015/150, Final Award, 14 November 2018, **CL-0031 / RL-0464**, paras. 545-546.

[741] Cl. Mem., para. 640.

[742] Cl. Reply, paras. 1004-1005.

[743] Cl. Reply, para. 1006.

554.    The Claimants further note that Dr Hern identifies an objective benchmark of the Claimants' costs to borrow, the 1-year average yield on the iBoxx BBB (5-7Y) index of 4.31 percent as of 15 June 2012 and 3.56 percent as of 28 December 2012.[744] The only "lawful" alternative to the Claimants' costs of borrowing would be a compound rate of LIBOR plus 2 percentage points as the default rate in international arbitration.[745]

555.    Finally, the Claimants accept the equitable use of a grace period and "*would agree to the 1 percent increase of post-award interest being applicable commencing only six months after the date of the award*."[746] Thus the increase would only apply if the Respondent were to refuse to comply with an award in the Claimants' favor.

### (2)    The Respondent's Position

556.    The Respondent argues that the Claimants' damages claims are "*highly overrated,*" and the calculations suffer from "*numerous flawed evaluation standards and technical errors.*" In particular, the Claimants fail to consider "*the significant risks involved with the engagement in the Offshore Wind Projects.*"[747]

### a.    The Claimants rely on an incorrect standard of valuation

557.    The Respondent submits that an "*automatic and unquestioning application*" of the *Chorzów Factory* standard is "*increasingly criticized.*"[748] According to the Respondent, the PCIJ made clear that it was not dealing with a paradigm case of unlawful conduct. *Chorzów Factory* involved a direct seizure of property which would have been illegal "*even if it had been accompanied by prompt and adequate compensation.*"[749]

558.    The Respondent submits that a correct reading of *Chorzów Factory* can only lead to the conclusion that "*when determining fair compensation for damages caused by an unlawful conduct, a tribunal must differentiate between an expropriation without compensation*

---

[744] Cl. Reply, para. 1004.

[745] Cl. Reply, para. 1005.

[746] Cl. Reply, para. 1007.

[747] Resp. C-Mem., para. 12. *See also* Resp. Rej., para. 17.

[748] Resp. C-Mem., para. 1475.

[749] Resp. C-Mem., para. 1476.

*where a state has the right to expropriate – as in the case of the ECT and other modern investment treaties – and a seizure of property which is inherently illegal even against compensation*."[750] *Chorzów Factory* does not support the general principle that the standard of compensation is the same in cases of direct and indirect expropriation.[751]

559.    According to the Respondent, the full reparation standard becomes applicable only in cases of "*an illegal act of a higher magnitude*," or acts that are particularly egregious.[752] The present case does not involve any such measures as the State had the right to regulate.[753] But even assuming the standard did apply in principle, it could only be applied in practice if it led to a proportionate and reasonable result. Thus, the standard of full valuation can only be appropriate "*if the investor does not retain any valuable rights or assets after the state's unlawful conduct*." In the present case, Strabag still holds shares in the NOH 2 Project Companies, and was able to divest the NOH 1 Project Companies.[754]

### (i)    The Claimants' valuation dates are incorrect

560.    The Respondent contends that the Claimants' chosen valuation dates "*do not correctly account for the objective value of Claimants' alleged investments*."[755] This is the case, in particular, because there has been no expropriation of the Claimants' alleged investments, whether direct or indirect.[756] The appropriate valuation date is not the date of the "*first important act on behalf of the state*," but rather "*the moment at which the negative impact caused by those acts reached a* 'watershed' *is considered the correct valuation date*."[757]

561.    The Respondent submits that there was no "*substantial and irreversible deprivation*" of the Claimants' investments on the valuation dates suggested by the Claimants; they were merely "*experiencing an adaption of the expected timescale for the realization of a number*

---

[750] Resp. C-Mem., para. 1476.
[751] Resp. Rej., para. 1551.
[752] Resp. C-Mem., para. 1476.
[753] Resp. C-Mem., para. 1477.
[754] Resp. C-Mem., para. 1483.
[755] Resp. C-Mem., para. 1485.
[756] Resp. C-Mem., para. 1486.
[757] Resp. C-Mem., para. 1487.

*of the NOH1 Projects*."[758] There was no deprivation of the Claimants' rights to the projects or their shares in the respective Project Companies.

562.    Similarly, while the NOH 2 projects were affected by the Development Freeze, this did not lead to any deprivation of the Claimants' assets because "*these projects were in such an embryonic state that it cannot even be said with certainty that they would have been capable of being realized in any event, regulatory amendments notwithstanding*." It therefore cannot be determined whether the NOH 2 projects failed because of the regulatory developments or rather because of "*the materialization of the myriad development risks the NOH2 Projects faced from the outset*."[759]

### (ii)    The Claimants' *ex ante* approach is incorrect

563.    The Respondent submits that there is no reason to limit the damages assessment by only taking into account information available at the valuation dates. According to the Respondent, an *ex post* assessment would ensure that the damages assessment takes into account all available information, including information available after the date of the alleged breaches. Another possibility would be to use a hybrid approach, *i.e.* an *ex ante* assessment which takes into account the realization of project-specific and market risks which, in the Respondent's view, Dr Hern's report does not reflect.[760]

564.    Thus, for the Offshore Wind Projects, the *ex post* approach would allow the Tribunal to take into account the fact that the Claimants "*were only able to market the NOH 1 Projects for a combined sales price of EUR 72 million, and were not able to find any buyer at all for the nascent NOH2 Projects*."[761] The Respondent refers, in support, to the *Quiborax v. Bolivia* award, where the tribunal held that "[u]*sing actual information is better suited for this purpose than projections based on information available on the date of the expropriation, as it allows to better reflect reality (including market fluctuations)* […]."[762] According to the Respondent, in the present case, "*Claimants have not shown with*

---

[758] Resp. C-Mem., para. 1488.

[759] Resp. C-Mem., para. 1489.

[760] Resp. C-Mem., para. 1494.

[761] Resp. C-Mem., para. 1495.

[762] Resp. C-Mem., para. 1496, quoting *Quiborax v. Bolivia*, **RL-0052**, para. 379.

*reasonable certainty that their Offshore Wind Projects would have obtained the necessary Approvals and grid connections to become operative despite the several project-specific and regulatory risks they were still facing at the time Claimants chose to divest them.*"[763]

### b. The Claimants did not suffer damage in the claimed amounts in the Offshore Wind Projects

#### (i) The Claimants' calculations fail to take into account the significant regulatory and project-specific risks

565.    The Respondent argues that the Claimants' damages calculations are "*deeply flawed*" because they "*completely fail[] to take into account the significant regulatory and project-specific risks associated with those projects.*" In the Respondent's view, "*the coming shift in the regulatory environment was already known – or at the very least knowable – at the point in time when Claimants opted to purchase the Offshore Wind Projects.*"[764]

566.    The Respondent alleges that the Claimants seek to present their acquisitions of the NOH 1 projects for a purchase price of EUR 43.8 million and the NOH 2 projects for a purchase price of EUR 78.4 million as a "*lucky buy.*" However, as demonstrated in Mr Demuth's report, "*these prices simply reflected the current and expected deteriorating environment for offshore wind projects at the time.*"[765] The Respondent notes that "[e]*ven the Claimants' expert Dr Hern admits that already before mid-2012, offshore wind farms were considered high-risk development projects.*"[766] The Respondent argues that significant delays and unrealistic expansion targets were already known or knowable at the time of Claimants' investments,[767] and that the Claimants' damages calculations ignore the commercial and legal due diligence commissioned by Strabag itself.[768]

567.    The Respondent further contends that the Claimants knowingly assumed significant development risks regarding the NOH 1 projects, including (i) uncertainty as to whether

---

[763] Resp. C-Mem., para. 1497.
[764] Resp. C-Mem., para. 1568.
[765] Resp. C-Mem., para. 1569.
[766] Resp. C-Mem., para. 1570.
[767] Resp. Rej., Sec. D.III.1.a.
[768] Resp. Rej., Sec. D.III.1.b.

the NOH 1 projects were feasible from an environmental standpoint; (ii) the risk that additional, costly and time-consuming environmental impact assessments might have to be conducted; and (iii) the ongoing and public internal differences of the individual project companies. Moreover, only two of the NOH 1 and NOH 2 projects (OWP Albatros and OWP West) had reached the stage of a public hearing and had thus achieved exclusivity and were protected against competition.[769]

568.   According to the Respondent, the Claimants assumed an even greater risk with respect to the NOH 2 projects. The Respondent notes that, "[e]*ven under the old legal regime, exclusivity was only awarded to wind farm projects which had reached the public hearing stage* [and] [n]*one of the NOH2 Projects ever got that far in the Approval process*." Consequently, these projects were exposed to a competitive risk that is not addressed in Dr Hern's calculation of damages. According to the Respondent, the geographical location of the NOH 2 projects created additional development risks.[770]

569.   The Respondent claims that all of these risks and uncertainties had been revealed in the legal and commercial due diligence performed by PwC before the Claimants' acquisition of the NOH 1 and NOH 2 projects. The Respondent therefore cannot be held responsible for the materialization of these risks.[771]

570.   The Respondent further claims that the Claimants' damages calculations fail to take into account significant approval and development risks faced by the offshore wind projects,[772] and that those calculations are incompatible with Dr Guillet's findings.[773]

### (ii)   The Claimants' approach to damages calculations is methodologically and technically flawed

571.   The Respondent submits that Dr Hern's but for approach to quantify the Claimants' damages "*lead*[s] *to incomprehensible results and massively overstated damages*

---

[769] Resp. C-Mem., para. 1573.

[770] Resp. C-Mem., para. 1574.

[771] Resp. C-Mem., para. 1575.

[772] Resp. Rej., Sec. D.III.1.c.

[773] Resp. Rej., Sec. D.III.1.d.

*amounts.*"[774] Dr Hern's calculations produce an overall value of projects that were still at the pre-application stage, suggesting that some 58 percent of the alleged value of a fully approved offshore wind project is achieved before its development has even started. Dr Hern's approach may be contrasted with that of Dr Guillet, "*who considers that the project value at the pre-application and initial application stage is close to zero and increases exponentially with the achievement of certain milestones.*"[775]

572.    The Respondent submits that Dr Hern's damages calculations, on which the Claimants primarily rely, suffer from "*severe methodological and technical flaws.*"[776] First, Dr Hern's calculations are based on what the Respondent describes as an "*irrational*" assumption that all of the Claimants' Offshore Wind Projects that were submitted for approval would in fact have been approved. The Respondent notes that this may be contrasted with the conclusion reached by the Claimants' commercial due diligence advisor PwC, who estimated that the likelihood of receiving an approval for all Offshore Wind Projects that had not reached the application conference stage, was below 50 percent.[777]

573.    The Respondent argues that the Claimants' damages calculation implies a "*miraculous*" increase of over 100 percent in the market value of the Offshore Wind Projects in the very short time period between the acquisition of the projects by the Claimants and the Claimants' valuation dates, even if the projects did not reach any significant development milestones during this period.[778] Dr Hern's damages calculations result in a fair market value of EUR 345.5 million for the Offshore Wind Projects as of the Valuation Dates, which substantially exceeds the costs of their acquisition, *i.e.* EUR 114.8 million.[779]

574.    According to the Respondent, Dr Hern's damages approach "*implicitly assumes that the value of an offshore wind project is essentially nothing but the function of development and*

---

[774] Resp. C-Mem., paras. 1576, 1578.
[775] Resp. C-Mem., para. 1578.
[776] Resp. C-Mem., para. 1582.
[777] Resp. C-Mem., para. 1583.
[778] Resp. Rej., paras. 1724-1725.
[779] Resp. Rej., para. 1725.

*capital costs*."[780] Furthermore, Dr Hern's adjusted DCF approach cannot validate the results of the flawed market approach as it is based on the "*inconceivable assumption that an offshore wind project would start operating as of 1 July 2019*."[781]

575. The Respondent further argues that Dr Hern's analysis is based on only six allegedly comparable transactions which he compares to the hypothetical sale of the Offshore Wind Projects. According to the Respondent, the selected transactions are in fact not comparable, "*nor does Dr Hern make the required adjustments for the significant differences between these transactions and the hypothetical sale of the Offshore Wind Projects*."[782]

576. The Respondent submits that Dr Hern has also failed to consider two relevant transactions, *Austerngrund* and *Deutsche Bucht*, which took place in 2011 and indicate a significantly lower cash flow multiple than the multiple calculated by Dr Hern. As a result, according to the Respondent, Dr Hern's cash flow multiple, and by extension his calculation of alleged damages, are significantly overstated.[783]

577. The Respondent contends that Dr Hern's calculation also fails to adequately consider the short-position held by the Claimants in call options held by Windreich AG, which would have been entitled to exercise these options if the value of the NOH 2 projects exceeded EUR 500,000 per WTG. As a result, Dr Hern overstates the alleged damages by ignoring the financial impact of the call options regarding the NOH 2 assets.[784]

578. Further, according to the Respondent, Dr Hern's adjustments to the utilized transaction multiple are unfounded and unjustified.[785] The development costs likely would have been higher than those of the benchmark (OWP Albatros), and the discount rate applied by Dr Hern does not adequately reflect the risks associated with the NOH 1 and NOH 2 projects. As illustrated in the Demuth Report, the correct weighted average cost of capital

---

[780] Resp. Rej., para. 1743.
[781] Resp. Rej., para. 1766.
[782] Resp. C-Mem., para. 1587.
[783] Resp. C-Mem., paras. 1597-1598.
[784] Resp. C-Mem., paras. 1599-1603.
[785] Resp. C-Mem., para. 1604.

("**WACC**") for the NOH 2 projects is likely to be more than double the WACC applied by Dr Hern.[786]

579.    The Respondent alleges that the Claimants engaged in "*cherry-picking*" when utilizing the often dramatically different value assessments of the several experts.[787] According to the Respondent, the gap in the values calculated by Dr Hern on the one hand and by PwC and Dr Guillet on the other hand shows that Dr Hern's method does not adequately consider the real approval risk.[788]

580.    Finally, the Respondent claims that while certain risks are specific to a certain project phase, it is important to acknowledge that an early-stage project not only carries risks specific to the early development stage, but implicitly also all of the risks specific to all subsequent project stages.[789] By applying an unreasonably low discount rate which fails to reflect this, Dr Hern significantly overstates the alleged damages.[790]

### (iii)    The Claimants' damages calculations are based on incomplete and incorrect assumptions regarding taxation

581.    The Respondent submits that the Claimants make a number of tax assumptions which the Respondent claims are not supported by the facts. Specifically, the Claimants base their calculations on the incorrect assumption that the hypothetical on-sale of the NOH 1 and NOH 2 projects would not have been subject to any taxation. This is the case regardless of whether the Claimants envisaged an asset deal or a share deal.[791]

582.    In an asset deal scenario, *i.e.* if the NOH 1 and NOH 2 projects had been sold directly to a third-party purchaser, Germany "*would in principle have had the right to tax any gain resulting from such sale*."[792] The gain would have been subject to German corporate income tax, including solidarity surcharge, and trade tax. While a reduction of the German

---

[786] Resp. C-Mem., paras. 1604-1606; Resp. Rej., Sec. D.III.2.g.

[787] Resp. C-Mem., para. 1607.

[788] Resp. C-Mem., para. 1611.

[789] Resp. Rej., Sec. D.III.2.b.

[790] Resp. Rej., para. 1736.

[791] Resp. C-Mem., para. 1612.

[792] Resp. C-Mem., para. 1613.

corporate income tax, including German solidarity surcharge and trade tax burden, is possible under certain circumstances, more information would be required to determine whether this would be the case, however, the Claimants have not provided such information. It also cannot be ruled out that value added tax ("**VAT**") and real estate tax liabilities could have been incurred.[793]

583. As for the share deal scenario, the Respondent notes that since NOH 1 and NOH 2 are established under Austrian law and have their registered seat in Austria, the question arises as to whether Austria or Germany would have had a right to tax any gain resulting from a sale. While exemptions from capital gain tax are available under Austrian law in such circumstances, the assumption made by Dr Hern that the Claimants would not have been liable to pay taxes on any cash flows received from the sale of the Offshore Wind Projects is implausible and incorrect at the very least in relation to the NOH 2 Project Companies as of the relevant valuation date (as the relevant shares had to be held for a period of at least one year).[794]

584. The Respondent acknowledges that since it can be assumed that neither NOH 1 nor NOH 2 had their place of management in Germany, they most likely would not have been subject to an unlimited German corporate income tax liability. However, these entities would possibly have fulfilled the conditions of a limited German corporate income tax liability of five percent.[795]

585. In response to the Claimants' rebuttal in their Reply, the Respondent argues that the Claimants have not provided any evidence in support of their claim that the sale of the Project Companies would have a "*standard approach*" in the German market. The Respondent further contends that the Claimants mischaracterized its position, as set out in the Respondent's Counter-Memorial, and notes that the Claimants have not provided information on whether NOH 1 opted for tax-neutral treatment under Section 10(3) of the Austrian Corporate Income Tax 2012. The Respondent adds that "[t]*here could very well*

---

[793] Resp. C-Mem., paras. 1613-1615.
[794] Resp. C-Mem., paras. 1618-1625.
[795] Resp. C-Mem., paras. 1626-1630.

