# Exhibit C



**TO THE SECRETARY-GENERAL OF THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**RELATING TO THE ARBITRATION PROCEEDINGS**

**STRABAG SE**

**ERSTE NORDSEE-OFFSHORE HOLDING GMBH AND**

**ZWEITE NORDSEE-OFFSHORE HOLDING GMBH**

CLAIMANTS

-v-

**THE FEDERAL REPUBLIC OF GERMANY**

RESPONDENT

ICSID CASE NO. ARB/19/29

_____

**RESPONDENT'S REQUEST FOR RECTIFICATION**

**31 JANUARY 2025**

_____

Noerr Partnerschaftsgesellschaft mbB
Börsenstraße 1
60313 Frankfurt am Main
Germany

‖‖N

(1) Respondent herewith respectfully submits its Request for Rectification of the award rendered on 18 December 2024 in the arbitration proceedings *Strabag SE and others v. Federal Republic of Germany* (ICSID Case No. ARB/19/29) ("**Award**") pursuant to Art. 49 (2) ICSID Convention and Rule 49 (1) ICSID Rules of Procedure for Arbitration Proceedings ("**ICSID Arbitration Rules**") ("**Request for Rectification**"). In accordance with Rule 49 (2) ICSID Arbitration Rules, the Request for Rectification is addressed to the Secretary-General only.

(2) The Federal Republic of Germany respectfully disagrees with the findings of the Award, specifically the decisions on jurisdiction, liability, quantum and costs, which it finds to be wrong as a matter of fact and law.

(3) Nevertheless, the purpose of this Request for Rectification is to rectify specific and obvious errors in the Award, as listed below. Indeed, the Award is riddled with clerical, arithmetical and other errors within the meaning of Art. 49 (2) ICSID Convention and Rule 49 (1) ICSID Arbitration Rules, as set forth in the following paragraphs.

(4) According to Art. 49 (2) ICSID Convention,

*"the Tribunal upon the request of a party* […] *shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award* […]. *The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered."*

(5) In turn, Rule 49 (1) ICSID Arbitration Rules, which sets out the procedure to be followed for rectification of an award refers more generally, to

*"any error in the award which the requesting party seeks to have rectified"*.

(6) In accordance with Rule 49 (1) ICSID Arbitration Rules, the following request states the errors in the Award which Respondent seeks to have rectified, starting with the clerical errors (**A.**), moving on to the arithmetical errors (**B.**) and then other errors (**C.**). In view of the sheer number of errors contained in the Award, which notably also impact the financial aspects and the operative part of the Tribunal's decision, Respondent respectfully requests a stay of enforcement (**D.**).

**A.**
**CLERICAL ERRORS**

(7) The Award suffers from many clerical errors, which require rectification pursuant to Rule 49 (1) ICSID Arbitration Rules.

(8) For ease of rectification, Respondent has listed all clerical errors in an errata sheet, which is attached to this letter as

**Annex 1**.



**B.**
**ARITHMETICAL ERRORS**

(9)     The Award suffers from arithmetical errors, which require rectification pursuant to Rule 49 (1) ICSID Arbitration Rules. There are discrepancies between the Financial Statements and the Award (**I.**). The calculation of the reimbursable amounts in the cost decision is inconsistent (**II.**) Moreover, the cost decision is incomplete, since it does not rely on up-to-date figures (**III.**)

**I.     Discrepancies between Financial Statement and Award**

(10)    There is a discrepancy between the arbitrators' fees and expenses as featured in the Financial Statement and the Award. According to the Financial Statement dated 18 December 2024 and attached for ease of reference as **Annex 2**, the fees and expenses of Prof Dr Maria Chiara Malaguti amount to USD 231,194.55 as of 29 November 2024. However, in the breakdown of the arbitration costs in para. 681 of the Award, the fees and expenses of Prof Dr Maria Chiara Malaguti are set at USD 218,552.09.

(11)    In addition, there is a further discrepancy between the advances paid to ICSID by both Parties as featured in the Financial Statement and the Award. According to the Financial Statement and the correspondence received by Respondent from ICSID, the advances paid by the Parties amount to USD 675,000.00 each. However, according to para. 661 and 673 of the Award – which in turn relies on the cost submissions of the Parties – , the advances paid to ICSID only amount to USD 550,000.00 for Claimants (including the filing fee, which does not appear in the Financial Statement) and USD 525,000.00 for Respondent.[1] It appears that the Award does not account for the most recent payment request by ICSID of 23 May 2024, by which ICSID requested the payment of an additional advance of USD 150,000.00 each from both Parties.

(12)    Respondent respectfully requests that the discrepancies between the Financial Statement and the Award be investigated and corrected.

**II.    Erroneous Calculation of Reimbursable Amounts in Cost Decision**

(13)    Respondent notes that the Tribunal in para. 683 of the Award decided to order the Parties to "*bear and equally share the fees and expenses of the Tribunal and the costs of ICSID facilities*", as "*these costs arise directly out of the Parties' arbitration agreement and thus constitute costs that the Parties have agreed to bear, before any arbitration proceedings, and thus regardless of the outcome of this case.*" Accordingly, the Tribunal's decision is that the Parties shall bear the fees and expenses of the Tribunal and the administrative fees and expenses of ICSID equally, and neither Party shall have a claim for reimbursement against the other Party with respect to such costs.

(14)    In para. 686 of the Award, the Tribunal determines that, with respect to legal costs (i.e. the costs of legal representation, costs of experts, costs of translation and in-house costs),

---

[1]     In Respondent's Statement of Costs, the advances paid to ICSID were converted to EUR 479,026.67.

‖‖N

"*the Respondent should bear 67 percent of the Claimants' legal costs, and, conversely, the Claimants should bear 33 percent of the Respondent's legal costs.*"

(15)   Nonetheless, in para. 687 of the Award, the Tribunal states that "*Claimants are entitled to their costs of arbitration in the amount of USD 368,500* […]." This is manifestly incorrect. The amount of USD 368,500.00 evidently constitutes 67 percent of Claimants' advances paid to ICSID in the amount of USD 550,000.00 (although, in reality it seems Claimants paid an amount of USD 675,000.00 to ICSID). However, according to para. 683 of the Award, the ICSID costs should be borne by the Parties equally and there should not be any reimbursement in view of those costs. Therefore, the statement regarding the alleged amount Claimants are "*entitled to*" according to para. 687 of the Award, on the one hand, and para. 683, on the other hand, is inconsistent and incorrect.

(16)   Due to the same calculation error, Section IX. lit j. of the Award (i.e. the operative part of the Award) is incorrect and needs to be rectified.

**III.    Incomplete Cost Decision**

(17)   The Award's cost decision is based on cost statements dated 14 April 2023. This presents an arithmetical error, as the Award does not take into account that the proceedings were only closed on 9 September 2024, i.e., one and half a year later. Hence, new updated cost statements including the period from 14 April 2023 through 9 September 2024 should be included in the Award. It should also reflect Prof Dr Maria Chiara Malaguti's most recent fee declaration.

**C.
OTHER ERRORS**

(18)   The Award is impaired by many other errors within the meaning of Rule 49 (1) ICSID Arbitration Rules. Already the structure of the Award must be criticized, as it neither respects the correct chronological order of events, nor presents a coherent structure regarding the issue of liability (**I.**). The Table of Abbreviations contains inconsistencies, which confuse the reader and obfuscate the meaning of the Tribunal's reasoning (**II.**).

(19)   In addition, the Award includes an erroneous and obviously incomplete presentation of the factual background of the dispute (**III.**) In many instances, Respondent's position for the most part has been summarized to the point of distortion and/or misrepresentation and not been adequately presented at all (**IV.**). The Award entirely omits the analyses of Respondent's German legal experts (**V.**) The summary of the June 2020 Decision by the German Constitutional Court is so tendentious and rudimentary that it must be considered erroneous (**VI.**) In addition, the Award contains a clear misquotation of Claimants' arguments (**VII.**). The quantum section of the Award contains incomplete and incorrect considerations regarding the applicable valuation method (**VIII.**) Also, the Tribunal's cost decision is inadequate and inconsistent with the Tribunal's findings on liability (**IX.**)

|||N

## I.  Confusing Structure of the Award

(20)  The structure of the Award is confusing with regard to both the presentation of the factual background (**1.**) as well as the presentation of the Tribunal's analysis on jurisdiction (**2.**) and liability (**3.**).

### 1.  Confusing Structure Regarding the Presentation of the Factual Background

(21)  In the Award, the events forming the basis of the dispute are presented in the wrong chronological order, which results in a confusing structure of the Award. Any reader is forced to jump back and forth in time.

(22)  Under the current structure of the Award, the Factual Background starts as follows:

III.  FACTUAL BACKGROUND .......................................................................... 17

A.  The Evolution of the Regulatory Framework Governing Offshore Wind Energy in Germany (1997-2012)........................................................................... 17

(1) The Development of the Regulatory Framework between 1997 and 2009 .... 17

a.  The 1997 Offshore Installations Ordinance ............................................... 17

b.  The 2000 Renewable Energy Sources Act ................................................. 18

c.  The 2002 Offshore Installations Ordinance ............................................... 19

d.  The 2004 Renewable Energy Sources Act ................................................. 20

e.  The 2006 Energy Act .................................................................................. 21

f.  The 2009 Renewable Energy Sources Act ................................................. 21

g.  The 2009 BNA Position Paper.................................................................... 22

h.  The 2009 Spatial Planning Ordinance ...................................................... 23

(23)  However, sections g. and h. need to be switched: While the 2009 Spatial Planning Ordinance is dated 21 September 2009, the 2009 BNA Position Paper is dated October 2009.

