# Exhibit F



# *Treaty Series*

———

*Treaties and international agreements
registered
or filed and recorded
with the Secretariat of the United Nations*

———

**VOLUME 2080**

———

# *Recueil des Traités*

———

*Traités et accords internationaux
enregistrés
ou classés et inscrits au répertoire
au Secrétariat de l'Organisation des Nations Unies*

**United Nations • Nations Unies
New York, 2002**

# I

*Treaties and international agreements*

*registered*

*September 1999*

*Nos. 36109 to 36116*

—————————

*Traités et accords internationaux*

*enregistrés*

*septembre 1999*

*N$^{os}$ 36109 à 36116*

# No. 36116

## Multilateral

**The Energy Charter Treaty (with annexes). Lisbon, 17 December 1994**

**Entry into force:** *16 April 1998, in accordance with article 44 (see following page)*

**Authentic texts:** *English, French, German, Italian, Russian and Spanish*

**Registration with the Secretariat of the United Nations:** *Portugal, 30 September 1999*

## Multilatéral

**Le Traité sur la Charte de l'énergie (avec annexes). Lisbonne, 17 décembre 1994**

**Entrée en vigueur :** *16 avril 1998, conformément à l'article 44 (voir la page suivante)*

**Textes authentiques :** *anglais, français, allemand, italien, russe et espagnol*

**Enregistrement auprès du Secrétariat des Nations Unies :** *Portugal, 30 septembre 1999*

| Participant | Ratification, Acceptance (A) and Approval (AA) | | |
|---|---|---|---|
| Austria | 16 | Dec | 1997 |
| Azerbaijan | 23 | Dec | 1997 |
| Bulgaria | 15 | Nov | 1996 |
| Croatia | 9 | Dec | 1997 |
| Cyprus | 16 | Jan | 1998 |
| Czech Republic | 17 | Jun | 1996 |
| Denmark | 16 | Dec | 1997 |
| European Communities | 16 | Dec | 1997 AA |
| Finland | 16 | Dec | 1997 |
| Georgia | 12 | Jul | 1995 |
| Germany | 16 | Dec | 1997 |
| Greece | 4 | Sep | 1997 |
| Italy with declarations | 16 | Dec | 1997 |
| Kazakhstan | 6 | Aug | 1996 |
| Kyrgyzstan | 7 | Jul | 1997 |
| Latvia | 15 | Jan | 1996 |
| Liechtenstein | 12 | Dec | 1997 |
| Luxembourg | 27 | Nov | 1997 |
| Netherlands | 16 | Dec | 1997 A |
| Portugal | 16 | Dec | 1997 |
| Republic of Moldova | 22 | Jun | 1996 |
| Romania | 12 | Aug | 1997 |
| Slovakia | 16 | Oct | 1995 |
| Slovenia | 10 | Sep | 1997 |
| Spain | 16 | Dec | 1997 |
| Sweden | 16 | Dec | 1997 |

| Participant | Ratification, Acceptance (A) and Approval (AA) | | |
|---|---|---|---|
| Switzerland | 19 | Sep | 1996 |
| Tajikistan | 25 | Jun | 1997 |
| Turkmenistan | 17 | Jul | 1997 |
| United Kingdom of Great Britain and Northern Ireland with declarations | 16 | Dec | 1997 |
| Uzbekistan | 12 | Mar | 1996 |

*Volume 2080, I-36116*

| Participant | Ratification, Acceptation (A) et Approbation (AA) | | | |
|---|---|---|---|---|
| Allemagne | 16 | déc | 1997 | |
| Autriche | 16 | déc | 1997 | |
| Azerbaïdjan | 23 | déc | 1997 | |
| Bulgarie | 15 | nov | 1996 | |
| Chypre | 16 | janv | 1998 | |
| Communautés européennes | 16 | déc | 1997 | AA |
| Croatie | 9 | déc | 1997 | |
| Danemark | 16 | déc | 1997 | |
| Espagne | 16 | déc | 1997 | |
| Finlande | 16 | déc | 1997 | |
| Grèce | 4 | sept | 1997 | |
| Géorgie | 12 | juil | 1995 | |
| Italie avec déclarations | 16 | déc | 1997 | |
| Kazakhstan | 6 | août | 1996 | |
| Kirghizistan | 7 | juil | 1997 | |
| Lettonie | 15 | janv | 1996 | |
| Liechtenstein | 12 | déc | 1997 | |
| Luxembourg | 27 | nov | 1997 | |
| Ouzbékistan | 12 | mars | 1996 | |
| Pays-Bas | 16 | déc | 1997 | A |
| Portugal | 16 | déc | 1997 | |
| Roumanie | 12 | août | 1997 | |
| Royaume-Uni de Grande-Bretagne et d'Irlande du Nord avec déclarations | 16 | déc | 1997 | |
| République de Moldova | 22 | juin | 1996 | |
| République tchèque | 17 | juin | 1996 | |

| Participant | Ratification, Acceptation (A) et Approbation (AA) | | |
|---|---|---|---|
| Slovaquie | 16 | oct | 1995 |
| Slovénie | 10 | sept | 1997 |
| Suisse | 19 | sept | 1996 |
| Suède | 16 | déc | 1997 |
| Tadjikistan | 25 | juin | 1997 |
| Turkménistan | 17 | juil | 1997 |

*Volume 2080, I-36116*

[ ENGLISH TEXT — TEXTE ANGLAIS ]

## THE ENERGY CHARTER TREATY

### PREAMBLE

The Contracting Parties to this Treaty,

Having regard to the Charter of Paris for a New Europe signed on 21 November 1990;

Having regard to the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991;

Recalling that all signatories to the Concluding Document of the Hague Conference undertook to pursue the objectives and principles of the European Energy Charter and implement and broaden their co-operation as soon as possible by negotiating in good faith an Energy Charter Treaty and Protocols, and desiring to place the commitments contained in that Charter on a secure and binding international legal basis;

Desiring also to establish the structural framework required to implement the principles enunciated in the European Energy Charter;

Wishing to implement the basic concept of the European Energy Charter initiative which is to catalyse economic growth by means of measures to liberalize investment and trade in energy;

Affirming that Contracting Parties attach the utmost importance to the effective implementation of full national treatment and most favoured nation treatment, and that these commitments will be applied to the Making of Investments pursuant to a supplementary treaty;

Having regard to the objective of progressive liberalization of international trade and to the principle of avoidance of discrimination in international trade as enunciated in the General Agreement on Tariffs and Trade and its Related Instruments and as otherwise provided for in this Treaty;

Determined progressively to remove technical, administrative and other barriers to trade in Energy Materials and Products and related equipment, technologies and services;

Looking to the eventual membership in the General Agreement on Tariffs and Trade of those Contracting Parties which are not currently parties thereto and concerned to provide interim trade arrangements which will assist those Contracting Parties and not impede their preparation for such membership;

Mindful of the rights and obligations of certain Contracting Parties which are also parties to the General Agreement on Tariffs and Trade and its Related Instruments;

Having regard to competition rules concerning mergers, monopolies, anti-competitive practices and abuse of dominant position;

Having regard also to the Treaty on the Non-Proliferation of Nuclear Weapons, the Nuclear Suppliers Guidelines and other international nuclear non-proliferation obligations or understandings;

*Volume 2080, I-36116*

Recognizing the necessity for the most efficient exploration, production, conversion, storage, transport, distribution and use of energy;

Recalling the United Nations Framework Convention on Climate Change, the Convention on Long-Range Transboundary Air Pollution and its protocols, and other international environmental agreements with  energy-related aspects; and

Recognizing the increasingly urgent need for measures to protect the environment, including the decommissioning of energy installations and waste disposal, and for internationally-agreed objectives and  criteria for these purposes,

Have agreed as follows:

PART I - DEFINITIONS AND PURPOSE

*Article 1 - Definitions*

As used in this Treaty:

(1) "Charter" means the European Energy Charter adopted in the Concluding Document of the Hague  Conference on the European Energy Charter signed at The Hague on 17 December 1991; signature of the  Concluding Document is considered to be signature of the Charter.

(2) "Contracting Party" means a state or Regional Economic Integration Organization which has consented  to be bound by this Treaty and for which the Treaty is in force.

(3) "Regional Economic Integration Organization" means an organization constituted by states to which   they have transferred competence over certain matters a number of which are governed by this Treaty,  including the authority to take decisions binding on them in respect of those matters.

(4) "Energy Materials and Products", based on the Harmonized System of the Customs Co-operation  Council and the Combined Nomenclature of the European Communities, means the items included in  Annex EM.

(5) "Economic Activity in the Energy Sector" means an economic activity concerning the exploration,  extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale  of Energy Materials and Products except those included in Annex NI, or concerning the distribution of heat  to multiple premises.

(6) "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and  includes:

(a) tangible and intangible, and movable and immovable, property, and any property rights such as leases,  mortgages, liens, and pledges;

(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company   or business enterprise, and bonds and other debt of a company or business enterprise;

(c) claims to money and claims to performance pursuant to contract having an economic value and  associated with an Investment;

(d) Intellectual Property;

(e) Returns;

(f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law   to undertake any Economic Activity in the Energy Sector.

A change in the form in which assets are invested does not affect their character as investments and the   term "Investment" includes all investments, whether existing at or made after the later of the date of entry   into force of this Treaty for the Contracting Party of the Investor making the investment and that for the   Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective   Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective   Date.

"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to   investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency   projects" and so notified to the Secretariat.

(7) "Investor" means:

(a) with respect to a Contracting Party:

(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

(ii) a company or other organization organized in accordance with the law applicable in that Contracting   Party;

(b) with respect to a "third state", a natural person, company or other organization which fulfils, mutatis   mutandis, the conditions specified in subparagraph (a) for a Contracting Party.

(8) "Make Investments" or "Making of Investments" means establishing new Investments, acquiring all or   part of existing Investments or moving into different fields of Investment activity.

(9) "Returns" means the amounts derived from or associated with an Investment, irrespective of the form in   which they are paid, including profits, dividends, interest, capital gains, royalty payments, management,   technical assistance or other fees and payments in kind.

(10) "Area" means with respect to a state that is a Contracting Party:

(a) the territory under its sovereignty, it being understood that territory includes land, internal waters and   the territorial sea; and

(b) subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with   regard to which that Contracting Party exercises sovereign rights and jurisdiction.

With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means   the Areas of the member states of such Organization, under the provisions contained in the agreement   establishing that Organization.

(11) (a) "GATT" means "GATT 1947" or "GATT 1994", or both of them where both are applicable.

(b) "GATT 1947" means the General Agreement on Tariffs and Trade, dated 30 October 1947, annexed to   the Final Act Adopted at the Conclusion of the Second Session of

the Preparatory Committee of the United Nations Conference on Trade and Employment, as subsequently rectified, amended or modified.

(c) "GATT 1994" means the General Agreement on Tariffs and Trade as specified in Annex 1A of the Agreement Establishing the World Trade Organization, as subsequently rectified, amended or modified.

A party to the Agreement Establishing the World Trade Organization is considered to be a party to GATT 1994.

(d) "Related Instruments" means, as appropriate:

(i) agreements, arrangements or other legal instruments, including decisions, declarations and understandings, concluded under the auspices of GATT 1947 as subsequently rectified, amended or modified; or

(ii) the Agreement Establishing the World Trade Organization including its Annex 1 (except GATT 1994), its Annexes 2, 3 and 4, and the decisions, declarations and understandings related thereto, as subsequently rectified, amended or modified.

(12) "Intellectual Property" includes copyrights and related rights, trademarks, geographical indications, industrial designs, patents, layout designs of integrated circuits and the protection of undisclosed information.

(13)(a) "Energy Charter Protocol" or "Protocol" means a treaty, the negotiation of which is authorized and the text of which is adopted by the Charter Conference, which is entered into by two or more Contracting Parties in order to complement, supplement, extend or amplify the provisions of this Treaty with respect to any specific sector or category of activity within the scope of this Treaty, or to areas of co-operation pursuant to Title III of the Charter.

(b) "Energy Charter Declaration" or "Declaration" means a non-binding instrument, the negotiation of which is authorized and the text of which is approved by the Charter Conference, which is entered into by two or more Contracting Parties to complement or supplement the provisions of this Treaty.

(14) "Freely Convertible Currency" means a currency which is widely traded in international foreign exchange markets and widely used in international transactions.

## Article 2 - Purpose of the Treaty

This Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.

## PART II - COMMERCE

## Article 3 - International Markets

The Contracting Parties shall work to promote access to international markets on commercial terms, and generally to develop an open and competitive market, for Energy Materials and Products.

*Article 4 - Non-Derogation from GATT and Related Instruments*

Nothing in this Treaty shall derogate, as between particular Contracting Parties which are parties to the GATT, from the provisions of the GATT and Related Instruments as they are applied between those Contracting Parties.

*Article 5 - Trade-Related Investment Measures*

(1) A Contracting Party shall not apply any trade-related investment measure that is inconsistent with the provisions of article III or XI of the GATT; this shall be without prejudice to the Contracting Party's rights and obligations under the GATT and Related Instruments and Article 29.

(2) Such measures include any investment measure which is mandatory or enforceable under domestic law or under any administrative ruling, or compliance with which is necessary to obtain an advantage, and which requires:

(a) the purchase or use by an enterprise of products of domestic origin or from any domestic source, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume or value of its local production; or

(b) that an enterprise's purchase or use of imported products be limited to an amount related to the volume or value of local products that it exports;

or which restricts:

(c) the importation by an enterprise of products used in or related to its local production, generally or to an amount related to the volume or value of local production that it exports;

(d) the importation by an enterprise of products used in or related to its local production by restricting its access to foreign exchange to an amount related to the foreign exchange inflows attributable to the enterprise; or

(e) the exportation or sale for export by an enterprise of products, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume or value of its local production.

(3) Nothing in paragraph (1) shall be construed to prevent a Contracting Party from applying the trade-related investment measures described in subparagraphs (2)(a) and (c) as a condition of eligibility for export promotion, foreign aid, government procurement or preferential tariff or quota programmes.

(4) Notwithstanding paragraph (1), a Contracting Party may temporarily continue to maintain trade-related investment measures which were in effect more than 180 days before its signature of this Treaty, subject to the notification and phase-out provisions set out in Annex TRM.

*Article 6 - Competition*

(1) Each Contracting Party shall work to alleviate market distortions and barriers to competition in Economic Activity in the Energy Sector.

(2) Each Contracting Party shall ensure that within its jurisdiction it has and enforces such laws as are necessary and appropriate to address unilateral and concerted anti-competitive conduct in Economic Activity in the Energy Sector.

(3) Contracting Parties with experience in applying competition rules shall give full consideration to providing, upon request and within available resources, technical assistance on the development and implementation of competition rules to other Contracting Parties.

(4) Contracting Parties may co-operate in the enforcement of their competition rules by consulting and exchanging information.

(5) If a Contracting Party considers that any specified anti-competitive conduct carried out within the Area of another Contracting Party is adversely affecting an important interest relevant to the purposes identified in this Article, the Contracting Party may notify the other Contracting Party and may request that its competition authorities initiate appropriate enforcement action. The notifying Contracting Party shall include in such notification sufficient information to permit the notified Contracting Party to identify the anti-competitive conduct that is the subject of the notification and shall include an offer of such further information and co-operation as the notifying Contracting Party is able to provide. The notified Contracting Party or, as the case may be, the relevant competition authorities may consult with the competition authorities of the notifying Contracting Party and shall accord full consideration to the request of the notifying Contracting Party in deciding whether or not to initiate enforcement action with respect to the alleged anti-competitive conduct identified in the notification. The notified Contracting Party shall inform the notifying Contracting Party of its decision or the decision of the relevant competition authorities and may if it wishes inform the notifying Contracting Party of the grounds for the decision. If enforcement action is initiated, the notified Contracting Party shall advise the notifying Contracting Party of its outcome and, to the extent possible, of any significant interim development.

(6) Nothing in this Article shall require the provision of information by a Contracting Party contrary to its laws regarding disclosure of information, confidentiality or business secrecy.

(7) The procedures set forth in paragraph (5) and Article 27(1) shall be the exclusive means within this Treaty of resolving any disputes that may arise over the implementation or interpretation of this Article.

## Article 7 - Transit

(1) Each Contracting Party shall take the necessary measures to facilitate the Transit of Energy Materials and Products consistent with the principle of freedom of transit and without distinction as to the origin, destination or ownership of such Energy Materials and Products or discrimination as to pricing on the basis of such distinctions, and without imposing any unreasonable delays, restrictions or charges.

(2) Contracting Parties shall encourage relevant entities to co-operate in:

(a) modernizing Energy Transport Facilities necessary to the Transit of Energy Materials and Products;

(b) the development and operation of Energy Transport Facilities serving the Areas of more than one Contracting Party;

(c) measures to mitigate the effects of interruptions in the supply of Energy Materials and Products;

(d) facilitating the interconnection of Energy Transport Facilities.

(3) Each Contracting Party undertakes that its provisions relating to transport of Energy Materials and Products and the use of Energy Transport Facilities shall treat Energy Materials and Products in Transit in no less favourable a manner than its provisions treat such materials and products originating in or destined for its own Area, unless an existing international agreement provides otherwise.

(4) In the event that Transit of Energy Materials and Products cannot be achieved on commercial terms by means of Energy Transport Facilities the Contracting Parties shall not place obstacles in the way of new capacity being established, except as may be otherwise provided in applicable legislation which is consistent with paragraph (1).

(5) A Contracting Party through whose Area Energy Materials and Products may transit shall not be obliged to

(a) permit the construction or modification of Energy Transport Facilities; or

(b) permit new or additional Transit through existing Energy Transport Facilities,

which it demonstrates to the other Contracting Parties concerned would endanger the security or efficiency of its energy systems, including the security of supply.