*be scenarios where it would be advisable to accept a taxation of possible capital gains in return for the possibility to offset losses in the case of failure.*"[796]

### (iv)    Strabag did not suffer damages in the claimed amounts in the NOH 1 projects or in the NOH 2 projects

586.    The Respondent submits that neither NOH 1 nor NOH 2, nor Strabag by virtue of its 51 percent shareholding, are entitled to any compensation for the NOH 1 and NOH 2 Project Companies.

587.    In any event, the amounts claimed by the Claimants in relation to Strabag are calculated incorrectly, and it is impossible to determine the methodology used by the Claimants to arrive at the amounts claimed for Strabag in their prayers for relief. The amounts claimed are clearly not based on the calculations of the Claimants' expert witness.[797]

588.    The Respondent contends that the Claimants' damages calculation would in any event be disproportionate since the Claimants only paid EUR 122.2 million to acquire the Offshore Wind Projects, and allegedly incurred development costs in the amount of EUR 10.2 million during the period from their acquisition to the valuation dates.[798] According to the Respondent, a realistic assessment of the value of the Offshore Wind Projects must be based on their purchase prices and considering the additional investments made by the Claimants, as well as the proceeds from the sale of OWP Albatros, OWP West and GlobalTech II.[799] The Claimants are therefore entitled to damages, at most, in the amount of EUR 80.9 million.[800]

### c.    The Claimants are not entitled to compound interest

589.    The Respondent submits that the Claimants' claim for pre- and post-award interest is unfounded and disproportionate.[801] According to the Respondent, since neither the ECT

---

[796] Resp. Rej., paras. 1773-1777.
[797] Resp. C-Mem., para. 1636.
[798] Resp. Rej., para. 1778.
[799] Resp. Rej., paras. 1778-1782.
[800] Resp. Rej., para. 1784.
[801] Resp. C-Mem., para. 1637.

nor the ILC Articles provide any guidance as to how the interest rate should be determined, "*the Tribunal has free reign to determine an interest rate it deems appropriate*."[802]

590.    The Respondent submits that it would not be appropriate to apply Strabag's market cost of borrowing in the present case since the Claimants have not offered any evidence proving that they had to borrow money at a market rate because of the Respondent not having compensated them for their alleged damage.[803] The appropriate pre-award interest rate is therefore determined by the Respondent's sovereign bond yields, which would be consistent with Article 13(1) of the ECT, which requires that interest be awarded "*at a commercial rate established on a market basis*."[804]

591.    The Respondent submits that no post-award interest should be awarded, and even if the Tribunal were to decide otherwise, the post-award interest rate should in any event not be set higher than the pre-award interest rate.[805] Awarding post-award interest at an increased interest rate primarily has a punitive function, which is inappropriate in the present case.[806] According to the Respondent, the rate of any post-award interest should be determined on the basis of the Respondent's sovereign bond yields.[807]

592.    Finally, the Respondent submits that awarding compound interest is neither necessary nor reasonable and, in any event, any such decision should be taken on a case-by-case basis.[808] In the present case, due to the "*embryonic and speculative nature*" of the Claimants' investments, the good-faith exercise by the Respondent of its right to regulate and the high total amount of damages claimed, awarding compound interest is neither appropriate nor necessary in order to compensate the Claimants for their alleged losses.[809]

---

[802] Resp. C-Mem., para. 1639.

[803] Resp. C-Mem., para. 1641.

[804] Resp. Rej., Sec. D.V.1.

[805] Resp. C-Mem., para. 1643.

[806] Resp. C-Mem., para. 1644.

[807] Resp. Rej., Sec. D.V.2.

[808] Resp. C-Mem., para. 1648.

[809] Resp. C-Mem., para. 1650.

**B.** **THE TRIBUNAL'S ANALYSIS**

**(1)** **The Scope of Valuation and the Valuation Date**

593. The Tribunal has determined in Sections VI.A(2) and VI.B(3) above that the Respondent has breached the FET standard in Article 10(1) of the ECT in relation to the NOH 1 and NOH 2 projects, and the expropriation standard in Article 13 of the ECT in relation to the NOH 2 projects. The Tribunal must next determine the quantum of the Claimants' losses as a result of these breaches.

594. The Tribunal has determined in Section VI.A(2) above that the Respondent's conduct amounted to a breach of the FET standard as regards the Offshore Wind Projects at the latest by 6 March 2015. When making this determination, the Tribunal further found that the Respondent's breach was a result of a series of acts beginning on 19 December 2013, when the BNA confirmed the first O-NEP, *i.e.* O-NEP 2013. Accordingly, in order to ensure that the value of the Claimants' investments is quantified at a date when the Respondent's conduct had not yet begun to erode their value, the date immediately prior to this date, *i.e.* 18 December 2013, must be considered the valuation date (the "**Valuation Date**") under the FET claim for both the NOH 1 and NOH 2 projects.[810] Any later date would necessarily reflect the impact of the earlier acts in the series and thus result in a quantification that would not adequately reflect the Claimants' loss.

595. As to the Claimants' expropriation claim, which is limited to the NOH 2 projects, the Tribunal has determined above that the way in which the regulatory measures taken by Germany during the period 2013-2017 were implemented "*gradually resulted* […] *in a total loss of the value of the NOH 2 projects*."[811] The Claimants' loss was thus also a result of a composite act, or a "*creeping*" expropriation, and the appropriate Valuation Date must be the date immediately prior to the first act in the series that resulted in the Claimants' loss of the NOH 2 projects. Accordingly, the Tribunal determines that the Valuation Date

---

[810] As noted by the ILC in the ILC Articles, "[i]*n such a case* [*i.e.* in the case of a breach consisting of a composite act], ***the breach extends over the entire period starting with the first of the actions or omissions of the series*** *and lasts for as long as these actions or omissions are repeated and remain not in conformity with the international obligation*:" ILC Articles, **CL-0191 / RL-0137**, Art. 15, pp. 62-63 [emphasis added]. For case law, *see*, *e.g.*, *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, **CL-0098 / RL-0300**, para. 417.

[811] *See above* paragraph 461.

for the purposes of quantifying the Claimants' expropriation claim must be the same date as that for quantifying the Claimants' FET claim, *i.e.* 18 December 2013.[812]

596.    The Parties agree that any residual value of the NOH 1 and NOH 2 projects as of the Valuation Date will have to be deducted from the compensation due. The Parties appear to agree that the residual value of the NOH 1 projects corresponds to the proceeds received from their subsequent sales, and that the NOH 2 projects had no residual value.[813] The Tribunal agrees. The residual value of the NOH 1 projects, as reflected in the sales proceeds, will therefore have to be deducted from any amounts due to the Claimants.

### (2)    Valuation of the NOH 1 and NOH 2 Projects

#### a.    *Valuation method*

597.    The Tribunal notes that Article 13 of the ECT specifically provides that, in case of expropriation, "*compensation shall amount to **the fair market value** of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the investment*" [emphasis added].[814]

598.    Article 10(1) of the ECT, which deals with the FET standard, does not specify any particular valuation standard, which therefore must be determined by the Tribunal.

599.    As summarized above, it is not entirely clear whether the Parties agree on the standard of valuation applicable to the Claimants' FET claim. While the Claimants take the view that the applicable standard of valuation for the purposes of both the expropriation claim and the FET claim is fair market value, the Respondent does not appear to take a definitive view on the standard applicable to the latter claim, instead challenging what it refers to as the Claimants' "*uncritical application of the full reparation standard*" adopted in the

---

[812] *See Crystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016 ("***Crystallex v. Venezuela***"), **CL-0125** / **RL-0290**, paras. 854-858 (fixing the valuation date on a date on which the tribunal found a "*self-standing breach*" of the FET standard and the "*first important act giving rise to the creeping expropriation*").

[813] Cl. First PHB, paras. 184-185; Tr. Day 1, 201:6–219:18. *See also* Demuth ERII, para. 638.

[814] ECT, **CL-0001**, Art. 13.

*Chorzów Factory* case.[815] According to the Respondent, when determining the amount of compensation due, a tribunal must differentiate between "*an expropriation without compensation where a state has the right to expropriate* [...] *and a seizure of a property which is inherently illegal even against compensation.*"[816] In the Respondent's view, the distinction is relevant because "*the full reparation standard was originally established in order to ensure that the compensation must account for the egregiousness of the state's breaches of its obligations.*"[817]

600.    However, the Respondent does not elaborate on how the distinction between a lawful expropriation (but for compensation) and an inherently illegal expropriation should be reflected in the quantification of the compensation due to the Claimants. Nor does the Respondent seek to quantify the deduction that in its view should be made from the full reparation standard. Instead, the Respondent argues that "*a 'full reparation' of an investment's value is only appropriate where the investor does not retain any valuable rights or assets after the state's alleged unlawful conduct.*"[818] Insofar as the Respondent suggests that any residual value of the Claimants' assets should be deducted from the compensation due, the Claimants agree, as noted above, so the matter is undisputed.

601.    Having considered the Parties' positions and the legal authorities in the record, the Tribunal considers that, as a legal matter, fair market value must be the applicable standard of valuation in case of both expropriation and breach of the FET standard, while keeping in mind that unlike in the case of expropriation, a breach of the FET standard does not necessarily result in a total loss of the investment, but rather in a diminution of its value.[819]

---

[815] Resp. C-Mem., para. 1474; however, in its Rejoinder, the Respondent appears to acknowledge that "*fair market value*" is the applicable standard of valuation: *see* paras. 1314, 1564.

[816] Resp. C-Mem., para. 1476.

[817] Resp. C-Mem., para. 1477.

[818] Resp. C-Mem., para. 1483.

[819] *See* ILC Articles, **CL-0191 / RL 0137**, Art. 36, p. 75. *See also Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR, and NovEnergia II Italian Portfolio SA v. Italian Republic,* SCC Case No. V2015/095, Final Award, 23 December 2018, **CL-0030 / RL-0034**, paras. 549-552; *Masdar v. Spain*, **CL-0034**, para. 566; *Anatolie Stati, Gabtirel Stati, Ascom Goup SA and Terra Raf Trans Traiding Ltd v. Republic of Kazakhstan,* SCC Case No. V116/2010, Award, 19 December 2013, **CL-0075**, paras. 1460-1461. *See further International Valuation Standards* (2020), **AD-0061**, p. 18, para. 30.1, and p. 23, paras. 100 and 110 (defining the fair market value as "*the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer*

As noted above, this is also the case here, as the Claimants' NOH 1 projects had residual value after the Valuation Date (as reflected in their sales proceeds), which must be taken into account and deducted from any compensation due to the Claimants.

602.　The Tribunal notes, in this connection, that the Parties' quantum experts independently agree that fair market value is the applicable standard of valuation, including in case of breach of the FET standard.[820]

603.　However, the Parties' quantum experts disagree on the appropriate valuation methodology, *i.e.* how the fair market value of the NOH 1 and NOH 2 projects should be determined in the circumstances of this case. The Claimants' quantum expert, Dr Hern, opines that the appropriate valuation methodology to quantify the Claimants' loss is a "*Market-Based Approach*" which assesses the fair market value of an asset indirectly, by incorporating market values of comparable assets.[821] Dr Hern bases his valuation on an analysis of six transactions involving offshore wind projects in the German North Sea and concluded during the period between 2009 and 2012, which he considers comparable to the Claimants' Offshore Wind Projects, including in terms of their development stage and the timing of the transactions, which were concluded before Germany introduced the measures at issue in this case. Dr Hern does not consider the Claimants' acquisition of the Offshore Wind Projects since, in his view, the purchase prices of the projects do not reflect their fair market value because the transactions were not simple sales but incorporated elements of formation of a joint venture.[822]

604.　Apart from relying on the six comparable transactions, Dr Hern also incorporates elements of an income-based approach, by first establishing a median transaction multiple per WTG

---

and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion").

[820] Hern ERI, paras. 20, 66; Demuth ERI, paras. 63, 158, 187; Demuth ERII, paras. 5-6, 14, 145-146 (noting that "[g]*enerally, I agree with Dr Hern's definition of the FMV and his sentiment that the but-for value should be based on this approach*").

[821] Hern ERI, para. 72.

[822] Hern ERII, paras. 74-80; Expert Presentation of Dr Richard Hern, slide 27.

for an approved project and then adjusting the value to reflect the development stage of each project and deducting the corresponding development costs to reach approval.[823]

605.    The Claimant's other quantum expert, Dr Guillet, relies on a methodology that values the Claimants' Offshore Wind Projects based on their development stage, relying on the history of transactions in the sector.[824] Dr Guillet's approach is therefore also, in effect, based on comparable transactions as he seeks to determine the fair market value of the Claimants' Offshore Wind Projects on the basis of transactions involving other offshore wind projects, taking into account their development stage. Unlike Dr Hern, who focuses on transactions in the German market, Dr Guillet's evidence is based on all available transactions in the offshore wind farm industry, in Europe and elsewhere, including both transactions for which public data is available and others for which confidential data is available to Dr Guillet, based on his personal experience in the industry.[825]

606.    The Respondent's expert, Mr Demuth, was instructed to assess Dr Hern's evidence and does not take a definitive view on the appropriate valuation methodology.[826] However, in his Second Expert Report Mr Demuth does produce an alternative analysis, rejecting on a number of grounds Dr Hern's comparable transactions analysis, including Dr Hern's position that the prices paid by the Claimants for the Offshore Wind Projects in December 2011 (NOH 1) and January 2012 (NOH 2) do not reflect the fair market value of the projects at the time. According to the Mr Demuth, "*the acquisition of the Offshore Wind Projects was an arm's length transaction and, consequently, their purchase prices are the best reference for their market value at that time.*"[827] Mr Demuth then goes on to develop an alternative assessment of the Claimants' damages based on (i) the purchase prices paid for the Offshore Wind Projects at acquisition; (ii) the additional investments made by the Claimants after the acquisition; and (iii) the proceeds from the sale of OWP Albatros, OWP West and GlobalTech II/III.[828] Mr Demuth thus effectively adopts a cost-based approach,

---

[823] Hern ERI, Sec. 4; Expert Presentation of Dr Richard Hern, slides 13-15.
[824] Guillet ER, para. 2.
[825] Guillet ER, para. 49.
[826] Demuth ERI, para. 3.
[827] Demuth ERII, para. 14. *See also* Demuth ERII, paras. 6, 59, 132.
[828] Demuth ERII, para. 629.

by adding to the original transaction prices the capital increases and the capital costs incurred by the Claimants in developing the projects after acquisition.[829] Like Dr Hern, he then deducts from the total figure the residual value, *i.e.* the Claimants' proceeds from the sale of the NOH 1 projects.[830]

607.    Having considered the evidence of the Parties' experts, the Tribunal determines that the appropriate valuation method in the present case is the comparable transactions method. This method is one of the two established methods of determining the fair market value of an asset. It is particularly well suited in the present case because of the availability of substantial data on other transactions, including on the Offshore Wind Projects themselves. By contrast, income-based approaches such as the DCF would be less suitable in the circumstances of this case, including because the NOH 1 and NOH 2 projects were still in a development stage and had not generated any revenue. The evidence before the Tribunal also indicates that in the offshore wind industry the DCF method is only applied to projects that are under construction or operation, that is, after they have reached financial close or final investment decision stage; projects that are still in a development stage are valued on the basis of a multiplier reflecting their development stage.[831] Similarly, while a cost-based (or sunk costs) approach may be appropriate in circumstances where the fair market value of an asset cannot be determined, for lack of evidence or otherwise, and where the sunk costs incurred by the investor may be considered a proxy for the value of the investment as of the valuation date (thus allowing the tribunal to place the investor in a position it would have been in had the breach not occurred), a cost-based approach is generally considered a methodology of last resort, applicable only where other, more market-value oriented methods are not available or not appropriate.[832]

---

[829] *See* Tr. Day 10, 128:8-9, 129:10-11, 20 (Testimony of Mr Alexander Demuth, confirming that "*my approach starts from the acquisition price and adds costs. It is not market comparable*") Having adopted a cost-based approach, Mr Demuth does not consider the further development stages achieved by three of the NOH 1 projects after their acquisition; GlobalTech II, shortly after its merger with GlobalTech III, reached the BSH hearing stage in June 2014, OWP West obtained the BSH permit on 15 April 2014, followed by the first BSH release in July 2015, and Albatros obtained conditional grid connection in October 2012. *See also* Guillet ER, paras. 165, 173; TenneT, Conditional Grid Connection Commitment for OWP Albatros, 31 October 2012, **C-0231**.