(24)  This error must be corrected in view of the importance of the issue. It is obvious that the chronological sequence of the events has been of utmost importance. A claimant who makes an investment in a dysfunctional market despite regular warning signs, presented in a correct chronological sequence, made a hazardous business decision and cannot have formed any legitimate expectations. A claimant who ignored a sequence of warning signs cannot claim legitimate trust.

### 2.  Confusing Structure Regarding Jurisdiction

(25)  The Award is confusing with respect to the structure regarding Section V. of the Award on Jurisdiction.

(26)  In para. 221 of the Award, the Tribunal states that Respondent had five arguments to support its position of the Tribunal not having jurisdiction *ratione materiae*:

||N

> *"(i) the Tribunal must consider both Article 1(6) of the ECT as well as Article 25(1) of the ICSID Convention when deciding whether there was a qualifying investment on behalf of the Claimants; (ii) Strabag's activities do not qualify as an investment under the ECT; (iii) Strabag's activities do not qualify as an investment under Article 25(1) of the ICSID Convention; (iv) Strabag's participation in NOH 1 and NOH 2 does not constitute an investment under Article 25(1) of the ICSID Convention; and (v) NOH 1 and NOH 2's operations do not constitute an investment under Article 25(1) of the ICSID Convention."*

(27) Thus, the Tribunal was classifying the arguments by giving them the roman symbols (i), (ii), (iii), (iv) and (v) as well as a short description of their content.

(28) However, when presenting these arguments in detail in paras. 224 et seq., the Tribunal does not stick to this enumeration approach. Instead of the five items announced in para. 221, the Tribunal proceeds to structure the Award in three items one of which has three sub-items:

> *"(i) the Tribunal must consider Article 1(6) of the ECT as well as Article 25(1) of the ICSID Convention together when determining whether the Claimants made an investment*
>
> *(ii) Strabag's activities do not qualify as an investment under the ECT*
>
> ***(iii)*** *Strabag's activities do not qualify as an investment under Article 25(1) of the ICSID Convention*
>
> ***(a)*** *Strabag's development of the GFT does not qualify as an investment under Article 25(1) of the ICSID Convention*
>
> ***(b)*** *Strabag's participation in NOH 1 and NOH 2 does not qualify as an investment under Article 25(1) of the ICSID Convention*
>
> ***(c)*** *The operations of NOH 1 and NOH 2's operations do not qualify as an investment under Article 25(1) of the ICSID Convention"* (emphasis added)

(29) This structure is confusing and requires rectification: Item (iii) is not even of substance, it remains completely empty. Nothing is said under item (iii). There is not even a roadmap. In addition, there are no items (iv) or (v) which would help the reader to see where the Tribunal discusses Respondent's arguments. Instead, new sub-items, (a), (b) and (c) are introduced, without any explanation to which other point they belong or how they relate to Respondent's arguments.

(30) The structure of the Award continues to be confusing with regard to the Claimants' arguments related to jurisdiction *ratione materiae* in paras. 250 to 276 of the Award. Here, the Tribunal also fails to keep the order, introducing new symbols. This again makes it impossible for a reader to relate the Tribunal's analysis to the presentation of Claimants' arguments.

‖‖N

### 3. Confusing Structure Regarding Liability

(31) The Award is also confusing when it comes to the structure of Section VI. of the Award regarding liability. The different sections do not have an equal structure, confusing the reader.

(32) Section VI.A. (2) presents the Tribunal's analysis on the alleged breaches of the Fair and Equitable Treatment Standard, and has two subsections, i.e.,

> *"a. Applicable legal standard* […]
>
> *b. The alleged breaches of the fair and equitable treatment standard.*"

(33) By contrast, Section IV.B., which presents the Tribunal's analysis on the alleged expropriations of Claimants' investments, does not feature the same subsections. The same issue arises for Section IV.C., presenting the Tribunal's analysis on the alleged breach of the Full Protection and Security Standard, and for Section IV.D., presenting the Tribunal's analysis on the alleged breach of the Non-Impairment Standard.

(34) This error should be corrected. It is necessary to clarify the legal standard that the Tribunal applies for all ECT standards that the Tribunal analyzed. This should be pointed out separately in the summary, at the very least that the applicable legal standard has been a disputed issue between the Parties.

(35) Section VII.A. (1) lit. b of the Award deals with the valuation date as presented by Claimants. Respondent has argued a different valuation date on several occasions.

(36) However, there is no corresponding section representing the alternative valuation date presented by Respondent. This is an error that needs to be corrected. The current wording of the Award creates the incorrect impression that Respondent agreed with Claimants' suggested valuation date, which is not the case.

### II. Errors in the Table of Abbreviations

(37) There are various imprecise entries (**1.**) and incorrect definitions of both TenneT TSO GmbH (**2.**) and *Bundesnetzagentur* (**3.**) in the Award's Table of Abbreviations. The order in which the various German legislative acts and other measures are presented in the Table of Abbreviations is incorrect (**4.**), and a large number of abbreviations and definitions used in the body of the Award are missing from the Table of Abbreviations (**5.**).

### 1. Imprecise Entry Regarding the IIL Articles

(38) The Award's Table of Abbreviations contains the following entry:

| ILC Articles | International Law Commission's Articles on State Responsibility for Internationally Wrongful Acts |
|---|---|



(39) However, the Table of Abbreviations does not feature the date and version of the ILC Articles referred to by the Tribunal, making it confusing and difficult to identify the version of the ILC Articles used in the Award. The final version of the ILC Articles was only adopted after a long discussion process with various intermediate steps and versions of the ILC Articles. Adding a date is necessary to avoid confusion.

## 2.    Incorrect Definition and Description of TenneT TSO GmbH

(40) Moreover, the definition of "*TenneT*" is incorrect. "*TenneT*" is defined in the Award's Table of Abbreviation as "*TenneT TSO GmbH, the national electricity transmission provider of the Netherlands*". However, TenneT TSO GmbH is a German limited liability company and a German electricity transmission provider, and a subsidiary of the Dutch company TenneT B.V. TenneT B.V. in turn is owned and controlled by the Kingdom of the Netherlands.[2] To avoid confusion, the incorrect description and definition of "*TenneT*", insofar as it refers to TenneT TSO GmbH, needs to be corrected.

(41) The incorrect definition of "*TenneT*" in the Table of Abbreviations leads to another incorrect statement in para. 83 of the Award, which incorrectly states the following: "*The TSO responsible for providing grid connections to OWFs in the EEZ in the North Sea was TenneT TSO GmbH ("**TenneT**"), the national electricity transmission system operator of the Netherlands, which was owned and controlled by the Dutch government.*" As explained above, the German company TenneT TSO GmbH is not the national transmission system operator of the Kingdom of the Netherlands.

(42) The corporate structure of TenneT TSO GmbH has been explained numerous times during the proceedings.[3] Hence, the fact that the Award nonetheless features an incorrect description and definition of "*TenneT*" can only mean that the wrong definition in the Table of Abbreviation is an error within the meaning of Rule 49 (1) ICSID Arbitration Rules. It must and can easily be rectified.

## 3.    Incorrect Abbreviation for *Bundesnetzagentur (BNetzA)*

(43) The Tribunal uses the abbreviation "*BNA*" for *Bundesnetzagentur*, the German Federal Network Agency. This abbreviation is not correct. The correct and official abbreviation is "*BNetzA*". The Tribunal has used Claimants' made-up abbreviation, without questioning or reviewing it, which is a tendentious error requiring rectification.

## 4.    Erroneous Presentation of Order of German Legislative Acts and Papers in the Table of Abbreviations

(44) The Award's Table of Abbreviations does not respect the correct chronological order of the German legislative acts and executive as well as administrative papers.

---

[2]    Respondent's Counter-Memorial, para. 495; **Exhibit R-0089**, **Exhibit R-0122**, **Exhibit R-0123**, **Exhibit R-0178**, **Exhibit R-0179**, **Exhibit R-0184**, **Exhibit R-0186**.

[3]    First Schomerus/Bäumler Report, para. 137; Respondent's Second Post-Hearing Brief, para. 43.

(45) Currently, the legislative acts and executive as well as administrative papers are presented as follows:

| 1997 Offshore Installations Ordinance | Offshore Installation Ordinance of 23 January 1997 |
| 2000 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 April 2000 |
| 2001 Directive | Directive 2001/77/EC |
| 2002 Offshore Installations Ordinance | Offshore Installations Ordinance of 4 April 2002 |
| 2004 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 August 2004 |
| 2009 BNA Position Paper | BNA Position Paper of October 2009 |
| 2006 Energy Act | Energy Act of 17 December 2006 |
| 2009 Renewable Energy Sources Act | Renewable Energy Sources Act of 1 January 2009 |
| 2009 Spatial Planning Ordinance | Spatial Planning Ordinance of 21 September 2009 |
| 2012 Energy Act | Energy Act of 28 December 2012 |
| 2012 Offshore Installations Ordinance | Offshore Installations Ordinance of 31 January 2012 |
| 2012 Renewable Energy Sources Act | Renewable Energy Sources Act of 1January 2012 |

(46) The 2009 BNetzA Position Paper is listed before the 2006 EnWG, completely ignoring the chronological sequence of those two measures.