Contracting Parties shall, subject to paragraphs (6) and (7), secure established flows of Energy Materials and Products to, from or between the Areas of other Contracting Parties.

(6) A Contracting Party through whose Area Energy Materials and Products transit shall not, in the event of a dispute over any matter arising from that Transit, interrupt or reduce, permit any entity subject to its control to interrupt or reduce, or require any entity subject to its jurisdiction to interrupt or reduce the existing flow of Energy Materials and Products prior to the conclusion of the dispute resolution procedures set out in paragraph (7), except where this is specifically provided for in a contract or other agreement governing such Transit or permitted in accordance with the conciliator's decision.

(7) The following provisions shall apply to a dispute described in paragraph (6), but only following the exhaustion of all relevant contractual or other dispute resolution remedies previously agreed between the Contracting Parties party to the dispute or between any entity referred to in paragraph (6) and an entity of another Contracting Party party to the dispute:

(a) A Contracting Party party to the dispute may refer it to the Secretary-General by a notification summarizing the matters in dispute. The Secretary-General shall notify all Contracting Parties of any such referral.

(b) Within 30 days of receipt of such a notification, the Secretary-General, in consultation with the parties to the dispute and the other Contracting Parties concerned, shall appoint a conciliator. Such a conciliator shall have experience in the matters subject to dispute and shall not be a national or citizen of or permanently resident in a party to the dispute or one of the other Contracting Parties concerned.

(c) The conciliator shall seek the agreement of the parties to the dispute to a resolution thereof or upon a   procedure to achieve such resolution.  If within 90 days of his appointment he has failed to secure such   agreement, he shall recommend a resolution to the dispute or a procedure to achieve such resolution and   shall decide the interim tariffs and other terms and conditions to be observed for Transit from a date which   he shall specify until the dispute is resolved.

(d) The Contracting Parties undertake to observe and ensure that the entities under their control or   jurisdiction observe any interim decision under subparagraph (c) on tariffs, terms and conditions for 12   months following the conciliator's decision or until resolution of the dispute, whichever is earlier.

(e) Notwithstanding subparagraph (b) the Secretary-General may elect not to appoint a conciliator if in his  judgement the dispute concerns Transit that is or has been the subject of the dispute resolution procedures   set out in subparagraphs (a) to (d) and those proceedings have not resulted in a resolution of the dispute.

(f) The Charter Conference shall adopt standard provisions concerning the conduct of conciliation and the   compensation of conciliators.

(8) Nothing in this Article shall derogate from a Contracting Party's rights and obligations under international law including customary international law, existing bilateral or multilateral agreements,   including rules concerning submarine cables and pipelines.

(9) This Article shall not be so interpreted as to oblige any Contracting Party which does not have a certain   type of Energy Transport Facilities used for Transit to take any measure under this Article with respect to   that type of Energy Transport Facilities.  Such a Contracting Party is, however, obliged to comply with   paragraph (4).

(10) For the purposes of this Article:

(a) "Transit" means

(i) the carriage through the Area of a Contracting Party, or to or from port facilities in its Area for loading or unloading, of Energy Materials and Products originating in the Area of another state and destined for the   Area of a third state, so long as either the other state or the third state is a Contracting Party; or

(ii) the carriage through the Area of a Contracting Party of Energy Materials and Products originating in   the Area of another Contracting Party and destined for the Area of that other Contracting Party, unless the two Contracting Parties concerned decide otherwise and record their decision by a joint entry in Annex N.  The two Contracting Parties may delete their listing in Annex N by delivering a joint written notification of   their intentions to the Secretariat, which shall transmit that notification to all other Contracting Parties. The deletion shall take effect four weeks after such former notification.

(b) "Energy Transport Facilities" consist of high-pressure gas transmission pipelines, high-voltage   electricity transmission grids and lines, crude oil transmission pipelines, coal slurry pipelines, oil product   pipelines, and other fixed facilities specifically for handling Energy Materials and Products.

*Article 8 - Transfer of Technology*

(1) The Contracting Parties agree to promote access to and transfer of energy technology on a commercial and non-discriminatory basis to assist effective trade in Energy Materials and Products and Investment and to implement the objectives of the Charter subject to their laws and regulations, and to the protection of Intellectual Property rights.

(2) Accordingly, to the extcnt necessary to give effect to paragraph (1) the Contracting Parties shall eliminate existing and create no new obstacles to the transfer of technology in the field of Energy Materials and Products and related equipment and services, subject to non-proliferation and other international obligations.

*Article 9 - Access to Capital*

(1) The Contracting Parties acknowledge the importance of open capital markets in encouraging the flow of capital to finance trade in Energy Materials and Products and for the making of and assisting with regard to Investments in Economic Activity in the Energy Sector in the Areas of other Contracting Parties, particularly those with economies in transition. Each Contracting Party shall accordingly endeavour to promote conditions for access to its capital market by companies and nationals of other Contracting Parties, for the purpose of financing trade in Energy Materials and Products and for the purpose of Investment in Economic Activity in the Energy Sector in the Areas of those other Contracting Parties, on a basis no less favourable than that which it accords in like circumstances to its own companies and nationals or companies and nationals of any other Contracting Party or any third state, whichever is the most favourable.

(2) A Contracting Party may adopt and maintain programmes providing for access to public loans, grants, guarantees or insurance for facilitating trade or Investment abroad. It shall make such facilities available, consistent with the objectives, constraints and criteria of such programmes (including any objectives, constraints or criteria relating to the place of business of an applicant for any such facility or the place of delivery of goods or services supplied with the support of any such facility) for Investments in the Economic Activity in the Energy Sector of other Contracting Parties or for financing trade in Energy Materials and Products with other Contracting Parties.

(3) Contracting Parties shall, in implementing programmes in Economic Activity in the Energy Sector to improve the economic stability and investment climates of the Contracting Parties, seek as appropriate to encourage the operations and take advantage of the expertise of relevant international financial institutions.

(4) Nothing in this Article shall prevent:

(a) financial institutions from applying their own lending or underwriting practices based on market principles and prudential considerations; or

(b) a Contracting Party from taking measures:

(i) for prudential reasons, including the protection of Investors, consumers, depositors, policy-holders or persons to whom a fiduciary duty is owed by a financial service supplier; or

(ii) to ensure the integrity and stability of its financial system and capital markets.

PART III - INVESTMENT PROMOTION AND PROTECTION

*Article 10 - Promotion, Protection and Treatment of Investments*

(1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.

Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.

Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

(2) Each Contracting Party shall endeavour to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3).

(3) For the purposes of this Article, "Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable.

(4) A supplementary treaty shall, subject to conditions to be laid down therein, oblige each party thereto to accord to Investors of other parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3). That treaty shall be open for signature by the states and Regional Economic Integration Organizations which have signed or acceded to this Treaty.

Negotiations towards the supplementary treaty shall commence not later than I January 1995, with a view to concluding it by 1 January 1998.

(5) Each Contracting Party shall, as regards the Making of Investments in its Area, endeavour to:

(a) limit to the minimum the exceptions to the Treatment described in paragraph (3);

(b) progressively remove existing restrictions affecting Investors of other Contracting Parties.

(6)(a) A Contracting Party may, as regards the Making of Investments in its Area, at any time declare voluntarily to the Charter Conference, through the Secretariat, its intention not to introduce new exceptions to the Treatment described in paragraph (3).

(b) A Contracting Party may, furthermore, at any time make a voluntary commitment to accord to Investors of other Contracting Parties, as regards the Making of Investments in

some or all Economic Activities in the Energy Sector in its Area, the Treatment described in paragraph (3).

Such commitments shall be notified to the Secretariat and listed in Annex VC and shall be binding under this Treaty.

(7) Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable.

(8) The modalities of application of paragraph (7) in relation to programmes under which a Contracting Party provides grants or other financial assistance, or enters into contracts, for energy technology research and development, shall be reserved for the supplementary treaty described in paragraph (4). Each Contracting Party shall through the Secretariat keep the Charter Conference informed of the modalities it applies to the programmes described in this paragraph.

(9) Each state or Regional Economic Integration Organization which signs or accedes to this Treaty shall, on the date it signs the Treaty or deposits its instrument of accession, submit to the Secretariat a report summarizing all laws, regulations or other measures relevant to:

(a) exceptions to paragraph (2); or

(b) the programmes referred to in paragraph (8).

A Contracting Party shall keep its report up to date by promptly submitting amendments to the Secretariat. The Charter Conference shall review these reports periodically.

In respect of subparagraph (a) the report may designate parts of the energy sector in which a Contracting Party accords to Investors of other Contracting Parties the Treatment described in paragraph (3).

In respect of subparagraph (b) the review by the Charter Conference may consider the effects of such programmes on competition and Investments.

(10) Notwithstanding any other provision of this Article, the treatment described in paragraphs (3) and (7) shall not apply to the protection of Intellectual Property; instead, the treatment shall be as specified in the corresponding provisions of the applicable international agreements for the protection of Intellectual Property rights to which the respective Contracting Parties are parties.

(11) For the purposes of Article 26, the application by a Contracting Party of a trade-related investment measure as described in Article 5(1) and (2) to an Investment of an Investor of another Contracting Party existing at the time of such application shall, subject to Article 5(3) and (4), be considered a breach of an obligation of the former Contracting Party under this Part.

(12) Each Contracting Party shall ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorizations.

### Article 11 - Key Personnel

(1) A Contracting Party shall, subject to its laws and regulations relating to the entry, stay and work of natural persons, examine in good faith requests by Investors of another Contracting Party, and key personnel who are employed by such Investors or by Investments of such Investors, to enter and remain temporarily in its Area to engage in activities connected with the making or the development, management, maintenance, use, enjoyment or disposal of relevant Investments, including the provision of advice or key technical services.

(2) A Contracting Party shall permit Investors of another Contracting Party which have Investments in its Area, and Investments of such Investors, to employ any key person of the Investor's or the Investment's choice regardless of nationality and citizenship provided that such key person has been permitted to enter, stay and work in the Area of the former Contracting Party and that the employment concerned conforms to the terms, conditions and time limits of the permission granted to such key person.

### Article 12 - Compensation for Losses

(1) Except where Article 13 applies, an Investor of any Contracting Party which suffers a loss with respect to any Investment in the Area of another Contracting Party owing to war or other armed conflict, state of national emergency, civil disturbance, or other similar event in that Area, shall be accorded by the latter Contracting Party, as regards restitution, indemnification, compensation or other settlement, treatment which is the most favourable of that which that Contracting Party accords to any other Investor, whether its own Investor, the Investor of any other Contracting Party, or the Investor of any third state.

(2) Without prejudice to paragraph (1), an Investor of a Contracting Party which, in any of the situations referred to in that paragraph, suffers a loss in the Area of another Contracting Party resulting from

(a) requisitioning of its Investment or part thereof by the latter's forces or authorities; or

(b) destruction of its Investment or part thereof by the latter's forces or authorities, which was not required by the necessity of the situation,

shall be accorded restitution or compensation which in either case shall be prompt, adequate and effective.

### Article 13 - Expropriation

(1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

(a) for a purpose which is in the public interest;

(b) not discriminatory;

111

(c) carried out under due process of law; and

(d) accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time  immediately before the Expropriation or impending Expropriation became known in such a way as to affect  the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on  the basis of the market rate of exchange existing for that currency on the Valuation Date.  Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

(2) The Investor affected shall have a right to prompt review, under the law of the Contracting Party  making the Expropriation, by a judicial or other competent and independent authority of that Contracting  Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1).

(3) For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.

## *Article 14 - Transfers Related to Investments*

(1) Each Contracting Party shall with respect to Investments in its Area of Investors of any other Contracting Party guarantee the freedom of transfer into and out of its Area, including the transfer of:

(a) The initial capital plus any additional capital for the maintenance and development of an Investment;

(b) Returns;

(c) Payments under a contract, including amortization of principal and accrued interest payments pursuant  to a loan agreement;

(d) Unspent earnings and other remuneration of personnel engaged from abroad in connection with that  Investment;

(e) Proceeds from the sale or liquidation of all or any part of an Investment;

(f) Payments arising out of the settlement of a dispute;

(g) Payments of compensation pursuant to Articles 12 and 13.

(2) Transfers under paragraph (1) shall be effected without delay and (except in case of a Return in kind) in a Freely Convertible Currency.

(3) Transfers shall be made at the market rate of exchange existing on the date of transfer with respect to spot transactions in the currency to be transferred.  In the absence of a market for foreign exchange, the rate to be used will be the most recent rate applied to inward investments or the most recent exchange rate for conversion of currencies into Special Drawing Rights, whichever is more favourable to the Investor.

(4) Notwithstanding paragraphs (1) to (3), a Contracting Party may protect the rights of creditors, or ensure  compliance with laws on the issuing, trading and dealing in securities and the satisfaction of judgements in  civil, administrative and criminal adjudicatory proceedings, through the equitable, non-discriminatory, and  good faith application of its laws and regulations.

(5) Notwithstanding paragraph (2), Contracting Parties which are states that were constituent parts of the  former Union of Soviet Socialist Republics may provide in agreements concluded between them that  transfers of payments shall be made in the currencies of such Contracting Parties, provided that such agreements do not treat Investments in their Areas of Investors of other Contracting Parties less favourably than either Investments of Investors of the Contracting Parties which have entered into such agreements or  Investments of Investors of any third state.

(6) Notwithstanding subparagraph (1)(b), a Contracting Party may restrict the transfer of a Return in kind  in circumstances where the Contracting Party is permitted under Article 29(2)(a) or the GATT and Related  Instruments to restrict or prohibit the exportation or the sale for export of the product constituting the Return in kind; provided that a Contracting Party shall permit transfers of Returns in kind to be effected as  authorized or specified in an investment agreement, investment authorization, or other written agreement between the Contracting Party and either an Investor of another Contracting Party or its Investment.

### Article 15 - Subrogation

(1) If a Contracting Party or its designated agency (hereinafter referred to as the "Indemnifying Party") makes a payment under an indemnity or guarantee given in respect of an Investment of an Investor (hereinafter referred to as the "Party Indemnified") in the Area of another Contracting Party (hereinafter referred to as the "Host Party"), the Host Party shall recognize:

(a) The assignment to the Indemnifying Party of all the rights and claims in respect of such Investment; and

(b) The right of the Indemnifying Party to exercise all such rights and enforce such claims by virtue of subrogation.

(2) The Indemnifying Party shall be entitled in all circumstances to:

(a) The same treatment in respect of the rights and claims acquired by it by virtue of the assignment  referred to in paragraph (1); and

(b) The same payments due pursuant to those rights and claims,

as the Party Indemnified was entitled to receive by virtue of this Treaty in respect of the Investment  concerned.

(3) In any proceeding under Article 26, a Contracting Party shall not assert as a defence, counterclaim, right of set-off or for any other reason, that indemnification or other compensation for all or part of the alleged damages has been received or will be received pursuant to an insurance or guarantee contract.

*Article 16 - Relation to other Agreements*

Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,

(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment.

*Article 17 - Non-Application of Part III in Certain Circumstances*

Each Contracting Party reserves the right to deny the advantages of this Part to:

(1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized; or

(2) an Investment, if the denying Contracting Party establishes that such Investment is an Investment of an Investor of a third state with or as to which the denying Contracting Party:

(a) does not maintain a diplomatic relationship; or

(b) adopts or maintains measures that:

(i) prohibit transactions with Investors of that state; or

(ii) would be violated or circumvented if the benefits of this Part were accorded to Investors of that state or to their Investments.

PART IV - MISCELLANEOUS PROVISIONS

*Article 18 - Sovereignty over Energy Resources*

(1) The Contracting Parties recognize state sovereignty and sovereign rights over energy resources. They reaffirm that these must be exercised in accordance with and subject to the rules of international law.

(2) Without affecting the objectives of promoting access to energy resources, and exploration and development thereof on a commercial basis, the Treaty shall in no way prejudice the rules in Contracting Parties governing the system of property ownership of energy resources.

(3) Each state continues to hold in particular the rights to decide the geographical areas within its Area to be made available for exploration and development of its energy resources, the optimalization of their recovery and the rate at which they may be depleted or otherwise exploited, to specify and enjoy any taxes, royalties or other financial pay-

114

ments payable by virtue of such exploration and exploitation, and to regulate the environmental and safety aspects of such exploration, development and reclamation within its Area, and to participate in such exploration and exploitation, inter alia, through direct participation by the government or through state enterprises.

(4) The Contracting Parties undertake to facilitate access to energy resources, inter alia, by allocating in a non-discriminatory manner on the basis of published criteria authorizations, licences, concessions and contracts to prospect and explore for or to exploit or extract energy resources.

## *Article 19 - Environmental Aspects*

(1) In pursuit of sustainable development and taking into account its obligations under those international agreements concerning the environment to which it is party, each Contracting Party shall strive to minimize in an economically efficient manner harmful Environmental Impacts occurring either within or outside its Area from all operations within the Energy Cycle in its Area, taking proper account of safety. In doing so each Contracting Party shall act in a Cost-Effective manner. In its policies and actions each Contracting Party shall strive to take precautionary measures to prevent or minimize environmental degradation. The Contracting Parties agree that the polluter in the Areas of Contracting Parties, should, in principle, bear the cost of pollution, including transboundary pollution, with due regard to the public interest and without distorting Investment in the Energy Cycle or international trade. Contracting Parties shall accordingly:

(a) take account of environmental considerations throughout the formulation and implementation of their energy policies;

(b) promote market-oriented price formation and a fuller reflection of environmental costs and benefits throughout the Energy Cycle;

(c) having regard to Article 34(4), encourage co-operation in the attainment of the environmental objectives of the Charter and co-operation in the field of international environmental standards for the Energy Cycle, taking into account differences in adverse effects and abatement costs between Contracting Parties;

(d) have particular regard to Improving Energy Efficiency, to developing and using renewable energy sources, to promoting the use of cleaner fuels and to employing technologies and technological means that reduce pollution;

(e) promote the collection and sharing among Contracting Parties of information on environmentally sound and economically efficient energy policies and Cost-Effective practices and technologies;

(f) promote public awareness of the Environmental Impacts of energy systems, of the scope for the prevention or abatement of their adverse Environmental Impacts, and of the costs associated with various prevention or abatement measures;

(g) promote and co-operate in the research, development and application of energy efficient and environmentally sound technologies, practices and processes which will minimize harmful Environmental Impacts of all aspects of the Energy Cycle in an economically efficient manner;

115

(h) encourage favourable conditions for the transfer and dissemination of such technologies consistent with the adequate and effective protection of Intellectual Property rights;

(i) promote the transparent assessment at an early stage and prior to decision, and subsequent monitoring, of Environmental Impacts of environmentally significant energy investment projects;

(j) promote international awareness and information exchange on Contracting Parties' relevant environmental programmes and standards and on the implementation of those programmes and standards;

(k) participate, upon request, and within their available resources, in the development and implementation of appropriate environmental programmes in the Contracting Parties.