[830] Demuth ERII, paras. 627-638; Expert Presentation pf Mr Alexander Demuth, slides 26, 50.

[831] *See* Guillet ER, paras. 46-50, 72.

[832] *See* Hern ERI, para. 69.

608.   As noted above, the Parties' quantum experts disagree on the appropriate composition of the reference group of comparable transactions, in particular on whether the Claimants' acquisition of the Offshore Wind Projects should be included among the relevant transactions, or indeed whether they should be used as the sole reference. The Tribunal must therefore determine, as a first step, whether the transactions between the Claimants and the Original Developers should be excluded because the purchase prices do not reflect the fair market value of the projects at the time (as the transactions were not simple sales but reflected the formation of a joint venture), which is the Claimants' position,[833] or whether they should be considered as the only relevant and most comparable transactions as they involved the very same assets as those at issue in this case, which is the Respondent's position.[834]

### b.    Application of the Comparable Transactions Method

609.   As summarized above, Dr Hern and Mr Demuth, the Parties' quantum experts, disagree on whether the prices paid by the Claimants for the NOH 1 and NOH 2 projects reflected their fair market value at the time, and accordingly on whether they should be considered comparable or indeed the sole comparable transactions. Dr Hern takes the view that the transactions were not simple sales but incorporated elements of a joint venture, which for a number of reasons affected the sales price, whereas Mr Demuth considers that, based on the relevant criteria and the available information, the Claimants' acquisition was an arm's length transaction and there is no basis to exclude it.

610.   The Tribunal must further determine whether the fact that the Claimants' acquisition of the NOH 1 and NOH 2 projects involved elements of a joint venture affected the prices paid to an extent that the prices cannot be considered to reflect the fair market value of the projects at the time.

611.   The Tribunal notes that the Parties' quantum experts have not elaborated on the difference, if any, between the prices paid and the fair market value of the projects as of the date of

---

[833] Hern ERII, paras. 74-80; Expert Presentation of Dr Richard Hern, slide 27.
[834] Demuth ERII, paras. 14-15. *See also* Demuth ERII, paras. 6, 59, 132; Resp. Rej., paras. 1778-1784.

acquisition.[835] However, the Tribunal considers that an indicative analysis may be performed based on the evidence in the record, including (i) the median development stage of the two groups of projects ("*third participation round*" for NOH 1 and "*application conference*" for NOH 2) as of the date of the transactions;[836] (ii) the total size (power generating capacity) of the two groups of projects on a per MW basis;[837] (iii) the valuation multiples of offshore wind projects estimated by Dr Guillet on a MEUR/MW basis taking into account their development stage;[838] (iv) the contemporaneous purchase prices of NOH 1 and NOH 2 (EUR 43.8 million for NOH 1 and EUR 78.4 million NOH 2, with a total of EUR 122.2 million); and (v) the fair market value range of the projects at the time of the transactions based on the multiples derived by Dr Guillet from market data. The indicative analysis is shown below.

| Project | Development stage | WTG = MW | MEUR / MW | Purchase price (MEUR) | Value range (MEUR) |
|---|---|---|---|---|---|
| NOH 1 | Third participation round (median) | 278 WTG = 1,390 MW | 0.05 – 0.10 | 43.8 | 69.5 – 139 (average 104) |
| NOH 2 | Application conference (median) | 619 WTG = 3,095 MW | 0.05 – 0.10 | 78.4 | 155 – 310 (average 233) |
| **TOTAL** | | 897 WTG = 4,485 MW | | **122.2** | **225 – 449 (average 337)** |

*Table 1: Indicative analysis of the value of NOH 1 and NOH 2 projects as of the date of the transactions*

---

[835] Dr Guillet notes however that Strabag paid 0.028 MEUR/MW for the projects, "*using the average for the full portfolio.*" Guillet ER, para. 55.

[836] *See*, *e.g.*, Cl. Mem., para. 121 and the supporting evidence referred to therein. This evidence shows that, of the six NOH 1 projects two were at the public hearing stage, two were at the third participation round stage, and two were at the application conference stage. The median is thus the average of the two projects that were at the third participation round stage. As to the nine NOH 2 projects, seven of them were in the application conference stage, whereas two were at application stage. The median is thus the application conference stage. (It is to be noted that Dr Guillet does not distinguish in his analysis between the third participation round and the hearing.)

[837] Guillet ER, para. 17. See also Hern ERI, Appendix C.

[838] Guillet ER, paras. 144, 150-197.

612.    The indicative analysis suggests that the Claimants appear to have acquired the NOH 1 and NOH 2 projects at a sizeable discount, with the price set at approximately one third of their indicative fair market value at the time.[839] The actual transaction price implies a MEUR/MW multiplier of 0.027, based on 4,485 MW, which reflects a development stage of participation round 1/participation round 2,[840] whereas the NOH 1 projects were already in the third development round, and the NOH 2 projects were in the application conference stage.[841]

613.    However, while the acquisition prices do not appear to reflect the fair market value of the projects at the time, it does not follow that there are no other elements in the transactions that should be taken into account in assessing the Claimants' contribution to the transactions, keeping in mind that, as determined by the Tribunal above, the Claimants' acquisition was an "*Investment*" in the Offshore Wind Projects within the meaning of Article 1(6) of the ECT. It is recalled that Article 1(6) provides a non-exhaustive list of assets which qualify as "*Investments*" under the ECT, including "*tangible and intangible* […] *assets*" and "*claims to performance pursuant to contract having an economic value and associated with an Investment*."

614.    The Tribunal notes that the agreements concluded between the Claimants and the Original Developers in connection with the acquisition of the Offshore Wind Projects include the Head of Terms and the Shareholder Agreement. As noted by the Claimants,[842] in these Agreements, Strabag not only agreed with the Original Developers on arrangements for the acquisition of the Offshore Wind Projects;[843] it also agreed to contribute to the joint venture in various other ways, including by way of developing the GFT for use by the Project

---

[839] The Tribunal notes that the valuation ranges are not self-fulfilling prophecies since they are based on Dr Guillet's multipliers and not on Dr Hern's cost-based methodology (quantifying the Claimants' but for losses at EUR 144.8 and EUR 230.6 million). The Claimants state, and it is not disputed, that two experts conducted their analyses independently: *see* Cl. Mem., para. 592.

[840] Guillet ER, para. 144.

[841] Based in the medium (or the middle value) of the projects, when arranged based on their development stage.

[842] Cl. First PHB, para. 216.

[843] In the Head of Terms, the parties agreed that the Offshore Wind Projects "*shall form the basis for future collaboration and shall be part of the pipeline that Strabag shall join*:" Head of Terms for a Share Purchase Agreement, 1 December 2010 ("**Head of Terms**"), **C-0062 / R-0104**, Sec. 2.1 (consolidated). Further arrangements preparing for the transfer of shareholding were agreed in the Shareholder Agreement, 19 May 2011 ("**Shareholder Agreement**"), **C-0063 / R-0105**.

Companies;[844] taking over the management of the projects and their financial planning;[845] providing financing;[846] manufacturing and installation of foundations and wind turbines at standard market conditions, in order to provide a reliable calculation basis for the projects;[847] and generally by way of contributing its expertise and experience in the construction industry.[848] Thus Strabag agreed, in addition to the price paid for its 51 percent shareholding in the Offshore Wind Projects (which was completed subsequently by way of the Share Purchase Agreements), to contribute to the Offshore Wind Projects in other ways, effectively by way of a deferred contribution, whereas the Original Developers' principal contribution was, apart from the pipeline of projects, their "*expertise from the previously completed approval procedure and planning of offshore wind projects.*"[849]

615. While there is no evidence before the Tribunal that would allow the quantification of Strabag's contributions other than the purchase price, they certainly had value that should be considered as a contribution to the NOH 1 and NOH 2 projects, even if not quantifiable (other than as the difference between the purchase price and the indicative fair market value of the Offshore Wind Projects at the time).[850] Consequently, while the Claimants' acquisition of the NOH 1 and NOH 2 projects should, in principle, neither be excluded from the group of comparable transactions, nor considered as the sole relevant transactions, but rather added to the group, this is in practice not feasible because the totality of the Claimants' contributions cannot be quantified, other than in an indicative way. Nonetheless, in light of the evidence before the Tribunal, the Tribunal is satisfied that the

---

[844] Head of Terms, **C-0062 / R-0104**, Preamble (item 2).

[845] Shareholder Agreement, **C-0063 / R-0105**, para. 4(b) ("*STRABAG undertakes to take over both the management of the investment and financial planning, including the acquisition of further equity investors and marketing of the PROJECTS, and the joint project development of the PROJECTS*").

[846] Shareholder Agreement, **C-0063 / R-0105**, paras. 11-15.

[847] Head of Terms, **C-0062 / R-0104**, Preamble (item 4).

[848] Shareholder Agreement, **C-0063 / R-0105**, Preamble, para. 6 (noting that "*STRABAG will not only participate as project developer and investor, but that in principle the construction of the PROJECTS shall also be carried out by STRABAG and its affiliated companies*").

[849] Shareholder Agreement, **C-0063 / R-0105**, Preamble.

[850] The Tribunal notes, however, that Dr Hern has quantified that the Claimants' investment expenditures (excluding the value of the initial purchase transactions) amount to a total of EUR 135.5 million (54.4 million for NOH 1 and 81.1 million for NOH 2): *see* Hern ERI, para. 160. *See also* Demuth ERII, Table 5, para. 638 (calculating the Claimants' capital increase and capital costs at EUR 50.9 million (excluding the acquisition prices of NOH 1 and NOH 2).

Claimants appear to have paid a fair market price for the Offshore Wind Projects, taking into account the unquantifiable elements of the transactions.

616. As for the group of six comparable transactions relied upon by Dr Hern, the Tribunal notes that Mr Demuth disagrees with Dr Hern's analysis, claiming that (i) the six transactions show a wide range of transaction prices and thus cannot be considered to establish a "*market consensus*;" (ii) most of the allegedly comparable transactions are fully permitted, whereas most of the Offshore Wind Projects were in a relatively early stage of development; (iii) the allegedly comparable transactions are closer to shore than the Offshore Wind Projects; and (iv) the allegedly comparable transactions show a different payment structure.[851]

617. The Tribunal notes that Dr Hern disagrees and claims that Mr Demuth's criticisms are unfounded, and that he has considered the issues identified by Mr Demuth and has taken them appropriately into account in his analysis.[852]

618. Having considered the experts' differences on the points listed above, the Tribunal determines that, apart from Mr Demuth's second point, which the Tribunal will address further below, the points raised by Mr Demuth reflect the type of inherent differences to be expected when addressing comparable transactions. As noted by the *Crystallex v. Venezuela* tribunal:

> [N]*o two companies will ever be exactly like. This is a given that must be accepted when using this kind of methodology. After all, "to compare" is a process made with objects similar to the subject rather than with identical objects – if those even exist.*[853]

619. More generally, as a matter of international law, while compensation cannot be provided for speculative or inherently uncertain damage,[854] a claimant is not required to prove the

---

[851] Demuth ERI, para. 29.

[852] *See* Hern ERII, Secs. 1, 3-4; Expert Presentation of Dr Richard Hern, slide 20 (noting that Mr Demuth in fact appears to agree with items (i) and (iii)).

[853] *Crystallex v. Venezuela*, **CL-0125 / RL-0290**, para. 902.

[854] See ILC Articles, **CL-0191 / RL-0317**, Art. 36(2) (providing that "*compensation shall cover any financially assessable damage including loss of profits insofar as it is established*") and Commentary, para. 27 ("*Tribunals have been reluctant to provide compensation for claims with inherently speculative elements*").

quantum of its loss with the same degree of certainty as the claimed breach or the existence of a loss. As the *Lemire v. Ukraine* tribunal noted:

> *The Tribunal agrees that it is a commonly accepted standard for awarding forward looking compensation that damages must not be speculative or uncertain, but proved with reasonable certainty; the level of certainty is unlikely, however, to be the same with respect to the conclusion that damages have been caused, and the precise quantification of such damages. Once causation has been established, and it has been proven that the in bonis party has indeed suffered a loss, less certainty is required in proof of the actual amount of damages; for this latter determination Claimant only needs to provide a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss.*[855]

620. The Tribunal is therefore satisfied that the six transactions identified by Dr Hern can be relied upon as the starting point of a comparable transactions analysis.

621. Mr Demuth further argues that Dr Hern should have included two additional transactions, *Austerngrund* and *Deutsche Bucht*, in the reference group of comparable transactions. These two transactions involve (i) a project of 80 WTGs in a late development stage, with an enterprise value of EUR 25.5 million (*Austerngrund*); and (ii) an already permitted project of 42 WTGs, with a disclosed enterprise value of EUR 14.9 million (*Deutsche Bucht*).[856] Mr Demuth claims that the two transactions indicate a significantly lower cash flow multiple than considered by Dr Hern in his analysis, which results in Dr Hern's analysis being overstated.

622. Dr Hern states, in response, that he does not consider the two transactions, *Austerngrund* and *Deutsche Bucht*, in his analysis because reliable data on the purchase price is not available. In any event, in Dr Hern's view, Mr Demuth's analysis of the two transactions is incomplete and erroneous.[857]

---

[855] *Lemire v. Ukraine*, **CL-0204 / RL-0494**, para. 246 (referring to M. Kantor, *Valuation for Arbitration* (2008), p. 72; J. Paulsson, "*The Expectation Model*," in Y. Derains and R. Kreindler (eds.), *Evaluation of Damages in International Arbitration* (2006), p. 60).

[856] Demuth ERI, paras. 403-407.

[857] Hern ERII, paras. 29, 217 *et seq*.

623.    Having considered the expert evidence, the Tribunal finds it appropriate to add the *Austerngrund* and *Deutsche Bucht* transactions to the reference group of comparable transactions. While the information available is not as complete as with the other six transactions, the Tribunal considers it is sufficient, keeping in mind the applicable standard regarding the required level of comparability, as noted above.[858]

624.    The Tribunal notes that there are also elements of valuation on which the experts appear to agree, or at least do not substantially disagree. First, Dr Hern's and Mr Demuth's views of the applicable transaction multiples per WTG (assuming this is the relevant data point to be applied to compare the relevant transactions) are not substantially different. Dr Hern derives a median multiple of EUR 553,315 per WTG at the approval stage for the NOH 2 projects and a multiple of EUR 559,116 for the NOH 1 projects. While Mr Demuth does not take a definitive view on the applicable transaction multiples (for the reasons discussed above), he does refer to the multiple of EUR 500,000 per WTG, derived by PwC in its CDDR on the basis of the Windreich Option, as "*an important benchmark*."[859] He also bases his criticism of Dr Hern's multiples on the approach adopted by PwC,[860] precisely because PwC's multiple is based on the Windreich Option, which effectively limited the value of the NOH 2 projects to EUR 500,000 per WTG.[861] According to Mr Demuth, had the value of the NOH 2 projects exceeded the threshold value of EUR 500,000 per WTG, "*Windreich would* [have] *reasonably exercise*[d] *its rights to buy the projects*."[862]

625.    The Tribunal notes that Windreich AG filed for insolvency in September 2013, which is before the Valuation Date of 18 December 2013.[863] The Tribunal therefore does not see any basis to "*cap*" the relevant transaction multiple at EUR 500,00 per WTG.

626.    The Tribunal next turns to the methodology to be applied to compare the relevant transactions. In this connection, the Tribunal recalls Mr Demuth's criticism, noted above,

---

[858] *See also* Hern ERII, para. 229 (noting that adding these transaction multiples to his list of comparable transactions decreases the median transaction value by about 6 percent).