(47) Considering their dates of adoption, the correct chronological order is as follows:

*2006 Energy Act (EnWG)*

*2009 Renewable Energy sources Act*

*2009 Spatial Planning Ordonnance*

*2009 BNetzA Position Paper*

*2012 Renewable Energy Sources Act (EEG)*

*2012 Offshore Installations Ordinance*

*2012 Energy Act (EnWG)*

(48) The chronological order of these acts was of great importance during the arbitration proceedings and hence must be respected from the beginning in the Award, starting with the Table of Abbreviations.



(49)    In addition, the Tribunal in its Table of Abbreviations – and thus also in the body of the Award –exclusively uses English translations of the relevant German legislative acts (e.g. "*Energy Act*" to refer to the German "*Energiewirtschaftsgesetz*" or "*EnWG*"), without even including a reference to the applicable German denomination. Respondent notes that this was the approach taken by Claimants in their written submissions. However, Claimants do not in all instances use the official English translation. As a result, it is extremely confusing for the reader to know which of the various German legislative acts the Tribunal is referring to in the Award. For example, the official English translation for the German "*Energiewirtschaftsgesetz*" is not "*Energy Act*", but "*Energy Industry Act*". The Award is therefore partially not comprehensible.

(50)    This is precisely why Respondent in its written submissions exclusively used the German definitions and abbreviations for the various legislative acts (e.g. "*EnWG*" instead of "*Energy Act*"). Respondent therefore respectfully requests that the Tribunal in its Table of Abbreviations and the body of the Award use – or at the very least also include – the German abbreviations of the respective legislative acts.

**5.    Omissions of Abbreviations in the Table of Abbreviations**

(51)    There are several acronyms and defined terms used throughout the Award which are not listed in the Table of Abbreviations, namely:

- "*Claimants' Observations on Rule 41 (V)*" (para. 15 of the Award),

- "*FIT*" (para. 107 of the Award),

- "*SOW*" (para. 107 of the Award),

- "*Head of Terms*" (para. 114 of the Award),

- "*Shareholder Agreement*" (para. 114 of the Award),

- "*Etanax*" (para. 114 of the Award),

- "*OWEVS*" (para. 114 of the Award),

- "*Development Freeze*" (para. 123 of the Award),

- "*Rasperia*" (para. 298 of the Award),

- "*PCIJ*" (para. 519 of the Award),

- "*Windreich Option*" (para. 537 of the Award),

- "*Valuation Date*" (para. 594 of the Award).

(52)    These terms and abbreviations should be included in the Table of Abbreviations for ease of reading and reference. A rectification of these omissions can be easily achieved.



### III. Incomplete Presentation of the Factual Background

(53) With respect to the factual background, Respondent points out that it seems that the Tribunal simply copied Claimants' submissions and allegations verbatim, without taking into account that on many occasions Respondent had disputed and corrected the allegations made. The presentation of the factual background therefore is erroneous and tendentious in many aspects and therefore requires rectification.

(54) The need for rectification, however, is not limited to the omission and distortion of Respondent's arguments. The factual background of the Award contains serious errors even with regard to undisputed facts.

(55) This is true for *inter alia* the presentation of the 2002 Offshore Installation Ordinance (**1.**), the presentation of the transitional provisions put in place for all relevant legislative changes (**2.**), the presentation of the priority areas in the German EEZ in the North Sea (**3.**), the presentation of the grid connection timeline for offshore wind projects (**4.**), the description of the GFT (**5.**), the presentation of the Renewable Energy Sources Act 2014 (EEG 2014) (**6.**), the presentation of various strategies, concepts and strategy papers (**7.**), the presentation of the Development Freeze issued by the BSH (**8.**) as well as of the circumstances of the sale of OWP Albatros, OWP West and Global Tech II & III (**9.**), the New Regulatory Framework introduced in 2017 (**10.**), the status of the domestic compensation proceedings as well as the compensation received by Claimants in the domestic compensation proceedings (**11.**).

### 1. Erroneous Presentation of the 2002 Offshore Installation Ordinance

(56) In para. 86 and para. 103 et seq. of the Award, the description of the 2002 Offshore Installation Ordinance is erroneous. It omits that the 2002 Offshore Installation Ordinance introduced the obligation to carry out an environmental impact assessment and introduced new grounds for a refusal of the issuance of Approval by means of a list of examples. This point has been a topic of discussion during the proceedings and must be included.[4] The Award leads the reader to believe that obtaining an Approval was a simple and straightforward endeavour. However, it was not sufficient for a developer to file an Application and simply wait for the BSH's decision. There was always a risk to be overtaken by a competitor. These facts are completely omitted in the Award, even though they are undisputed and are necessary for the understanding of the legal situation.

(57) The presentation of the 2002 Offshore Installation Ordinance is also erroneous and incomplete insofar as Respondent's position on the priority principle is only presented through the lens of Claimants' submissions: The quote that the Tribunal uses in para. 86 of the Award, i.e., "*equal treatment and fair procedure*" seems to be taken from Respondent's Rejoinder, but it does not relate to a statement made by Respondent. Instead, it relates to a statement made in Claimants' Reply, which was quoted in Respondent's Rejoinder.[5] Indeed, Respondent clearly marked the quote as such.[6] The quote in para. 86 of the Award

---

[4] Respondent's Counter-Memorial, para. 335; Respondent's Rejoinder, para. 405.
[5] Respondent's Rejoinder, para. 332.
[6] Respondent's Rejoinder, para. 332, referring to Claimants' Reply, para. 44.



therefore should be supplemented by this explanation. Otherwise, it is taken out of context and wrongly suggests that a position taken by Respondent is reported when it is not. In any event, para. 86 as well as para. 104 of the Award does not properly explain what the priority principle is. The Tribunal leans too heavily on Claimants' presentation of the principle without explaining that the priority principle was indeed applied in practice and resulted in the failure of several projects because they were overtaken by others.

(58)   Furthermore, the Award is confusing as it refers to the priority principle as being synonymous with "*equal treatment and fair procedure*". These two concepts are not synonymous and hence, this constitutes another error that needs to be corrected. Of course, the principle of equal treatment and fair procedure is a principle of general German administrative law. For reasons of equal treatment and fair procedure, the BSH applied the priority principle to all applicants. The distinction that was made throughout the proceedings should be included into the Award.

(59)   The Award furthermore erroneously omits that only one out of 13 NOH Projects was located within one of the – as the Tribunal puts it – "*designated areas*".[7] This is an undisputable and undisputed fact.[8] It therefore must be included in the Award.

(60)   The presentation of the 30-month-deadline in para. 95 of the Award also suffers from an error by omission. The 30-month-deadline was not absolute. In fact, the Tribunal omits that the BNetzA Position Paper 2009 explicitly states that grid connection may be delayed beyond the 30-month period, without the respective TSO being liable, if and to the extent the delay was caused by facts that allowed exculpation of the TSO pursuant to Sec. 276 or 278 German Civil Code.[9]

## 2.    No Presentation of the Transitional Provisions

(61)   The Tribunal also omitted any discussion about the transitional provisions put in place with every legislative reform. Respondent's respective arguments[10] were completely omitted from both the Factual Background and the Legal Analysis of Art. 10 ECT. In view of the importance that such transitional provisions have with regard to legitimate expectation, this is a serious error that needs rectification

(62)   The only time that reference is made to Respondent's arguments regarding transitional provisions at all is in para. 456 of the Award. However, there is no reference to any of Respondent's submissions and the presentation itself remains superficial and incomplete, to the point of distortion. This is an error that needs rectification.

---

[7]   The correct term used by the Parties during the proceedings is "*suitability area*", see Respondent's Counter-Memorial, para. 270; Claimants' First Post-Hearing Brief, para. 76.

[8]   Respondent's Counter-Memorial, para. 332.

[9]   BNetzA Position Paper 2009, p. 14; Respondent's Counter-Memorial, para. 1209.

[10]   E.g., Respondent's Rejoinder, para. 423 et seqq., para. 494 et seqq., para. 552 et seqq., para. 673 et seqq.



### 3.    Incomplete Presentation of the Factual Background regarding Priority Areas

(63)    The presentation of the factual background of the priority areas is incomplete. In para. 98 of the Award, in the section "*Factual Background*", the Tribunal correctly explains that the 2009 Spatial Planning Ordinance "*identified three priority areas for the development of offshore wind projects, each of which were located relatively close to the coastline. In these areas, the production of wind energy was granted priority over other spatially significant uses* […]." However, the Award fails to mention the fact that of Claimants' 13 Offshore Wind Projects, only two (OWP Albatros and OWP West) were located within the said priority areas.

(64)    This important – and undisputed – fact, which is omitted by the Tribunal in its description of the factual background of the dispute, is evidently relevant to Respondent's argument regarding the priority areas. Its omission creates an incomplete and misleading impression of the factual background. Respondent always discussed the creation of the priority areas in the context of their (extremely limited) overlap with the areas of Claimants' Offshore Wind Projects.[11] Since the Award does not explain this context in its summary factual background, it is not comprehensible why the priority areas are mentioned at all.

### 4.    Erroneous Presentation of the Grid Connection Timeline

(65)    The presentation of the grid connection timeline in the Award is also erroneous. Para. 109 of the Award reads as follows:

> "[…] *and on 31 October 2011, TenneT provided the test field with a conditional grid connection commitment, indicating that it would be able to provide the grid connection within 45 months.*"

(66)    In support of this statement, the Tribunal cites para. 163 of Claimants' Memorial. However, para. 163 of Claimants' Memorial does not support this statement. Para. 163 of Claimants' Memorial instead states the following:

> "*On 31 October 2011, TenneT provided the Albatros Test Field with a conditional grid connection commitment. However, it informed them that it would not have been in a position to provide the grid connection within the 30-Month Deadline under the 2009 BNA Position Paper, but rather within 45 months.*"

(67)    Claimants in turn rely on **Exhibit C-0170**, which however obviously does not support this statement at all, as **Exhibit C-0170** is dated 26 October 2011 and thus predates the alleged indication. The letter dated 31 October 2011 was submitted as **Exhibit C-0169** and does not even deal with the deadlines. This is a serious misquote.