(2) At the request of one or more Contracting Parties, disputes concerning the application or interpretation of provisions of this Article shall, to the extent that arrangements for the consideration of such disputes do not exist in other appropriate international fora, be reviewed by the Charter Conference aiming at a solution.

(3) For the purposes of this Article:

(a) "Energy Cycle" means the entire energy chain, including activities related to prospecting for, exploration, production, conversion, storage, transport, distribution and consumption of the various forms of energy, and the treatment and disposal of wastes, as well as the decommissioning, cessation or closure of these activities, minimizing harmful Environmental Impacts;

(b) "Environmental Impact" means any effect caused by a given activity on the environment, including human health and safety, flora, fauna, soil, air, water, climate, landscape and historical monuments or other    physical structures or the interactions among these factors; it also includes effects on cultural heritage or socio-economic conditions resulting from alterations to those factors;

(c) "Improving Energy Efficiency" means acting to maintain the same unit of output (of a good or service) without reducing the quality or performance of the output, while reducing the amount of energy required to   produce that output;

(d) "Cost-Effective" means to achieve a defined objective at the lowest cost or to achieve the greatest  benefit at a given cost.

### Article 20 - Transparency

(1) Laws, regulations, judicial decisions and administrative rulings of general application which affect trade in Energy Materials and Products are, in accordance with Article 29(2)(a), among the measures subject to the transparency disciplines of the GATT and relevant Related Instruments.

(2) Laws, regulations, judicial decisions and administrative rulings of general application made effective by any Contracting Party, and agreements in force between Contracting Parties, which affect other matters covered by this Treaty shall also be published promptly in such a manner as to enable Contracting Parties and Investors to become acquainted with them.  The provisions of this paragraph shall not require any Contracting Party to disclose confidential information which would impede law enforcement or otherwise  be contrary

to the public interest or would prejudice the legitimate commercial interests of any Investor.

(3) Each Contracting Party shall designate one or more enquiry points to which requests for information about the above mentioned laws, regulations, judicial decisions and administrative rulings may be addressed and shall communicate promptly such designation to the Secretariat which shall make it available on request.

*Article 21 - Taxation*

(1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

(2) Article 7(3) shall apply to Taxation Measures other than those on income or on capital, except that such provision shall not apply to:

(a) an advantage accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii); or

(b) any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure of a Contracting Party arbitrarily discriminates against Energy Materials and Products originating in, or destined for the Area of another Contracting Party or arbitrarily restricts benefits accorded under Article 7(3).

(3) Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:

(a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization; or

(b) any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts benefits accorded under the Investment provisions of this Treaty.

(4) Article 29(2) to (6) shall apply to Taxation Measures other than those on income or on capital.

(5)(a) Article 13 shall apply to taxes.

(b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

(i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

117

(ii) The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve   the issues so referred.  Where non-discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in   force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and   Development;

(iii) Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the   expiry of the six-month period;

(iv) Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

(6) For the avoidance of doubt, Article 14 shall not limit the right of a Contracting Party to impose or   collect a tax by withholding or other means.

(7)For the purposes of this Article:

(a) The term "Taxation Measure" includes:

(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision  thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages   or salaries paid by enterprises, as well as taxes on capital appreciation.

(c) A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement  in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry  responsible for taxes or their authorized representatives.

(d) For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

## Article 22 - State and Privileged Enterprises

(1) Each Contracting Party shall ensure that any state enterprise which it maintains or establishes shall conduct its activities in relation to the sale or provision of goods and ser-

vices in its Area in a manner consistent with the Contracting Party's obligations under Part III of this Treaty.

(2) No Contracting Party shall encourage or require such a state enterprise to conduct its activities in its  Area in a manner inconsistent with the Contracting Party's obligations under other provisions of this  Treaty.

(3) Each Contracting Party shall ensure that if it establishes or maintains an entity and entrusts the entity  with regulatory, administrative or other governmental authority, such entity shall exercise that authority in a  manner consistent with the Contracting Party's obligations under this Treaty.

(4) No Contracting Party shall encourage or require any entity to which it grants exclusive or special  privileges to conduct its activities in its Area in a manner inconsistent with the Contracting Party's  obligations under this Treaty.

(5) For the purposes of this Article, "entity" includes any enterprise, agency or other organization or  individual.

## Article 23 - Observance by Sub-National Authorities

(1) Each Contracting Party is fully responsible under this Treaty for the observance of all provisions of the  Treaty, and shall take such reasonable measures as may be available to it to ensure such observance by  regional and local governments and authorities within its Area.

(2) The dispute settlement provisions in Parts II, IV and V of this Treaty may be invoked in respect of  measures affecting the observance of the Treaty by a Contracting Party which have been taken by regional  or local governments or authorities within the Area of the Contracting Party.

## Article 24 - Exceptions

(1) This Article shall not apply to Articles 12, 13 and 29.

(2) The provisions of this Treaty other than

(a) those referred to in paragraph (1); and

(b) with respect to subparagraph (i), Part III of the Treaty

shall not preclude any Contracting Party from adopting or enforcing any measure

(i)  necessary to protect human, animal or plant life or health;

(ii) essential to the acquisition or distribution of Energy Materials and Products in conditions of short supply arising from causes outside the control of that Contracting Party, provided that any such measure shall be consistent with the principles that

(A) all other Contracting Parties are entitled to an equitable share of the international supply of such  Energy Materials and Products; and

(B) any such measure that is inconsistent with this Treaty shall be discontinued as soon as the conditions   giving rise to it have ceased to exist; or

119

(iii) designed to benefit Investors who are aboriginal people or socially or economically disadvantaged individuals or groups or their Investments and notified to the Secretariat as such, provided that such measure

(A) has no significant impact on that Contracting Party's economy; and

(B) docs not discriminate between Investors of any other Contracting Party and Investors of that Contracting Party not included among those for whom the measure is intended,

provided that no such measure shall constitute a disguised restriction on Economic Activity in the Energy Sector, or arbitrary or unjustifiable discrimination between Contracting Parties or between Investors or other interested persons of Contracting Parties. Such measures shall be duly motivated and shall not nullify or impair any benefit one or more other Contracting Parties may reasonably expect under this Treaty to an extent greater than is strictly necessary to the stated end.

(3) The provisions of this Treaty other than those referred to in paragraph (1) shall not be construed to prevent any Contracting Party from taking any measure which it considers necessary:

(a) for the protection of its essential security interests including those

(i) relating to the supply of Energy Materials and Products to a military establishment; or

(ii) taken in time of war, armed conflict or other emergency in international relations;

(b) relating to the implementation of national policies respecting the non-proliferation of nuclear weapons or other nuclear explosive devices or needed to fulfil its obligations under the Treaty on the Non-Proliferation of Nuclear Weapons, the Nuclear Suppliers Guidelines, and other international nuclear non-proliferation obligations or understandings; or

(c) for the maintenance of public order.

Such measure shall not constitute a disguised restriction on Transit.

(4) The provisions of this Treaty which accord most favoured nation treatment shall not oblige any Contracting Party to extend to the Investors of any other Contracting Party any preferential treatment:

(a) resulting from its membership of a free-trade area or customs union; or

(b) which is accorded by a bilateral or multilateral agreement concerning economic cooperation between states that were constituent parts of the former Union of Soviet Socialist Republics pending the establishment of their mutual economic relations on a definitive basis.

*Article 25 - Economic Integration Agreements*

(1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.

(2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalizing, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.

(3) This Article shall not affect the application of the GATT and Related Instruments according to Article 29.

## PART V - DISPUTE SETTLEMENT

*Article 26 - Settlement of Disputes between an Investor and a Contracting Party*

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3)(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b)(i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute nnder subparagraph (2)(a) or (b).

(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

(c) A Contracting Party listed in Annex 1A does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a)(i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Na-

*Volume 2080, I-36116*

tionals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or

(ii) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;

(b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or

(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

(5)(a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules;

(ii) an "agreement in writing" for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and

(iii) "the parties to a contract [to] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules.

(b) Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

(7) An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".

(8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

*Article 27 - Settlement of Disputes between Contracting Parties*

(1) Contracting Parties shall endeavour to settle disputes concerning the application or interpretation of this Treaty through diplomatic channels.

(2) If a dispute has not been settled in accordance with paragraph (1) within a reasonable period of time, either party thereto may, except as otherwise provided in this Treaty or agreed in writing by the Contracting Parties, and except as concerns the application or interpretation of Article 6 or Article 19 or, for Contracting Parties listed in Annex IA, the last sentence of Article 10(1), upon written notice to the other party to the dispute submit the matter to an ad hoc tribunal under this Article.

(3) Such an ad hoc arbitral tribunal shall be constituted as follows:

(a) The Contracting Party instituting the proceedings shall appoint one member of the tribunal and inform the other Contracting Party to the dispute of its appointment within 30 days of receipt of the notice referred to in paragraph (2) by the other Contracting Party;

(b) Within 60 days of the receipt of the written notice referred to in paragraph (2) the other Contracting Party to the dispute shall appoint one member. If the appointment is not made within the time limit prescribed, the Contracting Party having instituted the proceedings may, within 90 days of the receipt of the written notice referred to in paragraph (2), request that the appointment be made in accordance with subparagraph (d);

(c) A third member, who may not be a national or citizen of a Contracting Party party to the dispute, shall be appointed by the Contracting Parties parties to the dispute. That member shall be the President of the tribunal. If, within 150 days of the receipt of the notice referred to in paragraph (2), the Contracting Parties are unable to agree on the appointment of a third member, that appointment shall be made, in accordance with subparagraph (d), at the request of either Contracting Party submitted within 180 days of the receipt of that notice;

(d) Appointments requested to be made in accordance with this paragraph shall be made by the Secretary-General of the Permanent Court of International Arbitration within 30 days of the receipt of a request to do so. If the Secretary-General is prevented from discharging this task, the appointments shall be made by the First Secretary of the Bureau. If the latter, in turn, is prevented from discharging this task, the appointments shall be made by the most senior Deputy;

(e) Appointments made in accordance with subparagraphs (a) to (d) shall be made with regard to the qualifications and experience, particularly in matters covered by this Treaty, of the members to be appointed;

(f) In the absence of an agreement to the contrary between the Contracting Parties, the Arbitration Rules of UNCITRAL shall govern, except to the extent modified by the Contracting Parties parties to the dispute or by the arbitrators. The tribunal shall take its decisions by a majority vote of its members;

(g) The tribunal shall decide the dispute in accordance with this Treaty and applicable rules and principles of international law;

(h) The arbitral award shall be final and binding upon the Contracting Parties parties to the dispute;

*Volume 2080, I-36116*

(i) Where, in making an award, a tribunal finds that a measure of a regional or local government or authority within the Area of a Contracting Party listed in Part I of Annex P is not in conformity with this Treaty, either party to the dispute may invoke the provisions of Part II of Annex P;

(j) The expenses of the tribunal, including the remuneration of its members, shall be borne in equal shares by the Contracting Parties parties to the dispute. The tribunal may, however, at its discretion direct that a higher proportion of the costs be paid by one of the Contracting Parties parties to the dispute;

(k) Unless the Contracting Parties parties to the dispute agree otherwise, the tribunal shall sit in The Hague, and use the premises and facilities of the Permanent Court of Arbitration;

(l) A copy of the award shall be deposited with the Secretariat which shall make it generally available.

### *Article 28 - Non-Application of Article 27 to Certain Disputes*

A dispute between Contracting Parties with respect to the application or interpretation of Article 5 or 29 shall not be settled under Article 27 unless the Contracting Parties parties to the dispute so agree.

### PART VI - TRANSITIONAL PROVISIONS

### *Article 29 - Interim Provisions on Trade-Related Matters*

(1) The provisions of this Article shall apply to trade in Energy Materials and Products while any Contracting Party is not a party to the GATT and Related Instruments.

(2)(a) Trade in Energy Materials and Products between Contracting Parties at least one of which is not a party to the GATT or a relevant Related Instrument shall be governed, subject to subparagraphs (b) and (c) and to the exceptions and rules provided for in Annex G, by the provisions of GATT 1947 and Related Instruments, as applied on 1 March 1994 and practised with regard to Energy Materials and Products by parties to GATT 1947 among themselves, as if all Contracting Parties were parties to GATT 1947 and Related Instruments.

(b) Such trade of a Contracting Party which is a state that was a constituent part of the former Union of Soviet Socialist Republics may instead be governed, subject to the provisions of Annex TFU, by an agreement between two or more such states, until 1 December 1999 or the admission of that Contracting Party to the GATT, whichever is the earlier.

(c) As concerns trade between any two parties to the GATT, subparagraph (a) shall not apply if either of those parties is not a party to GATT 1947.

(3) Each signatory to this Treaty, and each state or Regional Economic Integration Organization acceding to this Treaty, shall on the date of its signature or of its deposit of its instrument of accession provide to the Secretariat a list of all tariff rates and other charges levied on Energy Materials and Products at the time of importation or exportation, notifying the level of such rates and charges applied on such date of signature or deposit. Any

changes to such rates or other charges shall be notified to the Secretariat, which shall inform the Contracting Parties of such changes.

(4) Each Contracting Party shall endeavour not to increase any tariff rate or other charge levied at the time of importation or exportation:

(a) in the case of the importation of Energy Materials and Products described in Part I of the Schedule relating to the Contracting Party referred to in article II of the GATT, above the level set forth in that Schedule, if the Contracting Party is a party to the GATT;

(b) in the case of the exportation of Energy Materials and Products, and that of their importation if the Contracting Party is not a party to the GATT, above the level most recently notified to the Secretariat, except as permitted by the provisions made applicable by subparagraph (2)(a).

(5) A Contracting Party may increase such tariff rate or other charge above the level referred to in paragraph (4) only if:

(a) in the case of a rate or other charge levied at the time of importation, such action is not inconsistent with the applicable provisions of the GATT other than those provisions of GATT 1947 and Related Instruments listed in Annex G and the corresponding provisions of GATT 1994 and Related Instruments; or

(b) it has, to the fullest extent practicable under its legislative procedures, notified the Secretariat of its proposal for such an increase, given other interested Contracting Parties reasonable opportunity for consultation with respect to its proposal, and accorded consideration to any representations from such Contracting Parties.

(6) Signatories undertake to commence negotiations not later than 1 January 1995 with a view to concluding by 1 January 1998, as appropriate in the light of any developments in the world trading system, a text of an amendment to this Treaty which shall, subject to conditions to be laid down therein, commit each Contracting Party not to increase such tariffs or charges beyond the level prescribed under that amendment.

(7) Annex D shall apply to disputes regarding compliance with provisions applicable to trade under this Article and, unless both Contracting Parties agree otherwise, to disputes regarding compliance with Article 5 between Contracting Parties at least one of which is not a party to the GATT, except that Annex D shall not apply to any dispute between Contracting Parties, the substance of which arises under an agreement that:

(a) has been notified in accordance with and meets the other requirements of subparagraph (2)(b) and Aunex TFU; or

(b) establishes a free-trade area or a customs union as described in article XXIV of the GATT.

### Article 30 - Developments in International Trading Arrangements

Contracting Parties undertake that in the light of the results of the Uruguay Round of Multilateral Trade Negotiations embodied principally in the Final Act thereof done at Marrakesh, 15 April 1994, they will commence consideration not later than 1 July 1995 or the entry into force of this Treaty, whichever is the later, of appropriate amendments to this Treaty with a view to the adoption of any such amendments by the Charter Conference.

*Article 31 - Energy-Related Equipment*

The provisional Charter Conference shall at its first meeting commence examination of the inclusion of energy-related equipment in the trade provisions of this Treaty.

*Article 32 - Transitional Arrangements*

(1) In recognition of the need for time to adapt to the requirements of a market economy, a Contracting Party listed in Annex T may temporarily suspend full compliance with its obligations under one or more of the following provisions of this Treaty, subject to the conditions in paragraphs (3) to (6):

Article 6(2) and (5)

Article 7(4)

Article 9(1)

Article 10(7) - specific measures

Article 14(1)(d) - related only to transfer of unspent earnings

Article 20(3)

Article 22(1) and (3)

(2) Other Contracting Parties shall assist any Contracting Party which has suspended full compliance under paragraph (1) to achieve the conditions under which such suspension can be terminated. This assistance may be given in whatever form the other Contracting Parties consider most effective to respond to the needs notified under subparagraph (4)(c) including, where appropriate, through bilateral or multilateral arrangements.