[859] Demuth ERII, para. 598. *See also* Demuth ERI, paras. 293-302; "*Adjusted PwC Valuation*," **Appendix AD-0002**.

[860] *See, e.g.*, Demuth ERI, paras. 286-302; Demuth ERII, paras. 520, 552-563.

[861] Mr Demuth suggests that Dr Guillet also failed to consider the Windreich Option: *see* Demuth ERII, para. 354.

[862] Demuth ERI, para. 289.

[863] Hern ERI, fn. 60; Hern ERII, para. 143.

that most of Dr Hern's comparable transactions are fully permitted, whereas most of the Offshore Wind Projects were at a relatively early stage of development.[864]

627. In order to make the Offshore Wind Projects comparable with the six transactions included in his reference group of comparable transactions as of approval date, Dr Hern calculates the evolution of the value of the Offshore Wind Projects over time, as a function of the Claimants' capital increases and capital expenditure, up to the approval date. In Mr Demuth's view, however, the increase in value of an offshore wind project is not a function of increase in development costs and the passage of time, but rather a function of achieving project milestones. Mr Demuth suggests that Dr Hern's calculation is therefore flawed and "*significantly overestimates the value of early stages development projects by assuming an increase of the projects' value relative to the costs incurred.*"[865]

628. The Tribunal notes that the Claimants' other quantum expert, Dr Guillet, effectively agrees with Mr Demuth, stating that "*the value of projects is not linked to the money spent on developing them, but on the actual results of such development efforts*."[866] Indeed, in his own analysis, Dr Guillet applies a different multiplier, MEUR/MW, which is linked to the corresponding project milestone, instead of a normalized transaction multiple per WTG as of approval date, which is the comparator applied by Dr Hern.

629. Having considered the experts' evidence on the issue, the Tribunal finds that Dr Guillet's approach better reflects market realities and is also methodologically more consistent than that of Dr Hern as it does not combine a comparable transactions method with a cost-based approach (which measures project progress based on capital expenditure rather than achievement of project milestones). Dr Guillet's approach also does not require an adjustment to reflect the Valuation Date adopted by the Tribunal as he considers the value of the Claimants' Offshore Wind Projects based on the applicable multiplier on alternatives dates, including as of the "*pre-ONEP phase,*" which is effectively the period prior to the Valuation Date.[867] While Dr Guillet's analysis includes transactions outside Germany, his

---

[864] *See above* paragraph 616.
[865] Demuth ER1, para. 287.
[866] Guillet ER, para. 71.
[867] *See* Dr Guillet's analysis of the NOH 1 and NOH 2 projects: Guillet ER, paras. 148-197.

evidence is that valuations for fully permitted projects have been consistent across markets.[868] Having reviewed Dr Guillet's transaction data, the Tribunal accepts his evidence on this point.

630. The approach adopted by the Tribunal above, including as to the applicable multiplier (MEUR/MW instead of EUR/WTG), implies that it is not strictly speaking necessary to rely only on the six comparable transactions derived by Dr Hern (plus the two transactions, *Austerngrund* and *Deutsche Bucht*, added above). However, since Dr Guillet's evidence, including his calculations of the MEUR/MW multiplier per development stage, is in part based on confidential information, the Tribunal considers it prudent, before proceeding to determine the value of the Offshore Wind Projects as of the Valuation Date, to test the validity of the MEUR/MW multiplier by comparing the purchase prices of the six comparable transactions against valuations calculated for these same transactions on the basis of the MEUR/MW multiplier. To be informative, the comparison must identify (i) the project in question; (ii) the development stage of the project on the date of the transaction; (iii) the size (power capacity) of the project measured in MW instead of the number of WTGs; (iv) the applicable multiplier (MEUR/MW) based on the development stage; (v) the purchase price; and (vi) the value range resulting from the use of the MEUR/MW multiplier. This analysis is set out below.

| Project | Development stage | WTG = MW[869] | MEUR / MW | Purchase price (MEUR)[870] | Value (MEUR) |
|---------|-------------------|---------------|-----------|----------------------------|--------------|
| GlobalTech I | Approved/ conditional grid connection | 80 = 400 | 0.15 – 0.20 | 24.1 (24% stake) | 14.4 – 16.8 |

---

[868] Guillet ER, paras. 49 (noting that valuations have been extremely consistent across the sector and are specifically linked to the stage of development of the project), 72; Expert Presentation of Dr Jerome Guillet, slide 8.

[869] Dr Guillet has set out his calculations on the basis of MW (power capacity) rather than per WTG (the number of turbines per project) and accordingly the latter needs to be converted into the former unit, to make Dr Guillet's valuations comparable to Dr Hern's valuations. According to the evidence (which appears undisputed), 1 WTG corresponds to 5 MW: *see* Guillet ER, para. 17, Hern ERI, Table 2.1, para 25; Cl. Mem., paras. 75(b), 181; Züblin, Draft Strategy Paper Concerning Foundation Structures for Offshore Wind Farms, 31 March 2004, **C-0087**, p. 1; Weber WSI, para. 16.

[870] As calculated by Dr Hern: *see* Hern ERI, Appendix C.1.

| | | | | | |
|---|---|---|---|---|---|
| Borkum Riffgrund I and II | Approval / Application conference (no grid connection for I) | 77 + 96 = 385 + 480 MW | 0.125 [871] | 56 (50% stake) | 54 |
| Gode Wind II | Unconditional grid connection | 84 = 420 | 0.15 – 0.20 | 80 | 63 – 84 |
| Gode Wind I and II | Unconditional grid connection | 54 + 84 = 270 + 420 | 0.15 – 0.20[872] | 144 | 103.5 – 138 |
| Borkum Riffgrund West | Approved / no unconditional grid connection | 80 = 400 | 0.10 – 0.20[873] | 32 | 40 – 80 |
| Gode Wind III | Application submitted – Participation round 1-2 | 15 = 75 | 0.01 – 0.05[874] | 10 | 0.75 – 3.75 |
| Austerngrund | Application conference[875] | 80 = 400 | 0.05 – 0.10 | 28.1[876] | 20 – 40 |
| Deutsche Bucht | BSH Hearing / Approved | 42 = 210 | 0.10 – 0.15 | 17.4[877] | 21 – 31.5 |

*Table 2: Valuation of comparable transactions based on the MEUR/MW multiple vs. actual transaction prices.*

631.    The table indicates that the MEUR/MW multiplier produces valuation ranges that generally correspond to the value of the comparable transactions: out of the eight transactions, the contemporaneous purchase price falls within the range of the values (or is close to the sole

---

[871] This the average of a multiplier based on application conference (<0.1) and BSH hearing (0.15). The transaction is also listed in Dr Guillet's analysis, with a multiplier 0.18 (but with 626 MW), *see* Guillet ER, Table 4.

[872] The transaction is also listed in Dr Guillet's table (in a transaction including Gode Wind III), with a multiplier 0.17, *see* Guillet ER, Table 4.

[873] The transaction is also listed in Dr Guillet's table, with a multiplier 0.08, *see* Guillet ER, Table 4.

[874] It is not clear whether Gode Wind III was in the stage of initial application or participation round 1 or 2. The transaction is also listed in Dr Guillet's table (in a transaction including Gode Wind I and II), with a multiplier 0.17, which would suggest a valuation of 12.75 MEUR, *see* Guillet ER, Table 4.

[875] The development stage of *Austerngrund* seems agreed: *see* Expert Presentation of Mr Alexander Demuth, slide 16.

[876] Mr Demuth calculates a nominal transaction price of EUR 25.5 million, *see* Demuth ERI, Table 15.

[877] Mr Demuth calculates a nominal transaction price of EUR 14.9 million, *see* Demuth ERI, Table 15.

value) calculated on the basis of the MEUR/MW multiplier in four of the eight cases, and is reasonably close to the range in the remaining four cases (with the exception, in relative terms, of Gode Wind III). The Tribunal is therefore satisfied that the MEUR/MW multiplier may be relied upon to quantify the indicative value of the NOH 1 and NOH 2 projects as of the Valuation Date, subject to further adjustments, including deduction of the residual value.

632.    Applying this approach produces an indicative valuation of the NOH 1 and NOH 2 projects set out in the table below.

| Project | Development Stage (as of the Valuation Date) | WTG = MW | MEUR/MW (Valuation Date)[878] | Claimed Valuation (MEUR)[879] | Indicative Valuation (MEUR) |
|---|---|---|---|---|---|
| **NOH 1** | | **200 = 1,000** | | **114.8** | **119.75 – 150 (average 134.875)** |
| GlobalTech II and III[880] | Third participation round[881] | 56 + 23 WTG = 280 + 115 MW | 0.05 – 0.1 | 33.0 | 19.75 – 39.5 |
| OWP West | Public hearing[882] | 42 WTG = 210 MW | 0.1 – 0.15 | 18.6 | 21 – 31.5 |
| Albatros | Approval / BSH permit / | 79 WTG = 395 MW | 0.2 | 63.1 | 79 |

---

[878] *As per* Guillet ER, paras. 191-197.

[879] Hern ERI, "*Damages Calculation*," **RH-001**.

[880] GlobalTech II and GlobalTech III were merged in 2013.

[881] Initial application filed in July 2008; completed two participation rounds in 2008-09; application conference in August 2009; application for permit and first BSH release filed in December 2009; third participation round in 2010; application for planning approval procedures in July 2012, but no further developments before O-NEP 2013 (the Valuation Date): *see* Guillet ER, para. 149. *See also* Hern ERI, Table 2.2, p. 21.

[882] Initial application filed in September 2006 and two participation rounds completed also in 2006; application conference in March 2007; third participation round in July 2009; BSH hearing in May 2010; revised application documents filed in June 2011, but no further developments before O-NEP 2013: *see* Guillet ER, para. 161. *See also* Hern ERI, Table 2.2, p. 21.

| | | | | |
|---|---|---|---|---|
| | conditional grid connection[883] | | | |
| **NOH 2** | | **619 = 3,095** | **230.6** | **130.75 – 245.5 (average 188.125)** |
| GAIA I Nord | Application / First participation round[884] | 80 WTG = 400 MW | 0.02 | 27.7 | 8 |
| GAIA II | Application conference[885] | 40 WTG = 200 MW | 0.05 – 0.1 | 15.5 | 10 – 20 |
| GAIA III | Application conference[886] | 80 WTG = 400 MW | 0.05 – 0.1 | 30.6 | 20 – 40 |
| GAIA IV | Application conference[887] | 68 WTG = 340 MW | 0.05 – 0.1 | 26.3 | 17 – 34 |
| GAIA V Nord | Application / first participation round[888] | 80 WTG = 400 MW | 0.02 | 27.4 | 8 |

[883] Initial application filed in November 2007; two participation rounds completed in 2008; application conference in June 2008; third participation round in December 2008; BSH hearing completed in March 2009; BSH permit obtained in August 2011: *see* Guillet ER, para. 173. *See also* Hern ERI, Table 2.2, p. 21; Expert Presentation of Dr Richard Hern, slide 28 (indicates Albatros progressed to conditional grid connection stage in October 2012).

[884] Initial applications filed in February 2010; first participation round started in 2011 but not completed before the first O-NEP phase: *see* Guillet ER, para. 183. *See also* Hern ERI, Table 2.2, p. 21.

[885] Initial application filed between January and end of August 2008; two participation rounds and application conference held between February and mid-September 2009 but the project did not progress to more advanced development stages during the pre-O-NEP phase: *see* Guillet ER, para. 182.

[886] Initial application filed between January and end of August 2008; two participation rounds and application conference held between February and mid-September 2009 but the project did not progress to more advanced development stages during the pre-O-NEP phase: *see* Guillet ER, para. 182.

[887] Initial application filed between January and end of August 2008; two participation rounds and application conference held between February and mid-September 2009 but the project did not progress to more advanced development stages during the pre-O-NEP phase: *see* Guillet ER, para. 182.

[888] Initial applications filed in February 2010; first participation round started in 2011 but not completed before the first O-NEP phase: *see* Guillet ER, para. 183. *See also* Hern ERI, Table 2.2, p. 21.

| | | | | | | |
|---|---|---|---|---|---|---|
| SeaStorm I | Application conference[889] | 80 WTG = 400 MW | 0.05 – 0.1 | 30.2 | 20 – 40 |
| SeaStorm II | Application conference[890] | 56 WTG = 280 MW | 0.05 – 0.1 | 21.6 | 14 – 28 |
| SeaWind III | Application conference[891] | 57 WTG = 285 MW | 0.05 – 0.1 | 22.2 | 14.25 – 28.5 |
| SeaWind IV | Application conference[892] | 78 WTG = 390 MW | 0.05 – 0.1 | 29.3 | 19.5 – 39 |
| **TOTAL** | **819** | **4,095** | | **345.4** | **250.75 – 395.5** |

*Table 3: Indicative valuation of the NOH 1 and NOH 2 projects based on the MEUR/MW multiplier*

633. The Tribunal considers that in all the circumstances the indicative valuation provides an appropriate basis for determining the compensation due to the Claimants, with the following adjustments:

   a.   As for NOH 1, the indicative valuation confirms the amount claimed by the Claimants, *i.e.* EUR 114.8 million, accordingly the Tribunal accepts the Claimants' quantification; and

   b.   As for NOH 2, the Tribunal considers it appropriate to adopt the middle value of the range for each project to avoid bias in either direction,[893] with the exception of GAIA I Nord and GAIA V Nord, which Dr Guillet values at EUR 5 million each;[894]

---

[889] Initial application filed between January and end of August 2008; two participation rounds and application conference held between February and mid-September 2009 but the project did not progress to more advanced development stages during the pre-O-NEP phase: *see* Guillet ER, para. 182.

[890] Initial application filed between January and end of August 2008; two participation rounds and application conference held between February and mid-September 2009 but the project did not progress to more advanced development stages during the pre-O-NEP phase *see* Guillet ER, para. 182.

[891] Initial application filed between January and end of August 2008; two participation rounds and application conference held between February and mid-September 2009 but the project did not progress to more advanced development stages during the pre-O-NEP phase: *see* Guillet ER, para. 182.

[892] Initial application filed between January and end of August 2008; two participation rounds and application conference held between February and mid-September 2009 but the project did not progress to more advanced development stages during the pre-O-NEP phase: *see* Guillet ER, para. 182.

[893] An approach also adopted by Dr Guillet: *see* Guillet ER, para. 14.

[894] *See* Guillet ER, paras. 9, 196.

accordingly, adopting Dr Guillet's valuation of GAIA I Nord and GAIA V Nord (rather than the EUR 8 million resulting from the indicative valuation), the NOH 2 projects are valued at EUR 182.125 million.

634. The Tribunal must next determine the compensation due to the Claimants based on the difference between the but for scenario, as quantified above, and the actual scenario, which involves determining any cash flows that the Claimants have earned since the Valuation Date, which include the proceeds from the sale of the NOH 1 projects, minus the costs incurred since the Valuation Date.

635. The Claimants have calculated the net present value of the sales proceeds from the NOH 1 projects as EUR 55.9 million, minus the costs associated with NOH 1 (EUR 5.5 million), which were incurred to mitigate the damage to the value of the projects. As for the NOH 2 projects, none of which could be sold and accordingly there are no sales proceeds to deduct, the costs associated with mitigation amount to EUR 4.1 million.[895] The Tribunal notes that the Parties have not calculated the net present values of the sales proceeds, or the costs, for any alternative valuation dates, including for the Valuation Date adopted by the Tribunal. Given the relatively short time period between the Claimants' valuation date for NOH 1 and the Valuation Date adopted by the Tribunal, the Tribunal adopts the revenue figures calculated by the Claimants for NOH 1, *i.e.* EUR 55.9 million.

636. As to costs, the Tribunal notes that the Claimants' calculation includes costs incurred between the Claimants' valuation dates and the Valuation Date adopted by the Tribunal. These costs amount to approximately EUR 3.11 million for NOH 1 and approximately EUR 3.47 million for NOH 2.[896] There is no evidence before the Tribunal that would allow it to calculate the net present values of these amounts, however, the Tribunal estimates that these would amount to approximately EUR 3 million for NOH 1 and EUR 3.4 million for

---

[895] Hern ERI, para. 139; "*Damages Calculation*," **RH-0001**; Hern ERII, Table 1.3, p. 22, paras. 155-157.
[896] "*Damages Calculation*," **RH-0001** (Table 4.8: Historical Costs Incurred by the NOH 1 and NOH 2 Projects).