(68)    Moreover, in para. 109 of the Award, the Tribunal even further distorts Claimants' already overstated allegation, by stating that TenneT "*would be able to provide the grid connection within 45 months*". This is not what Claimants submitted at all. Claimants were much more cautious in fixing the grid connection timeline, only stating that TenneT would be in a

---

[11]    Respondent's Counter-Memorial, para. 270, 363; Respondent's Rejoinder, para. 323.

‖‖N

position to provide a grid connection, "*rather within 45 months*".[12] There is no promise there, as the Tribunal makes it out to be with their error in para. 109 of the Award. This error needs to be rectified by using less strong words as the Tribunal does.

(69) Turning to para. 125 of the Award, which contains another error:

> "*The O-NEPs, which were to be adopted annually by the BNA based on a proposal made by the TSOs, set out the timeframe for grid expansion, including by establishing connection dates **for each offshore wind energy project**.*" (emphasis added)

(70) This is wrong, as the connection dates were established for clusters, not the individual wind energy project. All this is explained in **Exhibit C-0035**, which the Tribunal quotes. This error must be rectified as well.

## 5. Erroneous Description of the GFT

(71) The description of the GFT is erroneous as well. In para. 111 of the Award, the Tribunal makes the following statement:

> "*The development of the GFT required substantial up-front investment, in particular because it envisaged the use of a custom-made vessel and extensive offshore testing in the context of an actual offshore wind project.*"

(72) This description is erroneous as it is incomplete. The development of the GFT undisputedly did not only require one custom-made vessel, but two: One vessel was needed to transport the wind turbines to the site, and another vessel, with a completely different technical layout, was required to prepare the seabed for installation of the GFT.[13] The current version of the sentence does not present the complexity of the GFT in its entirety. It requires rectification.

## 6. Erroneous Presentation of the Renewable Energy Sources Act 2014

(73) In para. 131 of the Award, the Tribunal presents the Renewable Energy Sources Act 2014 in an erroneous manner. The Tribunal states that the Renewable Energy Sources Act 2014 "*reduced the expansion targets*", presenting this as undisputed fact, but relying only on Claimants' Memorial for support. The Tribunal completely ignores that the Renewable Energy Sources Act 2014 was the first act to introduce (not: reduce) the expansion targets, as Respondent has pointed out in many of its submissions.[14] This error requires rectification.

(74) Moreover, in para. 404 of the Award, the Tribunal erroneously states that the "*Renewable Energy Sources Act 2014*", i.e. the EEG 2014, "*adopted a tender system for the allocation of the previously unrestricted grid capacity*". However, the EEG 2014 foresaw a tender

---

[12] Claimants' Memorial, para. 163.
[13] Claimants' Reply, para. 226; Respondent's Counter-Memorial, para. 748; Respondent's Rejoinder, para. 791.
[14] Respondent's Rejoinder, para. 1695.

||IN

system for the remuneration of OWFs, not for the grid capacity.[15] In addition, the introduction of the tender system for the remuneration was only due until 2017 and thus not with immediate effect.

(75)   Accordingly, Sec. 2 (5) EEG 2014, which entered into force on 1 August 2014, reads:

> *"Financial support and the level of such support is to be determined by tenders for electricity from renewable energy sources and from mine gas by 2017 at the latest. To this end, experience with competition-based determining of the level of financial support will be gathered, initially with electricity from ground-mounted installations."*[16]

(76)   The introduction of a tender procedure for the remuneration was mandated by EU law, as namely stated in the *"Guidelines on State aid for environmental protection and energy 2014-2020".*[17] Therefore, EU state aid rules required that the remuneration for electricity from renewable energy sources should be determined in a competitive bidding process, steering them towards more market integration.[18] Respondent extensively explained this topic and Claimants' own expert, Mr Tomas Haug, had confirmed Respondent's explanations.[19] The statement in the Award that the tender system for the allocation of grid capacity was introduced by virtue of the EEG 2014 is thus incorrect and has to be rectified.

(77)   The tender system for the allocation of grid capacity, as referred to by the Tribunal, was envisaged in the *Energiewirtschaftsgesetz,* as amended in 2012 (*EnWG* 2012). The new rules for the allocation of grid capacity by the means of a tender procedure were set up and published by the BNetzA in August 2014.[20] Thus, also in this regard, the Award needs rectification.

## 7.   Erroneous Presentation and Confusion of the Strategies, Concepts and Strategy Papers

(78)   The Tribunal made another error confusing strategies and strategy papers. In para. 99 of the Award, the Tribunal states that the

> *"German federal government published a **further strategy paper"**.* (emphasis added)

(79)   The document referred to in para. 99 of the Award, however, is not a strategy paper, which already becomes clear when looking at its title and addressee.

---

[15]   Respondent's Counter-Memorial, para. 576, 588; Schomerus/Bäumler Report, para. 222 et seq.

[16]   Respondent's Counter-Memorial, para. 576.

[17]   Federal Government, Draft Act on the Fundamental Reform of the Renewable Energy Sources Act and on the Amendment of further Provisions of the Energy Industry Law, 5 May 2014, Bundestag Document 18/1304, pp. 93, 104; Haug Report, para. 361.

[18]   EU Commission, Guidelines on State aid for environmental protection and energy 2014-2020, 28 June 2014, (2014/C 200/01), attached as Exhibit RL-0227; Schomerus/Bäumler Report, para. 222 et seqq.

[19]   Respondent's Counter-Memorial, para. 576, 588; Haug Report, para. 361.

[20]   Claimants' Memorial, para. 308.



(80)  The document referred to in para. 99 of the Award is the Federal Government's Energy Concept for an Environmentally Friendly, Reliable and Affordable Energy Supply (*Energiekonzept für eine umweltschonende, zuverlässige und bezahlbare Energieversorgung*) of 28 September 2010, submitted as **Exhibit R-0012**. It therefore is a document that was submitted to the German Parliament within the political discussions. The paper is supposed to give ideas as to what needs to be done for a successful expansion of the German offshore wind energy sector. It is therefore not a strategy paper. It falls under the parliamentarian right to ask questions to the government.

(81)  The only strategy paper that existed was the Federal Government's Strategy for using Offshore Wind Energy (*Strategie der Bundesregierung zur Windenergienutzung auf See*) of January 2002 ("*Strategy for using Offshore Wind Energy*"), submitted as **Exhibit R-0020**. It was not introduced to the German Parliament for political discussion.

**8.    Erroneous Presentation of the Development Freeze**

(82)  The presentation of the development freeze is erroneous as well. In para. 124 of the Award, the Tribunal describes the Development Freeze as identifying areas in the EEZ in the North Sea "*that were reserved to accommodate future grid infrastructure, including the grid connection facilities and telecommunication cables* (…)".

(83)  Clearly, "*telecommunication cables*" had nothing to do with the development of the offshore wind energy sector. This error should be corrected by deleting the term "*telecommunication cables*".

(84)  In para. 389 of the Award, the Tribunal states:

> "*The Tribunal accepts, on the basis of the evidence before it, that the Development Freeze applied to a substantial part of the Claimants' NOH 2 projects. As noted above, the Development Freeze affected 40 percent of the planned NOH 2 installations, while two NOH 2 projects (SeaStorm I and SeaStorm II) were effectively stalled 'in their entirety.' The Respondent does not dispute the Claimants' evidence on the effect of the Development Freeze on the NOH 2 projects.*"

(85)  This presentation of Respondent's position is erroneous, as it does not fully represent Respondent's position and submissions. While Respondent has not disputed the existence of the Development Freeze as such or the areas covered by it, Respondent has disputed the allegedly detrimental effect on the development of Claimants' projects.[21] Early-stage projects were not affected by any measure as they were really far away from realization independent of any legislative measure. Plus, such projects could easily be adapted to the new parameters set out by the Development Freeze, with the developers not losing any money as nothing had been built anyway, and development costs could still be redirected and ultimately recovered.[22] If projects had already advanced to a certain

---

[21]  Respondent's Rejoinder, para. 506 et seq.; Respondent's First Post-Hearing Brief, para. 263, 274 et seq., 296.

[22]  Respondent's Counter-Memorial, para. 405 et seq.; Transcript: IV, 90, 1 to 100, 22.



degree, they could benefit from the transitional regulations Respondent had put in place.[23] More advanced projects, such as Claimants' OWP Albatros, were not affected by the Development Freeze at all, as those fell under the old regime.[24] This error therefore requires correction in order to avoid misunderstandings.

### 9. Incomplete Presentation of the Sale of OWP Albatros, OWP West and Global Tech II & III

(86)   The presentation of the sale of the OWP Albatros, OWP West and Global Tech II & III is incomplete. In para. 132 of the Award, the Tribunal notes that according to Claimants, they "*had to sell OWP Albatros and the Albatros Test Field to avoid the risk of not receiving a grid connection or having to incur additional costs in connection with the tender.*" However, the Tribunal conspicuously fails to state the purchase price received by Claimants for OWP Albatros and the Albatros Test Field, i.e. EUR 42 million.[25]

(87)   Likewise, in para. 133 of the Award, the Tribunal states that "*as an alleged damage mitigation measure, the Claimants sold their remaining NOH1 projects, OWP West and Global Tech II (into which Global Tech III had been merged).*" Again, the Tribunal fails to include the purchase price received by Claimants for the sale of the projects, i.e. EUR 15.1 million for OWP West and EUR 15 million for Global Tech II.[26]

(88)   These omissions amount to an error of the presentation of the factual background, as in the Tribunal's view, the purchase prices received by Claimants for the above-listed projects are significant for the quantum of Claimants' damages claims, and for the damage calculation method chosen by the Tribunal in Section VII. of the Award. Moreover, the purchase prices received by Claimants are undisputed. It is incomprehensible why the Tribunal would mention the sales of the NOH1 projects at all, if it does not also include the evidently relevant purchase prices.