(3) The applicable provisions, the stages towards full implementation of each, the measures to be taken and the date or, exceptionally, contingent event, by which each stage shall be completed and measure taken are listed in Annex T for each Contracting Party claiming transitional arrangements. Each such Contracting Party shall take the measure listed by the date indicated for the relevant provision and stage as set out in Annex T. Contracting Parties which have temporarily suspended full compliance under paragraph (1) undertake to comply fully with the relevant obligations by 1 July 2001. Should a Contracting Party find it necessary, due to exceptional circumstances, to request that the period of such temporary suspension be extended or that any further temporary suspension not previously listed in Annex T be introduced, the decision on a request to amend Annex T shall be made by the Charter Conference.

(4) A Contracting Party which has invoked transitional arrangements shall notify the Secretariat no less often than once every 12 months:

(a) of the implementation of any measures listed in its Annex T and of its general progress to full compliance;

(b) of the progress it expects to make during the next 12 months towards full compliance with its obligations, of any problem it foresees and of its proposals for dealing with that problem;

(c) of the need for technical assistance to facilitate completion of the stages set out in Annex T as necessary for the full implementation of this Treaty, or to deal with any problem notified pursuant to subparagraph (b) as well as to promote other necessary market-oriented reforms and modernization of its energy sector;

(d) of any possible need to make a request of the kind referred to in paragraph (3).

(5) The Secretariat shall:

(a) circulate to all Contracting Parties the notifications referred to in paragraph (4);

(b) circulate and actively promote, relying where appropriate on arrangements existing within other international organizations, the matching of needs for and offers of technical assistance referred to in   paragraph (2) and subparagraph (4)(c);

(c) circulate to all Contracting Parties at the end of each six month period a summary of any notifications made under subparagraph (4)(a) or (d).

(6) The Charter Conference shall annually review the progress by Contracting Parties towards implementation of the provisions of this Article and the matching of needs and offers of technical  assistance referred to in paragraph (2) and subparagraph (4)(c).  In the course of that review it may decide   to take appropriate action.

PART VII - STRUCTURE AND INSTITUTIONS

*Article 33 - Energy Charter Protocols and Declarations*

(1) The Charter Conference may authorize the negotiation of a number of Energy Charter Protocols or Declarations in order to pursue the objectives and principles of the Charter.

(2) Any signatory to the Charter may participate in such negotiation.

(3) A state or Regional Economic Integration Organization shall not become a party to a Protocol or  Declaration unless it is, or becomes at the same time, a signatory to the Charter and a Contracting Party to this Treaty.

(4) Subject to paragraph (3) and subparagraph (6)(a), final provisions applying to a Protocol shall be defined in that Protocol.

(5) A Protocol shall apply only to the Contracting Parties which consent to be bound by it, and shall not derogate from the rights and obligations of those Contracting Parties not party to the Protocol.

(6)(a) A Protocol may assign duties to the Charter Conference and functions to the Secretariat, provided   that no such assignment may be made by an amendment to a Protocol unless that amendment is approved   by the Charter Conference, whose approval shall not be subject to any provisions of the Protocol which are   authorized by subparagraph (b).

(b) A Protocol which provides for decisions thereunder to be taken by the Charter Conference may, subject  to subparagraph (a), provide with respect to such decisions:

(i) for voting rules other than those contained in Article 36;

(ii) that only parties to the Protocol shall be considered to be Contracting Parties for the purposes of Article 36 or eligible to vote under the rules provided for in the Protocol.

### Article 34 - Energy Charter Conference

(1) The Contracting Parties shall meet periodically in the Energy Charter Conference (referred to herein as the "Charter Conference") at which each Contracting Party shall be entitled to have one representative. Ordinary meetings shall be held at intervals determined by the Charter Conference.

(2) Extraordinary meetings of the Charter Conference may be held at such times as may be determined by the Charter Conference, or at the written request of any Contracting Party, provided that, within six weeks of the request being communicated to the Contracting Parties by the Secretariat, it is supported by at least one-third of the Contracting Parties.

(3) The functions of the Charter Conference shall be to:

(a) carry out the duties assigned to it by this Treaty and any Protocols;

(b) keep under review and facilitate the implementation of the principles of the Charter and of the provisions of this Treaty and the Protocols;

(c) facilitate in accordance with this Treaty and the Protocols the co-ordination of appropriate general measures to carry out the principles of the Charter;

(d) consider and adopt programmes of work to be carried out by the Secretariat;

(e) consider and approve the annual accounts and budget of the Secretariat;

(f) consider and approve or adopt the terms of any headquarters or other agreement, including privileges and immunities considered necessary for the Charter Conference and the Secretariat;

(g) encourage co-operative efforts aimed at facilitating and promoting market-oriented reforms and modernization of energy sectors in those countries of Central and Eastern Europe and the former Union of Soviet Socialist Republics undergoing economic transition;

(h) authorize and approve the terms of reference for the negotiation of Protocols, and consider and adopt the texts thereof and of amendments thereto;

(i) authorize the negotiation of Declarations, and approve their issuance;

(j) decide on accessions to this Treaty;

(k) authorize the negotiation of and consider and approve or adopt association agreements;

(l) consider and adopt texts of amendments to this Treaty;

(m) consider and approve modifications of and technical changes to the Annexes to this Treaty;

(n) appoint the Secretary-General and take all decisions necessary for the establishment and functioning of the Secretariat including the structure, staff levels and standard terms of employment of officials and employees.

(4) In the performance of its duties, the Charter Conference, through the Secretariat, shall co-operate with and make as full a use as possible, consistently with economy and efficiency, of the services and programmes of other institutions and organizations with established competence in matters related to the objectives of this Treaty.

(5) The Charter Conference may establish such subsidiary bodies as it considers appropriate for the performance of its duties.

(6) The Charter Conference shall consider and adopt rules of procedure and financial rules.

(7) In 1999 and thereafter at intervals (of not more than five years) to be determined by the Charter Conference, the Charter Conference shall thoroughly review the functions provided for in this Treaty in the light of the extent to which the provisions of the Treaty and Protocols have been implemented. At the conclusion of each review the Charter Conference may amend or abolish the functions specified in paragraph (3) and may discharge the Secretariat.

*Article 35 - Secretariat*

(1) In carrying out its duties, the Charter Conference shall have a Secretariat which shall be composed of a Secretary-General and such staff as are the minimum consistent with efficient performance.

(2) The Secretary-General shall be appointed by the Charter Conference. The first such appointment shall be for a maximum period of five years.

(3) In the performance of its duties the Secretariat shall be responsible to and report to the Charter Conference.

(4) The Secretariat shall provide the Charter Conference with all necessary assistance for the performance of its duties and shall carry out the functions assigned to it in this Treaty or in any Protocol and any other functions assigned to it by the Charter Conference.

(5) The Secretariat may enter into such administrative and contractual arrangements as may be required for the effective discharge of its functions.

*Article 36 - Voting*

(1) Unanimity of the Contracting Parties Present and Voting at the meeting of the Charter Conference where such matters fall to be decided shall be required for decisions by the Charter Conference to:

(a) adopt amendments to this Treaty other than amendments to Articles 34 and 35 and Annex T;

(b) approve accessions to this Treaty under Article 41 by states or Regional Economic Integration Organizations which were not signatories to the Charter as of 16 June 1995;

(c) authorize the negotiation of and approve or adopt the text of association agreements;

(d) approve modifications to Annexes EM, NI, G and B;

(e) approve technical changes to the Annexes to this Treaty; and

(f) approve the Secretary-General's nominations of panelists under Annex D, paragraph (7).

The Contracting Parties shall make every effort to reach agreement by consensus on any other matter requiring their decision under this Treaty. If agreement cannot be reached by consensus, paragraphs (2) to (5) shall apply.

(2) Decisions on budgetary matters referred to in Article 34(3)(e) shall be taken by a qualified majority of Contracting Parties whose assessed contributions as specified in Annex B represent, in combination, at least three-fourths of the total assessed contributions specified therein.

(3) Decisions on matters referred to in Article 34(7) shall be taken by a three-fourths majority of the Contracting Parties.

(4) Except in cases specified in subparagraphs (1)(a) to (f), paragraphs (2) and (3), and subject to paragraph (6), decisions provided for in this Treaty shall be taken by a three-fourths majority of the Contracting Parties Present and Voting at the meeting of the Charter Conference at which such matters fall to be decided.

(5) For purposes of this Article, "Contracting Parties Present and Voting" means Contracting Parties present and casting affirmative or negative votes, provided that the Charter Conference may decide upon rules of procedure to enable such decisions to be taken by Contracting Parties by correspondence.

(6) Except as provided in paragraph (2), no decision referred to in this Article shall be valid unless it has the support of a simple majority of the Contracting Parties.

(7) A Regional Economic Integration Organization shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Treaty; provided that such an Organization shall not exercise its right to vote if its member states exercise theirs, and vice versa.

(8) In the event of persistent arrears in a Contracting Party's discharge of financial obligations under this Treaty, the Charter Conference may suspend that Contracting Party's voting rights in whole or in part.

*Article 37 - Funding Principles*

(1) Each Contracting Party shall bear its own costs of representation at meetings of the Charter Conference and any subsidiary bodies.

(2) The cost of meetings of the Charter Conference and any subsidiary bodies shall be regarded as a cost of the Secretariat.

(3) The costs of the Secretariat shall be met by the Contracting Parties assessed according to their capacity to pay, determined as specified in Annex B, the provisions of which may be modified in accordance with Article 36(1)(d).

(4) A Protocol shall contain provisions to assure that any costs of the Secretariat arising from that Protocol are borne by the parties thereto.

(5) The Charter Conference may in addition accept voluntary contributions from one or more Contracting Parties or from other sources. Costs met from such contributions shall not be considered costs of the Secretariat for the purposes of paragraph (3).

PART VIII - FINAL PROVISIONS

*Article 38 - Signature*

This Treaty shall be open for signature at Lisbon from 17 December 1994 to 16 June 1995 by the states and Regional Economic Integration Organizations which have signed the Charter.

*Article 39 - Ratification, Acceptance or Approval*

This Treaty shall be subject to ratification, acceptance or approval by signatories. Instruments of ratification, acceptance or approval shall be deposited with the Depositary.

*Article 40 - Application to Territories*

(1) Any state or Regional Economic Integration Organization may at the time of signature, ratification, acceptance, approval or accession, by a declaration deposited with the Depositary, declare that the Treaty shall be binding upon it with respect to all the territories for the international relations of which it is responsible, or to one or more of them. Such declaration shall take effect at the time the Treaty enters into force for that Contracting Party.

(2) Any Contracting Party may at a later date, by a declaration deposited with the Depositary, bind itself under this Treaty with respect to other territory specified in the declaration. In respect of such territory the Treaty shall enter into force on the ninetieth day following the receipt by the Depositary of such declaration.

(3) Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification to the Depositary. The withdrawal shall, subject to the applicability of Article 47(3), become effective upon the expiry of one year after the date of receipt of such notification by the Depositary.

(4) The definition of "Area" in Article 1(10) shall be construed having regard to any declaration deposited under this Article.

*Article 41 - Accession*

This Treaty shall be open for accession, from the date on which the Treaty is closed for signature, by states and Regional Economic Integration Organizations which have signed the Charter, on terms to be approved by the Charter Conference. The instruments of accession shall be deposited with the Depositary.

*Article 42 - Amendments*

(1) Any Contracting Party may propose amendments to this Treaty.

131

(2) The text of any proposed amendment to this Treaty shall be communicated to the Contracting Parties by the Secretariat at least three months before the date on which it is proposed for adoption by the Charter Conference.

(3) Amendments to this Treaty, texts of which have been adopted by the Charter Conference, shall be communicated by the Secretariat to the Depositary which shall submit them to all Contracting Parties for ratification, acceptance or approval.

(4) Instruments of ratification, acceptance or approval of amendments to this Treaty shall be deposited with the Depositary. Amendments shall enter into force between Contracting Parties having ratified, accepted or approved them on the nineteenth day after deposit with the Depositary of instruments of ratification, acceptance or approval by at least three-fourths of the Contracting Parties. Thereafter the amendments shall enter into force for any other Contracting Party on the nineteenth day after that Contracting Party deposits its instrument of ratification, acceptance or approval of the amendments.

### Article 43 - Association Agreements

(1) The Charter Conference may authorize the negotiation of association agreements with states or Regional Economic Integration Organizations, or with international organizations, in order to pursue the objectives and principles of the Charter and the provisions of this Treaty or one or more Protocols.

(2) The relationship established with and the rights enjoyed and obligations incurred by an associating state, Regional Economic Integration Organization, or international organization shall be appropriate to the particular circumstances of the association, and in each case shall be set out in the association agreement.

### Article 44 - Entry into Force

(1) This Treaty shall enter into force on the nineteenth day after the date of deposit of the thirtieth instrument of ratification, acceptance or approval thereof, or of accession thereto, by a state or Regional Economic Integration Organization which is a signatory to the Charter as of 16 June 1995.

(2) For each state or Regional Economic Integration Organization which ratifies, accepts or approves this Treaty or accedes thereto after the deposit of the thirtieth instrument of ratification, acceptance or approval, it shall enter into force on the nineteenth day after the date of deposit by such state or Regional Economic Integration Organization of its instrument of ratification, acceptance, approval or accession.

(3) For the purposes of paragraph (1), any instrument deposited by a Regional Economic Integration Organization shall not be counted as additional to those deposited by member states of such Organization.

*Volume 2080, I-36116*

### *Article 45 - Provisional Application*

(1) Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory  in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.

(2)(a) Notwithstanding paragraph (1) any signatory may, when signing, deliver to the Depositary a  declaration that it is not able to accept provisional application. The obligation contained in paragraph (1)  shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depositary.

(b) Neither a signatory which makes a declaration in accordance with subparagraph (a) nor Investors of  that signatory may claim the benefits of provisional application under paragraph (1).

(c) Notwithstanding subparagraph (a), any signatory making a declaration referred to in subparagraph (a)  shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in  accordance with Article 44, to the extent that such provisional application is not inconsistent with its laws  or regulations.

(3)(a) Any signatory may terminate its provisional application of this Treaty by written notification to the  Depositary of its intention not to become a Contracting Party to the Treaty.

Termination of provisional application for any signatory shall take effect upon the expiration of 60 days from the date on which such signatory's written notification is received by the Depositary.

(b) In the event that a signatory terminates provisional application under subparagraph (a), the obligation of the signatory under paragraph (1) to apply Parts III and V with respect to any Investments made in its Area during such provisional application by Investors of other signatories shall nevertheless remain in effect with respect to those Investments for twenty years following the effective date of termination, except as  otherwise provided in subparagraph (c).

(c) Subparagraph (b) shall not apply to any signatory listed in Annex PA. A signatory shall be removed  from the list in Annex PA effective upon delivery to the Depositary of its request therefor.

(4) Pending the entry into force of this Treaty the signatories shall meet periodically in the provisional Charter Conference, the first meeting of which shall be convened by the provisional Secretariat referred to in paragraph (5) not later than 180 days after the opening date for signature of the Treaty as specified in Article 38.

(5)The functions of the Secretariat shall be carried out on an interim basis by a provisional Secretariat until  the entry into force of this Treaty pursuant to Article 44 and the establishment of a Secretariat.

(6) The signatories shall, in accordance with and subject to the provisions of paragraph (1) or subparagraph  (2)(c) as appropriate, contribute to the costs of the provisional Secretariat as if the signatories were  Contracting Parties under Article 37(3). Any modifications

made to Annex B by the signatories shall terminate upon the entry into force of this Treaty.

(7) A state or Regional Economic Integration Organization which, prior to this Treaty's entry into force, accedes to the Treaty in accordance with Article 41 shall, pending the Treaty's entry into force, have the rights and assume the obligations of a signatory under this Article.

### Article 46 - Reservations

No reservations may be made to this Treaty.

### Article 47 - Withdrawal

(1) At any time after five years from the date on which this Treaty has entered into force for a Contracting Party, that Contracting Party may give written notification to the Depositary of its withdrawal from the Treaty.

(2) Any such withdrawal shall take effect upon the expiry of one year after the date of the receipt of the notification by the Depositary, or on such later date as may be specified in the notification of withdrawal.

(3) The provisions of this Treaty shall continue to apply to Investments made in the Area of a Contracting Party by Investors of other Contracting Parties or in the Area of other Contracting Parties by Investors of that Contracting Party as of the date when that Contracting Party's withdrawal from the Treaty takes effect for a period of 20 years from such date.

(4) All Protocols to which a Contracting Party is party shall cease to be in force for that Contracting Party on the effective date of its withdrawal from this Treaty.

### Article 48 - Status of Annexes and Decisions

The Annexes to this Treaty and the Decisions set out in Annex 2 to the Final Act of the European Energy Charter Conference signed at Lisbon on 17 December 1994 are integral parts of the Treaty.

### Article 49 - Depositary

The Government of the Portuguese Republic shall be the Depositary of this Treaty.

*Article 50 - Authentic Texts*

   In witness whereof the undersigned, being duly authorized to that effect, have signed this Treaty in English, French, German, Italian, Russian and Spanish, of which every text is equally authentic, in one original, which will be deposited with the Government of the Portuguese Republic. Done at Lisbon on the seventeenth day of December in the year one thousand nine hundred and ninety-four.