NOH 2.[897] Accordingly, the costs for NOH 1 amount to EUR 2.5 million (EUR 5.5 million – EUR 3 million) and for NOH 2 to EUR 0.7 million (EUR 4.1 million – EUR 3.4 million).

637.   These adjustments lead in the actual scenario to a net cash flow of EUR 53.4 million (EUR 55.9 million – EUR 2.5 million) for NOH 1 (which therefore must be deducted from the but for valuation of NOH 1 as of the Valuation Date) and an additional mitigation cost of EUR 0.7 million for NOH 2 (which must be added to the but-for valuation of NOH 2 as of the Valuation Date). Accordingly, subject to any further adjustments, the provisional compensation due to NOH 1 amounts to EUR 61.4 million (EUR 114.8 million – EUR 53.4 million = EUR 61.4 million) and the provisional compensation due to NOH 2 amounts to EUR 182.825 million (EUR 182.125 million + EUR 0.7 million = EUR 182.825 million).

### c.    Taxation of the Award

638.   The Claimants instructed Dr Hern to rely on the assumption that they would not have been liable to pay taxes on any cash flows received from the sale of the Offshore Wind Projects. As summarized above, the Respondent challenged the assumption in its Counter-Memorial, raising a number of arguments.

639.   However, in response to the Claimants' response in the Reply, the Respondent appears to have abandoned its arguments and in its Rejoinder merely argues that (i) the Claimants have not provided any evidence to show that it is a standard approach in the German market to organize the sale of an entire business as a share deal rather than as an asset deal; and (ii) it is unclear whether NOH 1 had opted out of the tax-neutral treatment under Austrian law as the Claimants have not provided the necessary information. The Respondent notes that there could well have been scenarios where this would have been advisable.

640.   The Tribunal notes that, insofar as the Respondent suggests that a hypothetical sale of NOH 2's shares in the NOH 2 Project Companies before 11 January 2013 would have triggered the application of the Austrian corporate income tax of 25 percent, it follows from

---

[897] Estimated on the basis that the total historical costs amount to EUR 5.91 million for NOH 1 (incurred during the period 2013-2016) and EUR 4.33 million for NOH 2 (incurred during the period 2012-2019). *See* Hern ERI, para. 139.

the Tribunal's determination that the Valuation Date – and accordingly the date of the hypothetical sale – should be 18 December 2013, that the transaction would not have been subject to this tax.

641.   As for the Respondent's remaining arguments, the Tribunal notes that (i) the Claimants have in fact provided evidence in support of their position that a share deal is the preferred approach, showing that the sales of OWP Albatros, OWP West and OWP GlobalTech II were executed by way of share deals; and (ii) there is no evidence in the record to support the Respondent's argument (insofar as it is pursued) that the Claimants could have opted for the transactions being taxable in Austria.

642.   Accordingly, the Tribunal finds that there is no basis to make any further adjustments to the compensation due to the Claimants on the basis of any applicable Austrian or German tax laws.

### d.   *Double Recovery*

643.   As summarized above, NOH 2 is entitled under the amended Offshore Wind Energy Act (the "**2020 Offshore Wind Energy Act**") to be compensated for the necessary site investigation costs incurred in connection with the development of the NOH 2 projects, to the extent that such expenses relate to data and documentation that may be used for the preparatory investigation of sites to be carried out under the new tender system.[898]

644.   The Claimants state in their submissions that the prohibition of double recovery is "*inherent*" in the principle of full compensation, and acknowledge that any compensation received from the German authorities would have to be deducted from the compensation awarded by the Tribunal.[899]

---

[898] 2020 Offshore Wind Energy Act, **C-0306 / RL-0148**, Sec. 10a.

[899] Cl. Mem., para. 576 (confirming that "*the Claimants do not seek any double recovery and will reduce their damages claim in this arbitration to account for any amounts received in the future arising from the German Constitutional Court decision*"); Cl. First PHB, para. 354 ("*The Claimants are also prepared to provide any further undertaking the Tribunal deems appropriate to avoid any form of double compensation, should the amount awarded under the 2020 Constitutional Court decision still be unknown at the time this Tribunal issues its final award in this proceeding*").

645.  The Tribunal takes note of, and accepts, the Claimants' acknowledgement that they are not entitled to double recovery.

646.  On 9 October 2023, the Claimants wrote to the Tribunal, informing that they had received the amount of EUR 2,558,901.42 in accordance with the 2020 Offshore Wind Energy Act, broken down as follows:

a.      SeaWind III – EUR 781,946.90 from the BSH;

b.      SeaWind IV – EUR 17,000 from the BSH;

c.      GAIA II – EUR 5,625 (from bp OFW Management 3 GmbH ("**BP**"));

d.      GAIA II – EUR 5,625 (from North Sea OWF N12-1 GmbH & Co. KG, ("**TotalEnergies**"));

e.      GAIA III – EUR 221,447.39 from BP;

f.      GAIA III – EUR 653,092.15 from TotalEnergies; and

g.      GAIA IV – EUR 874,164.98 from TotalEnergies.

647.  The Claimants indicated in their letter that they have "*no objections to satisfying Germany's request made in its letter of 2 October 2023 to put forward an updated damages calculation – even at this stage of the arbitration – taking into account the limited compensation received to date.*"[900]

648.  On 6 August 2024, the Claimants wrote to the Tribunal, acknowledging that, on 30 July 2024, GAIA I Nord and GAIA V Nord had received further payments by the BSH in the amount of EUR 368,606.67 and EUR 350,718.36, respectively.

649.  The Respondent submits that, as a consequence of the Constitutional Court's June 2020 decision and the domestic compensation scheme, the Tribunal is "*procedurally barred from rendering any decision in favor of Claimants as any such decision would be moot and*

---

[900] Letter from the Claimants to the Tribunal, 9 October 2023, p. 4.

*premature*."[901] In the Respondent's view, in the circumstances, "*it is impossible for the Tribunal to formulate an award that is both enforceable and avoiding double compensation*."[902] The Claimants could and should have reduced their claims in light of the German domestic compensation scheme, but they chose not to. Contrary to what the Claimants appear to suggest, "*the right to compensation of costs created by Respondent does not allow for any set-off, as the debtor will be a third party not involved in the arbitration*."[903]

650.   As noted, the Claimants acknowledge and confirm that they do not seek double compensation. The Tribunal further takes note of the Respondent's position, including that in the circumstances of this case a set-off is not possible, as some of the payments made to the Claimants under the 2020 Offshore Wind Energy Act appear to have been made by third parties. Accordingly, the Tribunal considers it appropriate to deduct the compensation already received by the Claimants, in the amount of EUR 3,278,226.45, from the compensation payable to NOH 2 under this Award. The total compensation due to NOH 2 thus amounts to EUR 179,546,773.55 (EUR 182,825,000 – EUR 3,278,226.45).

651.   Furthermore, if any further compensation is to be paid to any of the NOH 2 Project Companies in the future, prior to the payment of the amounts due to the Claimants under this Award,[904] the Respondent is entitled to deduct any such amounts from the amounts due to the Claimants under this Award. Alternatively, if any further compensation is to be paid to the NOH 2 Project Companies after payment by the Respondent of the amounts due to the Claimants under this Award, the Respondent is directed to inform the payer of the Respondent's right to receive the corresponding sums due pursuant to this Award and NOH 2 is directed to confirm and/or instruct the payer that payment should be made to the Respondent. In the event any payment is nonetheless made to NOH 2, the Tribunal declares that NOH 2 is under an obligation to return, on behalf of the NOH 2 Project Companies,

---

[901] Resp. First PHB, para. 102.

[902] Resp. First PHB, para. 104.

[903] Resp. Second PHB, para. 81.

[904] The Tribunal understands that compensation may still be payable to SeaStorm I and SeaStorm II: *see* Letter from the Claimants to the Tribunal, 9 October 2023, p. 3.

any such amounts to the Respondent, including for further reimbursement to a third party if appropriate.

**(3)    Interest**

652.    The Tribunal notes that both Parties rely, in support of their positions on interest, on Article 13(1) of the ECT, which provides that "[c]*ompensation shall also include interest at a commercial rate established on a market basis*." Thus there is no dispute as to the applicable legal standard, and that this standard – commercial rate – applies to both the Claimants' FET claim and expropriation claim.

653.    As to pre-award interest, the Tribunal has determined above that the Valuation Date is 18 December 2013; accordingly, pre-award interest shall run from this date until the date of this Award.

654.    As to the applicable interest rate, as summarized above, the Parties disagree as to whether the rate should be fixed by reference to Strabag's debt financing costs or the average yield of Germany's sovereign bonds since the valuation dates. Having considered the Parties' positions and the supporting evidence and legal authorities, the Tribunal determines that the applicable interest rate should be based, in accordance with *Chorzów Factory*, on the principle that the Claimants must be made whole and accordingly must be entitled to compensation based on what they would have earned had they invested the funds corresponding to the amounts awarded during the period when the Claimants were deprived of such funds.

655.    The Claimants' quantum expert, Dr Hern, calculates the claimed pre-award interest rate (by reference to 1-year yield of the iBoxx BBB (7-10Y) index – *see* Exhibit RH-0094 for description), as 4.31 percent as of 15 June 2012, in relation to NOH 2, and 3.56 percent as of 28 December 2012, in relation to NOH 1 and Strabag. The Claimants refer, alternatively, to LIBOR + 2, which has often been applied by arbitral tribunals.

656.    The Tribunal notes there is no evidence in the record relating to commercial rates as of the Valuation Date adopted by the Tribunal. Accordingly, and taking into account the principle that the Claimants should be made whole, the Tribunal determines that the applicable

interest rate is to be set at a fixed rate of 3 percent as of 18 December 2013. The Tribunal does not consider it appropriate to refer to LIBOR, as it has been phased out.

657.    The Tribunal determines that the same interest rate of 3 percent should also apply to post-award interest, and that post-award interest should be payable from 60 days of the date of this Award until the date of payment. The Tribunal does not consider it appropriate to fix the post-award interest rate at a rate higher than the pre-award interest, with or without a grace period, in order to incentivize the Respondent's compliance with the Award. The Tribunal must assume that, in accordance with its agreement to arbitrate as determined by the Tribunal, the Respondent will comply with the Award.

658.    The Parties also disagree on whether the interest awarded should be compounded. The Tribunal notes that the standard practice in investment treaty arbitration, including under the ECT, is to award compound interest.[905] There is no basis in the circumstances of this case to deviate from this practice. The Tribunal further considers that the commercially appropriate period of compounding is yearly. Accordingly, the Tribunal determines that pre-award interest should be compounded yearly from the Valuation Date, 18 December 2013, until the date of this Award. As to post-award interest, it should similarly be compounded yearly from 60 days of the date of the Award until the date of payment.

## VIII.    COSTS

### A.    THE PARTIES' POSITIONS

#### (1)    The Claimants' Position

659.    The Claimants request that the Tribunal order the Respondent to bear the Claimants' costs in their entirety, plus interest from the date at which the costs were incurred until the date of payment.

660.    The Claimants submit that they conducted themselves in the course of the proceeding in an expeditious and cost-effective manner, and the costs incurred reflect the complexity of

---

[905] *See*, *e.g.*, *STEAG GmbH v Kingdom of Spain*, ICSID Case No. ARB/15/4, Award, 17 August 2021, **CL-0331**, para. 104;  *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Award, 18 December 2020, **RL-0247**, para. 134. *See also* J. Dow, "*Interest in International Arbitration Damages*," in *Global Arbitration Review* (2018), **RH-0160**, pp. 5, 8.

the matter, while largely keeping in line with average costs of ICSID proceedings. According to the Claimants, the costs would have been lower, but for the Respondent's "*failed procedural strategies*."[906] The Respondent's failed applications include (i) application for dismissal of the case under ICSID Arbitration Rule 41(5); (ii) request for bifurcation of the proceedings; and (iii) application to intervene from the European Commission. The Respondent also made extensive document production requests, which were largely unsuccessful, and requested two rounds of post-Hearing submissions.[907]

661. The Claimants' costs, including legal fees and expenses, totaling USD 550,000.00, GBP 818,772.13 and EUR 13,491,994.46, break down as follows:

| 1. Costs of the Centre paid by the Claimants (including advance payments) | |
| --- | --- |
| Filing fee requested on 21 August 2019 | US$25,000.00 |
| Advance payment requested on 8 May 2020 | US$150,000.00 |
| Advance payment requested on 22 October 2021 | US$150,000.00 |
| Advance payment requested on 18 July 2022 | US$75,000.00 |
| Advance payment requested on 6 January 2023 | US$150,000.00 |
| **Total** | **US$550,000.00** |

| 2. Costs of the Party Representatives | |
| --- | --- |
| Travel and accommodation costs | **€5,691.73** |

| 3. Costs of Legal Counsel | | | |
| --- | --- | --- | --- |
| **Phase** | **Legal Fees** | **VAT**[908] | **Total** |
| Preparation of the Arbitration | €86,844.25 | €12,375.31 | **€99,219.56** |
| Request for Arbitration | €205,639.00 | €29,303.56 | **€234,942.56** |
| Constitution of the Tribunal | €215,074.80 | €30,648.16 | **€245,722.96** |
| Application under ICSID Rules 41(5) | €75,682.80 | €10,068.99 | **€85,751.79** |
| First Session/Procedural Order No. 1 | €46,202.30 | €6,506.06 | **€52,708.36** |
| Memorial | €2,708,687.20 | €336,216.37 | **€3,044,903.57** |
| EC Intervention | €34,258.10 | €4,566.10 | **€38,824.20** |
| Observations on Bifurcation | €144,472.90 | €20,587.39 | **€165,060.29** |

---

[906] Cl. First SoC, para. 3.

[907] Cl. First SoC, para. 4.

[908] The Claimants allocate the costs incurred amongst them as follows: Strabag: 25 percent, NOH 2: 60 percent and NOH 1: 15 percent. The Claimants explain that until December 2020, Counsel for the Claimants was organized as an LLP with an office in Austria, and the reverse-charge mechanism was not applicable, according to Austrian VAT Act, 27 July 2022, **C-0452**, Sec. 19(1). Counsel for the Claimants was thus required to charge the Austrian VAT to Strabag. These amounts are deductible for Strabag and are therefore not claimed as costs in this proceeding. As from January 2021 onwards, Counsel for the Claimants was reorganized as a PartGmbB, with no office in Austria. Since then, no VAT was charged to Strabag. NOH 1 and NOH 2 do not conduct any activities that are subject to VAT and are therefore not entitled to deduct input-VAT under Austrian law: *see* H.G. Ruppe and M. Achatz, *VAT Act Commentary* (*Umsatzsteuergesetz Kommentar*), (2017), **C-0453**, para. 36. According to the Claimants, the amounts of VAT paid by NOH 1 and NOH 2 constitute actual costs for them and are claimed as costs in this proceeding.

| Document Production | €598,714.80 | €85,316.86 | **€684,031.66** |
|---|---|---|---|
| Reply | €2,007,901.30 | €286,125.94 | **€2,294,027.24** |
| Hearing on the Merits and Reconsideration | €1,829,356.58 | €260,683.31 | **€2,090,039.90** |
| Rejoinder on Jurisdiction | €134,665.97 | €19,189.90 | **€153,855.87** |
| Post-Hearing Briefs | €412,500.00 | €58,781.25 | **€471,281.25** |
| **Total** | €8,500,000.00 | €1,160,369.19 | **€9,660,369.19** |

### 4. Disbursements

| Item | Invoiced Amount | VAT[909] | Total |
|---|---|---|---|
| Flight expenses | €9,583.07 | €1,365.59 | **€10,948.66** |
| Accommodation[910] | €72,760.75 | €10,368.41 | **€83,129.16** |
| Taxi and other travel expenses | €970.15 | €138.25 | **€1,108.40** |
| Meal expenses | €6,842.00 | €974.97 | **€7,816.97** |
| Translation costs | €43,154.77 | €6,149.55 | **€49,304.32** |
| Hearing services | €4,644.71 | €661.88 | **€5,306.59** |
| Data hosting and review platforms | €38,272.61 | €5,302.63 | **€43,575.24** |
| Other expenses[911] | €8,296.77 | €1,182.28 | **€9,479.05** |
| **Total** | €184,524.83 | €26,143.56 | **€210,668.39** |

### 5. Costs of Experts and other Consultants

| Experts | Invoiced Amount | VAT[912] | Total |
|---|---|---|---|
| Atkins/Kent | £711,981.27 | £106,790.86 | **£818,772.13** |
| Green Giraffe B.V./Jérôme Guillet | €108,750.00 | €14,169.38 | **€122,919.38** |
| Peter Steinfeld[913] | €43,987.50 | €5,970.83 | **€49,958.33** |
| NERA Economic Consulting | €2,201,248.86 | €302,424.91 | **€2,503,673.77** |
| Posser Spieth Wolfers & Partners – Palais Holler[914] | €659,701.02 | €90,500.15 | **€750,201.17** |
| Prof Dr Charlotte Kreuter-Kirchhof | €120,000.00 | €17,100.00 | **€137,100.00** |
| Prof Dr Jörg Gundel | €45,000.00 | €6,412.50 | **€51,412.50** |
| **Total (£)** | £711,981.27 | £106,790.86 | **£818,772.13** |
| **Total (€)** | €3,178,687.38 | €436,577.77 | **€3,615,265.15** |

### 6. FINAL TOTALS

| | |
|---|---|
| **Total (US$)** | **US$550,000.00** |
| **Total (£)** | **£818,772.13** |
| **Total (€)** | **€13,491,994.46** |

---

[909] The Claimants state that VAT refers solely to the shares of NOH 1 and NOH 2 for these cost items. *See above* footnote 908.