### 10. Incomplete Presentation of the New Regulatory Framework 2017

(89)   The presentation of the new regulatory framework introduced in 2017 is incomplete as well. In para. 136 of the Award, the Tribunal presents the New Regulatory Framework 2017:

> "*On 1 January 2017, the Offshore Wind Energy Act (the "Offshore Wind Energy Act")103 and an amended Renewable Energy Sources Act (the "2017 Renewable Energy Sources Act")104 entered into force. These laws introduced a new regulatory regime for offshore wind energy based on a compulsory tendering system, which replaced the earlier feed-in tariffs, and rules on eligibility to participate in the transitional tenders, which replaced the earlier Plan Approval Process.*"

---

[23]   Respondent's Rejoinder, para. 513 et seq. as well as para. 519 et seq.; Respondent's Second Post-Hearing Brief, para. 110, 111, 124.

[24]   Respondent's First Post-Hearing Brief, para. 90; Respondent's Second Post-Hearing Brief, para. 72.

[25]   Claimants' Memorial, para. 504.

[26]   Claimants' Memorial, para. 513 et seq.



(90)    This presentation is incomplete as it omits that the introduction of a tendering system was mandated by EU law, as Respondent had already informed the Tribunal during the arbitration proceedings.[27] This is an error that requires rectification.

**11.    Incomplete Presentation of the Compensation Received by Claimants in the Domestic Compensation Proceedings**

(91)    The Award also contains serious errors regarding the domestic compensation scheme, omitting important facts in its presentation of this topic. In para. 143 et seqq. of the Award, the Tribunal correctly explains that in November 2020, the German legislator introduced a new Section 10a to the Offshore Wind Energy Act, adopting a new compensation procedure for offshore wind projects.

(92)    Conversely, the Tribunal completely fails to mention in its summary of the factual background that Claimants undisputedly received several million EUR's worth of compensation payments both from German State (through the BSH) under the compensation regime introduced in Section 10a of the Offshore Wind Energy Act, as well as from third parties under the compensation regime introduced in Section 10b of the Offshore Wind Energy Act. This creates the obviously false impression that Claimants have not received any compensation under national law.

(93)    In para. 54, 57 and 61, the Award erroneously states that there are "*ongoing compensation proceedings in the German domestic courts*". There are no such proceedings "*ongoing in the German domestic courts*". All compensation proceedings still are pending before the BSH, with Claimants having the opportunity to take the matter to the German domestic courts in the future if they are unsatisfied with the final administrative decision. Thus, in any event, it is not possible to calculate any damages at this point in time and the risk of double compensation remains. Respondent has never stated otherwise.

(94)    With a view to the fact that Section VII. of the Award addresses the risk of double recovery resulting from the compensation payments received by Claimants and makes specific directions to both Parties to address this risk (para. 643 et seqq. of the Award), it is necessary to include the compensation payments Claimants have already received in the section on the factual background, besides any clarification about the current status of the domestic compensation proceedings.

**IV.    Incomplete Presentation of Respondent's Arguments**

(95)    While the Tribunal contends that it considered all arguments, the presentation of Respondent's position is erroneous on many occasions, distorting the picture on which the Tribunal has based its decision. Many of Respondent's arguments, relating to many important aspects of the case, have been fully omitted. Their addition is necessary for the sake of procedural fairness and to give a complete picture of what has been discussed during these proceedings. Respondent's arguments regarding the invalidity of intra-EU investor-state arbitration are omitted or incorrectly represented (**1.**). Furthermore, Respondent's

---

[27]    Respondent's Second Post-Hearing Brief, para. 112.



submissions on the section "*Procedural History*" are incorrectly presented (**2.**). Finally, several of Respondent's key arguments regarding disputed facts are omitted entirely (**3.**).

### 1.    Erroneous Presentation of the Arguments regarding Invalidity of Intra-EU Arbitration

(96)    The Tribunal failed to address the many arguments advanced by Respondent regarding the inadmissibility of intra-EU investor-state arbitrations. The Tribunal limits itself to enumerating the Parties' different positions but ends its analysis without addressing all of them.

(97)    For instance, the Tribunal does not discuss Respondent's arguments regarding the prevalence of EU law over the ECT in accordance with the supplementary means of interpretation in Article 31 VCLT.[28] While the Tribunal even quotes Respondent's position in para. 161 of the Award, and announces, in para. 189 of the Award, that it "*must now engage in the '*more elaborate analysis*' that it was not required to undertake in connection with Respondent's Rule 41 (5) Application*", it falls short of its promise. The Tribunal does not take into account Respondent's arguments regarding the prevalence of EU law over the ECT at all: The Tribunal neither deals with the findings *Electrabel S.A. v. Republic of Hungary* (**Exhibit RL-0252**)[29] nor Art. 351 TFEU nor with the bilateral relationships that the ECT deals with.[30] This is a serious error.

(98)    There are several other errors in the Award's Section V. on Jurisdiction. In para. 152 of the Award, the Tribunal states that according "*to the Respondent, there is no valid arbitration agreement between the Parties under Article 25(1) of the ICSID Convention or Article 26 of the ECT*", presenting the two provisions as alternatives. They are not, as Respondent has explained at length.[31] Art. 25 (1) ICSID Convention is dependent on consent. Art. 26 ECT can serve as such basis for consent, although not in intra-EU disputes. This imprecision must be rectified.

(99)    In para. 163 of the Award, a sentence must be added at the end as to the effect of the judgments rendered by the CJEU. As Respondent explained *inter alia* in para. 146 of Respondent's Rejoinder on the Merits and Reply on Jurisdiction, the CJEU's judgments have *ex tunc* and *erga omnes* effect. Adding such sentence will enable the reader to understand Respondent's position and render the entire presentation less tendentious. If no such sentence is added, the paragraph suggests that Respondent might not have understood the content mechanisms of EU law.

(100)    In para. 212 of the Award, the Tribunal resorts to speculation to present Respondent's arguments, by stating

> "*Although the Respondent does not elaborate on its position in its submissions on jurisdiction, **it appears** that the Respondent's case is that the ECT, on the one hand,*

---

28    Respondent's Memorial on Jurisdiction and Request for Bifurcation, para. 109 et seqq.

29    As explained in Respondent's Memorial on Jurisdiction and Request for Bifurcation, para. 109 et seqq.

30    *Ibid*, para. 112 et seqq.

31    *Ibid*, para. 159 et seqq., 209 et seqq.

||IN

*and the TFEU and the TEU on the other hand, relate to 'the same subject matter',
and that accordingly, the ECT applies to the parties of the ECT that are also parties
to the TFEU and the TEU only to the extent that the provisions of the ECT are com-
patible with the TFEU and the TEU."* (emphasis added)

(101)   Such speculation is another serious error. It is not cured by the fact that the Tribunal refers
to paras. 153 et seq. of Respondent's Rule 41 (5) Application for support, in an attempt to
gloss over the speculation just announced. This is a misleading and an error, as para. 153
et seq. of Respondent's Rule 41 (5) Application do not contain a statement that would turn
the speculation to fact.

### 2.   Erroneous Presentation of Respondent's Submissions in the Procedural His-tory

(102)   The section "*Procedural History*" also presents several errors in the form of imprecise ex-
pressions, resulting in misleading statements.

(103)   For instance, para. 73 of the Award reads as follows:

"*On 19 August 2024, the Respondent provided its comments on the Claimants' letter
of 6 August 2024 and the Claimants' updated damages calculations.*"

(104)   In line with the chosen chronological approach, the Tribunal had listed Claimants' letter of
6 August 2024 in para. 71 of the Award. However, in para. 71 of the Award the term
"*Claimants' updated damages calculation*" is not used at all. Instead, the Award refers to
"*German domestic compensation scheme*" and the "*updated version of Exhibit RH-0111,
which contained the Claimants' pre-award interest analysis*":

"*On 6 August 2024, the Claimants wrote to the Tribunal, providing a further update
on the status of payments under the German domestic compensation scheme, to-
gether with an updated version of Exhibit RH-0111, which contained the Claimants'
pre-award interest analysis.*"

(105)   Thus, the topic of Claimants' letter of 6 August 2024 is much narrower than para. 73 of the
Award suggests. Respondent asks that this erroneous and imprecise summary of its com-
ments be corrected.

### 3.   Omission of Respondent's Arguments Regarding Disputed Facts

(106)   While the Tribunal states in para. 76 of the Award that it would identify an event or devel-
opment as an allegation or argument, where such event or development is disputed, the
Tribunal is not consistent with this approach.