ANNEXES TO THE ENERGY CHARTER TREATY[1]

1. ANNEX EM
ENERGY MATERIALS AND PRODUCTS
(IN ACCORDANCE WITH ARTICLE 1 (4))

2. ANNEX NI
NON-APPLICABLE ENERGY MATERIALS AND PRODUCTS FOR DEFINITION
OF "ECONOMIC ACTIVITY IN THE ENERGY SECTOR
(IN ACCORDANCE WITH ARTICLE 1(5))

3. ANNEX TRM
NOTIFICATION AND PHASE-OUT (TRIMS)
(IN ACCORDANCE WITH ARTICLE 5 (4))

4. ANNEX N
LIST OF CONTRACTING PARTIES REQUIRING AT LEAST 3 SEPARATE AREAS
TO BE INVOLVED IN A TRANSIT    (IN ACCORDANCE WITH ARTICLE 7(10)(A))

5. ANNEX VC
LIST OF CONTRACTING PARTIES WHICH HAVE MADE VOLUNTARY BIND-
ING COMMITMENTS IN RESPECT OF   ARTICLE 10(3)
(IN ACCORDANCE WITH ARTICLE 10(6))

6. ANNEX ID
LIST OF CONTRACTING PARTIES NOT ALLOWING AN INVESTOR TO RESUB-
MIT THE SAME DISPUTE TO INTERNATIONAL ARBITRATION AT A LATER
STAGE UNDER ARTICLE 26    (IN ACCORDANCE WITH ARTICLE 26(3)(B)(I))

7. ANNEX IA
LIST OF CONTRACTING PARTIES NOT ALLOWING AN INVESTOR OR CON-
TRACTING PARTY TO SUBMIT A DISPUTE CONCERNING THE LAST SEN-
TENCE OF ARTICLE 10(1) TO INTERNATIONAL ARBITRATION
(IN ACCORDANCE WITH ARTICLES 26(3)(C) AND 27(2))

8.   ANNEX P
SPECIAL SUB-NATIONAL DISPUTE PROCEDURE
(IN ACCORDANCE WITH ARTICLE 27(3)(I))

---

1. Not published.

*Volume 2080, I-36116*

### 9.   ANNEX G
### EXCEPTIONS AND RULES GOVERNING THE APPLICATION OF THE PROVISIONS OF THE GATT AND RELATED INSTRUMENTS
### (IN ACCORDANCE WITH ARTICLE 29(2)(A))


### 10.ANNEX TFU
### PROVISIONS REGARDING TRADE AGREEMENTS BETWEEN STATES WHICH WERE CONSTITUENT PARTS OF THE FORMER UNION OF SOVIET SOCIALIST REPUBLICS
### (IN ACCORDANCE WITH ARTICLE 29(2)(B))


### 11. ANNEX D
### INTERIM PROVISIONS FOR TRADE DISPUTE SETTLEMENT
### (IN ACCORDANCE WITH ARTICLE 29 (7))


### 12. ANNEX B
### FORMULA FOR ALLOCATING CHARTER COSTS
### (IN ACCORDANCE WITH ARTICLE 37(3))


### 13. ANNEX PA
### LIST OF SIGNATORIES WHICH DO NOT ACCEPT THE PROVISIONAL APPLICATION OBLIGATION OF ARTICLE 45(3)(B)
### (IN ACCORDANCE WITH ARTICLE 45(3)(C))


### 14. ANNEX T
### CONTRACTING PARTIES' TRANSITIONAL MEASURES
### (IN ACCORDANCE WITH ARTICLE 32 (1))


### ANNEX EM
### ENERGY MATERIALS AND PRODUCTS (IN ACCORDANCE WITH ARTICLE 1(4))


| | | |
|---|---|---|
| Nuclear Energy: | 26.12 | Uranium or thorium ores and concentrates. |
| | 26.12.10 | Uranium ores and concentrates. |
| | 26.12.20 | Thorium ores and concentrates. |
| | 28.44 | Radioactive chemical elements and radioactive isotopes (including the fissile or fertile chemical elements and isotopes) and their compounds; mixtures and residues containing these products. |

137

*Volume 2080, I-36116*

|  | 28.44.10 | Natural uranium and its compounds. |
|--|----------|-----------------------------------|
|  | 28.44.20 | Uranium enriched in U235 and its compounds; plutonium and its compounds. |
|  | 28.44.30 | Uranium depleted in U235 and its compounds; thorium and its compounds. |
|  | 28.44.40 | Radioactive elements and isotopes and radioactive compounds other than 28.44.10, 28.44.20 or 28.44.30. |
|  | 28.44.50 | Spent (irradiated) fuel elements (cartridges) of nuclear reactors. |
|  | 28.44.10 | Heavy water (deuterium oxide). |
| Coal, Natural, Gas, Petroleum fuels manufactured fom coal. and Petroleum Products, Electrical Energy | 27.01 | Coal, briquettes, ovoids and similar solid |
|  | 27.02 | Lignite, whether or not agglomerated excluding jet. |
|  | 27.03 | Peat (including peat litter), whether or not agglomerated. |
|  | 27.04 | Coke and semi-coke of coal, of lignite or of peat, whether or not agglomerated; retort carbon. |
|  | 27.05 | Coal gas, water gas, producer gas and similar gases, other than petroleum gases and other gaseous hydrocarbons. |
|  | 27.06 | Tar distilled from coal, from lignite or from peat, and other mineral tars, whether or not dehydrated or partially distilled, including reconstituted tars. |

| 27.07 | Oils and other products of the distillation of high temperature coal tar; similar products in which the weight of the aromatic constituents exceeds that of the non-aromatic constituents (e.g., benzole, toluote, xylole, naphtalene, other aromatic hydrocarbon mixtures, phenols, creosote oils and others). |
|-------|---|
| 27.08 | Pitch and pitch coke, obtained from coal tar or from other mineral tars. |
| 27.09 | Petroleum oils and oils obtained from bituminous minerals, crude. |
| 27.10 | Petroleum oils and oils obtained from bituminous minerals, other than crude. |
| 27.11 | Liquified petroleum gases and other gaseous hydrocarbons |
| | natural gas |
| | propane |
| | butanes |
| | ethylene, propylene, butylene and butadiene (27.11.14) |
| | other |
| | In gaseous state: |
| | natural gas |
| | other |
| 27.13 | Petroleum coke, petroleum bitumen and other residues of petroleum oils or of oils obtained from bituminous minerals. |
| 27.14 | Bitumen and asphalt, natural; bituminous or oil shale and tar sands; asphaltites and asphaltic rocks. |
| 27.15 | Bituminous mixtures based on natural asphalt, on natural bitumen, on petroleum bitumen, on mineral tar or on mineral tar pitch (e.g., bituminous mastics, cut-backs). |

*Volume 2080, I-36116*

|  | 27.16 | Electrical energy. |
|---|---|---|

Other Energy

|  | 44.01.10 | Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms. |
|---|---|---|
|  | 44.02 | Charcoal (including charcoal from shells or nuts), whether or not agglomerated. |

## ANNEX NI
## NON-APPLICABLE ENERGY MATERIALS AND PRODUCTS FOR DEFINITIONS OF "ECONOMIC ACTIVITY IN THE ENERGY SECTOR" (IN ACCORDANCE WITH ARTICLE 1(5))

| 27.07 | Oils and other products of the distillation of high temperature coal tar; similar products in which the weight of the aromatic constituents exceeds that of the non-aromatic constituents (e.g., benzole, toluole, xylole, naphtalene, other aromatic hydrocarbon mixtures, phenols, creosote oils and others). |
|---|---|
| 44.01.10 | Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms. Charcoal (including charcoal from shells or nuts), whether or not agglomerated. |
| 44.02 | Charcoal (including charcoal from shells or nuts), whether or not agglomerated. |

## ANNEX TRM
## NOTIFICATION AND PHASE-OUT (TRIMS) (IN ACCORDANCE WITH ARTICLE 5(4))

1) Each Contracting Party shall notify to the Secretariat all trade-related investment measures which it applies that are not in conformity with the provisions of Article 5, within:

(a) 90 days after the entry into force of this Treaty if the Contracting Party is a party to the GATT; or

(b) 12 months after the entry into force of this Treaty if the Contracting Party is not a party to the GATT.

Such trade-related investment measures of general or specific application shall be notified along with their principal features.

(2) In the case of trade-related investment measures applied under discretionary authority, each specific application shall be notified. Information that would prejudice the legitimate commercial interests of particular enterprises need not be disclosed.

(3) Each Contracting Party shall eliminate all trade-related investment measures which are notified under paragraph (1) within:

(a) two years from the date of entry into force of this Treaty if the Contracting Party is a party to the GATT; or

(b) three years from the date of entry into force of this Treaty if the Contracting Party is not a party to the GATT.

(4) During the applicable period referred to in paragraph (3) a Contracting Party shall not modify the terms of any trade-related investment measure which it notifies under paragraph (1) from

those prevailing at the date of entry into force of this Treaty so as to increase the degree of inconsistency with the provisions of Article 5 of this Treaty.

(5) Notwithstanding the provisions of paragraph (4), a Contracting Party, in order not to disadvantage established enterprises which are subject to a trade-related investment measure notified under paragraph (1), may apply during the phase-out period the same trade-related investment measure to a new Investment where:

(a) the products of such Investment are like products to those of the established enterprises; and

(b) such application is necessary to avoid distorting the conditions of competition between the new Investment and the established enterprises.

Any trade-related investment measure so applied to a new Investment shall be notified to the Secretariat. The terms of such a trade-related investment measure shall be equivalent in their competitive effect to those applicable to the established enterprises, and it shall be terminated at the same time.

(6) Where a state or Regional Economic Integration Organization accedes to this Treaty after the Treaty has entered into force:

(a) the notification referred to in paragraphs (1) and (2) shall be made by the later of the applicable date in paragraph (1) or the date of deposit of the instrument of accession; and

(b) the end of the phase-out period shall be the later of the applicable date in paragraph (3) or the date on which the Treaty enters into force for that state or Regional Economic Integration Organization.

## 4. Aunex N

### List of Contracting Parties Requiring at least 3 separate Areas to be involved in a Transit
### (In accordance with Article 7(10)(a))

1. Canada and United States of America

ANNEX VC
LIST OF CONTRACTING PARTIES WHICH HAVE MADE VOLUNTARY BINDING
COMMITMENTS
IN RESPECT OF   ARTICLE 10(3)
(IN ACCORDANCE WITH ARTICLE 10(6))


ANNEX ID

LIST OF CONTRACTING PARTIES NOT ALLOWING AN INVESTOR TO RESUB-
MIT THE SAME DISPUTE TO INTERNATIONAL ARBITRATION   AT A LATER
STAGE   UNDER ARTICLE 26
(IN ACCORDANCE WITH ARTICLE 26(3)(B)(I))

1. Australia

2. Azerbaijan

3. Bulgaria

4. Canada

5. Croatia

6. Cyprus

7. The Czech Republic

8. European Communities

9. Finland

10. Greece

11. Hungary

12. Ireland

13. Italy

14. Japan

15. Kazakhstan

16. Norway

17. Poland

18. Portugal

19. Romania

20. The Russian Federation

21. Slovenia

22. Spain

23. Sweden

24. United States of America

7. Annex IA  List of Contracting Parties Not Allowing an Investor or Contracting Party to Submit a Dispute Concerning the   last Sentence of Article 10(1) to International Arbitration   (In accordance with Articles 26(3)(c) and 27(2))

1. Australia

2. Canada

3. Hungary

4. Norway

## ANNEX P
## SPECIAL SUB-NATIONAL DISPUTE PROCEDURE  (IN ACCORDANCE WITH ARTICLE 27(3)(I))

Part I

1. Canada

2. Australia

Part II

(1) Where, in making an award, the tribunal finds that a measure of a regional or local government or authority  of a Contracting Party (hereinafter referred to as the "Responsible Party") is not in conformity with a provision   of this Treaty, the Responsible Party shall take such reasonable measures as may be available to it to ensure   observance of the Treaty in respect of the measure.

(2) The Responsible Party shall, within 30 days from the date the award is made, provide to the Secretariat   written notice of its intentions as to ensuring observance of the Treaty in respect of the measure.  The   Secretariat shall present the notification to the Charter Conference at the earliest practicable opportunity, and   no later than the meeting of the Charter Conference following receipt of the notice.  If it is impracticable to   ensure observance immediately, the Responsible Party shall have a reasonable period of time in which to do   so.  The reasonable period of time shall be agreed by both parties to the dispute.  In the event that such agreement is not reached, the Responsible Party shall propose a reasonable period for approval by the Charter Conference.

(3) Where the Responsible Party fails, within the reasonable period of time, to ensure observance in respect   of the measure, it shall at the request of the other Contracting Party party to the dispute (hereinafter referred   to as the "Injured Party") endeavour to agree with the Injured Party on appropriate compensation as a mutually   satisfactory resolution of the dispute.

(4) If no satisfactory compensation has been agreed within 20 days of the request of the Injured Party, the   Injured Party may with the authorization of the Charter Conference suspend such of its obligations to the   Responsible Party under the Treaty as it considers equivalent to those denied by the measure in question, until   such time as the Contracting Parties have reached agreement on a resolution of their dispute or the non-conforming measure has been brought into conformity with the Treaty.

143

(5) In considering what obligations to suspend, the Injured Party shall apply the following principles and  procedures:

(a) The Injured Party should first seek to suspend obligations with respect to the same Part of the Treaty as that  in which the tribunal has found a violation.

(b) If the Injured Party considers that it is not practicable or effective to suspend obligations with respect to  the same Part of the Treaty, it may seek to suspend obligations in other Parts of the Treaty.  If the Injured Party  decides to request authorization to suspend obligations under this subparagraph, it shall state the reasons  therefor in its request to the Charter Conference for authorization.

(6) On written request of the Responsible Party, delivered to the Injured Party and to the President of the  tribunal that rendered the award, the tribunal shall determine whether the level of obligations suspended by the  Injured Party is excessive, and if so, to what extent.  If the tribunal cannot be reconstituted, such  determination  shall be made by one or more arbitrators appointed by the Secretary-General. Determinations pursuant to this  paragraph shall be completed within 60 days of the request to the tribunal or the appointment by the Secretary-General.  Obligations shall not be suspended pending the determination, which shall be final and binding.

(7) In suspending any obligations to a Responsible Party, an Injured Party shall make every effort not to affect   adversely the rights under the Treaty of any other Contracting Party.

## ANNEX G
## EXCEPTIONS AND RULES GOVERNING THE APPLICATION OF THE PROVISIONS OF THE GATT AND RELATED INSTRUMENTS  (IN ACCORDANCE WITH ARTICLE 29(2)(A))

(1) The following provisions of GATT 1947 and Related Instruments shall not be applicable under Article  29(2)(a):

(a) General Agreement on Tariffs and Trade

II - Schedules of Concessions (and the Schedules to the General Agreement on Tariffs and Trade)

IV - Special Provisions relating to Cinematographic Films

XV- Exchange Arrangements

XVIII - Governmental Assistance to Economic Development

XXII - Consultation

XXIII - Nullification or Impairment

XXV - Joint Action by the Contracting Parties

XXVI - Acceptance.  Entry into Force and Registration

XXVII - Withholding or Withdrawal of Concessions

XXVIII - Modification of Schedules

XXVIII - bis Tariff Negotiations

XXIX - The relation of this Agreement to the Havana Charter

XXX - Amendments

XXXI - Withdrawal

XXXII - Contracting Parties

XXXIII - Accession

XXXV - Non-application of the Agreement between particular Contracting Parties

XXXVI - Principles and Objectives

XXXVII - Commitments

XXXVIII - Joint Action

Annex H - Relating to Article XXVI

Annex I - Notes and Supplementary Provisions (related to above GATT articles)

Safeguard Action for Development Purposes

Understanding Regarding Notification, Consultation, Dispute Settlement and Surveillance.

(b) Related Instruments

(i ) Agreement on Technical Barriers to Trade (Standards Code)

Preamble (paragraphs  1, 8, 9)

1.3 General provisions

2.6.4 Preparation, adoption and application of technical regulations and standards by central government  bodies

10.6 Information about technical regulations, standards and certification systems

11 Technical assistance to other Parties

12 Special and differential treatment of developing countries

13 The Committee on Technical Barriers to Trade

14 Consultation and dispute settlement

15 Final provisions (other than 15.5 and 15.13)

Annex 2 - Technical Expert Groups

Annex 3 - Panels

(ii)  Agreement on Government Procurement

(iii) Agreement on Interpretation and Application of Articles VI, XVI and XXIII (Subsidies and Countervailing  Measures)

10 Export subsidies on certain primary products

12 Consultations

13 Conciliation, dispute settlement and authorized counter measures

14 Developing countries

16 Committee on Subsidies and Countervailing Measures

17 Conciliation

18 Dispute settlement

19.2 Acceptance and accession

19.4 Entry into force

19.5(a) National legislation

19.6 Review

19.7 Amendments

19.8 Withdrawal

19.9 Non-application of this Agreement between particular signatories

19.11 Secretariat

19.12 Deposit

19.13 Registration

(iv) Agreement on Implementation of Article VII (Customs Valuation)

1.2(b)(iv) Transaction value

11.1 Determination of customs value

14 Application of Annexes (second sentence)

18 Institutions (Committee on Customs Valuation)

19 Consultation

20 Dispute settlement

21 Special and differential treatment of developing countries

22 Acceptance and accession

24 Entry into force

25.1 National legislation

26 Review

27 Amendments

28 Withdrawal

29 Secretariat

30 Deposit

31 Registration

Annex II Technical Committee on Customs Valuation

Annex III Ad Hoc Panels

Protocol to the Agreement on Implementation of Article VII (except I.7 and I.8; with necessary conforming   introductory language)

(v) Agreement on Import Licensing Procedures

1.4 General provisions (last sentence)

2.2 Automatic import licensing (footnote 2)

4 Institutions, consultation and dispute settlement

5 Final provisions (except paragraph 2)

(vi) Agreement on Implementation of Article VI (Antidumping Code)

13 Developing Countries

14 Committee on Anti-Dumping Practices

15 Consultation, Conciliation and Dispute Settlement

16 Final Provisions (except paragraphs 1 and 3)

(vii) Arrangement Regarding Bovine Meat

(viii) International Dairy Arrangement

(ix) Agreement on Trade in Civil Aircraft

(x) Declaration on Trade Measures Taken for Balance-of-Payments Purposes.