[910] The Claimants state that these costs were originally incurred in GBP and then converted to EUR at the given exchange rate in Counsel for the Claimants' disbursements invoices.

[911] The Claimants state that these expenses include bank charges, courier fees and printing.

[912] The VAT refers solely to the shares of NOH 1 and NOH 2 for these cost items. *See above* footnote 908.

[913] The Claimants state that Mr Steinfeld acted as consultant for the Claimants in relation to certain Gravity Foundation Technology-related aspects.

[914] The Claimants state that Posser Spieth Wolfers & Partners acted as consultants for the Claimants for regulatory matters.

662.    The Claimants submit that the Tribunal has the power to determine and allocate the costs pursuant to Article 61(2) of the ICSID Convention. The main factors applied by ICSID tribunals when allocating costs are (i) the outcome of the proceeding or any part of it; (ii) the conduct of the parties during the proceeding, including the extent to which they acted in an expeditious and cost-effective manner and complied with the Tribunal's orders and directions; (iii) the complexity of the issues; and (iv) the reasonableness of the costs claimed.[915]

663.    Based on these principles, the Claimants submit that, if they succeed, the Respondent should be held liable for the entire cost of the proceeding. However, if the Claimants' claims are rejected, the Tribunal should order each Party to bear their own costs, in view of the Parties' conduct during the proceedings and the complexity of the case. In the Claimants' view, the Tribunal should order the Respondent to bear the consequences of its inefficient conduct of the proceedings and take note of the Claimants' good faith and the fact that their claims cannot be considered frivolous.

664.    In any event, the Respondent should bear the entirety of the costs relating to its (i) unsuccessful Rule 41(5) Application (in the amount of EUR 85,751.79), in accordance with ICSID practice; (ii) Request for Bifurcation (in the amount of EUR 165,060.29), which was denied on each of the three grounds raised by the Respondent; and (iii) document production (in the amount of EUR 684,031.66), which was unreasonably extensive, and of which only 53 percent were successful, compared to the Claimants' corresponding figure of 96 percent.

665.    The Claimants contend, in response to the Respondent's cost submission, that the Respondent has misused its Statement of Costs to plead the merits of the case, which is a further indication of the Respondent's procedural inefficiency and should be taken into account in allocating costs between the Parties.[916] The Claimants further argue that (i) the Parties largely agree on the legal standard applicable to the allocation of costs; (ii) the

---

[915] Cl. First SoC, para. 7, citing *PNG Sustainable Development Program Ltd v. The Independent State of Papua New Guinea*, ICSID Case No. ARB/13/33, Award, 5 May 2015, **CL-0067**, para. 406.

[916] Cl. Second SoC, paras. 2, 13-14.

Claimants' procedural conduct was fair and efficient; and (iii) the Respondent's request for reimbursement of its in-house costs should fail.

666.    As for the applicable legal standard, the Claimants note that the Respondent agrees that Article 61(2) of the ICSID Convention is the relevant standard, and that the Tribunal has wide discretion in determining the factors relevant for cost allocation. However, the Claimants disagree with the Respondent's suggestion that the Parties' motives and intentions should be taken into account in cost allocation. The Parties' conduct is "*an objective fact that the Tribunal must assess on the basis of their procedural behaviour in this proceeding.*"[917]

667.    The Claimants note that the fact that there is only a "*small difference*" between the costs claimed by the Parties shows that the Claimants' costs are reasonable. ICSID tribunals have taken the Parties' relative costs into account in determining whether the costs claimed are reasonable.[918] The Claimants also deny the Respondent's suggestion that they are not entitled to pursue remedies in parallel before an international tribunal and before domestic courts, including because there is no rule requiring exhaustion of local remedies in the ECT.[919]

668.    The Claimants submit that the Respondent cannot claim in-house costs. According to the Claimants, "*the general rule is that in-house costs are not recoverable.*"[920] According to the Claimants, in-house costs can be claimed only if they are not part of a party's normal operating expenses, or if they represent special costs incurred for the purposes of the arbitration.[921] The Respondent's cost claim does not meet either requirement and is also unsubstantiated.

669.    In conclusion, the Claimants request that the Tribunal:

---

[917] Cl. Second SoC, para. 8.

[918] Cl. Second SoC, paras.10-12.

[919] Cl. Second SoC, paras. 15-20.

[920] Cl. Second SoC, para. 25.

[921] Cl. Second SoC, para. 25, citing *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Award, 29 December 2004, **CL-0179**, para 371.

(a) *ORDER Germany to pay all costs and expenses of these proceedings, including the Tribunal's fees and expenses, ICSID's other costs, and the cost of the Claimants' legal representation, in the amount of* **€ 13,491,994.46, £ 818,772.13** *plus* **US$ 550,000.00,** *together with interest on such costs at 9 percent points above the German base rate;*

(b) *ORDER any further relief as the Tribunal may deem appropriate.*

*In the alternative, if the Claimants' claims are denied, the Claimants respectfully request that the Tribunal:*

(a) *ORDER each Party to bear its own costs, including its legal representation (with the exception of (b) below), and 50 percent of the Tribunal's fees and expenses as well as ICSID's costs;*

(b) *ORDER Germany to pay* **€85,751.79, €165,060.29** *and* **€684,031.66** *together with interest on such amounts at 9 percent points above the German base rate; corresponding to the Claimants' costs in relation to the Application under ICSID Rule 41(5), Request for Bifurcation and the Document Production respectively; and*

(c) *ORDER any further relief as the Tribunal may deem appropriate.*[922]

## (2)     The Respondent's Position

670. The Respondent submits that it is entitled to full reimbursement of its costs in accordance with the costs follow the event principle, which is well-established in ICSID arbitration, "*as Respondent should rightfully prevail in this arbitration.*"[923] However, even if it did not prevail, the Respondent contends that the Tribunal should take into account the Claimants' conduct in these proceedings when deciding on costs. The Respondent refers to its jurisdictional objections, including EU law, and its defenses on the merits in support of its position.[924]

---

[922] Cl. First SoC, paras. 18-19 [footnotes omitted]; Cl. Second SoC, para. 37.

[923] Resp. First SoC, paras. 3, 5.

[924] Resp. First SoC, paras. 5-19.

671. As to the Claimants' conduct, the Respondent contends that the Claimants should bear the costs of the arbitration even if the Tribunal were to find that their claims have merit because (i) it was unreasonable for the Claimants not to accept the Respondent's jurisdictional objection under EU law and the Respondent's request for bifurcation; (ii) the Claimants failed to discharge their burden of proof on their damages claims; (iii) the Claimants improperly seek double compensation in the claims relating to the NOH 2 projects; (iv) the Claimants belatedly introduced new factual exhibits into the record just prior to the Hearing, even if they predated the Claimants' Reply; and (v) the Claimants unnecessarily submitted two contradictory expert reports on quantum.[925]

672. The Respondent further submits that, "[a]*ccording to past ICSID tribunals, if the respondent is a sovereign State, the general principles of cost allocation, such as the 'costs follow the event,' have to be amended.*"[926] In the present case, when amending the regulatory framework governing offshore wind energy, Germany acted in the public interest and in good faith, and exercised its sovereign right to regulate. It also created "*a fair compensation regime for any OWF developers negatively impacted by these changes.*"[927]

673. The Respondent submits that it has incurred costs in the amount of EUR 12,607,327.19, broken down as follows:

| | Subtotal / Total (€) |
|---|---|
| **Tribunal/ ICSID** | 479,026.67 |
| **Costs of legal representation** | |
| Fees | 6,680,575.16 |
| Travel expenses | 48,362.96 |
| Further expenses | 52,526.29 / 6,781,464.41 |
| **Costs of experts** | |
| 8.2 Consulting AG | |
| Fees | 355,168.89 |
| Travel expenses | 8,211.04  / 363,379.93 |
| Desios | |
| Fees | 281,860.45 |
| Travel expenses | 4,314.75 / 286,175.20 |

---

[925] Respondent's Statement of Costs, paras. 27-39.

[926] Respondent's Statement of Costs, para. 40, *citing Burlington Resources, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Reconsideration and Award, 7 February 2017, **RL-0325**, para. 621.

[927] Respondent's Statement of Costs, para. 41.

| Legal experts | |
|---|---|
| Fees | 140,841.00 |
| Travel expenses | 7,297.66 / 148,138.66 |
| **Forensic Accountants (Alvarez & Marsal)** | |
| Fees + expenses | 3,980,236.20 |
| Travel expenses | 21,939.27 / 4,002,175.47 / 4,799,869.26 |
| **Costs of translation** | 23,954.29 |
| **Inhouse costs (Staff BMWK[928] responsible for ARB/19/29)** | 505,989.51 |
| **Further expenses (Travel expenses civil servants)** | 17,023.05 |
| **Total** | **12,607,327.19** |

674.    In response to the Claimants' Statement of Costs, the Respondent submits that the total amount of the Claimants' claim, EUR 13,491,994.46, GBP 818,772.13 and USD 550,000, "*is significantly higher than the total amount of the costs Respondent had incurred, EUR 12,607,327.19.*"[929] The Respondent also challenges certain costs and travel and accommodation expenses incurred by the Claimants and rejects the Claimants' contention that it did not conduct the arbitration proceedings efficiently.

675.    Specifically, the Respondent contends that the costs claimed by the Claimants' experts Atkin and Kent "*are considerably higher*" than the costs of the Respondent's corresponding experts, and in any event cannot be reimbursed in full.[930] The Respondent also considers that the costs of the Claimants' legal expert, Prof Dr Charlotte Kreuter-Kirchhof are unreasonable as they are significantly higher than those of the Respondent's legal experts. The Respondent further contends that the costs incurred by Mr Peter Steinfeld and Posser Spieth Wolfers & Partners cannot be reimbursed since they did not produce any evidence in the course of the proceeding or appear at the Hearing.[931]

676.    As to efficiency of its procedural conduct, the Respondent contends that it merely exercised its procedural rights in a reasonable manner when challenging the Tribunal's jurisdiction and requesting bifurcation. Indeed, according to the Respondent, "*EU law imposes an*

---

[928] Federal Ministry for Economic Affairs and Climate Action (*Bundesministerium für Wirtschaft und Klimaschutz*).
[929] Resp. Second SoC, para. 2.
[930] Resp. Second SoC, para. 4.
[931] Resp. Second SoC, paras. 5-7.

*obligation on Respondent to effectively challenge the jurisdiction of arbitral bodies which are based on invalid arbitration agreements.*"[932]

677.   In conclusion, the Respondent requests that the Tribunal:

> *1.    Order Claimants to bear their own costs, all costs and expenses incurred by Respondent in connection with these arbitration proceedings ICSID ARB/19/29 as well as the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of ICSID,*
>
> *2.    Order Claimants to reimburse Respondent for all of the costs mentioned in this Statement of Costs, i.e. in the amount of EUR 12,607,327.19, plus any further costs invoiced to Respondent in these arbitration proceedings ICSID ARB/19/29 subsequent to the submission of this Statement of Costs, including interest at a reasonable commercial rate from the date of the award to the date of payment,*
>
> *3.    Allow Respondent to submit a response to Claimants' Statement of Costs.*[933]

## B.    THE TRIBUNAL'S ANALYSIS

678.   The relevant provision for the purposes for determining the Parties' claims for costs is Article 61(2) of the ICSID Convention, which provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

679.   Rule 47(1)(j) of the ICSID Arbitration Rules further provides that the award shall contain, *inter alia*, "*any decision of the Tribunal regarding the cost of the proceeding.*"

680.   There is no dispute between the Parties, and it is well established in ICSID arbitration, that the provisions quoted above provide the Tribunal with broad discretion as to how the costs of the arbitration, including the Parties' legal costs and the fees and expenses of the

---

[932] Resp. Second SoC, paras. 18-25.
[933] Resp. First SoC, para. 48.

Tribunal and the ICSID Secretariat, should be allocated. The Tribunal notes that the Parties further agree that the "*costs follow the event*" rule governs, in principle, the allocation of costs, however, the Respondent submits that the rule should be adjusted to reflect the circumstances where, as here, the respondent State has acted in the public interest and in good faith.

681.  The costs of the arbitration, including the fees and expenses of the Tribunal and ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' fees and expenses | |
| Dr Veijo Heiskanen | USD 427,264.63 |
| Ms Judith Gill KC | USD 238,532.62 |
| Prof Dr Maria Chiara Malaguti | USD 218,552.09 |
| ICSID's administrative fees | USD 272,000.00 |
| Direct expenses | USD 208,177.60 |
| **Total** | **USD 1,364,526.94** |

682.  The above costs have been paid out of the advances made by the Parties in equal parts, except for the lodging fee which was made by the Claimants only. As a result, each Party's share of the costs of arbitration amounts to **USD 682,263.47**.

683.  The Tribunal considers it appropriate that the Parties bear and equally share the fees and expenses of the members of the Tribunal and the costs of ICSID facilities. These costs arise directly out of the Parties' arbitration agreement and thus constitute costs that the Parties have agreed to bear, before any arbitration proceedings, and thus regardless of the outcome of this case. The remaining balance, if any, will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

684.  As to legal costs, the Tribunal agrees that these costs should "*follow the event*" and accordingly their allocation should reflect the relative success of the Parties. In this connection, the Tribunal notes that the Claimants prevailed on jurisdiction and in part on liability and quantum. As to liability, while the Claimants prevailed on their FET claim for the Offshore Wind Projects and on their expropriation claim for the NOH 2 projects, their

FET and expropriation claims for the GFT were dismissed in their entirety. The claims for the breach of the FPS and Non-Impairment standards were also unsuccessful. As to quantum, the Claimants largely prevailed on the claims that reached the quantum stage. Conversely, the Respondent failed on its Rule 41(5) objection, request for bifurcation, jurisdictional objections and in part on liability. The Respondent also largely failed on quantum.

685. The Tribunal finds that the Parties' costs are reasonable, in view of the complexity of the case, as also reflected in the fact that the difference between the total costs incurred by the Parties is relatively modest in the context of ICSID proceedings.

686. As to allocation of costs, the Tribunal notes that, while the Claimants have broken down their costs, in part, based on the phase of the proceedings, the Respondent has only given an overall figure for each category of costs (costs of legal representation, costs of experts, costs of translation and in-house costs). The Tribunal must therefore estimate the allocation of the Parties' costs based on their relative success, as summarized above. In light of these principles, the Tribunal determines that, in view of the outcome of the proceedings, the Respondent should bear 67 percent of the Claimants' legal costs, and conversely, the Claimants should bear 33 percent of the Respondent's legal costs.

687. Accordingly, the Claimants are entitled to their costs of arbitration in the amount of USD 368,500, GBP 548,577.33 and EUR 9,039,636.29, and the Respondent is entitled to its costs of arbitration in the amount of EUR 4,160,417.97. The Tribunal considers it appropriate to net these amounts against each other, and accordingly the Tribunal orders the Respondent to pay the Claimants their costs of arbitration in the amount of USD 368,500, GBP 548,577.33 and EUR 4,879,218.32.

688. The Tribunal considers it appropriate to award the Claimants interest on the net amount of their cost awards at the rate of 3 percent per annum, compounded yearly, and payable from 60 days of the date of this Award.