(107)   For instance, in para. 126 of the Award, the Tribunal has copied Claimants' arguments to
present facts as undisputed when they are not. The presentation of the "*2012 Energy Act*"
i.e. the *Energiewirtschaftsgesetz* or *EnWG* 2012 and its effects in para. 126 of the Award
is tendentious and angled. It falls short of reflecting the many discussions the Parties had
during the arbitration proceedings. This must be rectified, in particular since the Tribunal
apparently itself considers this German legislative measure to be of great importance for



its decision. The presentation of the EnWG 2012 therefore in its current form is erroneous. It must be substituted by a truly neutral description of the facts. In view of the fact that in para. 122 of the Award, the Tribunal announced to present a simple summary of the facts, the rectification is done best by also presenting Respondent's argument.

(108)    This, however, is not the only error of such kind in the Award. In para. 129 of the Award, the Tribunal states as follows:

> The Claimants illustrate the effect of the O-NEP 2013 on the Claimants' Offshore Wind Projects with the following table:[91]

| OFFSHORE WIND PROJECTS' EXPECTED GRID CONNECTION DATES | | |
|---|---|---|
| PROJECT | 2011 WHEN THE CLAIMANTS MADE THEIR[st] INVESTMENT | O-NEP 2013 |
| NOH 1 Projects | | |
| OWP Albatros | Q3 2014 (Approval: Q3 2011) | 2018 |
| OWP West | Q4 2014 (Approval: Q4 2011) | 2021 |
| GlobalTech II (merged with GlobalTech III) | Q4 2015 (Approval: Q4 2012) | 2022 |
| NOH 2 Projects | | |
| GAIA I Nord | Q4 2016 (Approval: Q4 2013) | 2025 |
| GAIA II | Q4 2015 (Approval: Q4 2012) | 2027 |
| GAIA III | Q4 2015 (Approval: Q4 2012) | 2027 |
| GAIA IV | Q4 2015 (Approval: Q4 2012) | 2027 |
| GAIA V Nord | Q4 2016 (Approval: Q4 2013) | 2025 |
| SeaStorm I | Q1 2016 (Approval: Q1 2013) | None (completely affected by the Development Freeze) |
| SeaStorm II | Q1 2016 (Approval: Q1 2013) | None (completely affected by the Development Freeze) |
| SeaWind III | Q1 2016 (Approval: Q2 2013) | 2029 |
| SeaWind IV | Q1 2016 (Approval: Q2 2013) | 2029 |

(109)    The error here lies in the Tribunal not clearly indicating that this table only shows Claimants' version of events, and that the dates featured in the table exclusively reflect Claimants' subjective wishful thinking. Respondent's rebuttal of these expectations, and its explanations that Claimants' grid connection expectations were unrealistic to begin with, are omitted.[32]

(110)    The disagreement between the Parties regarding the dates needs to be made clear, e.g., by substituting the introductory sentence with the following:

> *"In the Claimants' subjective opinion, and disputed by the Respondent, the effect of the O-NEP 2013 on the Claimants' Offshore Wind Projects was as follows:* […]"

---

[32]    E.g., Respondent's Rejoinder, para. 577 et seqq.



## V.    Not Mentioning the German Legal Experts' Analyses Is an Error

(111)    The Award is also erroneous as it does not mention the analyses given by the German legal experts at all. The testimony of the experts took up two whole hearing days. Yet, the Tribunal does not mention any of their analyses in the Award. This concerns both Claimants' legal experts as well as Respondent's legal experts.

(112)    It seems implausible that the Tribunal did not consider their expert reports, and did not include the assessment of these expert reports in the Award, at all. This concerns both Parties' experts and is an error that demands rectification.

## VI.    Inadequate Summary of June 2020 Decision Issued by German Constitutional Court

(113)    The Award presents an incomplete and overly short summary of the decision issued by the German Constitutional Court dated 30 June 2020.

(114)    The summary of the June 2020 Decision in paras. 140 et seq. is one example out of many showing that the Tribunal for the greatest part in the Award erroneously and exclusively relied on Claimants' statements and allegations to summarize the facts, presenting these allegations as undisputed and factually correct. Footnotes 110 to 113 corresponding to paras. 140 et seq. illustrate this approach taken by the Tribunal particularly well, as Claimants' Memorial is even quoted before the primary source, i.e. the June 2020 Decision. If there is a primary source, the Tribunal must rely on it, especially if the goal is to present a neutral and undisputed summary of the facts, including decisions that the Tribunal intends to refer to.

(115)    The summary of the June 2020 Decision contained in paras. 140 et seq is not a neutral summary of the June 2020 Decision but simply reproduces the interpretation of the June 2020 Decision as presented by Claimants. Moreover, Respondent's view or sources are not quoted, either, which is also contrary to a neutral approach and must be corrected.

(116)    In particular, the summary of the June 2020 Decision does not make clear that the term "*legitimate expectations*" under German law designates something different than the term "*legitimate expectations*" under ECT law. As the Tribunal may recall, in Respondent's Counter-Memorial on the Merits, Respondent used the term of "*legitimate trust*" to make this distinction very clear.[33] Respondent also repeatedly emphasized the differences in the concepts in its other submissions. Prof Jelena Bäumler explained the German concept of legitimate expectations in great detail in the Schomerus-Bäumler-Expert report.[34] Prof Jörg Terhechte also explained this point during the Hearing.[35] Regardless, the Award does not explain these differences, which is an error requiring rectification. It seems that the Tribunal fell for a false friend.

---

[33]  Respondent's Counter-Memorial on the Merits, para. 86 et seq.
[34]  E.g., Schomerus/Bäumler Report, para. 25, Schomerus/Bäumler Report, Sections 3.5.2 through 3.5.6.
[35]  Transcript: VIII, Day 8, 106, 23 to 107, 5; VIII, Day 8, 97, 1 to 100, 16.



(117) The statements made in para. 141 of the Award are copied from Claimants' submissions, in particular para. 388 of Claimants' Memorial, apparently without referring to the original source, the June 2020 Decision, to confirm:

> *"[…] legitimate expectations are created if the state encourages and induces invest-ment, and once such expectations have been created, the fundamental features of the legislative basis of the developer's investment cannot be substantially changed to the developer's detriment without any compensation."*

(118) The copying exercise results in an erroneous presentation of the content of the June 2020 Decision. This error could have easily avoided by consulting the source mentioned in para. 388 of Claimants' Memorial, i.e., para. 133 of the June 2020 Decision. Para. 133 of the June 2020 Decision does not make any statement with regard to "*fundamental fea-tures*" at all. Para. 133 of the June 2020 Decision does also not state that compensation is the only way to remedy changes of the law. It does mention though that frequent changes in a specific field of law prevent the formation of legitimate trust. It also mentions that the individual situation of the respective applicant must be taken into account. This error requires rectification.

(119) Another error requiring rectification relates to the term "*position in the Plan Approval Pro-cess*". In para. 142 of the Award, the Tribunal uses the term without clarifying that the position meant by the German Constitutional Court was only a procedural position, which was not a property right.[36] Consequently, there was no violation of Art. 14 German Con-stitution and the compensation for their costs was an adequate remedy. In their questions for the Parties' Second Post-Hearing Briefs of 4 October 2022, the Tribunal had also cor-rectly used the term "*procedural position*", which is clearer. This ambiguity amounts to an error as well and therefore should also be rectified, to avoid misunderstanding.

(120) In this context, it should also be pointed out that the paragraphs of the June 2020 Decision quoted in footnote 112 of the Award do not support the statements made in the corre-sponding paragraph of the Award, i.e., para. 141. Footnote 112 of the Award refers to paragraph 163 of the June 2020 Decision in support of the statement:

> *"Applying this standard, the Court held that the regulatory regime that was in place prior to the introduction of the Offshore Wind Energy Act, including the priority prin-ciple, had created on the part of the applicants the legitimate expectation that they would be in a position to develop, build and operate their offshore wind projects, if they continued to progress the various steps in the Plan Approval Process, or its predecessor, the approval process under the 2002 Offshore Installations Ordi-nance."*

(121) However, footnote 163 of the June 2020 Decision deals with an allegation made by the applicants in the proceedings before the German Constitutional Court. The German Con-stitutional Court did not adopt this allegation as a finding. Hence, the reference is erroneous and must be rectified.

---

[36] Respondent's Rejoinder on the Merits and Reply on Jurisdiction, para. 240 et seq.



(122) In any event, several important aspects of the June 2020 Decision have been left out entirely in the Award: The Award does not mention that the German Constitutional Court did not find a violation of Art. 3 German Constitution, which also was an undisputed fact.[37] The Award does not make any reference to the fact that the established violation only related to a marginal area of the WindSeeG, either.[38] Furthermore, the Award does not mention that the German Constitutional Court recognized the change to the tendering system and held that the measures were foreseeable for the industry.[39] These are all aspects relevant to the case, which were also discussed in extenso during these proceedings. Leaving these arguments out is an error which requires rectification.

(123) Within the legal analysis, para. 416 of the Award must be deleted. Para. 416 of the Award currently is part of the Tribunal's analysis of the fair and equitable treatment standard of Art. 10 (1) ECT. This paragraph does not relate to fair and equitable treatment at all. Instead, para. 416 of the Award relates to the German Constitutional Court's analysis of Art. 14 of the German Constitution, which is the protection standard for property rights. Para. 416 of the Award therefore is misplaced. For the sake of avoiding misunderstandings, para. 416 of the Award must be deleted.

**VII.    Misquoting Claimants**

(124) In para. 182 of the Award, the Tribunal states that "*the Claimants note that in another ECT proceeding brought against Germany in 2012, Germany never raised the intra-EU objection*", citing para. 623 of Claimants' Reply and the decision on the Achmea issue rendered in *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12.