(c)All other provisions in the GATT or Related Instruments which relate to:

(i) governmental assistance to economic development and the treatment of developing countries, except for   paragraphs (1) to (4) of the Decision of 28 November 1979 (L/4903) on Differential and more Favourable   Treatment, Reciprocity and Fuller Participation of Developing Countries;

(ii) the establishment or operation of specialist committees and other subsidiary institutions;

(iii) signature, accession, entry into force, withdrawal, deposit and registration.

(d) All agreements, arrangements, decisions, understandings or other joint action pursuant to the provisions   listed in subparagraphs (a) to (c).

(2) Contracting Parties shall apply the provisions of the "Declaration on Trade Measures Taken for Balance-of-Payments Purposes" to measures taken by those Contracting Parties which are not parties to the  GATT, to the   extent practicable in the context of the other provisions of this Treaty.

(3) With respect to notifications required by the provisions made applicable by Article 29(2)(a):

(a) Contracting Parties which are not parties to the GATT or a Related Instrument shall make their notifications   to the Secretariat. The Secretariat shall circulate copies of the notifications to all Contracting Parties.   Notifications to the Secretariat shall be in one of the authentic languages of this Treaty. The accompanying   documents may be solely in the language of the Contracting Party;

(b) such requirements shall not apply to Contracting Parties to this Treaty which are also parties to the GATT   and Related Instruments, which contain their own notification requirements.

(4) Trade in nuclear materials may be governed by agreements referred to in the Declarations related to this   paragraph contained in the Final Act of the European Energy Charter Conference.

ANNEX TFU
PROVISIONS REGARDING TRADE AGREEMENTS BETWEEN STATES WHICH
WERE CONSTITUENT PARTS OF THE FORMER UNION OF SOVIET SOCIALIST
REPUBLICS
(IN ACCORDANCE WITH ARTICLE 29(2)(B))

(1) Any agreement referred to in Article 29(2)(b) shall be notified in writing to the Secretariat by or on behalf of all of the parties to such agreement which sign or accede to this Treaty:

(a) in respect of an agreement in force as of a date three months after the date on which the first of such parties signs or deposits its instrument of accession to the Treaty, no later than six months after such date of signature or deposit; and

(b) in respect of an agreement which enters into force on a date subsequent to the date referred to in subparagraph (a), sufficiently in advance of its entry into force for other states or Regional Economic Integration Organizations which have signed or acceded to the Treaty (hereinafter referred to as the "Interested Parties") to have a reasonable opportunity to review the agreement and make representations concerning it to the parties thereto and to the Charter Conference prior to such entry into force.

(2) The notification shall include:

(a) copies of the original texts of the agreement in all languages in which it has been signed;

(b) a description, by reference to the items included in Annex EM, of the specific Energy Materials and Products to which it applies;

(c) an explanation, separately for each relevant provision of the GATT and Related Instruments made applicable by Article 29(2)(a), of the circumstances which make it impossible or impracticable for the parties to the agreement to conform fully with that provision;

(d) the specific measures to be adopted by each party to the agreement to address the circumstances referred to in subparagraph (c); and

(e) a description of the parties' programmes for achieving a progressive reduction and ultimate elimination of the agreement's non-conforming provisions.

(3) Parties to an agreement notified in accordance with paragraph (1) shall afford to the Interested Parties a reasonable opportunity to consult with them with respect to such agreement, and shall accord consideration to their representations. Upon the request of any of the Interested Parties, the agreement shall be considered by the Charter Conference, which may adopt recommendations with respect thereto.

(4) The Charter Conference shall periodically review the implementation of agreements notified pursuant to paragraph (1) and the progress having been made towards the elimination of provisions thereof that do not conform with provisions of the GATT and Related Instruments made applicable by Article 29(2)(a). Upon the request of any of the Interested Parties, the Charter Conference may adopt recommendations with respect to such an agreement.

148

(5) An agreement described in Article 29(2)(b) may in case of exceptional urgency be allowed to enter into force without the notification and consultation provided for in sub-paragraph (1)(b), paragraphs (2) and (3), provided that such notification takes place and the opportunity for such consultation is afforded promptly. In such a case the parties to the agreement shall nevertheless notify its text in accordance with subparagraph (2)(a) promptly upon its entry into force.

(6) Contracting Parties which are or become parties to an agreement described in Article 29(2)(b) undertake to limit the non-conformities thereof with the provisions of the GATT and Related Instruments made applicable by Article 29(2)(a) to those necessary to address the particular circumstances and to implement such an agreement so as least to deviate from those provisions.

They shall make every effort to take remedial action in light of representations from the Interested Parties and of any recommendations of the Charter Conference.

### ANNEX D
### INTERIM PROVISIONS FOR TRADE DISPUTE SETTLEMENT
### (IN ACCORDANCE WITH ARTICLE 29(7))

(1)(a) In their relations with one another, Contracting Parties shall make every effort through co-operation and consultations to arrive at a mutually satisfactory resolution of any dispute about existing measures that might materially affect compliance with the provisions applicable to trade under Article 5 or 29.

(b) A Contracting Party may make a written request to any other Contracting Party for consultations regarding any existing measure of the other Contracting Party that it considers might affect materially compliance with provisions applicable to trade under Article 5 or 29. A Contracting Party which requests consultations shall to the fullest extent possible indicate the measure complained of and specify the provisions of Article 5 or 29 and of the GATT and Related Instruments that it considers relevant. Requests to consult pursuant to this paragraph shall be notified to the Secretariat, which shall periodically inform the Contracting Parties of pending consultations that have been notified.

(c) A Contracting Party shall treat any confidential or proprietary information identified as such and contained in or received in response to a written request, or received in the course of consultations, in the same manner in which it is treated by the Contracting Party providing the information.

(d) In seeking to resolve matters considered by a Contracting Party to affect compliance with provisions applicable to trade under Article 5 or 29 as between itself and another Contracting Party, the Contracting Parties participating in consultations or other dispute settlement shall make every effort to avoid a resolution that adversely affects the trade of any other Contracting Party.

(2)(a) If, within 60 days from the receipt of the request for consultation referred to in subparagraph (1)(b), the Contracting Parties have not resolved their dispute or agreed to resolve it by conciliation, mediation, arbitration or other method, either Contracting Party may deliver to the Secretariat a written request for the establishment of a panel in accordance with subparagraphs (b) to (f). In its request the requesting Contracting Party shall

state the substance of the dispute and indicate which provisions of Article 5 or 29 and of the GATT and Related Instruments are considered relevant. The Secretariat shall promptly deliver copies of the request to all Contracting Parties.

(b)The interests of other Contracting Parties shall be taken into account during the resolution of a dispute. Any other Contracting Party having a substantial interest in a matter shall have the right to be heard by the panel and to make written submissions to it, provided that both the disputing Contracting Parties and the Secretariat have received written notice of its interest no later than the date of establishment of the panel, as determined in accordance with subparagraph (c).

(c)A panel shall be deemed to be established 45 days after the receipt of the written request of a Contracting Party by the Secretariat pursuant to subparagraph (a).

(d)A panel shall be composed of three members who shall be chosen by the Secretary-General from the roster described in paragraph (7). Except where the disputing Contracting Parties agree otherwise, the members of a panel shall not be citizens of Contracting Parties which either are party to the dispute or have notified their interest in accordance with subparagraph (b), or citizens of states members of a Regional Economic Integration Organization which either is party to the dispute or has notified its interest in accordance with subparagraph (b).

(e)The disputing Contracting Parties shall respond within ten working days to the nominations of panel members and shall not oppose nominations except for compelling reasons.

(f)Panel members shall serve in their individual capacities and shall neither seek nor take instruction from any government or other body. Each Contracting Party undertakes to respect these principles and not to seek to influence panel members in the performance of their tasks.

Panel members shall be selected with a view to ensuring their independence, and that a sufficient diversity of backgrounds and breadth of experience are reflected in a panel.

(g)The Secretariat shall promptly notify all Contracting Parties that a panel has been constituted.

(3)(a)The Charter Conference shall adopt rules of procedure for panel proceedings consistent with this Annex. Rules of procedure shall be as close as possible to those of the GATT and Related Instruments. A panel shall also have the right to adopt additional rules of procedure not inconsistent with the rules of procedure adopted by the Charter Conference or with this Annex.

In a proceeding before a panel each disputing Contracting Party and any other Contracting Party which has notified its interest in accordance with subparagraph (2)(b), shall have the right to at least one hearing before the panel and to provide a written submission.

Disputing Contracting Parties shall also have the right to provide a written rebuttal. A panel may grant a request by any other Contracting Party which has notified its interest in accordance with subparagraph (2)(b) for access to any written submission made to the panel, with the consent of the Contracting Party which has made it.

The proceedings of a panel shall be confidential. A panel shall make an objective assessment of the matters before it, including the facts of the dispute and the compliance of

measures with the provisions applicable to  trade under Article 5 or 29. In exercising its functions, a panel shall consult with the disputing Contracting  Parties and give them adequate opportunity to arrive at a mutually satisfactory solution. Unless otherwise  agreed by the disputing Contracting Parties, a panel shall base its decision on the arguments and submissions  of the disputing Contracting Parties. Panels shall be guided by the interpretations given to the GATT and   Related Instruments within the framework of the GATT, and shall not question the compatibility with Article   5 or 29 of practices applied by any Contracting Party which is a party to the GATT to other parties to the   GATT to which it applies the GATT and which have not been taken by those other parties to dispute resolution   under the GATT.

Unless otherwise agreed by the disputing Contracting Parties, all procedures involving a panel, including the  issuance of its final report, should be completed within 180 days of the date of establishment of the panel;  however, a failure to complete all procedures within this period shall not affect the validity of a final report.

(b)A panel shall determine its jurisdiction; such determination shall be final and binding. Any objection by  a disputing Contracting Party that a dispute is not within the jurisdiction of the panel shall be considered by  the panel, which shall decide whether to deal with the objection as a preliminary question or to join it to the  merits of the dispute.

(c)In the event of two or more requests for establishment of a panel in relation to disputes that are substantively  similar, the Secretary-General may with the consent of all the disputing Contracting Parties appoint a single  panel.

(4)(a)After having considered rebuttal arguments, a panel shall submit to the disputing Contracting Parties the  descriptive sections of its draft written report, including a statement of the facts and a summary of the  arguments made by the disputing Contracting Parties. The disputing Contracting Parties shall be afforded an  opportunity to submit written comments on the descriptive sections within a period set by the panel.

Following the date set for receipt of comments from the Contracting Parties, the panel shall issue to the   disputing Contracting Parties an interim written report, including both the descriptive sections and the panel's  proposed findings and conclusions. Within a period set by the panel a disputing  Contracting Party may submit  to the panel a written request that the panel review specific aspects of the interim report before issuing a final report. Before issuing a final report the panel may, in its discretion, meet with the disputing Contracting Parties  to consider the issues raised in such a request.

The final report shall include descriptive sections (including a statement of the facts and a summary of the  arguments made by the disputing Contracting Parties), the panel's findings and conclusions, and a discussion  of arguments made on specific aspects of the interim report at the stage of its review. The final report shall  deal with every substantial issue raised before the panel and necessary to the resolution of the dispute and shall  state the reasons for the panel's conclusions.

A panel shall issue its final report by providing it promptly to the Secretariat and to the disputing Contracting  Parties. The Secretariat shall at the earliest practicable opportunity distribute the final report, together with  any written views that a disputing Contracting Party desires to have appended, to all Contracting Parties.

(b)Where a panel concludes that a measure introduced or maintained by a Contracting Party does not comply with a provision of Article 5 or 29 or with a provision of the GATT or a Related Instrument that applies under Article 29, the panel may recommend in its final report that the Contracting Party alter or abandon the measure or conduct so as to be in compliance with that provision.

(c)Panel reports shall be adopted by the Charter Conference. In order to provide sufficient time for the Charter Conference to consider panel reports, a report shall not be adopted by the Charter Conference until at least 30 days after it has been provided to all Contracting Parties by the Secretariat. Contracting Parties having objections to a panel report shall give written reasons for their objections to the Secretariat at least 10 days prior to the date on which the report is to be considered for adoption by the Charter Conference, and the Secretariat shall promptly provide them to all Contracting Parties. The disputing Contracting Parties and Contracting Parties which notified their interest in accordance with subparagraph (2)(b) shall have the right to participate fully in the consideration of the panel report on that dispute by the Charter Conference, and their views shall be fully recorded.

(d)In order to ensure effective resolution of disputes to the benefit of all Contracting Parties, prompt compliance with rulings and recommendations of a final panel report that has been adopted by the Charter Conference is essential. A Contracting Party which is subject to a ruling or recommendation of a final panel report that has been adopted by the Charter Conference shall inform the Charter Conference of its intentions regarding compliance with such ruling or recommendation. In the event that immediate compliance is impracticable, the Contracting Party concerned shall explain its reasons for non-compliance to the Charter Conference and, in light of this explanation, shall have a reasonable period of time to effect compliance. The aim of dispute resolution is the modification or removal of inconsistent measures.

(5)(a)Where a Contracting Party has failed within a reasonable period of time to comply with a ruling or recommendation of a final panel report that has been adopted by the Charter Conference, a Contracting Party to the dispute injured by such non-compliance may deliver to the non-complying Contracting Party a written request that the non-complying Contracting Party enter into negotiations with a view to agreeing upon mutually acceptable compensation. If so requested the non-complying Contracting Party shall promptly enter into such negotiations.

(b)If the non-complying Contracting Party refuses to negotiate, or if the Contracting Parties have not reached agreement within 30 days after delivery of the request for negotiations, the injured Contracting Party may make a written request for authorization of the Charter Conference to suspend obligations owed by it to the non- complying Contracting Party under Article 5 or 29.

(c)The Charter Conference may authorize the injured Contracting Party to suspend such of its obligations to the non-complying Contracting Party, under provisions of Article 5 or 29 or under provisions of the GATT or Related Instruments that apply under Article 29, as the injured Contracting Party considers equivalent in the circumstances.

(d)The suspension of obligations shall be temporary and shall be applied only until such time as the measure  found to be inconsistent with Article 5 or 29 has been removed, or until a mutually satisfactory solution is  reached.

(6)(a)Before suspending such obligations the injured Contracting Party shall inform the non-complying  Contracting Party of the nature and level of its proposed suspension. If the non-complying Contracting Party  delivers to the Secretary-General a written objection to the level of suspension of obligations proposed by the  injured Contracting Party, the objection shall be referred to arbitration as provided below.  The proposed  suspension of obligations shall be stayed until the arbitration has been completed and the determination of the  arbitral panel has become final and binding in accordance with subparagraph (e).

(b)The Secretary-General shall establish an arbitral panel in accordance with subparagraphs (2)(d) to (f), which  if practicable shall be the same panel which made the ruling or recommendation referred to in subparagraph  (4)(d), to examine the level of obligations that the injured Contracting Party proposes to suspend. Unless the  Charter Conference decides otherwise the rules of procedure for panel proceedings shall be adopted in  accordance with subparagraph (3)(a).

(c)The arbitral panel shall determine whether the level of obligations proposed to be suspended by the injured  Contracting Party is excessive in relation to the injury it experienced, and if so, to what extent. It shall not  review the nature of the obligations suspended, except insofar as this is inseparable from the determination of  the level of suspended obligations.

(d)The arbitral panel shall deliver its written determination to the injured and the non-complying Contracting  Parties and to the Secretariat within 60 days of the establishment of the panel or within such other period as  may be agreed by the injured and the non-complying Contracting Parties. The Secretariat shall present the  determination to the Charter Conference at the earliest practicable opportunity, and no later than the  meeting of the Charter Conference following receipt of the determination.

(e)The determination of the arbitral panel shall become final and binding 30 days after the date of its  presentation to the Charter Conference, and any level of suspension of benefits allowed thereby may thereupon  be put into effect by the injured Contracting Party in such manner as that Contracting Party considers  equivalent in the circumstances, unless prior to the expiration of the 30 days period the Charter Conference  decides otherwise.

(f)In suspending any obligations to a non-complying Contracting Party, an injured Contracting Party shall make  every effort not to affect adversely the trade of any other Contracting Party.

(7)Each Contracting Party may designate two individuals who shall, in the case of Contracting Parties which  are also party to the GATT, if they are willing and able to serve as panelists under this Annex, be panelists  currently nominated for the purpose of GATT dispute panels.

The Secretary-General may also designate, with  the approval of the Charter Conference, not more than ten individuals, who are willing and able to serve as  panellists for purposes of dispute resolution in accordance with paragraphs (2) to (4).  The Charter Conference  may in addition decide to designate for the same purposes up to 20 individu-

*Volume 2080, I-36116*

als, who serve on dispute settlement rosters of other international bodies, who are willing and able to serve as panelists. The names of all of the individuals so designated shall constitute the dispute settlement roster. Individuals shall be designated strictly on the basis of objectivity, reliability and sound judgement and, to the greatest extent possible, shall have expertise in international trade and energy matters, in particular as relates to provisions applicable under Article 29. In fulfilling any function under this Annex, designees shall not be affiliated with or take instructions from any Contracting Party. Designees shall serve for renewable terms of five years and until their successors have been designated. A designee whose term expires shall continue to fulfil any function for which that individual has been chosen under this Annex. In the case of death, resignation or incapacity of a designee, the Contracting Party or the Secretary-General, whichever designated said designee, shall have the right to designate another individual to serve for the remainder of that designee's term, the designation by the Secretary-General being subject to approval of the Charter Conference.

(8)Notwithstanding the provisions contained in this Annex, Contracting Parties are encouraged to consult throughout the dispute resolution proceeding with a view to settling their dispute.

(9)The Charter Conference may appoint or designate other bodies or fora to perform any of the functions delegated in this Annex to the Secretariat and the Secretary-General.