## IX.    AWARD

689. For the reasons set out above, the Tribunal determines as follows:

a.    The Respondent's objections to the Tribunal's jurisdiction and to the admissibility of the claims are rejected;

b.    The Tribunal has jurisdiction in this matter and the Claimants' claims are admissible;

c.    The Respondent has breached its obligation under Article 10(1) of the ECT by failing to accord fair and equitable treatment to NOH 1's and NOH 2's investments in their respective Offshore Wind Projects;

d.    The Respondent has breached its obligation under Article 13(1) of the ECT by taking measures having effect equivalent to expropriation of NOH 2's investments in its Offshore Wind Projects;

e.    The Respondent is ordered to compensate NOH 1 for the loss and damage caused to NOH 1's investments in its Offshore Wind Projects as a result of the Respondent's breach of Article 10(1) of the ECT, in the amount of EUR 61,400,000.00;

f.    The Respondent is ordered to compensate NOH 2 for the loss and damage caused to NOH 2's investments in its Offshore Wind Projects as a result of the Respondent's breaches of Article 10(1) and 13(1) of the ECT, in the amount of EUR 179,546,773.55;

g.    The Respondent is ordered to pay pre-award interest on the amounts awarded to NOH 1 and NOH 2 in sub-paragraphs (e) and (f) above as of 18 December 2013 at a rate of 3 percent per annum until the date of this Award, compounded yearly;

h.    The Respondent is ordered to pay post-award interest on the amounts awarded to NOH 1 and NOH 2 in sub-paragraphs (e) and (f) above at a rate of 3 percent per annum, payable as of 60 days from the date of this Award until the date of payment of such amounts in full, compounded yearly;

i.    The Parties shall bear and equally share the fees and expenses of the Tribunal and the costs of the ICSID facilities;

j.      The Respondent is ordered to pay the Claimants the costs incurred by the Claimants in relation to this proceeding, in the amount of USD 368,500, GBP 548,577.33 and EUR 4,879,218.32, with interest at the rate of 3 percent per annum, compounded yearly, and payable from 60 days from the date of this Award;

k.      The Respondent is entitled to deduct, upon payment, from the compensation payable to NOH 2 pursuant to this Award, any further compensation paid to any of the NOH 2 Project Companies pursuant to Section 10a of the 2020 Offshore Wind Energy Act, in addition to the amount of EUR 3,278,226.45 already paid and deducted from this Award; or alternatively, if any further compensation is to be paid to any of the NOH 2 Project Companies after payment by the Respondent of the amounts due to the Claimants under this Award, the Respondent is hereby directed to inform the payer of its right to receive the corresponding sums due pursuant to this Award and NOH 2 is directed to confirm and/or instruct the payer that payment should be made to the Respondent. In the event any payment is nonetheless made, the Tribunal hereby declares that NOH 2 is under an obligation to transfer, on behalf of the NOH 2 Project Companies, any such payments to the Respondent, including for further reimbursement to a third party if appropriate; and

l.      All other claims and requests for relief are denied.

_____
Ms Judith Gill KC
Arbitrator

Date:    **DEC 1 7 2024**

_____
Prof Dr Maria Chiara Malaguti
Arbitrator
(*subject to the attached dissenting opinion*)

Date:

_____
Dr Veijo Heiskanen
President of the Tribunal

Date:

227

_____
Ms Judith Gill KC
Arbitrator

Date:

Prof Dr Maria Chiara Malaguti
Arbitrator
(*subject to the attached dissenting opinion*)

Date:

_____
Dr Veijo Heiskanen
President of the Tribunal

Date:

228

_____                    _____
        Ms Judith Gill KC                                Prof Dr Maria Chiara Malaguti
          Arbitrator                                              Arbitrator
                                                   (*subject to the attached dissenting opinion*)

Date:                                                       Date:




_____
        Dr Veijo Heiskanen
      President of the Tribunal

        Date:     **DEC 1 7 2024**

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the arbitration proceeding between

## STRABAG SE, ERSTE NORDSEE-OFFSHORE HOLDING GMBH AND ZWEITE NORDSEE-OFFSHORE HOLDING GMBH

Claimants

and

## FEDERAL REPUBLIC OF GERMANY

Respondent

**ICSID Case No. ARB/19/29**

─────────────────────────────────

# PARTIAL DISSENTING OPINION

─────────────────────────────────

Prof. Dr. Maria Chiara Malaguti, Arbitrator

8th December 2024

Summary of conclusions ..................................................................................................2

On the applicable legal standard under Article 10(1) ECT ............................................3

    Undertaking to encourage and create stable conditions and the State's right to regulate ....................4

    Legitimate expectations arising from general measures.................................................6

    Legitimate expectations of stability .............................................................................6

On the challenged measures..........................................................................................8

    The Legal Framework the Claimants relied upon at the time of the Investment ................................9

    Framing of O-NEPs in the Domestic Regulatory Context............................................12

    The 2017 Offshore Wind Energy Act ........................................................................13

Effects on the assessment of the Respondent's behavior under Article 13 .........................................14

1.      I am writing this Partial Dissenting Opinion under Article 48(4) of the ICSID Convention.

2.      It has been a privilege and a genuine pleasure to be part of the Arbitral Tribunal in this case. The deliberations have been enriching and rewarding, as well as intellectually honest. While we reached consensus on most of the findings, I found myself in disagreement with the assessment of the circumstances under the FET Standard in the end. Since it seems to me that this divergence derives essentially from a different reading of the scope of a State's undertakings under Article 10(1) ECT (first and second sentence) against its right to regulate, it is worth trying to express how I assess the facts of the dispute under my understanding. As this is a controversial issue that led various tribunals to diverge in their findings under Article 10(1) ECT, and without jeopardizing the integrity of the Award issued by the Tribunal Majority by any means, I feel it is my duty to express my dissent where in my view it is relevant to the interpretation of the ECT and international investment law in general.[1]

**Summary of conclusions**

3.      I concur with my colleagues in the assessment of the Respondent's behaviors as for the claims linked to the GFT (Award, §§380-393).

4.      I also concur with my colleagues in the assessment of the Respondent's behaviors related to the Offshore Wind Projects under the Full Protection and Security Standard (Award, §§484-490) and the Non-Impairment Standard (Award, §§508-517).[2]

5.      I instead diverge in the assessment of the challenged measures under Article 10(1) ECT and, more precisely, the application of the FET Standard. Whether analyzed in its own right under the FET Standard or as part of investors' legitimate expectations, my interpretation differs as to the scope of the "stability undertaking" in relation to the State's right to regulate. The difference surfaces primarily in the actual assessment of both the challenged measures against the State's undertaking

---

[1] "*An investment treaty arbitrator should dissent where he or she discerns a principled basis to do so*", Laurence Shore & Kenneth Juan Figueros, *Dissents, Concurrences and a Necessary Divide Between Investment and Commercial Arbitration*, 3 Global Arb. Rev. 18, 20 (2008), footnote 22.

[2] To avoid any misunderstanding, I notice that some statements of the Tribunal Majority's assessment under the FET Standard on which I dissent, are referred to under the FPS and the Non-Impairment Standards. However, these statements do not affect the overall reasoning and findings of the Tribunal Majority under these two Standards, which are actually reinforced by the fact that, despite the reading of some behaviors as infringing Article 10(1) (and Article 13) ECT, the challenged measures did not amount to violation of the FPS and Non-Impairment Standards.

to encourage and create stable conditions for the investors, and what the Claimants should have reasonably expected at the time of making the investment.

6.    As I shall describe, I would conclude that the Respondent violated the FET Standard under Article 10(1) ECT when, in 2017, it adopted the Renewable Energy Sources Act (Award, §136) without any form of compensation for those investors that had legitimately relied on the previous mechanisms for authorization and had taken active steps as well as undertaken exchanges with the regulator (and other relevant stakeholders) to follow such previous procedure, and accomplish the various different steps they were allowed to in order to (hopefully) achieve the final goal, but could not participate in the new compulsory tendering process. This constituted a radical change in the regulation that, although in furtherance of public interest, did not proportionately protect the positions of investors that had been legitimately acquired under the previous mechanism. In my understanding, all acts and behaviors before the 2017 Renewable Energy Sources Act were instead legitimate manifestations of the State's right to regulate, which did not constitute *per se* a radical change, were proportionate, and would not come as totally unexpected to investors.

7.    In the light of my assessment of the Respondent's acts and behaviors when judging under FET, my analysis under the expropriation standard would also differ from that of the Tribunal Majority. I agree that the Respondent should be held liable under Article 13 ECT for creeping expropriation, but I consider that this was produced through a series of acts and behaviors which were legitimate *per se*, and that ultimately culminated with the 2017 Renewable Energy Sources Act, which crystallized the expropriation and thus led to the complete deprivation of the Claimants' investment. In the absence of such Act, expropriation would not have occurred.

8.    In the light of my assessment, it is apparent that the point in time for the initiation of the violations under both Article 10(1) and Article 13 ECT would differ from that established by the Tribunal Majority and be set at the time of adoption of the 2017 Offshore Wind Energy Act. This would affect also the valuation date, to be postponed to early 2017.

**On the applicable legal standard under Article 10(1) ECT**

9.    By concurring with the Tribunal Majority that the first sentence of Article 10(1) ECT forms part of the context of the second sentence of Article 10(1), and thus informs and defines the FET Standard (Award, §368), I feel the need firstly to elaborate on the relationship between the State's undertaking to encourage and create stable conditions under Article 10(1) and its right to regulate.

3

*Undertaking to encourage and create stable conditions and the State's right to regulate*

10.    Where an investor makes an investment in a domestic energy sector, relying on the regulatory and legal framework at the date of the investment for its financing and economic feasibility analysis, it is vulnerable to future regulatory changes. The purpose of Article 10(1) ECT is to assuage investors' fears: the Contracting States undertake to promote a "stable" legal framework commensurate with the relevant energy sector or source. This is why the ECT places greater emphasis on stable conditions for investments than other treaties.[3]

11.    However, the undertaking to encourage and create stable conditions is not absolute. National legislation and regulation are dynamic by nature, and States enjoy a sovereign right to amend their laws and regulations and to adopt new ones in furtherance of the public interest. In the global energy transition necessary to achieve the climate change mitigation and adaptation goals pursuant to the UN Framework Convention on Climate Change ("UNFCCC") and agreements thereunder, it is critical that States are understood to continue to enjoy such sovereign rights. The ECT's stable conditions requirement therefore does not operate as a stabilization clause requiring States to freeze their regulatory framework for foreign investors.[4]

12.    Furthermore, when a market – as the one at stake in the relevant years – is still immature, the dynamic nature of regulation is even more impelling, and the room for the State powers to regulate even wider.

13.    This general understanding has been expressed by several tribunals in previous cases. In *Silver Ridge*, the tribunal for instance clarifies:

> "In order to draw the proper line between acceptable adaptations and non-acceptable alterations of the legal framework, in the Tribunal's view, the ECT requires that a balance be struck between two principles [...]: on the one hand, the interest of investors in a stable and transparent legal framework [...], and on the other, the host State's sovereignty, notably

---

[3] I am using almost *verbatim* the language found in *Encavis*, a recently issued award that Parties did not submit, but which is publicly available: *Encavis AG and others v. Italian Republic*, ICSID Case No. ARB/20/39, Award, 11 March 2024 (Prof. Juan Fernández-Armesto, Ms. Wendy Miles KC, Mr. Alexis Mourre) ("*Encavis*"), §651.

[4] *Encavis*, §652.

including the ability to adapt its legislative and regulatory framework to new developments, which are unavoidable in a long-term cooperation."[5]

14.    The *Antaris* tribunal adds:

> "The host State is not required to elevate the interests of the investor above all other considerations, and the application of the FET standard allows for a balancing or weighing exercise by the State and the determination of a breach of the FET standard must be made in the light of the high measure of deference which international law generally extends to the right of national authorities to regulate matters within their own borders."[6]

15.    Against the background of these cases, with which I agree, the State's undertaking to encourage and create stable conditions within its legal framework must be read jointly and balanced with the State's sovereign right to manage and modify its regulatory regime and adapt it to changing circumstances.

16.    Tribunals adjudicating investors' claims that the stable conditions requirement was breached, have variously considered and weighed these principles. As summarized in *Encavis*:

a.    One factor of special relevance is whether the regulatory change is radical or fundamental in character. If the amendment provokes a radical change in an existing regulatory regime, it is more likely to result in a violation of the stable conditions requirement. The assessment of whether a change meets these characteristics is not a determination to be made in the abstract, but a judgement which requires that the tribunal consider the specific circumstances of the case.

b.    A second factor is whether the State acted in public interest and exercised its regulatory powers proportionally. Regulatory changes adopted proportionally to respond to public interest concerns will not fall afoul of the stable conditions' requirement.[7]

---

[5] RL-0260, *Silver Ridge Power BV v. Italian Republic*, ICSID Case No. ARB/15/37, Award, 26 February 2021 (Judge Bruno Simma, Judge O. Thomas Johnson, Prof. Bernardo M. Cremades) ("*Silver Ridge*"), §411. References to other previous awards are found at §§412-413 of the *Silver Ridge* award.
[6] CL-0130, *Antaris GmbH and Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (Lord Collins of Mapesbury, Mr. Gary Born, H.E. Judge Peter Tomka) ("*Antaris*"), §360(9). The *Antaris* tribunal cites various other awards to the same end at footnote 544.
[7] *Encavis*, §656.

5

*Legitimate expectations arising from general measures*

17.   Secondly, I would like to quickly preface the elements included under legitimate expectations according to the FET Standard to further assess the expectations of the Claimants.

18.   As is well-known, legitimate expectations are usually meant to comprise three elements: a) behavior by the State, or by entities whose conduct is attributable to the State, which has given rise to legitimate expectations on the part of the investor, to be assessed at the time the investor decided to make the investment; b) reliance by the investor on those expectations when making the investment; and c) subsequent measures adopted by or attributed to the State which frustrate the investor's expectation.

19.   As for State behaviors apt to create legitimate expectations, although it is still somehow controversial, various tribunals agree that legitimate expectations may in principle arise either from specific commitments addressed by the State to the specific investor, or from general legislation created with the purpose of attracting investments. However, when legitimate expectations arise from a general measure, tribunals generally underline that the measure must have been created with the specific purpose of attracting investment, so that not all general measures would *per se* be apt to generate legitimate expectations.

20.   In *Silver Ridge*, the tribunal recognized the possibility for a State to create legitimate expectations by enacting general legislation, emphasizing the characteristics that such general legislation should have to constitute a valid basis for legitimate expectations:

> "[A] State may make specific commitments to investors also by virtue of legislative or regulatory acts which are not addressed to particular individuals, provided that these acts are sufficiently specific regarding their content and their object and purpose. In this context, the Tribunal considers the creation of legitimate expectations more likely where a State has adopted legislative or regulatory acts 'with a specific aim to induce […] investments'."[8]

*Legitimate expectations of stability*

21.   As for the reliance by the investor, the main issue in this case seems to be whether, once legitimate expectations by the Claimants were proven, Article 10(1) ECT would be considered violated by

---

[8] RL-0260, *Silver Ridge*, §408.

6

the sole fact that such expectations were infringed, or whether also in this case the public interest motivation, reasonableness and proportionality of the State's behavior would justify the measure.

22.    In my understanding, the undertaking by the State to ensure stable conditions is subject to the same limits as when it is considered on its own under FET.