(125) However, this is a misrepresentation, as Respondent did indeed raise the intra-EU objection in *Vattenfall AB and others v. Federal Republic of Germany*. Even Claimants do not deny this. Para. 623 of Claimants' Reply, i.e. the section cited by the Tribunal, reads:

> "*As noted by the Claimants in their Observations on Bifurcation filed on April 2021, in another ECT proceeding brought against Germany in 2012, Vattenfall v Germany, it was not until after the CJEU issued the Achmea decision that Germany raised the intra-EU objection* […].*"*

(126) Therefore, the Award requires rectification insofar as it incorrectly represents and misquotes Claimants' argument to Respondent's detriment.

**VIII.    Incorrect and Incomplete Considerations in Decision on Quantum**

(127) The Tribunal's decision on quantum includes several significant errors which require rectification. The errors mainly lie in the incomplete presentation of the data used to calculate

---

[37] Respondent's Counter-Memorial, para. 143; Respondent's Rejoinder, para. 229.
[38] Respondent's Counter-Memorial, para. 122 et seqq., 144 et seqq.; Respondent's Rejoinder, para. 225 et seqq., 248 et seqq.
[39] Respondent's Rejoinder, para. 222; Respondent's Counter-Memorial, para. 139 et seqq.



damages. Respondent's arguments have been shortened to an extent that there are such significant gaps in the Award that it is incomprehensible in parts.

(128) The presentation of outlier projects in the Tribunal's comparative damages analysis is incomplete and thus incorrect (**1.**). The Tribunal further erroneously ignores the different payment structures included in the allegedly comparable transactions, which leads to a significant overstatement of damages (**2.**). Finally, the Tribunal mischaracterizes Mr Alexander Demuth's alternative damages assessment (**3.**).

## 1.    Incomplete Presentation of Outliers in "*Sanity Check*" Analysis

(129) In para. 630 et seq. of the Award, the Tribunal conducts a sanity check of the valuation approach adopted by the Tribunal (which is essentially the approach adopted by Claimants' valuation expert Dr Jérôme Guillet, who relies on an MEUR/MW multiplier, which corresponds to a project's development stage). The Tribunal explains in para. 630 of the Award that

> "[…] *since Dr Guillet's evidence, including his calculations of the MEUR/MW multiplier per development stage, is in part based on confidential information, the Tribunal considers it prudent, before proceeding to determine the value of the Offshore Wind Projects as of the Valuation Date, to test the validity of the MEUR/MW multiplier by comparing the purchase prices of the six comparable transactions against valuations calculated for these same transactions on the basis of the MEUR/WTG multiplier.*"

(130) The Tribunal then proceeds in para. 630 of the Award to list eight offshore wind projects, including their development stage, the number of WTGs and the MW capacity, the applicable MEUR/MW multiplier, the contemporaneous purchase price, and the valuation generated by applying the MEUR/MW multiplier. The Tribunal notes in para. 631 of the Award that

> "*the table indicates that the MEUR/MW multiplier produces valuation ranges that generally correspond to the value of the comparable transactions: out of the eight transactions, the contemporaneous purchase price falls within the range of values (or is close to the sole value) calculated on the basis of the MEUR/MW multiplier in four out of the eight cases, and is reasonably close to the range in the remaining for cases (**with the exception, in relative terms, of Gode Wind III**.)*" (emphasis added)

(131) The Tribunal therefore concludes that the table in para. 630 of the Award features only one exception to the rule that the purchase price generally falls in the value range achieved by applying the MEUR/MW multiplier, i.e. the project Gode Wind III. For Gode Wind III, the table shows a purchase price of EUR 10 million, while the value range according to the multiplier is EUR 0.75 – 3.57 million.

(132) However, there is evidently another outlier in the table in para. 630 of the Award. According to the table, the offshore wind project Global Tech I generated a purchase price of EUR 24.1 million (for a 24.1 percent stake), whereas the value range calculated by applying the MEUR/MW multiplier is EUR 14.4 – 16.8 million. Therefore, the purchase price was considerably outside of the calculated value range – by a similar margin as in the case of Gode Wind III.



(133)  Yet, the Tribunal completely fails to mention this second outlier. This creates the false impression that the Tribunal's analysis is more reliable than it actually is. Evidently, two exceptions in a field of only eight projects would have cast much more doubt on the reliability of the Tribunal's conclusion. To rectify this false impression and paint a true picture of the reliability of the Tribunal's conclusion, the project Global Tech I must be included as an additional exception.

### 2. Erroneously Ignoring Different Payment Structures Significantly Inflates Damages

(134)  In para. 629 of the Award, the Tribunal explains that it considers the multiples approach presented by Dr Jérôme Guillet, i.e. applying a MEUR/MW multiplier, to be appropriate. In para. 616 of the Award, the Tribunal explicitly notes that the "*comparable transactions*" relied upon by Claimants' second valuation expert, Dr Richard Hern – which the Tribunal also relies upon for its damages calculation – feature a number of differences:

> *"As for the group of six comparable transactions relied upon by Dr Hern, the Tribunal notes that Mr Demuth disagrees with Dr Hern's analysis, claiming that (i) the six transactions show a wide range of transaction prices and thus cannot be considered to establish a 'market consensus', (ii) most of the allegedly comparable transactions are fully permitted, whereas most of the Offshore Wind Projects were in a relatively early stage of development, (iii) the allegedly comparable transactions are closer to shore than the Offshore Wind Projects, and (iv) the allegedly comparable transactions show a different payment structure."*

(135)  The Tribunal determines in para. 618 of the Award that it does not consider these differences between the supposedly comparable transactions identified by Mr Alexander Demuth to be so relevant that they would disqualify the transactions as market comparables:

> *"Having considered the experts' differences on the points listed above, the Tribunal determines that, apart from Mr Demuth's second point, which the Tribunal will assess further below, the points raised by Mr Demuth reflect the type of inherent differences to be expected when addressing comparable transactions."*

(136)  The Tribunal then proceeds to rely upon (*inter alia*) the transactions identified by Dr Richard Hern for its damages valuation. The Tribunal ignores, however, that a valuation relying on multiples necessarily requires an adjustment to equalize differences between the different assets or transactions, in order to graduate the impact of these differences on the value. This applies most importantly to the different payment structures identified by Mr Alexander Demuth.[40]

(137)  While the NOH Projects are valued by the Tribunal as of the valuation date selected by the Tribunal, and thus at a fixed point in time, the observable prices for the comparable projects contained in the table at para. 630 of the Award reflect, with two exceptions, a

---

[40]  Second Demuth Report, para. 48, 356 et seqq., 412 et seqq.



purchase price mechanism in which payments were only due once the project had reached certain milestones.[41]

(138)  As Mr Alexander Demuth explained at length at the Hearing, such conditional payments, which depend on the occurrence of future events, may not simply be added up to form one nominal value. Rather, the conditional milestone payments must be valued with the respective probabilities of occurrence.[42] This is intuitively necessary, as a purchaser is understandably willing to pay a higher overall purchase price if part of the payment is only due after an important future milestone has been reached. Effectively, the value of the project only increases upon the occurrence of the respective milestone, as the development risk is reduced over time. Dr Jérôme Guillet confirmed this assessment.[43]

(139)  Therefore, the fact that the Tribunal's damages calculation does not at all account for the fact that the purchase prices featured in the table in para. 630 of the Award include transactions with conditional milestone payments is a significant omission and a glaring methodological error which must be rectified.

### 3.   Mischaracterization of Mr Alexander Demuth's Alternative Damages Assessment

(140)  Finally, the Tribunal mischaracterizes the alternative damages calculation conducted by Respondent's expert, Mr Alexander Demuth. In footnote 829 of the Award, the Tribunal states the following:

> "Having adopted a cost-based approach, Mr Demuth does not consider the further development stages achieved by three of the NOH 1 projects after their acquisition; GlobalTech II […] reached the BSH hearing stage in June 2014, OWP West obtained the BSH permit on 15 April 2014, followed by the first BSH release in July 2015, and Albatros obtained conditional grid connection in October 2012."

(141)  It is already incorrect that Mr Alexander Demuth's alternative damages calculation is a simple cost approach. In fact, Mr Alexander Demuth's calculation is based on the purchase price paid by Claimants for the NOH Projects, and thus on the market value at the time of acquisition. He then develops this market value further by adding the further costs of development as well as an appropriate return on the capital invested.[44]

(142)  Moreover, and to the benefit of Claimants, Mr Alexander Demuth assumed that their additional expenses were made shortly after the acquisition of the projects, and therefore added capital costs on both the purchase price and the additional expenses.[45] Mr Alexander Demuth therefore added an extra yield to the benefit of Claimants – despite the fact that with the exception of OWP Albatros, none of the NOH Projects reached any significant

---

[41]  Demuth Report, para. 354, Table 13.
[42]  Mr Alexander Demuth's Opening Presentation, slide 14; Transcript, X, Day 10, 16, 1 to 18, 14.
[43]  Transcript, IX, Day 9, 26, 4-16.
[44]  Second Demuth Report, para. 629 et seqq.
[45]  *Ibid*, para. 636.



development milestones in between their acquisition by Claimants and the valuation dates selected by Claimants (i.e. 15 June 2012 for NOH 2 and 28 December 2012 for NOH 1).[46]

(143)   Insofar as the Tribunal argues that Mr Alexander Demuth should have considered the NOH Projects' development progress, this is obviously not methodologically required when calculating damages based on a cost approach. As explained above, Mr Alexander Demuth does not consider Claimants' contribution to the – very limited – progress the NOH Projects to be substantial. Nonetheless, Mr Alexander Demuth still applied a generous premium for Claimants by adding capital costs.