## ANNEX B
## FORMULA FOR ALLOCATING CHARTER COSTS
### (IN ACCORDANCE WITH ARTICLE 37(3))

(1)Contributions payable by Contracting Parties shall be determined by the Secretariat annually on the basis of their percentage contributions required under the latest available United Nations Regular Budget Scale of Assessment (supplemented by information on theoretical contributions for any Contracting Parties which are not UN members).

(2)The contributions shall be adjusted as necessary to ensure that the total of all Contracting Parties' contributions is 100%.

## ANNEX PA
## LIST OF SIGNATORIES WHICH DO NOT ACCEPT THE PROVISIONAL APPLICA-
## TION OBLIGATION OF ARTICLE 45(3)(B)
### (IN ACCORDANCE WITH ARTICLE 45(3)(C))

1.The Czech Republic

2.Germany

3.Hungary

4.Lithuania

5.Poland

## ANNEX T - CONTRACTING PARTIES' TRANSITIONAL MEASURES
### (IN ACCORDANCE WITH ARTICLE 32(1))

List of Contracting Parties entitled to transitional arrangements

| | |
|---|---|
| Albania | Latvia |
| Armenia | Lithuania |
| Azerbaijan | Moldova |
| Belarus | Poland |
| Bulgaria | Romania |
| Croatia | The Russian Federation |
| The Czech Republic | Slovakia |
| Estonia | Slovenia |
| Georgia | Tajikistan |
| Hungary | Turkmenistan |
| Kazakhstan | Ukraine |
| Kyrgyzstan | Uzbekistan |

List of provisions subject to transitional arrangements

| Provision | Page | Provision | Page |
|---|---|---|---|
| Article 6(2) | 98 | Article 10(7)84 | 116 |
| Article 6(5) | 104 | Article 14(1)(d) | 117 |
| Article 7(4) | 110 | Article 20(3) | 119 |
| Article 9(1) | 114 | Article 22(3) | 124 |

## ARTICLE 6(2)

"Each Contracting Party shall ensure that within its jurisdiction it has and enforces such laws as are necessary and appropriate to address unilateral and concerted anti-competitive conduct in Economic Activity in the Energy Sector."

## COUNTRY: ALBANIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

There is no law on protection of competition in Albania. The law No 7746 of 28 July 1993 on Hydrocarbons and the law No 7796 of 17 February 1994 on Minerals do not include such provisions. There is no law on electricity which is in the stage of preparation. This law is planned to be submitted to the Parliament by the end of 1996. In these laws Albania intends to include provisions on anti-competitive conduct.

PHASE-OUT

1 January 1998.

## COUNTRY: ARMENIA

SECTORAll energy sectors.

LEVEL OF GOVERNMENT

National.DESCRIPTION

At present a state monopoly exists in Armenia in most energy sectors. There is no law on

protection of competition, thus the rules of competition are not yet being implemented. There

are no laws on energy. The draft laws on energy are planned to be submitted to the Parliament in 1994. The laws are envisaged to include provisions on anti-competitive behaviour, which would be harmonized with the EC legislation on competition.

PHASE-OUT

31 December 1997.

## COUNTRY: AZERBAIJAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

The anti-monopoly legislation is at the stage of elaboration .

PHASE OUT
1 January 2000.


COUNTRY: BELARUS


SECTOR
All energy sectors.
LEVEL OF GOVERNMENT
National.
DESCRIPTION
Anti-monopoly legislation is at the stage of elaboration.
PHASE-OUT
1 January 2000.


COUNTRY: GEORGIA


SECTOR All energy sectors.
LEVEL OF GOVERNMENT
National .DESCRIPTION

Laws on de-monopolization are at present at the stage of elaboration in Georgia and that is  why the State has so far the monopoly for practically all energy sources and energy resources, which restricts the possibility of competition in the energy and fuel complex.

PHASE-OUT
1 January 1999.


COUNTRY: KAZAKHSTAN


SECTOR  All energy sectors.
LEVEL OF GOVERNMENT
National DESCRIPTION

The law on Development of Competition and Restriction of Monopolistic Activities (No 656  of 11 June 1991) has been adopted, but is of a general nature.  It is necessary to develop the

legislation further, in particular by means of adopting relevant amendments or adopting a  new law. PHASE-OUT

1 January 1998.

## COUNTRY: KYRGYZSTAN

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

National DESCRIPTION

The law on Anti-monopoly Policies has already been adopted. The transitional period is needed to adapt provisions of this law to the energy sector which is now strictly regulated by the state. PHASE-OUT

1 July 2001.

## COUNTRY: MOLDOVA

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

National. DESCRIPTION

The law on Restriction of Monopolistic Activities and Development of Competition of 29 January 1992 provides an organizational and legal basis for the development of competition, and of measures to prevent, limit and restrict monopolistic activities; it is oriented towards implementing market economy conditions. This law, however, does not provide for concrete measures of anti-competitive conduct in the energy sector, nor does it cover completely the requirements of Article 6.

In 1995 drafts of a law on Competition and a State Programme of De-monopolization of the Economy will be submitted to the Parliament. The draft law on Energy which will be also submitted to the Parliament in 1995 will cover issues on de-monopolization and development of competition in the energy sector.

PHASE-OUT

1 January 1998.

*Volume 2080, I-36116*

## COUNTRY: ROMANIA

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

National. DESCRIPTION

The rules of competition are not yet implemented in Romania. The draft law on Protection of Competition has been submitted to the Parliament and is scheduled to be adopted during 1994.The draft contains provisions with respect to anti-competitive behaviour, harmonized with the EC's law on Competition.

PHASE OUT

31 December 1996.

## COUNTRY: THE RUSSIAN FEDERATION

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

The Federation.

DESCRIPTION

A comprehensive framework of anti-monopoly legislation has been created in the Russian Federation but other legal and organizational measures to prevent, limit or suppress monopolistic activities and unfair competition will have to be adopted and in particular in the energy sector.

PHASE-OUT

1 July 2001.

## COUNTRY: SLOVENIA

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

National. DESCRIPTION

Law on Protection of Competition adopted in 1993 and published in Official Journal No 18/93 treats anti-competitive conduct generally. The existing law also provides for conditions for the establishment of competition authorities. At present the main competition authority is the Office of Protection of Competition in the Ministry of Economic Relations and Development.

With regard to importance of energy sector a separate law in this respect   is foreseen and thus more time for full compliance is needed.

PHASE-OUT

1 January 1998.

## COUNTRY: TAJIKISTAN

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

National. DESCRIPTION

In 1993 Tajikistan passed the law on De-monopolization and Competition.  However, due to   the difficult economic situation in Tajikistan, the jurisdiction of the law has been temporarily suspended.

PHASE-OUT

31 December 1997.

## COUNTRY: TURKMENISTAN

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

National. DESCRIPTION

Under the Ruling of the President of Turkmenistan No 1532 of 21 October 1993 the Committee on Restricting Monopolistic Activities has been established and is acting now, the   function of which is to protect enterprises and other entities from monopoly conduct and   practices and to promote the formation of market principles on the basis of the development   of competition and entrepreneurship.

Further development of legislation and regulations is needed which would regulate anti- monopoly conduct of enterprises in the Economic Activity in the Energy Sector.

PHASE-OUT

1 July 2001.

## COUNTRY: UZBEKISTAN

SECTOR All energy sectors.

LEVEL OF GOVERNMENT

National. DESCRIPTION

The law on Restricting Monopoly Activities has been adopted in Uzbekistan and has been in force since July 1992. However, the law (as is specified in article 1, paragraph 3) does not extend to the activities of enterprises in the energy sector.

PHASE-OUT

1 July 2001.


## ARTICLE 6(5)


"If a Contracting Party considers that any specified anti-competitive conduct carried out within the Area of another Contracting Party is adversely affecting an important interest relevant to the purposes identified in this Article, the Contracting Party may notify the other Contracting Party and may request that its competition authorities initiate appropriate  enforcement action.  The notifying Contracting Party shall include in such notification   sufficient information to permit the notified Contracting Party to identify the anti- competitive conduct that is the subject of the notification and shall include an offer of such  further information and co-operation as that Contracting Party is able to provide.  The notified Contracting Party or, as the case may be, the relevant competition authorities may consult with the competition authorities of the notifying Contracting Party and shall accord   full consideration to the request of the notifying Contracting Party in deciding whether or not to initiate enforcement action with respect to the alleged anti-competitive conduct identified in the notification.  The notified Contracting Party shall inform the notifying Contracting Party of its decision or the decision of the relevant competition authorities and may if it wishes inform the notifying Contracting Party of the grounds for the decision.  If enforcement action is initiated, the notified Contracting Party shall advise the notifying Contracting Party of its outcome and, to the extent possible, of any significant interim development."


## COUNTRY: ALBANIA


SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

In Albania there are no established institutions to enforce the competition rules. Such institutions will be provided for in the law on the Protection of Competition which is planned to be finalized in 1996.

PHASE-OUT

1 January 1999.

## COUNTRY: ARMENIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Institutions to enforce the provisions of this paragraph have not been established in Armenia.

The laws on Energy and Protection of Competition are planned to include provisions to establish such institutions.

PHASE-OUT

31 December 1997.

## COUNTRY: AZERBAIJAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Anti-monopoly authorities shall be established after the adoption of anti-monopoly legislation.

PHASE-OUT

1 January 2000.

## COUNTRY: BELARUS

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Anti-monopoly authorities shall be established after the adoption of anti-monopoly legislation.

PHASE-OUT

1 January 2000.

## COUNTRY: GEORGIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Laws on de-monopolization are at present at the stage of elaboration in Georgia and that is   why there are no competition authorities established yet.

PHASE-OUT

1 January 1999.

## COUNTRY: KAZAKHSTAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

An Anti-monopoly Committee has been established in Kazakhstan, but its activity needs improvement, both from legislative and organizational points of view, in order to elaborate   an effective mechanism handling the complaints on anti-competitive conduct.

PHASE-OUT

1 January 1998.

## COUNTRY: KYRGYZSTAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

There is no mechanism in Kyrgyzstan to control the anti-competitive conduct and the relevant legislation.  It is necessary to establish relevant anti-monopoly authorities.

PHASE-OUT

1 July 2001.

*Volume 2080, I-36116*

## COUNTRY: MOLDOVA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

The Ministry of Economy is responsible for the control of competitive conduct in Moldova.

Relevant amendments have been made to the law on Breach of Administrative Rules, which envisage some penalties for violating rules of competition by monopoly enterprises.

The draft law on Competition which is now at the stage of elaboration will have provisions on the enforcement of competition rules.

PHASE-OUT

1 January 1998.

## COUNTRY: ROMANIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Institutions to enforce the provisions of this paragraph have not been established in Romania.

The Institutions charged with the enforcement of competition rules are provided for in the draft law on Protection of Competition which is scheduled to be adopted during 1994.

The draft also provides a period of nine months for enforcement, starting with the date of its publication.

According to the Europe Agreement establishing an association between Romania and the European Communities, Romania was granted a period of five years to implement competition rules.

PHASE OUT

1 January 1998.

COUNTRY: TAJIKISTAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Tajikistan has adopted laws on De-monopolization and Competition, but institutions to enforce competition rules are in the stage of development.

PHASE-OUT

31 December 1997.

COUNTRY: UZBEKISTAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

The Iaw on Restricting Monopoly Activities has been adopted in Uzbekistan and has been in force since July 1992. However, the law (as is specified in article I, paragraph 3) does not extend to the activities of the enterprises in the energy sector.

PHASE-OUT

1 July 2001.

ARTICLE 7(4)

"In the event that Transit of Energy Materials and Products cannot be achieved on commercial terms by means of Energy Transport Facilities the Contracting Parties shall not place obstacles in the way of new capacity being established, except as may be otherwise provided in applicable legislation which is consistent with paragraph (1)."

COUNTRY: AZERBAIJAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

*Volume 2080, I-36116*

It is necessary to adopt a set of laws on energy, including licensing procedures regulating   transit.

During a transition period it is envisaged to build and modernize power transmission lines, as well as generating capacities with the aim of bringing their technical level to the world requirements and adjusting to conditions of a market economy.

PHASE OUT

31 December 1999.

## COUNTRY: BELARUS

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Laws on energy, land and other subjects are being worked out at present, and until their final adoption, uncertainty remains as to the conditions for establishing new transport capacities for energy carriers in the territory of Belarus.

PHASE-OUT

31 December 1998.

## COUNTRY: BULGARIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Bulgaria has no laws regulating Transit of Energy Materials and Products.  An overall restructuring is ongoing in the energy sector, including development of institutional framework, legislation and regulation.

PHASE-OUT

The transitional period of 7 years is necessary to bring the legislation concerning the Transit  of Energy Materials and Products in full compliance with this provision.

1 July 2001.

COUNTRY: GEORGIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

It is necessary to prepare a set of laws on the matter. At present there are substantially different conditions for the transport and transit of various energy sources in Georgia (electric power, natural gas, oil products, coal).

PHASE-OUT

1 January 1999.

COUNTRY: HUNGARY

SECTOR

Electricity industry.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

According to the current legislation establishment and operation of high-voltage transmission lines is a state monopoly. The creation of the new legal and regulatory framework for establishment, operation and ownership of high-voltage transmission lines is under preparation.

The Ministry of Industry and Trade has already taken the initiative to put forward a new Act on Electricity Power, that will have its impact also on the Civil Code and on the Act on Concession. Compliance can be achieved after entering in force of the new law on Electricity and related regulatory decrees.

PHASE-OUT

31 December 1996.

## COUNTRY: POLAND

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Polish law on Energy, being in the final stage of coordination, stipulates for creating new legal regulations similar to those applied by free market countries (licenses to generate, transmit, distribute and trade in energy carriers). Until it is adopted by the Parliament a temporary suspension of obligations under this paragraph is required.

PHASE-OUT

31 December 1995.

Article 9(1)

"The Contracting Parties acknowledge the importance of open capital markets in encouraging the flow of capital to finance trade in Energy Materials and Products and for the making of and assisting with regard to Investments in Economic Activity in the Energy Sector in the Areas of other Contracting Parties, particularly those with economies in transition. Each Contracting Party shall accordingly endeavour to promote conditions for access to its capital market by companies and nationals of other Contracting Parties, for the purpose of financing trade in Energy Materials and Products and for the purpose of Investment in Economic Activity in the Energy Sector in the Areas of those other Contracting Parties, on a basis no less favourable than that which it accords in like circumstances to its own companies and nationals or companies and nationals of any other Contracting Party or any third state, whichever is the most favourable."

## COUNTRY: AZERBAIJAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Relevant legislation is at the stage of elaboration.

PHASE-OUT

1 January 2000.

COUNTRY: BELARUS

SECTOR
All energy sectors.
LEVEL OF GOVERNMENT
National.
DESCRIPTION
Relevant legislation is at the stage of elaboration.
PHASE-OUT
1 January 2000.

COUNTRY: GEORGIA

SECTOR
All energy sectors.
LEVEL OF GOVERNMENT
National.
DESCRIPTION
Relevant legislation is at the stage of preparation.
PHASE-OUT
1 January 1997.

COUNTRY: KAZAKHSTAN

SECTOR
All energy sectors.
LEVEL OF GOVERNMENT
National.
DESCRIPTION
The bill on Foreign Investments is at the stage of authorization approval with the aim
to  adopt it by the Parliament in autumn 1994.
PHASE-OUT
1 July 2001.

## COUNTRY: KYRGYZSTAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Relevant legislation is currently under preparation.

PHASE-OUT

1 July 2001.

Article 10(7)Specific Measures

"Each Contracting Party shall accord to Investments in its Area of Investors of another Contracting Party, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable".

## COUNTRY: BULGARIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Foreign persons may not acquire property rights over land. A company with more than fifty per cent of foreign person's share may not acquire property right over agricultural land;

Foreigners and foreign legal persons may not acquire property rights over land except by way of inheritance according to the law. In this case they have to make it over;

A foreign person may acquire property rights over buildings, but without property rights over the land;

Foreign persons or companies with foreign controlling participation must obtain a permit before performing the following activities:

exploration, development and extraction of natural resources from the territorial sea, continental shelf or exclusive economic zone;

acquisition of real estate in geographic regions designated by the Council of Ministers.

The permits are issued by the Council of Ministers or by a body authorized by the Council of Ministers.

PHASE-OUT

1 July 2001.

Article 14(1)(d)

"Each Contracting Party shall with respect to Investments in its Area of Investors of any  other Contracting Party guarantee the freedom of transfer into and out of its Area, including  the transfer of:

unspent earnings and other remuneration of personnel engaged from abroad in connection  with that Investment;"

COUNTRY: BULGARIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Foreign nationals employed by companies with more than 50 per cent of foreign  participation, or by a foreign person registered as sole trader or a branch or a representative office of a foreign company in Bulgaria, receiving their salary in Bulgarian leva, may  purchase foreign currency not exceeding 70 per cent of their salary, including social security payments.

PHASE-OUT

1 July 2001.

COUNTRY: HUNGARY

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

According to the Act on Investments of Foreigners in Hungary, article 33, foreign top managers, executive managers, members of the Supervisory Board and foreign employees may transfer their income up to 50 per cent of their after tax earnings derived from the company of their employment through the bank of their company.

PHASE-OUT

The phase out of this particular restriction depends on the progress Hungary is able to make in the implementation of the foreign exchange liberalization programme whose final target is the full convertibility of the Forint. This restriction does not create barriers to foreign investors.

Phase-out is based on stipulations of Article 32.

1 July 2001.

Article 20(3)

"Each Contracting Party shall designate one or more enquiry points to which requests for information about the above mentioned laws, regulations, judicial decisions and administrative rulings may be addressed and shall communicate promptly such designation to the Secretariat which shall make it available on request."

### COUNTRY: ARMENIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

In Armenia there are no official enquiry points yet to which requests for information about the relevant laws and other regulations could be addressed. There is no information centre either.