23.    The *Blusun* tribunal, commenting on the prior case *Charanne*,[9] states:

> "It [the *Charanne* tribunal] concluded:
>
>> 'under international law ... in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory framework such as that at issue in this arbitration is to not be modified at any time to adapt to the needs of the market and to the public interest'.
>
> But this did not mean the ECT imposed no constraint on legislative change:
>
>> 'an investor has a legitimate expectation that, when modifying the existing regulation based on which the investment was made, the State will not act unreasonably, disproportionately or contrary to the public interest'."[10]

24.    The *Blusun* tribunal also describes the inherent limits in the assessment by a tribunal of the State's right to regulate:

> "Of the three criteria suggested in *Charanne*, 'public interest' is largely indeterminate and is, anyway, a judgement entrusted to the authorities of the host state. Except perhaps in very clear cases, it is not for an investment tribunal to decide, contrary to the considered view of those authorities, the content of the public interest of their state, nor to weigh against it the largely incommensurable public interest of the capital-exporting state. The criterion of 'unreasonableness' can be criticized on similar grounds, as an open-ended mandate to second-guess the host state's policies. By contrast, disproportionality carries in-built limitations

---

[9] RL-0263, *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Case No. 062/2012, Award, 21 January 2016 (Mr. Alexis Mourre, Prof. Dr. Guido Santiago Tawil, Dr. Claus Von Wobeser) ("*Charanne*").
[10] RL-0292, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (Judge James Crawford AC, Dr. Stanimir Alexandrov, Prof. Pierre-Marie Dupuy) ("*Blusun*"), §317.

and is more determinate. It is a criterion which administrative law courts, and human rights courts, have become accustomed to applying to governmental action."[11]

25. On the other hand, the tribunal in *Antin* offers some indications on how to establish when a change is radical and what reliance of investors deserves to be protected:

> "[...] considering the context, object and purpose of the ECT, the Tribunal concludes that the obligation under Article 10(1) of the ECT to provide FET to protected investments comprises an obligation to afford fundamental stability in the essential characteristics of the legal regime relied upon by the investors in making long-term investments. This does not mean that the legal framework cannot evolve or that a State Party to the ECT is precluded from exercising its regulatory powers to adapt the regime to the changing circumstances in the public interest. It rather means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered —i.e., stripped of its key features— as applied to existing investments in ways that affect investors who invested in reliance on those regimes."[12]

26. The criteria used to analyze the "stability undertaking" both on its own under FET and through the lens of the investors' legitimate expectations seem to coincide.

27. Either as an autonomous standard embedded in FET, or as a component of legitimate expectation, it is my understanding that the undertaking of encouraging and creating stable conditions for investments should thus be applied within the abovementioned boundaries.

**On the challenged measures**

28. As stated in the Award, "the Claimants' case is that the Respondent breached the FET standard, in relation to both the GFT and the Offshore Wind Projects, by dismantling the key components of the regulatory framework governing offshore wind energy. According to the Claimants, these changes were implemented by four sets of measures: (i) the Development Freeze; (ii) the shift to a centralized grid connection system; (iii) the reduction of expansion targets and halting the

---

[11] RL-0292, *Blusun*, §318.
[12] CL-0033, *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (Dr. Eduardo Zuleta, Mr. J. Christopher Thomas KC, Prof. Francisco Orrego Vicuña) ("*Antin*"), §532.

development in areas further away from shore; and (iv) the introduction of a compulsory tender procedure by way of the 2017 Renewable Energy Sources Act and the Offshore Wind Energy Act" (Award, §371).

29.    The Tribunal Majority finds that "the Development Freeze was a legitimate regulatory measure at the time it was enacted and did not amount to a breach of the FET standard in relation to the Claimants' Offshore Wind Projects, regardless of whether the applicable FET standard is stated in terms of legitimate expectations, regulatory stability or proportionality" (Award, §398).

30.    The Tribunal Majority also finds that "the 2012 Energy Act substantially modified the system for obtaining grid connections by introducing the annual O-NEPs for the EEZ in the North Sea" (Award, §400). However, "the centralized grid connection system introduced by [this] Act was on its face a justified and legitimate measure in view of the challenges faced by the offshore wind energy industry at the time, and did not necessarily have to result in additional delay in granting grid connections" (Award, §422).

31.    I agree with these findings.

32.    Conversely, the Tribunal Majority considers that "the way in which the O-NEPs were in fact implemented did result in substantial additional delay" (Award, §422). Moreover, the Claimants had "reasonably expected at the time they made their investments that the delivery time for a grid connection indicated in the 2009 BNA Position Paper would not be unreasonably delayed" (Award, §423). Such expectations would however be frustrated "when O-NEPs 2013, 2014 and 2015 established grid connection dates that were much later than the delayed dates envisaged by TenneT at the time when the Development Freeze was introduced" (Award, §424). The precise moment for the violation is set in March 2015, when a BSH Circular endorsed the priority given by the O-NEPs to projects closer to shore regardless of their stage of development (Award, §426).

33.    While I agree with the further finding that the policy change enacted by 2014 Renewable Energy Sources Act did not amount to a breach of FET (Award, §428), I disagree with the assessment made of the legitimate expectations of the Claimants on which the violation is based, on the one side, and the illegitimacy of the O-NEPs under the FET Standard, on the other.

*The Legal Framework the Claimants relied upon at the time of the Investment*

34.    The Claimants made their investment between 2010 and 2011. At that time the 2009 Spatial Planning Ordinance (Award, §97), the 2009 Renewable Energy Sources Act (Award, §91) and the

2002 Offshore Installations Ordinance (Award, §86) were all in place. Such measures were the result of (in some cases repeated) amendments to the original acts of a decade before. Some regulatory changes had thus already occurred since the very first regulatory measure governing offshore wind energy projects in Germany's EEZ, the 1997 Offshore Installation Ordinance, some of which not irrelevant in regulating the mechanisms for obtaining connection to the grid and the consequent rights of applicants (Award, §§78 ff.).

35.    In particular, the objective of the 2009 Spatial Planning Ordinance was to facilitate the economic and scientific use of the EEZ, while ensuring the safety and ease of maritime navigation and protection of the marine environment. It was based on the establishment of priority areas for each of the activities to be ensured (shipping, exploitation of non-living resources, pipelines and submarine cables, marine scientific research, energy production – wind energy in particular – fisheries and mariculture, and marine environment), and set holistic guidelines for spatial (joint) development. Some areas would be exclusively devoted to specific activities, and in its entirety the plan would have to respond and support the Respondent's Sustainability Strategy. The 2009 Spatial Planning Ordinance was indeed based *inter alia* on the "Strategy of the Federal Government for the Use of Wind Energy at Sea", which was in turn part of the Federal Government's Sustainability Strategy. The Strategy on Wind Energy at Sea was oriented in particular towards exploiting the potential for wind energy as quickly as possible.[13]

36.    In this context, the Ordinance "identified three priority areas for the development of offshore wind projects, each located relatively close to the coastline. In these areas, the production of wind energy was granted priority over other spatially significant uses, and spatially significant planning, measures and projects that were not compatible with the function of the wind energy priority areas were prohibited" (Award, §98).

37.    The measures described are all general in nature, and do not address the Claimants specifically, nor an easily defined specific category of operators.

38.    As stated, in my understanding legitimate expectations can arise from general measures provided that they were created with the purpose of attracting investments ("legislative or regulatory acts 'with a specific aim to induce [...] investments'": *Silver Ridge, supra*, at §20). I do not believe this was the case: the measures were addressed without distinction to anyone wanting to enter the wind energy market, either national or foreign, and irrespective of status. They also included incentives

---

[13] RL-0198, 2009 Spatial Planning Ordinance, Section 2.3, p. 4

to energy production (but this did not directly concern the issue of the connection to the grid, which was a pre-condition to the obtainment of an authorization leading to incentives), of course, but if establishing a mechanism of incentives by law aimed at the expansion of a new market were enough to satisfy the condition, basically any measure in the renewable energy sector would be qualified as a commitment creating legitimate expectations.

39.   Moreover, the legislation in force at the time of the investment was already the result of progressive amendments to the regulatory framework, and thus investors should have been aware of the continuous changes, at least if reasonably within the general principles applicable to the sector. This would also include the 2009 Spatial Planning Ordinance, which already included divisions into zones and priorities, as well as the principles under which precedence was to be given to projects or areas where the potential for wind energy could seemingly be exploited as quickly as possible. Finally, it was clear that any plan had to be consistent with the overall sustainability goals established in the Respondent's Sustainability Strategy, going beyond wind energy production.

40.   I also dissent on the reliance that could be derived from the 2009 BNA Position Paper.

41.   The Tribunal Majority considers that this was a non-binding instrument, and did not create a legal right to a 30-months delivery time for grid connection, as indicated in the Position Paper itself (Award, §422). I agree.

42.   I also agree with the statement that "it [the 2009 BNA Position Paper] […] was an authoritative indication […] of the expected timeframe at the time of its adoption" (Award, §422).

43.   However, in my understanding this statement cannot make the Position Paper amount to a valid basis for legitimate expectations under the ECT. The 2009 BNA Position Paper was a general, non-binding instrument addressing the market at large and offering general indication with an apparent double function: providing the agency with interpretation of the law (the 2009 Energy Act) and offering simultaneous guidance on conditions to be satisfied to obtain a grid connection under the circumstances. I do see that these kinds of documents issued by the relevant authority intend to reduce uncertainty and provide guidance in the market, thus generating some level of expectation on their content, but they cannot by themselves be read as a commitment on which to base legitimate expectations to be protected under the FET, in the light of their general nature and the fact that they can be overcome and are clearly meant to address the specific circumstances at the time they are issued.

44.    This does not mean that the Respondent was thus free to behave under no constraints. Following *Blusun* (*supra*, §23), "an investor has a legitimate expectation that, when modifying the existing regulation based on which the investment was made, the State will not act unreasonably, disproportionately or contrary to the public interest". Or, applying the stability standard autonomously, the Respondent must act in public interest, exercise its regulatory powers proportionally and not disrupt systems under which the Claimants had made their investment (*supra*, §16).

*Framing of O-NEPs in the Domestic Regulatory Context*

45.    The various measures adopted from 2012 to 2016 did not depart from the principles established in the measures in force at the time of making the investment. Changes occurred, also relevant, but they did not disrupt the general regulatory framework. I concur with the Tribunal Majority in reaching this conclusion, on which I do not need to elaborate further.

46.    O-NEPs were subsidiary measures (adopted by the BNA based on a proposal made by the TSO) implementing a legitimate legislative act (the 2012 Energy Act), found not to be in violation of the ECT. They were legitimately adopted within the competences of the BNA. Furthermore, they established their plan within the boundaries set by the 2012 Energy Act:

> "Section 17b – Offshore grid development plan
>
> […]
>
> (2) […] Criteria for the timing of implementation may include, in particular, the progress of realization of the offshore plants to be connected, the efficient use of the connection capacity to be built, the spatial proximity to the coast, and the planned commissioning of the grid connection points."[14]

47.    The BNA did apply these criteria by legitimately choosing to elaborate its plan based primarily on spatial proximity to the coast. I dissent from the statement by the Tribunal Majority that the prioritization of this criterion against the others established in Section 17b(2) was an indication of illegitimate behavior (Award, §425). Criteria were not listed in order of priority, and nothing indicated that the authority would not be able to rely primarily on any of these ("*may* include").

---

[14] C-0035.

48.     Furthermore, the choice is in line with the overall regulation of the EEZ, including the principles expressed in the measures in force at the time of the investment, including the 2009 Spatial Planning Ordinance. The O-NEPs also seem to be in line with the general sustainability principles established in the Sustainability Strategy of the Federal Republic of Germany and may also respond to the criteria of an efficient use of the connection capacity to be built.

49.     On the other hand, I would follow the indication by the *Blusun* tribunal not to second-guess the host State's policies, as it is impossible to establish whether the choice of one of the other criteria would have produced less adverse consequences on investors or would have been more efficient. They might have produced less adverse consequences on the Claimants, but possibly more adverse consequences on other investors, in the light of the general constraints.

50.     O-NEPs were general regulatory enactments properly approved and enacted in accordance with municipal administrative law, intended to apply to an entire, heavily regulated sector, and promulgated in the furtherance of the common good, in compliance with a set of legislative acts consistent with the ECT. In this context, I would consider them reasonable and a proportionate response to the public interest that was being pursued.

*The 2017 Offshore Wind Energy Act*

51.     Finally, the Tribunal Majority finds that the 2017 Offshore Wind Energy Act (the "2017 Act") "formalized as a matter of law the effects of the March 2015 Circular" (Award, §429).

52.     In light of my reading of the O-NEPs within the domestic regulatory framework, I cannot share this finding. The 2017 Act did terminate the plan approval process and replaced it with a new, mandatory centralized tender procedure. This was a radical change, which was further complemented by a modification in the remuneration regime as it eliminated the feed-in tariff (Award, §430). However, I cannot share the finding that the 2017 Act merely formalized the effects of measures already taken earlier "as the approval processes had *de facto* been suspended already since 2013-2014 for projects located further away from shore" (Award, §430).

53.     O-NEPs were secondary measures, which could always be modified by a legislative act. The suspension operated by the O-NEPs could have been interrupted in any way and the connection procedures reinstated. In fact, if the 2017 Act had not modified the procedure for obtaining the connection and excluded plants such as those of the Claimants, this or any other alternative legislative act could have instead restored the Claimants to their rights. The delays could have been

13

cushioned. It is the 2017 Act, as a legislative act that radically changes the method of obtaining the connection and that excludes plants designed far from the coast, that determines the effective impossibility for the Claimants to continue with the procedures for requesting the necessary authorizations. The previous delays are the factual, not legal, cause of the exclusion of the Claimants' plants, and could still have been remedied.

54.    I do not intend to ignore in this way the effects of the long delays produced by the O-NEPs, and the vanishing of efforts and activities of the Claimants because of the *de facto* blockage produced by the progression of the various challenged measures. However, *per se* such measures could be considered reasonable and proportionate until the definitive change of regime occurred and there was no longer any possibility of curing the previous delays or blockages.

55.    I wonder whether it would be possible to state that the breach of Article 10(1) ECT by the 2017 Act could be confirmed and reinforced by the circumstances of the case. The progression of measures undertaken before its enactment, *de facto* making the participation to the new system by the Claimants impossible, contributed to the fact that the change in regulation was in breach of Article 10(1). If it is more likely that a change results in a violation of the stable conditions requirement if it provokes a radical change in an existing regulatory regime (*Encavis*, *supra*, §16), such likeness may indeed be reinforced by the context formed by the previous State acts immediately preceding the regulation of the grid connection.

**Effects on the assessment of the Respondent's behavior under Article 13**

56.    At the outset, I agree with the statement by the Tribunal Majority that a breach of Article 10(1) ECT does not entail that the measures in violation also amount, *ipso jure*, to an unlawful expropriation (Award, §460).

57.    I equally agree that the regulatory measures taken by Germany during the 2012-2017 period gradually resulted, as a matter of fact, in a total loss of the value of the NOH 2 projects (Award, §461).

58.    However, consistent with its conclusions under Article 10(1), the Tribunal Majority considers that what amounts to creeping indirect expropriation was composed by a series of administrative acts in violation of the ECT starting in 2013 (Award, §462).

59.    I disagree.

14

60.   I rather qualify the situation as entailing legitimate State measures whose progression led to expropriation which crystallized only with the adoption of the 2017 Act, as the act that indeed caused the definitive loss of value of the investment.

61.   UNCTAD has defined a creeping expropriation as a sub-category of indirect expropriation formed by an "incremental encroachment on one or more of the ownership rights of a foreign investor that eventually destroys (or nearly destroys) the value of his or her investment or deprives him or her of control over the investment." Thus, "[a] series of separate State acts, usually taken within a limited time span, are then regarded as constituent parts of the unified treatment of the investor or investment."[15]

62.   Indeed, the decisive factor in classifying indirect expropriation as a creeping expropriation is whether the expropriation results from a series of acts, each of which by itself is not sufficient to crystallize an expropriation:

> "By definition, creeping expropriation refers to a process, to steps that eventually have the effect of an expropriation. If the process stops before it reaches that point, then expropriation would not occur. This does not necessarily mean that no adverse effects would have occurred. Obviously, each step must have an adverse effect but by itself may not be significant or considered an illegal act. The last step in a creeping expropriation that tilts the balance is similar to the straw that breaks the camel's back. The preceding straws may not have had a perceptible effect but are part of the process that led to the break."[16] [emphasis added]

63.   Finally, since in my understanding the expropriation crystallized with the 2017 Offshore Wind Energy Act (if the process had stopped before it reached that point, then expropriation would not have occurred: *supra*, §62), and the violation thus occurred at that point in time, I consider that the valuation date should be at a time immediately preceding such crystallization, thus the same as the validation date in relation to the violation of Article 10(1) ECT.

---

[15] United Nations, *Expropriation: UNCTAD Series on Issues in International Investment Agreements* II (2012), p. 11.
[16] *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007 (Dr. Andrés Rigo Sureda, Judge Charles N. Brower, Prof. Domingo Bello Janeiro), §263.

64.    I thus conclude that the Respondent violated Article 10(1) and Article 13 ECT by adopting the 2017 Offshore Wind Energy Act, while no violation occurred by prior measures, and that the validation date under both legal bases should be established in early 2017.

Prof. Dr. Maria Chiara Malaguti

16