(144)   In any event, insofar as the Tribunal criticizes that Mr Alexander Demuth should have taken into account further development stages reached by Global Tech II and OWP West, these further steps were only achieved in 2014, i.e. long after both of Claimants' valuation dates, and incidentally also after the valuation date adopted by the Tribunal (i.e. 18 December 2013). It is therefore illogical that the Tribunal criticizes that these *ex post* development should have been considered. This error should be corrected.

## IX.    Inadequate and Inconsistent Cost Decision

(145)   As outlined above (B.), the Tribunal's cost decision is flawed due to several arithmetical inconsistencies and errors. However, in addition, the basis for the Tribunal's decision on cost allocation is not comprehensible and lacks any justification in the Award.

(146)   In para. 686 of the Award, the Tribunal decides that "*in view of the outcome of the proceedings, the Respondent should bear 67 percent of Claimants' legal costs, and conversely, Claimants should bear 33 percent of the Respondent's legal costs.*"

(147)   This is despite the fact that the Tribunal notes, in para. 684 of the Award, that "*while the Claimants prevailed on their FET claim for the Offshore Wind Projects and on their expropriation claim for the NOH2 projects, their FET and expropriation claims for the GFT were dismissed in their entirety. The claims for the breach of the FPS and Non-Impairment standards were also unsuccessful.*"

(148)   In sum, the result of the Award is that out of the four claims raised by Claimants with regard to the Offshore Wind Projects, two failed entirely. In addition, Claimants' FET and expropriation claims with respect to the GFT also failed entirely. In terms of quantum, Claimants overall sought compensation in an amount of EUR 505,3 million, not even half of which was awarded to them by the Tribunal. According to the Tribunal's decision, Respondent is ordered to pay an amount of EUR 240,95 million to Claimants in total.

(149)   In addition, Claimants have also not prevailed with regard to their interest claim, as the Tribunal has rejected the interest rates put forward by Claimants and has instead adopted an interest rate of 3 percent.

(150)   Against this background, it is incomprehensible on what basis the Tribunal determined to award Claimants 67 percent of their legal costs. This clearly contradicts the Tribunal's

---

[46]   *Ibid*, para. 627, 636.



finding in para. 684 of the Award that "*as to legal costs, the Tribunal agrees that these costs should 'follow the event' and accordingly their allocation should reflect the relative success of the Parties.*" While it may be true that Claimants prevailed on jurisdiction, they lost with regard to the majority of their liability claims.

## D.
## REQUEST FOR STAY OF ENFORCEMENT PENDING RECTIFICATION

(151)  Respondent also kindly requests to stay the enforcement of the Award pending rectification. The Tribunal has the power to do so pursuant to Art. 44 to 47 ICSID Convention.

(152)  Art. 44 to 47 ICSID Convention grant the Tribunal full power to decide any issue which is not decided by the applicable rules to the proceeding: Indeed, Art. 44 ICSID Convention provides:

> "*If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.*"

(153)  The question of a stay of enforcement until a request for rectification has been decided is not explicitly covered by the ICSID Convention, the ICSID Arbitration Rules or any rules agreed by the Parties. Therefore, the Tribunal has the power to decide a stay of enforcement on the basis of Art. 44 ICSID Convention.

(154)  Moreover, in similar terms, Art. 46 ICSID Convention states

> "*[e]xcept as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.*"

(155)  In accordance with Art. 49 (2) ICSID Convention, the decision rectifying an award

> "*shall become part of the award and the periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered.*"

(156)  Thus, the decision to stay the enforcement of the Award is incidental to the decision to rectify the Award. Therefore, the Tribunal also has power to decide a stay of enforcement based on Art. 46 ICSID Convention.

(157)  Accordingly, the Tribunal should stay the enforcement of the Award as the Award will not be complete until the decision regarding this Request for Rectification has been rendered. This is particularly true regarding the errors in the operative part of the Award, i.e., Section IX. lit. j. Since the errors of the Award also concern the arbitrators' fees and the amount of the cost reimbursement owed to Claimants, a stay of enforcement is imperative. As long as the final amounts to be paid by the Parties are not corrected and clarified, there must not be any enforcement attempts. Yet, ICSID already sent a certified paper copy to

Claimants, without first consulting with Respondent whether rectification or other remedies were warranted.

(158)    In any event, it should be noted that Rule 54 ICSID Arbitration Rules, pertaining to stay the enforcement of the award in the context of annulment proceedings, has been interpreted in a flexible manner, including for instance requests for supplementary decisions and rectification after the conclusion of an annulment procedure, even if not referred to specifically in the ICSID Arbitration Rules.[47] The arguments apply *mutatis mutandis* to this Request for Rectification.

(159)    Hence, Respondent respectfully requests the Tribunal to stay the enforcement of the Award at least until it has taken a decision on this Request for Rectification.

(160)    Since this Award requires rectification in many aspects, the certified copy that ICSID sent to Claimants on or after 10 January 2025 is still riddled with errors, including errors which affect the operative part, and cannot serve any purpose, let alone serve as a basis for any enforcement attempts by Claimants. Respondent therefore respectfully requests that the Tribunal order Claimants to send back the certified copy obtained from ICSID to the Secretary-General.

(161)    Respondent also respectfully requests the Tribunal to find that post-award interest will not start to accrue on 17 February 2025, but only 60 days from the date of the decision on this Request for Rectification for the following reasons:

(162)    First, Section IX. lit. h) of the Award refers to "*the date of this Award*" as the start for the post-award interest period. Since post-award interest can only accrue on sums truly due, the term "*the date of this Award*" can only designate the version of the Award that can serve as basis for enforcement. In case of rectification however, the initial Award can no longer serve as basis for enforcement, as it has become subject to modification by the Tribunal. This is particularly true here, as the operative part of the Award requires rectification regarding the overall sum the Tribunal awarded Claimants. The new operative part will only start to exist once the decision on the Request for Rectification has been taken. Thus, the Award can no longer be considered to have been issued on 18 December 2024, but only on the date of the rectification.

(163)    Second, Respondent has requested a stay of enforcement, which results in a provisional stay of the Award, pursuant to Rule 54 ICSID Arbitration Rules. It is self-evident that an unenforceable Award cannot have any effect regarding the accrual of interest. Hence, the wording in Section IX. lit. h) of the Award must be understood as referring to the date on which the Award has been corrected and finally dispatched to the parties.

(164)    Third, procedural fairness also warrants a postponement of the start of the interest period: As the operative part of the Award must be corrected and hence, the correct sums due

---

[47]    *Víctor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Republic of Chile's Request for a stay of enforcement of the unannulled portion of the award, accessible at Víctor Pey Casado and President Allende Foundation v. Republic of Chile (I), ICSID Case No. ARB/98/2 | italaw, para. 32 relating to a request for a supplementary decision.



remain to be determined, post-award interest must not start accruing, as it is unclear on which basis it will accrue.

(165) Fourth, and in any event, the short deadlines foreseen in both the Award and the ICSID Convention cannot be held against Respondent and result in the start of post-Award interest accruing: The request for rectification had to be filed within 45 days after the date of the Award. According to para. 689 lit. h) of the Award, post-award-interest is scheduled to accrue 60 days after the date of the Award. Thus, the deadline between the date of filing for the request and the date on which post-award-interest is scheduled to start accruing therefore is only 15 days. This is a very short deadline to take a decision to rectify the many errors in this Award. It would be unfair if Respondent had to pay post-award-interest regardless. For reasons of fairness, the start of the post-award-interest period must be stayed as well.

(166) Pursuant to Art. 49 (2) ICSID Convention and Rule 49 (1) ICSID Arbitration Rules, this Request for Rectification is submitted to the Secretary-General of the International Centre for the Settlement of Investment Disputes. It is made within the 45-day-time limit from the date of the rendering of the Award, in accordance with Art. 49 (1) ICSID Convention and Administrative and Financial Regulation 29.

(167) In accordance with Rule 49 (1) (d) ICSID Arbitration Rules as well Regulation 16 of the Administrative and Financial Regulations, Respondent paid the lodging fee in the amount of USD 10,000.00 necessary to file this Request for Rectification. The payment was made on 27 January 2025 to the following bank account:

| | |
|---|---|
| Account Name: | International Centre for Settlement of Investment Disputes |
| Account Number: | 226000253217 |
| Beneficiary Bank: | Bank of America |
| | 730 15th Street, N.W., 7th Floor |
| | Washington, D.C. 20005 |
| | United States of America |
| Fedwire (ABA #): | 026009593 |
| ACH #: | 054001204 |
| SWIFT: | BOFAUS3N |

(168) ICSID's corresponding payment confirmation issued by email on 30 January 2025 is attached to this submission as **Annex 3**.

(169) In view of the foregoing, Respondent respectfully requests that:

   **1.    The Secretary-General register this Request for Rectification of the Award pursuant to Rule 49 (1) ICSID Arbitration Rules and notify the Parties of the registration transmitting a copy to the Tribunal and Claimants;**



2. **The Tribunal order and inform all Parties that the execution of the Award has been provisionally stayed until this Request for Rectification is decided;**

3. **The Tribunal order Claimants to send back the certified copy of the Award to the Secretary-General, which ICSID sent to Claimants on or after 10 January 2025;**

4. **The Award be rectified under Rule 49 (1) ICSID Arbitration Rules in accordance with this Request for Rectification.**

(170)  Respondent reserves all rights.

Respectfully submitted on 31 January 2025

Noerr Partnerschaftsgesellschaft mbB

Dr. Anke Meier
Rechtsanwältin