There is a plan to establish such a centre in 1994-1995. Technical assistance is required.

PHASE-OUT

31 December 1996.

### COUNTRY: AZERBAIJAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

There are no official enquiry points so far in Azerbaijan to which requests for information about relevant laws and regulations could be addressed. At present such information is concentrated in various organizations.

PHASE OUT

31 December 1997.

COUNTRY: BELARUS

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Official enquiry offices which could give information on laws, regulations, judicial decisions and administrative rulings do not exist yet in Belarus. As far as the judicial decisions and administrative rulings are concerned there is no practice of their publishing.

PHASE-OUT

31 December 1998.

COUNTRY: KAZAKHSTAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

The process of establishing enquiry points has begun. As far as the judicial decisions and administrative rulings are concerned they are not published in Kazakhstan (except for some decisions made by the Supreme Court), because they are not considered to be sources of law.

To change the existing practice will require a long transitional period.

PHASE-OUT

1 July 2001.

COUNTRY: MOLDOVA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

It is necessary to establish enquiry points.

PHASE-OUT

*Volume 2080, I-36116*

31 December 1995.

### COUNTRY: THE RUSSIAN FEDERATION

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

The Federation and the Republics constituting Federation.

DESCRIPTION

No official enquiry points exist in the Russian Federation as of now to which requests for information about relevant laws and other regulation acts could be addressed. As far as the judicial decisions and administrative rulings are concerned they are not considered to be sources of law.

PHASE-OUT

31 December 2000.

### COUNTRY: SLOVENIA

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

In Slovenia there are no official enquiry points yet to which requests for information about relevant laws and other regulatory acts could be addressed. At present such information is available in various ministries. The Law on Foreign Investments which is under preparation foresees establishment of such an enquiry point.

PHASE-OUT

1 January 1998.

### COUNTRY: TAJIKISTAN

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

*Volume 2080, I-36116*

There are no enquiry points yet in Tajikistan to which requests for information about relevant laws and other regulations could be addressed. It is only a question of having available funding.

PHASE-OUT

3I December 1997.

## COUNTRY: UKRAINE

SECTOR

All energy sectors.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

Improvement of the present transparency of laws up to the level of international practice is required. Ukraine will have to establish enquiry points providing information about laws, regulations, judicial decisions and administrative rulings and standards of general application.

.PHASE-OUT

I January 1998.

## ARTICLE 22(3)

"Each Contracting Party shall ensure that if it establishes or maintains a state entity and entrusts the entity with regulatory, administrative or other governmental authority, such entity shall exercise that authority in a manner consistent with the Contracting Party's obligations under this Treaty".

## COUNTRY: THE CZECH REPUBLIC

SECTOR

Uranium and nuclear industries.

LEVEL OF GOVERNMENT

National.

DESCRIPTION

In order to deplete uranium ore reserves that are stocked by Administration of State Material Reserves, no imports of uranium ore and concentrates, including uranium fuel bundles containing uranium of non-Czech origin, will be licensed.

PHASE-OUT

1 July 2001.

Decisions with Respect to the Energy Charter Treaty

The European Energy Charter Conference has adopted the following Decisions:

1.With respect to the Treaty as a whole

In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall  prevail to the extent of the conflict, without prejudice to the positions of the Contracting  Parties in respect of the Svalbard Treaty.  In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.

2.With respect to Article 10(7)

The Russian Federation may require that companies with foreign participation obtain legislative approval for the leasing of federally-owned property, provided that the Russian Federation shall ensure without exception that this process is not applied in a manner which discriminates among Investments of Investors of other Contracting Parties.

3.With respect to Article 14(*)

(1)The term "freedom of transfer" in Article 14(1) does not preclude a Contracting Party (hereinafter referred to as the "Limiting Party") from applying restrictions on movement of capital by its own Investors, provided that: (a)such restrictions shall not impair the rights granted under Article 14(1) to Investors of other Contracting Parties with respect to their Investments;

(b)such restrictions do not affect Current Transactions; and

(c)the Contracting Party ensures that Investments in its Area of the Investors of all other Contracting Parties are accorded, with respect to transfers, treatment no less favourable than that which it accords to Investments of Investors of any other Contracting Party or of any third state, whichever is the most favourable.

(2)This Decision shall be subject to examination by the Charter Conference five years after entry into force of the Treaty, but not later than the date envisaged in Article 32(3).

(3)No Contracting Party shall be eligible to apply such restrictions unless it is a Contracting Party which is a state that was a constituent part of the former Union of Soviet Socialist  Republics, which has notified the provisional Secretariat in writing no later than 1 July 1995 that it elects to be eligible to apply restrictions in accordance with this Decision.

(4)For the avoidance of doubt, nothing in this Decision shall derogate, as concerns Article 16, from the rights hereunder of a Contracting Party, its Investors or their Investments, or  from the obligations of a Contracting Party.

(5)For the purposes of this Decision:

"Current Transactions" are current payments connected with the movement of goods, services or persons that are made in accordance with normal international practice, and do not  include arrangements which materially constitute a combination of a current payment

and a capital transaction, such as deferrals of payments and advances which is meant to circumvent respective legislation of the Limiting Party in the field.

4. With respect to Article 14(2)

Without prejudice to the requirements of Article 14 and its other international obligations, Romania shall endeavour during the transition to full convertibility of its national currency to take appropriate steps to improve the efficiency of its procedures for the transfers of Investment Returns and shall in any case guarantee such transfers in a Freely Convertible Currency without restriction or a delay exceeding six months. Romania shall ensure that Investments in its Area of the Investors of all other Contracting Parties are accorded, with respect to transfers, treatment no less favourable than that which it accords to Investments of Investors of any other Contracting Party or of any third state, whichever is the most favourable.

5. With respect to Articles 24(4)(a) and 25

An Investment of an Investor referred to in Article 1(7)(a)(ii), of a Contracting Party which is not party to an EIA or a member of a free-trade area or a customs union, shall be entitled to treatment accorded under such EIA, free-trade area or customs union, provided that the Investment:

(a) has its registered office, central administration or principal place of business in the Area of a party to that EIA or member of that free-trade area or customs union; or

(b) in case it only has its registered office in that Area, has an effeetive and continuous link with the economy of one of the parties to that EIA or member of that free-trade area or customs union.

\*This Decision has been drafted in the understanding that Contracting Parties which intend to avail themselves of it and which also have entered into Partnership and Cooperation Agreements with the European Communities and their Member States containing an article disapplying those Agreements in favour of the Treaty, will exchange letters of understanding which have the legal effect of making Article 16 of the Treaty applicable between them in relation to this Decision. The exchange of letters shall be completed in good time prior to signature.

*[ For the signatures, see p. 613 of this volume.]*

Done at Lisbon on the seventeenth day of December in the year one thousand nine hundred and ninety-four.

Fait à Lisbonne, le dix-sept décembre mil neuf cent quatre-vingt-quatorze.

Geschehen zu Lissabon am siebzehnten Dezember neunzehnhundertvierundneunzig.

Fatto a Lisbona il diciassettesimo giorno del mese di dicembre dell'anno millenovecentonovantaquattro.

Совершено в Лиссабоне в семнадцатый день декабря одна тысяча девятьсот девяносто четвертого года.

Hecho en Lisboa, el diecisiete de diciembre de mil novecientos noventa y cuatro.

Për Republikën e Shqipërisë

Հայաստանի  Հանրապետության համար

For Australia /

Für die Republik Österreich /

_____

*1 See declaration on p. 627 - Voir déclaration à la page 627.*

613

*Volume 2080, I-36116*

Pour le Royaume de Belgique
Voor het Koninkrijk België
Für das Königreich Belgien

Cette signature engage également la Communauté française de Belgique, la Communauté flamande, la Communauté germanophone de Belgique, la Région wallonne, la Région flamande et la Région de Bruxelles-Capitale

Deze handtekening bindt eveneens de Vlaamse Gemeenschap, de Franse Gemeenschap van België, de Duitstalige Gemeenschap van België, het Waals Gewest en het Brussels Hoofdstedelijk Gewest

Diese Unterschrift bindet ebenso die Flämische Gemeinschaft, die Französische Gemeinschaft Belgiens, die Deutschsprachige Gemeinschaft Belgiens, die Flämische Region, die Wallonische Region und die Region Brüssel-Hauptstadt

Ад імя Рэспублікі Беларусь

За Република България [1]

_____

*1 See declaration on p. 627 - Voir déclaration à la page 627.*

614

*Volume 2080, I-36116*

**For Canada**
**Pour le Canada**

**za Republiku Hrvatsku**

**For the Republic of Cyprus** *1*

**Za Českou Republiku**

08/06/1995

---
*1 See declaration on p. 627 - Voir déclaration à la page 627.*

*Volume 2080, I-36116*

For Kongeriget Danmark

Eesti Vabariigi nimel

Por las Comunidades Europeas
For De Europæiske Fællesskaber
Für die Europäischen Gemeinschaften
Για τις Ευρωπαϊκές Κοινότητες
For the European Communities
Pour les Communautés européennes
Per le Comunità europee
Voor de Europese Gemeenschappen
Pelas Comunidades Europeias

Suomen tasavallan puolesta

*Volume 2080, I-36116*

Pour la République française

*Alain Grenier*

საქართველოს რესპუბლიკის სახელით

Für die Bundesrepublik Deutschland

*Unter Vorbehalt der Ratifizierung*
*Walter Klew*

Για την Ελληνική Δημοκρατία

A Magyar Köztársaság nevében [1]

Fyrir hönd Lyðveldisins Íslands [1]

Thar cheann Na hÉireann
For Ireland

Per la Repubblica italiana [1]

---

[1] See declaration on p. 627 - Voir déclaration à la page 627.

*Volume 2080, I-36116*

日本国のために [1]

Казакстан Республикасынын атынан

Киргиз Республикасы Учун

Latvijas Republikas varda

---

[1]  *See declaration on p. 627 - Voir déclaration à la page 627.*

619

*Volume 2080, I-36116*

Für das Fürstentum Liechtenstein  /

Lietuvos Respublikos vardu

Pour le Grand-Duché de Luxembourg  /

For the Republic of Malta  /

---

*1 See declaration on p. 627 - Voir déclaration à la page 627.*

Pentru Republica Moldova

Voor het Koninkrijk der Nederlanden  *1*

For Kongeriket Norge  *1*

16.06.95

Za Rzeczpospolitą Polską  *1*

---

*1  See declaration on p. 627 - Voir déclaration à la page 627.*

621

*Volume 2080, I-36116*

Pela República Portuguesa  *1*

Pentru România  *1*

За Российскую Федерацию

Za Slovenskú republiku

---

*1 See declaration on p. 627 - Voir déclaration à la page 627.*

Za Republiko Slovenijo

Por el Reino de España

För Konungariket Sverige

Für die Schweizerische Eidgenossenschaft
Pour la Confédération suisse
Per la Confederazione svizzera  *1*

---

*1  See declaration on p. 627 -  Voir declaration à la page 627.*

*Volume 2080, I-36116*

Аз номи Тоҷикистон [1]

Türkiye Cumhuriyeti adina [1]

Туркменистан Хөкүмөтиниң адындан [1]

За Украïну

---

1  *See declaration on p. 627 ÷ Voir declaration à la page 627.*

**For the United Kingdom of Great Britain and Northern Ireland**  *1*

*[signature]*

**For the United States of America**

Узбекистоп Республикаси Хукумати помидан

*[signature]*

---

*1  See declaration on p. 627 - Voir déclaration à la page 627.*

Za Republiku Bosnu i Hercegovinu

Lisbon , 14.06. 1995

*Volume 2080, I-36116*

## DECLARATIONS MADE UPON SIGNATURE - DECLARATIONS FAITES LORS DE LA SIGNATURE

| | |
|---|---|
| *AUSTRALIA* | *AUSTRALIE* |
| *BULGARIA* | *BULGARIE* |
| *CYPRUS* | *CHYPRE* |
| *HUNGARY* | *HONGRIE* |
| *ICELAND* | *ISLANDE* |
| *JAPAN* | *JAPON* |
| *LIECHTENSTEIN* | *LIECHTENSTEIN* |
| *MALTA* | *MALTE* |
| *NORWAY* | *NORVÈGE* |
| *POLAND* | *POLOGNE* |
| *SWITZERLAND* | *SUISSE* |
| *TURKMENISTAN* | *TURKMÉNISTAN* |

[ ENGLISH TEXT — TEXTE ANGLAIS ]

They could not accept provisional application of the Treaty in accordance with Article 45(2)(a)

[TRANSLATION - TRADUCTION]

.... qu'ils ne pouvaient pas accepter l'application provisoire du Traité conformément au paragraphe 2(a) de l'article 45.

---

*GREAT BRITAIN AND NORTHERN IRLAND*

[ ENGLISH TEXT — TEXTE ANGLAIS ]

"The Government of Great Britain and Northern Ireland declares that with respect to its signature of the Energy Charter Treaty provisional application under Article 45(1) shall extend to the United Kingdom of Great Britain and Northern Ireland and to Gibraltar."

*ROYAUME-UNI DE GRANDE-BRETAGNE ET D'IRLANDE DU NORD*

[TRANSLATION - TRADUCTION]

Le Gouvernement de la Grande-Bretagne et de l'Irlande du Nord déclare qu'eu égard à sa signature du Traité sur la Charte de l'énergie, l'énergie, l'application provisoire conformément au paragraphe 1 de l'Article 45 sera étendue au Royaume-Uni de la Grande-Bretagne et de l'Irlande du Nord et à Gibraltar.

627

*Volume 2080, I-36116*

<table>
<tr><td>NETHERLANDS</td><td>PAYS-BAS</td></tr>
</table>

| [ ENGLISH TEXT — TEXTE ANGLAIS ] | [TRANSLATION - TRADUCTION] |
|---|---|
| The Treaty will not be applied provisionally by Netherlands Antilles and Aruba | Le Traité ne sera pas appliqué provisoirement par les Antilles néerlandaises et Aruba. |

| | |
|---|---|
| AUSTRIA | AUSTRALIE |
| ITALY | BULGARIE |
| LUXEMBOURG | CHYPRE |
| PORTUGAL | HONGRIE |
| ROMANIA | ISLANDE |
| TURKEY | JAPON |

| [ ENGLISH TEXT — TEXTE ANGLAIS ] | [TRANSLATION - TRADUCTION] |
|---|---|
| ...that they will apply the Treaty provisionally in accordance with Artcile 45(1) to the extent which is not inconsistent, laws or regulations. | .... qu'ils appliquent le Traité provisoirement conformément au paragraphe 1 de l'Article 45 dans la mesure où il n'est pas incompatible avec leurs constitutions, lois et règlements. |

*Volume 2080, I-36116*

| NORWAY | NORVÈGE |
|---|---|
| [ ENGLISH TEXT — TEXTE ANGLAIS ] | [TRANSLATION - TRADUCTION] |

To Declaration V in the Final Act of the Energy Charter , cf. Article 18(2) of the Energy Charter Treaty: "Norway does not accpet the declaration contained in paragraph V of the Final Act of the European Energy Charter Conference concerning Article 18(2) of the Energy Charter Treay. Norway will apply and interprete the Treaty in accordance with generally recognized rules and principles of observance, application and interpretation of treaties as reflected in Part III of the Vienna Convention on the Law of Treaties of 25 May 1969. In particular in the context of Article 18(2) it is recalled that a Party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. The treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

To Part V of the Energy Charter Treaty: "Part V of the Energy Charter Treaty, and in particular Article 26, may give raise to problems with respect to Norwegian ratification. In signing the Energy Charter Treaty, Norway therefore reserves its right after the entry into force of the treaty to revert to these possible problems within the framework of Article 42 or Article 43".

Au sujet de la Déclaration V de l'Acte final de la Charte de l'énergie, cf. paragraphe 2 de l'Article 18 du Traité sur la Charte de l'énergie: La Norvège n'accepte pas la déclaration contenue dans le paragraphe V de l'Acte final de la Charte de l'énergie concernant le paragraphe 2 de l'article 18 du Traité sur la Charte de l'énergie. La Norvège appliquera et interprètera le Traité conformément aux règles et aux principes d'observance, d'application et d'interprétation généralement reconnus des traités tels que reflétés dans la partie III de la Convention de Vienne sur le droit des traités du 25 mai 1969. En particulier dans le contexte du paragraphe 2 de l'Article 18, il est rappelé qu'une Partie ne peut invoquer les provisions de ses lois internes pour justifier son manquement aux obligations d'un traité. Le traité sera interprété de bonne foi selon le sens commun donné aux termes du traité dans leur contexte et au vu de leur objet et but.

Au sujet de la partie V du Traité sur la Charte de l'énergie : La partie V du Traité sur la Charte de l'énergie, et en particulier l'Article 26, peut donner lieu à des problèmes en ce qui concerne la ratification de la Norvège. En signant le Traité sur la Charte de l'énergie , la Norvège se réserve donc le droit après l'entrée en vigueur de s'adresser à ces problèmes possibles dans le contxte de l'article 42 ou l'Article 43.

To article 45, paragraphs (2)(c) and (6) fot he Energy Charter Treaty: "the Government of Norway declares pursuant to Article 45, paragraphs (2)(c) and (6) of the Energy Charter Treaty that it will contribute to the costs of the provisional Secretariat subject to the approval by the Norwegian Storting (Parliament) in accordance with the Norwegian Constitution".

Au sujet des paragraphes 2c et 6 de l'Article 45 du Traité sur la Charte de l'énergie : Le Gouvernement de la Norvège déclare que conformément aux paragraphes 2c et 6 de l'Article 45 du Traité sur la Charte de l'énergie, il contribuera aux coûts du Secrétariat provisoire sous réserve de l'application du Storting norvégien (Parlement) conformément à la Constitution norvégienne.